No. 4:13-cv-1900

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION
_____

CHARLES THOMPSON,

*Petitioner,*

v.

WILLIAM STEPHENS,

Director, Texas Department of Criminal Justice,
Institutional Division,

*Respondent.*
_____

Petition for Writ of Habeas Corpus
from a Capital Murder Conviction in the 262nd Court of Harris County
_____

**PETITION FOR WRIT OF HABEAS CORPUS**
_____

**SETH KRETZER**                           **JONATHAN LANDERS**
SBN: 24043764                            SBN: 24070101

The Lyric Center                         2817 W. T.C. Jester
440 Louisiana Street; Suite 200          Houston, Texas 77018
Houston, TX 77056
(713) 775-3050 (office)                  (713) 301-3153 (Office)
(713) 224-2815 (fax)                     (713) 685-5020 (fax)
*email: seth@kretzerfirm.com*            *e-mail: jlanders.law@gmail.com*

Court-Appointed Attorneys for Petitioner Charles Thompson

1

_____

## PETITION FOR WRIT OF HABEAS CORPUS

_____

TO THE HONORABLE U.S. DISTRICT COURT:

NOW COMES, **CHARLES THOMPSON**, the Petitioner, and respectfully submits his Petition for Writ of Habeas Corpus, asking the Court to issue a writ ordering his release from the Institutional Division of the Texas Department of Criminal Justice.  This application follows his conviction and death sentence in the 262nd Judicial District of Harris County, cause number 782657, styled *State v. Charles Thompson*.

Thompson is illegally restrained of his liberty by the Director of the Texas Department of Criminal Justice – Institutional Division, by virtue of a sentence and judgment imposing the penalty of death rendered in cause number 782657, styled *State v. Thompson*.  (See Exhibit "A").

## <u>CERTIFICATE OF INTERESTED PARTIES</u>

The undersigned counsel of record for Petitioner, CHARLES THOMPSON, certifies that the following listed persons have an interest in the outcome of this case. These representations are made in order that this court may evaluate possible disqualifications or recusal.

| Interested Parties | | |
|---|---|---|
| *Individual* | *Address* | *Participation* |
| Petitioner | | |
| Mr. Charles Thompson | Polunsky Unit | Petitioner |
| Mr. Seth Kretzer | The Lyric Center<br>440 Louisiana Street<br>Suite 200<br>Houston, TX 77002<br>(713) 775-3050 (direct)<br>(713) 224-2815 (fax) | Appointed attorney for current federal habeas |
| Mr. Jonathan Landers | Jonathan Landers<br>2817 W. T.C. Jester<br>Houston, Texas 77018<br>(713) 301-3153 – (phone)<br>(713) 685-5020 – (fax) | Appointed attorney for current federal habeas |
| Mr. Ellis McCullough | 4008 Louetta Rd, #365<br>Spring, TX 77388 | Trial Counsel |
| Ms. Bettina Richardson | United States Attorney's Office<br>601 NW Loop 410 Ste 600<br>San Antonio, TX 78216 | Trial Counsel |
| Terrence A. Gaiser | 2900 Smith St Ste 220<br>Houston, TX 77006 | Trial Counsel |

| Interested Parties | | |
|---|---|---|
| *Individual* | *Address* | *Participation* |
| Kyle Johnson | 929 Preston St Ste 200<br>Houston, TX 77002 | Trial Counsel |
| Floyd Freed | 6630 Cypresswood Dr.<br>Suite 200<br>Spring, Texas 77379 | State direct appellate lawyer |
| Jonathan Munier | 1244 Heights Blvd<br>Houston TX 77008-6918 | State direct appellate counsel |
| Danny Easterling | 1018 Preston<br>6th Floor<br>Houston, TX  77002 | State writ lawyer |
| *Respondent* | | |
| The Hon. Mr. Greg Abbott | | Texas Attorney General |
| Ms. Katherine Hayes | Office of the Attorney General<br>Capital Litigation Division<br>P.O. Box 12548,<br>Capitol Station<br>Austin, TX 78711-2548) | Asst. Attorney General |
| *Judges* | | |
| Honorable Doug Shaver | P.O. Box 8693<br>Horseshoe Bay, TX 78657 | Trial Judge (Retired) |
| | | |
| | | |

## DESIGNATION OF ABBREVIATIONS and EXPLANATION OF THE TRIAL RECORD

"RR" refers to reporter's record from the state trial court.  "CR" refers to clerk's record from state trial court.

## STATEMENT OF JURISDICTION

This petition is submitted pursuant to 28 U.S.C. § 2254 et. seq., and amendments four, five, six, eight, and fourteen, of the United States Constitution, and section nine, clause two of the United States Constitution (habeas corpus).

## THOMPSON'S AEDPA DEADLINE WAS SATISFIED

Thompson's direct appeal to the Court of Criminal Appeals (CCA) was first decided on October 24, 2001. *Thompson v. State*, 93 S.W.3d 16 (Tex. Crim. App. 2001). On original submission, the cause was remanded for a new punishment hearing due to error occurring during the punishment phase of the trial. Thereafter, the CCA granted Thompson's first ground for rehearing in which he maintained that the Court failed to fully consider his fourth point of error on original submission. However, on January 29, 2003, the CCA issued an opinion stating that their decision to grant rehearing was improvident and withdrew the order granting rehearing. *Thompson v. State*, 108 S.W.3d 269 (2003).

Thompson had a properly filed state writ on file with the Harris County Clerk's office, which was never disposed of, until the Court of Criminal Appeals disposed of the writ on April 17, 2013.

The Supreme Court denied cert on October 6, 2003. *Thompson v. Texas*, 124 S.Ct. 250 (2003).

At the retrial on punishment, the jury answered the special issues as before, and Thompson was again sentenced to death. A new direct appeal followed, and the CCA denied relief in an opinion dated October 31, 2007. 2007 WL 3208755.

6

The CCA denied habeas relief in an opinion dated April 17, 2013. 2013 WL 1655676. Thompson's AEDPA deadline is therefore April 17, 2014. 28 U.S.C. 2244(d)(2); *see also Fields v. Johnson*, 159 F.3d 914, 916 (5th Cir. 1998).

## EXHAUSTION

Thompson states that almost all of the federal constitutional claims alleged herein have been exhausted in proceedings before the Texas courts.[1]    The remaining claims are also ripe for review because cause and prejudice can be shown.

## Summary of Arguments

[A summary of the arguments will be included in the Amended Writ]

## PROCEDURAL HISTORY

### A.    Procedural History in State Court

Thompson was convicted of capital murder in April of 1999. TEX. PENAL CODE § 19.03(a). Based on the jury's answers to the special issues set forth in Texas Code of Criminal Procedure Article 37.071, sections 2(b) and 2(e), the trial judge sentenced Thompson to death. Art. 37.071 § 2(g).  On direct appeal, the

---

1. The burden is on Respondents to demonstrate that Sparks failed to exhaust a particular claim.  *See, e.g.*, *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938); *Esslinger v. Davis*, 44 F.3d 1515, 1528 (11th Cir. 1995); *Herbst v. Scott*, 42 F.3d 902, 905 (5th Cir. 1995); *English v. United States*, 42 F.3d 473, 477 (9th Cir. 1994); *Brown v. Maass*, 11 F.3d 914, 914-15 (9th Cir. 1993); *Harmon v. Ryan*, 959 F.2d 1457, 1461 (9th Cir. 1992).

CCA affirmed the conviction, but vacated the sentence and remanded the cause to the trial court for a new hearing on punishment. *Thompson v. State*, 93 S.W.3d 16 (Tex. Crim. App.2001). At the retrial on punishment, the jury answered the special issues as before, and appellant was again sentenced to death. The CCA denied direct appellate relief on October 31, 2007. *Thompson v. State*, 2007 WL 3208755.

On October 30, 2000 (while the original direct appeal was pending), Thompson filed a writ under Texas' dual track habeas system. That writ was amended June 27, 2007. The CCA denied relief on April 17, 2013. *Ex Parte Thompson*, 2013 WL 1655676.

### B.    Procedural History in Federal Court

On April 23, 2013, Thompson filed a motion for appointment of counsel. (Doc. No. 2). This Court appointed Seth Kretzer on April 30; on May 7, Jonathan Landers was appointed as co-counsel. (Doc. No. 5). On May 14, this Court granted the joint motion for proposed scheduling order, and ordered a due date of April 15, 2014, with Amended Pleadings due by July 14. (Doc. No. 7).

### STATEMENT OF FACTS

### I.    Introduction

In the indictment filed July 23, 1998, Petitioner was charged with capital murder for intentionally causing the death of the complainants, Darren Cain and

Dennise Hayslip, by shooting them with a firearm. CR at 51. Under Texas law, a person commits capital murder if they murder more than one person during the same criminal transaction. TEX. PEN. CODE § 19.03 (a)(7)(A). As a strict legal matter, if Thompson was only criminally responsible for the death of one of the alleged victims, he was not guilty of capital murder.

The sole defense during the guilt and innocence stage of Thompson's trial was that Thompson was not criminally responsible for Dennise Hayslip's death. 10 RR at 10-12. Rather, Thompson intended to show that her death was the result of a botched surgery to repair the damage done when she was shot in the mouth by the Petitioner. *Id.* (defense opening explaining Thompson did not cause the death of Ms. Hayslip).[1] An expert witness called by the defense during guilt and innocence explained that it was not the gun shot, but malpractice of the doctors involved in the surgery to repair the gunshot wound, which lead to the Ms. Hayslip's death. 12 RR at 203-33. Specifically, the defense expert, Dr. Radalat, believed the wound was survivable and was not a lethal wound in and of itself. *Id.* at 232. This idea was at odds with the autopsy performed on Ms. Hayslip. *See* State's Exhibit 80.

---

[1] ___ RR ___, refers to the reporter record for Thompson's initial trial. The volume number is given first, and then the page number is given. For example, 10 RR at 10-12 corresponds to volume 10, pages 10-12, of Thompson's initial trial.

Interestingly, Thompson's first death sentence was reversed, and a new punishment phase was ordered, because the State of Texas violated his Sixth Amendment Right to counsel by sending an undercover officer to interview him in the jail after his right to counsel had attached. *Thompson v. State*, 93 S.W.3d 16, 22-29 (Tex. Crim. App. 2001). The undercover officer had uncovered plans related to Thompson's attempt to put a "hit" out on potential witnesses; the initial tip came from a jail house snitch. *Id.* This was by far the most damaging punishment phase testimony in Thompson's initial trial. The other extraneous offense admitted included the following:

> [A]n arrest as a juvenile for a burglary and destruction of property, trespass, and theft. Appellant was arrested as an adult for driving under the influence—and as a result of the arrest became belligerent and threatened the deputy. Appellant was also arrested by an agent of the United States Customs Service at a border crossing where he was driving a truck filled with seventeen undocumented illegal aliens. Finally, a deputy with the Harris County Jail who was an expert on gang-related activities in penal institutions testified that letters connected to appellant had gang-related symbols on them.

*Id.* at 28 n. 9. Because of the incendiary nature of this testimony, the Texas Court of Criminal Appeals had no choice but to order a new punishment hearing. *Id.*

10

Luckily for the State of Texas, a self-admitted, long time, full time informant was also present in the Harris County Jail in 1998.[2]  17 RR2 at 149, 152-53. That informant, Robin Rhodes, had also obtained the same information relating to "hits" from Thompson.  *See Id.* at 138, 141; State's Exhibit 92 (alleged "hit list"). After obtaining a "hit list" from Thompson, Rhodes turned the list over to Harris County District Attorney's Office investigator Mike Kelly.  *Id.* at 141.  This evidence was once again relied upon by the State in the Thompson's punishment phase retrial. *Id.*

## II.  Guilt Innocence Factual Overview

The facts established at trial show that Ms. Hayslip, who had been dating Thompson and letting him stay at her apartment, became romantically interested in

---

2 Robin Rhodes' extensive work with the Harris County District Attorney's Office, as well as local law enforcement, was also discussed in the 1st District Court of Appeals case *Stephens v. State*, 59 S.W.3d 377, 381 (Tex. App.—Houston [1st Dist.] 2001, pet. ref'd):

Rhodes testified before the jury that he was currently employed by the Harris County Organized Crime Narcotics Task Force, which included the Harris County District Attorney's Office, as a confidential informant in over 50 cases, more than 80 percent of which resulted in convictions; that he had twice testified for the State, including once in a capital murder prosecution; and that the State had not doubted him.

Rhodes was not allowed to testify that (1) the Harris County District Attorney's Office paid him $30,000 for his participation in the capital murder case; (2) he received $300 from the Harris County District Attorney's Office about four weeks before this trial; (3) more than $1000 was pending for his help with a large narcotics transaction; (4) he had helped secure over 50 search warrants; and (5) the search warrants obtained solely on the basis of Rhodes's statements were "too numerous to count."

a different man, Darren Cain.  *See* 11 RR at 102-03. This lead to a rivalry between

the two impulsive men. After staying at a bar until 2 a.m. on April 30, 1998, Cain

decided to go to Hayslip's apartment, even though Thompson was there.  *Id.* at

108-09.  Cain was intoxicated; his autopsy report showed an alcohol concentration

far in excess of that deemed to constitute intoxication under Texas law.  State's

Exhibit 79.  Cain had also consumed some cocaine on the night in question. *Id.*

For whatever reason, Cain did not heed a friend's warning not to go to Hayslip's

apartment.  11 RR at 109. When Cain arrived, Thompson became angry and

brandished a stick, but Cain got the better of him and hit him several times in the

face, causing the left side of Thompson's face to swell.  11 RR at 73-74. A

neighbor who heard the commotion called the sheriff's department. A sheriff's

deputy came to the scene and ordered Thompson to leave the property after Cain

said he did not want to press any charges. 11 RR at 78-80. Thompson returned a

little after 6 a.m. with a handgun, kicked open the apartment door, and went inside.

The evidence was sufficient to prove that Thompson caused the death of

Darren Cain by shooting him with a firearm, and that would support a conclusion

that Thompson was guilty of murdering Cain. The evidence also was sufficient to

show that Thompson is the person who put a handgun to Hayslip's face and fired

into her cheek.  11 RR at 132.

However, Hayslip was still alive after the shooting and went next door to get help. She had a hole in her cheek about the size of a nickel, and she was bleeding from her mouth. 11 RR at 60, 84. Hayslip was taken by a Life Flight helicopter to the emergency room at Memorial Hermann Hospital. 12 RR 185. During the flight, Hayslip was sitting up and alert. 12 RR  183–85.  Indeed, Hayslip was still alert and awake hours later, before surgery, when her brother arrived at the hospital and had a chance to see her.  11 RR 250-54.

After Hayslip was taken into the emergency room, the facts become murky. It was determined that Hayslip's tongue was lacerated by a bullet wound, and her jaw was broken.  12 RR 214. The lead physician, Robert Marvin, testified that the treating physicians needed to assist Hayslip's respiration, and to that end a nasotracheal tube was inserted.  12 RR at 13.

Doctor Marvin believed the tube to be properly placed so as to direct fresh air into Hayslip's lungs and to aid the exhaling of $CO_2$.  Then Dr. Marvin and his assistants left to scrub down in preparation for operating. 12 RR 219.  Apparently no one stayed behind to watch the patient.

After some five to ten minutes, monitors indicated that Hayslip was undergoing bradycardia. 12 RR at 219. That is a condition in which the heart slows down due to inadequate oxygen intake. Assuming proper procedures were used, there would have been "continuing monitoring of the gasses that go in and out of

13

the human body during a procedure such as this," according to a defense expert, Dr. Pat Radalat. 12 RR at 219-220. According to the surgical report written by Dr. Marvin and reviewed by Dr. Radalat, the apparent cause of the bradycardia was the improper location of the nasotracheal tube, and the doctors responded by opening an alternative airway.  12 RR at 220, 226-227. Whether the tube became dislodged, or whether it was erroneously place to begin with, is not clear. Assuming, however, that it was properly placed, somehow no one paid attention to Hayslip's plight until the biochemical measurements indicated a high degree of distress.

Defense expert Dr. Radalat said the result of the lack of proper respiration was an "anoxic assault," meaning "the brain didn't get enough oxygen and was severely damaged." 12 RR at 222. The slow heartbeat eventually reflected by monitors was actually a late-stage consequence of oxygen deprivation, in that the heart at first accelerates to deliver more oxygen, but itself suffers from oxygen deficiency and slows down. 12 RR at 223-24. Radalat said the results indicated that Hayslip was "without oxygen for 5 minutes or so, perhaps longer." 12 RR at 222. As a result of the mishap in surgery, Hayslip was comatose and, after several days, her family consented to termination of artificial life support.   12 RR at 247.

Dr. Radalat was a licensed physician and attorney. After reviewing the medical records of the treatment of Ms. Hayslip from Memorial Hermann Hospital, it was his opinion that her wound was not lethal if proper medical treatment had

14

been performed by medical personnel at the time of her operation. 12 RR at 203-257. However, Dr. Radalat did not perform well on cross examination, and a bruising cross examination by the state's attorney no doubt affected the strength of his opinion. *See, e.g.*, St. Writ R. at 170 (affidavit of trial counsel explaining "Dr. Radalat was not a strong witness on cross-examination by the state.")

Strikingly, the pathologist who actually performed the autopsy on Hayslip, Dr. Paul Shrode, was not called to testify. Instead, a different pathologist from the Harris County Medical Examiner's Office was called. 12 RR at 102. The defense objected to a person other than Dr. Shrode giving an opinion as to the cause of death. *Id.* at 105. This objection was overruled. *Id.* As a result, Dr. Patricia Moore was allowed to testify that the cause of death was "a gunshot wound to the face." *Id.* 106. The autopsy does not mention that Hayslip was rendered brain dead as a result of the surgery. State's Exhibit 80. Thompson contends that no rational jurist could agree that this conclusion was correct, and believes that Dr. Paul Shrode's background provides decisive legal cause for questioning his work.

Thompson was convicted of capital murder on April 14, 1999. Cl. R. at 198.

## III.   Dr. Paul Shrode[3]

---

3 All references refer to the noted appendices included in the larger Appendix 2. Below is a list of the references:
Appendix A – Affidavit of Dr. Robert Pfalzgraf, dated February 10, 2010.
Appendix B – Shrode's application for employment at Harris County Medical Examiner's Office
Appendix C – Ohio Parole Board recommendation of clemency for Richard Nields in the form of a commutation to life without the possibility of parole. Published May 18, 2010.

Dr. Shrode completed a fellowship, or the period of training a physician may optionally undertake following his or her residency after medical school, at the Hamilton County Coroner's Office in Cincinnati, Ohio. Appendix A, page 1. This fellowship was from December 2, 1996 to June 27, 1997. *Id.* During this time, Shrode performed the autopsy of Patricia Newsome related to the investigation into capital murder charges against Richard Nields. Appendix C, page 11. Immediately following his fellowship, on July 1, 1997, Shrode began working as an Assistant Medical Examiner for the Harris County Medical Examiner's Department. Appendix B.

---

Appendix D -- *El Paso Times* newspaper article dated February 23, 2010.
Appendix E – Letter from American Board of Pathology to Shrode, dated October 28, 2003.
Appendix F – El Paso County exit interview following Shrode's termination.
Appendix G -- Reporter's Record, Trial Court Cause No. 2006CM4085, dated August 13, 2007.
Appendix H – Letter from American Board of Pathology dated October 19, 2009
Appendix I -- *El Paso Times* newspaper articles dated November 18 and November 19, 2010
Appendix J – *Carlsbad Current-Argus* newspaper article dated February 4, 2013
Appendix K – Autopsy of Glenda Hayslip
Appendix L – Memo signed by Chief Medical Examiner of Harris County Joye M. Carter
Appendix M – Memo signed by supervisor
Appendix N – Two memos about five pending autopsies
Appendix O – July 19, 1999 Performance Evaluation
Appendix P – November 20, 2000 Performance Evaluation
Appendix Q -- October 16, 2002 Performance Evaluation
Appendix R -- December 12, 2003 Performance Evaluation
Appendix S – Memo regarding large backlog of pending and incomplete cases
Appendix T – Shrode's resignation notice
Appendix U – Texas Tech University offer of employment.
Appendix V – Application to Lubbock County dated April 8, 2004.
Appendix W – Shrode's first resume submitted to El Paso County
Appendix X – Shrode's amended resume, with false legal qualifications
Appendix Y – Another amended resume, with false legal qualifications omitted
Appendix Z – *El Paso Times* newspaper article dated May 25, 2010.

Later that year, while employed by Harris County, Shrode testified as an expert witness for the prosecution at Nields' trial. Appendix A, page 2. Relying on Shrode's testimonial conclusions based on his own autopsy, which were not included in his autopsy report, Appendix A, page 3, a jury sentenced Nields to death on December 22, 1997. Appendix C, page 2.

Nields' sentence was later commuted to life without parole when Shrode's fellowship supervisor and Chief Deputy Coroner Dr. Robert Pfalzgraf reviewed Shrode's trial testimony for the first time. Appendix C, page 20. On May 18, 2010, the Ohio Parole Board published its recommendation of clemency for Nields based primarily on the videotaped testimony of Pfalzgraf, in which he outlined five specific areas where Shrode's conclusions were incorrect and not "scientifically supported." Appendix C, page 18.

Pfalzgraf testified that Shrode had no scientific basis for his conclusion that Nields beat Patricia Newsome, left for 15 minutes to six hours, and then returned and strangled her. Appendix C, pps. 11-12. He testified that there was no evidence to support the age of the bruises, which contradicted Shrode's testimony that the bruising has occurred between 15 minutes and "all the way up to six hours" before death. *Id.* He also said Shrode was incorrect when he concluded that the lack of DNA evidence under her fingernails meant she was already unconscious when she was strangled; one cannot scientifically conclude anything from that. Appendix C,

page 12. He added that he had never even seen a case where there was DNA evidence under fingernails in all his years as a pathologist. *Id.* Shrode also testified during Nields' trial about rigor mortis and petechia as support of a gap between beating and strangulation. *Id.* Pfalzgraf said that there was no medical evidence to support that there were two separate acts at all. *Id.* Nor was there any evidence that Newsome was unconscious at the time of death. *Id.*

Pfalzgraf noted in his affidavit that one assertion by Shrode at the trial had "no relevance to when the victim sustained the trauma to her head." Appendix A, page 3. Pfalzgraf's affidavit added that he was not hired by the prosecution or the defense for this review, and he asserted twice that he would not have signed an autopsy containing Shrode's testimonial conclusions "because they were incorrect." Appendix A at 3.

The short gap between this unscientific testimony and the autopsy relevant to Charles Thompson's case, which Shrode performed, providing the ultimate conclusion of cause of death, should not go unnoticed. Shrode completed the autopsy report on Glenda Hayslip on May 7, 1998, just five months after Nields was sentenced to death. Appendix K, page 2.

Dr. Shrode began his career at Harris County with misstatements about his work history and credentials. His application for employment states that he graduated from Southwest Texas State University in San Marcos in May 1979,

18

citing the degree received as "paralegal." Appendix B, page 1. Shrode did attend Texas State University, as the school is now called, for one semester, but he did not graduate with any degree. Appendix D. Shrode also reported that he worked as a paralegal from May 1979 to August 1983. Appendix B, page 3. Shrode has never been a member of the State Bar of Texas as a paralegal or lawyer.

On October 5, 2001, Shrode was disciplined for "defective and improper work" resulting in a wrong determination of cause of death. Appendix M. Additional remarks on the counseling worksheet include, "The determination of cause of death was incorrect and the case was not completed on time despite all pertinent information available since [two months before the disciplinary notice]. The appropriate cause of death, manner of death and 'how injury occurred' determinations were discussed on numerous occasions[.]" *Id.*

A performance evaluation dated July 19, 1999 reported that Shrode was "overwhelmed at times by caseload." Appendix O, page 3. The tone of further performance evaluations would become increasingly worrisome. On November 20, 2000, the evaluator, Joye M. Carter, did not rate him (that is, check any boxes from Poor to Excellent) on the category of "Thoroughness" ("Attention to requisite detail, to completeness; avoidance of superficiality") and added as a note, "consultation on difficult or questionable cases with Chief." Appendix P, page 2. His major weakness is listed as "lack of board certification" and "poor

19

communicator when dissatisfied with work." Appendix P, page 4. This major weakness is the same on an evaluation dated October 16, 2002. Appendix Q, page 4. The last evaluation, dated December 16, 2003, rates him as "fair" in multiple characteristics, and notes several times that he must reduce his backlog of 178 incomplete autopsy reports, in addition to 103 pending cases. Appendix R, page 2. An additional memo, dated December 15, 2003, reprimands him for the pending and incomplete autopsies and relieves him of additional duties until they are complete. Appendix S. The last performance evaluation also notes as a major weakness his lack of board certification, but that an accomplishment was that he took his forensic and anatomic pathology boards, "results pending." Appendix R, page 4.

However, Shrode knew two months before, by October of 2003, that he had failed the anatomic pathology portion of the combined anatomic pathology and forensic pathology exam, and thus was not board certified. Appendix E. Shrode resigned his position at Harris County on May 14, 2004. Appendix T.

Shrode then worked as an assistant professor of pathology for Texas Tech University's medical school in Lubbock. Appendix U. Lubbock County contracted with Texas Tech for medical examiner services, and Shrode performed autopsies while employed by the university. Appendix D, page 1. However, in Shrode's application for employment in El Paso County, which would be his next employer,

he listed in his work history the title "Deputy Medical Examiner" for the Lubbock County Medical Examiner's Office. Appendix W, page 1.

Shrode was hired as Chief Medical Examiner of El Paso in December of 2005. Appendix F. He applied with a resume that stated that he passed his forensic pathology boards, when in fact he'd passed only one portion of the combined exam. Appendix W. Later resumes would change the wording of this credential. Appendix X and Y. The first resume also stated that he possessed a "Graduate Law Degree" from Southwest Texas State University, which has no law school. Appendix W, page 2. On August 13, 2007, he was cross-examined by attorney Theresa Caballero about his resume during a child protection case. Appendix G, page 216. In response to her questions, he admitted that he did not have a law degree, but falsely claimed to have "a degree in law from the graduate school of political science." *Id.* at 217. He also said he attended one year of school. *Id.* Again, Shrode attended only one semester at the school now known as Texas State University, and he did not receive any degree. Appendix D. During the cross-examination, he also falsely stated, "I was a member of the State Bar of Texas." Appendix G, page 220. After that testimony, he produced another resume that falsely stated that his qualifications included a degree in law from a graduate school of political science ("Not a law degree") and that he was a member of the State Bar from '79 to '83 as a paralegal. Appendix X. Shrode was neither an

attorney nor a paralegal at any time. Appendix Z, page 2. A 2004 application sent by Shrode to the Lubbock County Medical Examiner's Office includes the same false claim about possessing a law degree and working as a paralegal. Appendix V, pages 2 and 3.

The amended resume (and another undated resume that omits the false legal qualifications) also added that he was "Surgical Pathology Board Eligible." Appendices X and Y. It is Thompson's opinion that there is no board certification offered in surgical pathology by any recognized medical board. Shrode became ineligible to sit for the boards on December 31, 2008. Appendix H. Both later resumes additionally state that his board certifications in anatomic pathology and forensic pathology are pending. Appendices X and Y. The first amended resume, included in the El Paso personnel file, features a handwritten note: "Do not know when this version was recd., or how or from whom." Appendix X.

El Paso County fired Shrode in May 2010 after Nields' sentence was commuted. Appendix F. Before the Nields case, the County Commissioners had questioned him about the various lies on his resume. Appendix Z. When he was fired, he was the highest paid county employee, making $254,000 annually. *Id.*

After Nields' commutation and since Shrode was fired, cases against at least two people have been thrown out based on the unreliability of Shrode's work as a medical examiner. Monea Tyson was arrested in January 2009 following the death

of her young son. Appendix I. Police detectives got the warrant for Tyson's arrest based on Shrode's testimony, which ruled the death a homicide by blunt force trauma to the head. *Id.* at 3. During Tyson's trial, which occurred after Shrode was fired by El Paso County, a defense witness and independent forensic pathologist testified that it was her opinion that the death was caused by sepsis. *Id.* at 1, 3. This expert witness noted that Shrode's autopsy had called some marks bruises that were actually just benign skin discolorations, and had also failed to take into account that the child was treated for a cold a few days before his death. *Id.* at 1. Tyson was acquitted of capital murder on Nov. 18, 2010. *Id.* at 3.

The trial of Curtis Jones, of Carlsbad, New Mexico, ended in a mistrial because there were questions about the credibility of Shrode, who performed the autopsy on the 20-month-old girl Jones was accused of killing. Appendix J. District Court Judge Jane Shuler Gray declared a mistrial on her own initiative, citing a lack of credible testimony and noting, "[I]t's all an issue of due process," according to the newspaper report. *Id.*

### IV.    Punishment Phase Testimony

The Court of Criminal Appeals succinctly summarized the punishment phase evidence at issue in this writ, that from the second punishment hearing:

> Evidence presented at appellant's punishment retrial showed that appellant and the victim, Glenda Dennise Hayslip, were romantically involved for nearly a year, but appellant became increasingly

possessive, jealous, and abusive. Hayslip met Darren Cain, and the two began dating. Around 3 a.m. on April 30, 1998, police responded to a disturbance call at Hayslip's apartment and found appellant, Cain, and Hayslip arguing. No one wanted to press charges, so police told appellant to leave the complex and warned him not to return. Appellant returned with a gun three hours later and shot both Hayslip and Cain. Cain had multiple gunshot wounds to his neck and chest, and Hayslip was shot at close range in the face. Cain died at the scene, and Hayslip died in the hospital a week later.

A few hours after committing the murders, appellant went to the home of Diane Zernia and confessed to her. After calling his father, appellant surrendered to authorities. Appellant later phoned Zernia from jail and tried to persuade her to lie about what he had told her, but she refused. Appellant also attempted, from prison, to solicit someone to kill Zernia and was later indicted for solicitation to commit capital murder. The State also presented evidence that appellant was associated with the Aryan Brotherhood gang in prison. A fellow jail inmate testified that appellant gave him a list of people who appellant believed were potential witnesses and told the inmate that he would pay him to "eliminate" the witnesses or otherwise make sure that they would not appear in court. The inmate turned the list over to the police.

The State also presented evidence that appellant began committing crimes as a juvenile. In 1984, while living with his parents in an upper-middle-class neighborhood in Colorado, appellant committed a string of crimes that resulted in over $60,000 of damage to homes and property. While on probation from the youth center, appellant stole his father's motorcycle, ran away, and committed a variety of crimes. He was arrested again in 1987 and sentenced to a juvenile facility. Appellant had problems with drugs and alcohol from an early age. He married, but later abandoned his wife and two children. In 1996, appellant was arrested for transporting illegal immigrants from Mexico.

*Thompson v. State*, AP-73,431, 2007 WL 3208755 at 3 (Tex. Crim. App. 2007).

Interestingly, the Court of Criminal Appeals made no mention of the testimony

related to Robin Rhodes, concerning an alleged hit Thompson tried to put out on multiple state witnesses. Clearly, that evidence is the most damning evidence admitted at the punishment hearing.

During his defense, Thompson first called his ex-roommate, Sean Johnson. 17 RR2 at 232-246. He explained that Thompson and Hayslip had a rocky relationship which revolved around bars and drinking. *Id.* at 235-37. The couple would fight a lot, but also had good times. *Id.* He also explained that Thompson abused cocaine, marijuana, and alcohol. *Id.* at 238. Johnson explained that Thompson's cocaine use changed his personality, and made him more erratic and temperamental. *Id.*

An ex-employer, and fellow cocaine user, David Rutherford also testified to Thompson's drug use around the time of the murder. 18 RR2 at 99-106. He testified that Thompson had come to his house after the shootings, was hysterical, and was saying "I did it, I can't believe I did it." *Id.* at 109-112. He also confirmed that Chuck had a wound on his arm after the shooting. *Id.* at 112-17.

Lauren Cook, a bartender at Bimbo's known as "Missy", also testified on Thompson's behalf. RR2. Vol. 18 p. 141-142. She would often see Thompson and Hayslip in the bar. RR2. Vol. 18 p. 143. She confirmed that Thompson and Hayslip had an "on again off again relationship." RR2. Vol. 18 p. 144. Missy remembered the night of the alleged offense and that Thompson and Hayslip were in the bar on

25

that night. RR2. Vol. 18 p. 147. They stayed for three or four hours and had been in a good mood. RR2. Vol. 18 p. 147-48. Missy remembered them leaving at about 11:00 p.m. RR2. Vol. 18 p. 149.

William Jordan had also been with Thompson and Hayslip on the night of shootings.   Jordan was twenty-nine years old at the time of trial. RR2. Vol. 18 p. 194. Jordan had known Thompson since the seventh grade and had lived with Thompson for a few months after he had broken up with Hayslip. RR2. Vol. 18 p. 198. Jordan was present with Thompson and Hayslip on the night of the alleged offense. RR2. Vol. 18 p. 203. They were all patronizing Bimbo's. RR2. Vol. 18 p. 203. Jordan believed that Thompson and Hayslip were acting better that night than he had seen them before. RR2. Vol. 18 p. 204.

Alana Lancaster saw Thompson immediately after the shootings.  RR2. Vol. 18 p. 242. Lancaster knew Thompson through David Rutherford. RR2. Vol. 18 p. 243. She told the jury that one morning Thompson appeared at her house at 6:44 a.m. RR2. Vol. 18 p. 244. Thompson had a gunshot wound to his arm where a gunshot had grazed him, and he told her that he had shot his girlfriend and a guy she was with. RR2. Vol. 18 p. 245. He appeared to be in shock and stated that he could not believe that he had shot them. RR2. Vol. 18 p. 245.

Thompson also called Dr. Katherine McQueen to testify on his behalf. RR2. Vol. 18 p. 156. Dr. McQueen was a physician who specialized in internal medicine

26

and psychiatry. RR2. Vol. 18 pp. 156-1576. She told the jury that she examined Thompson for two hours. RR2. Vol. 18 p. 164. She determined that Thompson had alcohol and cocaine dependencies that were in remission. RR2. Vol. 18 p. 165. Thompson also had a strong family history of substance dependency. RR2. Vol. 18 p. 166. Dr. McQueen stated that there is a strong correlation between use of cocaine as a child and violence. RR2. Vol. 18 p. 174.

Tamara Collier was Thompson's ex-wife and the mother of his two children. RR2. Vol. 18 p. 250. Collier and Thompson met while they were in Colorado, and they were married in 1991. RR2. Vol. 18 p. 253. They moved to Texas in 1993. RR2. Vol. 18 p. 254. Collier separated from Thompson and moved back to Colorado in 1995 because she did not believe that Thompson had been acting responsibly. RR2. Vol. 18 p. 256-57.

Steve Thompson, Thompson's father, also testified in his son's defense. RR2. Vol. 18 p. 268. Steve remembered Thompson having problems learning in school, and believed that Thompson was dyslexic. RR2. Vol. 18 p. 276. Steve also believed that Thompson also had attention deficit problems. RR2. Vol. 18 p. 277. The Petitioner's father admitted to experimenting with marihuana and cocaine. RR2. Vol. 18 p. 286. However, Thompson's father believed that Thompson's older brother had been a bad influence on Thompson, and that this was why Thompson kept getting into trouble when he was young. RR2. Vol. 19 pp. 8-10.

## V.    Full time informant, Robin Rhodes

In a "Supplemental Notice of Intent to Use Extraneous Offenses" the Harris County District Attorney's office gave the following notice: "On or about August 21, 1998 the defendant prepared a list of witnesses to fellow inmate Robin Rhodes for the purpose of Rhodes to kill or otherwise use physical means to prevent from testifying at trial."  Cl. R.2 at 109-10.  Importantly, Thompson had already been charged, by indictment, with capital murder by the time Rhodes obtained this list from Thompson.  *See* Cl. R. at 51 (Indictment filed 7/29/98).

The District Attorney's office never gave any *Brady* notice related to their close and continuing relationship with Rhodes; however, Thompson's attorney, Terrence Gaiser apparently discovered the possible connection on Thursday, October 20, 2005, three weeks after voir dire had begun in the second trial.  *See* Cl. R.2 at 209-14.  In a motion for continuance (the second one filed in this case), Attorney Gaiser explains that he learned of Rhodes' participation in a previous capital murder trial "literally by accident."  *Id.*  Gaiser explained that his subsequent "investigation leads counsel to believe that Rhodes may well have been an agent of the State while he was incarcerated with the defendant, if so, his testimony is clearly inadmissible."  Attached to the motion for continuance was the following affidavit:

## AFFIDAVIT IN SUPPORT OF MOTION FOR CONTINUANCE

BEFORE ME, THE UNDERSIGNED AUTHORITY, appeared, Terrence Gaiser, who being by me duly sworn did depose and say:

"My name is Terrence Gaiser.   I am the lawyer for Charles Victor Thompson, the Defendant in the above referenced cause.

"On Thursday, October 20, 2005, approximately 72 hours before the making of this affidavit, I learned for the first time, when I overheard a conversation Mr. Wisner (the prosecutor) was having, that the State's witness Robin Rhodes had testified in a previous capital murder trial.  Robin Rhodes was an inmate in the Harris County Jail in 1998.  In this case, he supposedly will testify that Mr. Thompson approached him about doing away with certain witnesses in this case.   When I asked Mr. Wisner, he informed me it was the killing of a S.W.A.T. officer that had been tried by Assistant District Attorney, Lyn McClellan.

"On Friday, October 21, 2005, I ran into Lyn McClellan at the Harris County Criminal Justice Center as he was riding an elevator.   Mr. McClellan informed me that the case he had tried was the Benavides case, and he was still occasionally receiving telephone calls from Robin Rhodes asking him for favors for various of Rhodes' relatives and associates.

"When I read the case of Benavides v. State, 992 S.W. 2d 511, I learned that there had been an informant in that case whose credibility was important to the validity of the police procedures in that case.  It did not mention Robin Rhodes name.   My reading of newspaper articles concerning the Benavides case leads me to believe that Rhodes may have been remunerated.

29

"In view of these discoveries and the fact that Counsel is just now beginning to investigate this newly acquired information, which would appear was all within the knowledge of the State for years, and is clearly information that should have been disclosed pursuant to Brady v. Maryland, counsel would request a continuance, not for delay, but that justice may be done."

_____
TERRENCE GAISER

SWORN TO AND SUBSCRIBED BEFORE ME THIS THE 23rd DAY OF OCTOBER 2005.

_____
NOTARY PUBLIC

*Id.*  The motion for continuance was denied, and there is no indication that the District Attorney's office ever provided the defense with information showing the true nature of Robin Rhodes' involvement with the office, or his long-time informant status with local police departments.

30

Rhodes' testimony was incredibly harmful.  Rhodes testified that in 1998 he was in Harris County Jail for a parole violation.  17 CR2 at 134.  During his stay, he had the opportunity to go on recreation with a group of people that included Thompson.  *Id.* at 136.  The two struck up a conversation, during which the defendant explained he "wanted some people to not appear or to disappear."  *Id.* at 138.  Apparently, Rhodes found out that Thompson had problem with "a female and another man and there was some people that could tie him to it."  *Id.* at 138.  According to Rhodes, Thompson thought Rhodes could "make them go away."  *Id.* Rhodes remembered that Thompson had explained "he had gone over to the apartment and he had shot the gentleman and got mad because it didn't kill him and they accidentally got into a struggle and he shot himself and the he shot the guy again."  *Id.* at 139.  He said, about Hayslip, "the bitch wouldn't get up again."  *Id.*

Thompson apparently gave Rhodes a list of the people he wanted not to show up in court.  *Id.* at 140-41.  After he got the list, Rhodes contacted his handler, Officer Floyd Winkler who worked for the Harris County Organized Crime Unit.  *Id.*  An investigator from the DA's office, Mike Kelly, came to see Rhodes, and he gave him the list, which was admitted as State's Exhibit 92.  *Id.*; State's Ex. 92.  The list was, amazingly, admitted without objection.  *Id.*

31

The extent of Rhodes' involvement with Harris County law enforcement was partially exposed on cross-examination. His work with the government went back a long time. *Id.* at 149. He had done a lot of work for law enforcement, and the Harris County District Attorney's Office. *Id.* at 151-52. He had been paid for that work. *Id.* at 153. Back in '98 and '99, according to Rhodes' own testimony, "[Rhodes] was a full-time informant for the Harris County Organized Crime Task Force." *Id.* It was his understanding that this task force was part of the District Attorney's office. He had been paid to testify at the Edward John Benavides capital murder trial. *Id.* at 157. He apparently was paid $20-30,000 out of the forfeiture proceedings linked to that case. *Id.* at 158-59.

After Rhodes' testimony, defense counsel made the following objection:

Your Honor, at this time I move to strike the testimony of Robin Rhodes because of the violation of *Brady v. Maryland* that has occurred in this case. The State of Texas insisted that they had done nothing for this man, that the District Attorney's Office did not have them in their employ and the fact of the matter, by his own testimony, reveals that he has been in the employ of the District Attorney's Office and has been paid by the District Attorney's office to --

*Id.* at 163. The trial court denied the motion before defense counsel could finish his statement. *Id.*

In spite of the testimony and request for mistrial, neither state appellate counsel nor state writ counsel raised this *Brady* violation at the state level. Nor

was an ineffective assistance of counsel claim filed related to trial counsel's failure to lodge a Sixth Amendment objection to Rhodes' testimony.

To this day, the Harris County District Attorney's office continues to deny having any records showing that Rhodes was in their employ.

## GENERAL DISCUSSION OF CAPITAL PUNISHMENT LAW IN TEXAS

The following is an overview of capital punishment law in Texas. This summary is provided simply as a general guide; not all capital murder trials follow this pattern.

The Texas Legislature has designated certain types of murders as eligible for the death penalty. To warrant the death penalty, the defendant must have committed another serious crime in addition to committing a murder. For instance, kidnapping and then killing a person is a capital offense. So is killing two people, rather than one, which happened in the present case.

In recent years, once a person is indicted for capital murder and the State decides to pursue the death penalty, the defendant is assigned two attorneys. One of the lawyers is the lead attorney; the other is the second chair attorney. Both attorneys are charged with investigating the case, filing motions, selecting the jury, and arguing as forcefully as possible for a not guilty verdict or a lesser conviction than capital murder, or if all else fails, for a life sentence.

The district attorney's office will equally prepare, usually assigning two, sometimes three, prosecutors to the case, along with one or two investigators and paralegals.

Lawyers for the defendant will usually file a large number of pretrial motions. The reason for this is because the state and federal law requires all issues raised on appeal to be first presented to the trial judge. Death penalty jurisprudence is thick with constitutional and statutory issues. All unsettled challenges to death penalty procedures must be raised. Failing to do so will result in those issues being waived for direct appeal. Moreover, because the Supreme Court has insisted that effective assistance of counsel requires attorneys who are knowledgeable about death penalty litigation, the failure of trial lawyers to raise important issues at trial for later review on appeal can lead accusations that the trial lawyers were ineffective.

In a capital case, the trial judge will hold several pretrial hearings on motions by the State and defense. The judge will address motions to suppress, constitutional challenges, and hearings on the qualifications of experts. Any defense requests denied by the judge are preserved for appeal.

Texas adheres to individual voir dire of potential jurors. Generally, a large number of veniremen are summoned to the courthouse, around 600 or 700. Many

jurors exercise certain allowable rights not to serve; others cannot be found.  On appearance day, about 300 jurors or so will show.

The trial judge will perform the initial qualification of the jury panel.  Either side may ask for the jury to be shuffled at this point.  Jurors will be seated randomly in numerical order.  Beginning with juror number one, the first twelve jurors who are not struck or removed for cause will constitute the jury.

The judge will screen out those who cannot speak and write English, who have felony or moral turpitude convictions, and those who are entitled to legitimate legal exemptions from service.  In addition, the judge will hear explanations about physical disability, business conflicts, general biases, or other personal issues that might disqualify a juror.  The judge may excuse some jurors but not others.  At this stage, the attorneys for both sides have minimal input, other than a few questions for individual jurors called to the bench.  Frequently, the lawyers for both sides will agree to excuse a juror for some reason.  There is a certain Texas statutory provision that allows lawyers on both sides to agree to excuse a juror.

Qualifying the jury to this point is a difficult, day-long affair.  Once the venire is qualified for general jury service, they are scheduled for individual voir dire examination.  Generally in groups of five to ten, they are instructed to return to court over the next three to four weeks for individual questioning about their views on the death penalty.

When each juror arrives on his or her designated day, each side is generally allowed approximately forty-five minutes to question the juror. After the juror leaves, each side is permitted to challenge for cause. If granted, the juror is finally excused and deleted from the pool. If challenges for cause are denied, the juror remains in the pool and subject to a peremptory challenge or to become part of the twelve-member petit jury.

There are two methods in Texas for permitting peremptory challenges. For many years, judges required peremptory challenges to be exercised immediately after the juror is questioned individually and challenges for cause denied. This is sometimes called the sequential method of selecting the jury. The State goes first. If the State strikes the juror, the juror is gone. If the State declines to strike the juror, then the right passes to the defense. If the defense strikes the juror, the juror is eliminated. If the defense does not strike the juror, then the juror joins the twelve-member petit jury. This process is repeated until twelve jurors and two alternates are seated. Each side has ten peremptory challenges. This form of jury selection was used in Thompson's trial.

Once the jury is selected and sworn, trial proceeds in the usual fashion. If the defendant is found guilty of capital murder, the sentencing phase begins. In response to the Supreme Court's insistence that the jury decision-making process be guided, Texas has constructed three questions, called special issues. The

questions have varied over the years. In Thompson's case, only two questions were asked: the future dangerousness question and the mitigation question.

The method of answering the special issues is complicated. If the jurors unanimously answer both questions in the State's favor, as they did here, then the judge sentences the defendant to death automatically. If the jurors answer *unanimously* any one of the questions in the defendant's favor, then the judge will sentence the defendant to life in prison.

Jurors are also told that in order to answer any special issue in the defendant's favor, at least ten of the jurors must agree.

The jurors are *not* told certain outcomes. It is possible that the jurors might fail to agree *unanimously* on the answer in the State's favor to any special issue. If this occurs, then the defendant is automatically sentenced to life in prison. There is no retrial. Unlike in any non-capital case, a hung jury does not result in a retrial of the sentencing phase of a capital case. The result is always either a life sentence or a death sentence. Jurors, however, are not told this.

As a corollary, jurors are also not told that a single juror can decide in favor of a life sentence. Unanimity is required for a death sentence. A life sentence is the result of anything other than unanimity—the result of a single juror's decision.

Moreover, jurors are not told what occurs if fewer than twelve jurors agree on an answer to a special issue in the State's favor, but fewer than ten jurors agree

37

on an answer in the defendant's favor.  Again, the answer is that the defendant receives an automatic life sentence.

Once the judge pronounces the death sentence and signs the judgment, appeal is automatic to the Texas Court of Criminal Appeals ("CCA").  At the same time that the trial judge appoints an appellate lawyer, the judge will also appoint an attorney to file the defendant's state Article 11.071 application for state writ of habeas corpus.  The state writ must be filed shortly after the state direct appeal brief is filed, before the CCA decides the appeal.  If the direct appeal is affirmed, the defendant has the right to appeal to the United States Supreme Court.  Once the CCA denies the direct appeal and the state writ application, the inmate must proceed to federal district court.

## ARGUMENT AND AUTHORITIES

### Overview of Claims for Relief

**Claim One:** The Evidence Is Legally Insufficient to Support the Conviction of Capital Murder Because the Intervening Medical Care Rendered to Dennise Hayslip Was the True Cause of her Death

**Claim Two:** Thompson was Denied his Sixth Amendment Right to Counsel, Which is Made Applicable to State Felony Prosecutions By the Due Process Clause of the Fourteenth Amendment

**Claim Three:** The State Violated Thompson's Sixth and Fourteenth Amendment Rights Through Its "Deliberate Elicitation" of

38

Incriminating Statements From A Career Informant Named Robin Rhodes

**Claim Four:** The Trial Court Committed Reversible Error by Restricting the Jury's Consideration to Only Punishment Issues During the Retrial of Thompson's Prosecution for Capital Murder Where the State Sought the Death Penalty, in Violation of Thompson's Federal Constitutional Right to Trial By Jury

**Claim Five:** The Trial Court Committed Reversible Error in Proceeding To Trial Before a Jury on the Special Punishment Issues Presented During a Capital Murder Prosecution Where the State Sought the Death Penalty, Where the Indictment Returned Against Thompson Did Not Allege Any Facts Pertaining to the Special Issues, in Violation of Thompson's Federal Constitutional Right to Due Process

**Claim Six:** The Trial Court Committed Reversible Error in Allowing Michael Gene Donaghy to Testify to the Number and Types of People Who Attended Glenda Hayslip's Funeral, Where the Testimony Exceeded the Proposed Scope of Victim Impact Testimony, in Violation of Thompson's Constitutional Right Against Cruel and Unusual Punishment

**Claim Seven:** Thompson's Convictions Should be Reversed, and Punishment Imposed at Life Imprisonment, as the Texas Scheme for Executing Defendants by Lethal Injection is Cruel and Unusual, in Violation of Thompson's Federal Constitutional Protection Against Cruel and Unusual Punishment

**Claim Eight:** Texas' Dual Track Habeas Application System Violates Due Process of Law, as Guaranteed by the Fourteenth Amendment to the United States Constitution

**Claim Nine:** If The Evidence of Capital Murder Was Sufficient Based on Texas' Statutory Law Related to Concurrent Causation, That Law is Unconstitutional as Applied in This Case Because it Violates Due Process and Reduces the Reliability of a Guilt Determination, In Violation of the Eighth Amendment

**Claim Ten:** Thompson Received Ineffective Assistance of Counsel at Trial, in Violation of the Sixth and Fourteenth Amendments

**Claim Eleven:** The Trial Court's Denial of Thompson's Request For a Continuance Deprived Thompson Of Due Process of Law and Effective Assistance, In Violation of the Sixth and Fourteenth Amendments

**Claim Twelve:** The Use of Evidence of Youthful Misconduct at the Punishment Stage of Trial Violated the Eighth Amendment

**Claim Thirteen:** The Jury Instructions Violated Thompson's Due Process Rights by Failing to Instruct the Jury that the State Had the Burden of Proof Beyond a Reasonable Doubt on the Mitigation Issue at The Punishment Stage of Trial, In Violation of the Fourteenth Amendment

**Claim Fourteen:** Texas Capital Sentencing Scheme Violates the Eighth Amendment With Respect to the Burden of Proof on the Mitigation Issue, Because the Instructions Gave the Jury Mixed Signals as to How the Mitigation Issue is to be Applied

**Claim Fifteen:** Additional Claims Presented Related to the Autopsy Performed by Dr. Shrode

**Claim Sixteen:** Trial Counsel Rendered Ineffective Assistance of Counsel

**Claim Seventeen:** State Habeas Counsel Rendered Ineffective Assistance Counsel

<u>**DETAILED ARGUMENTS**</u>

**Claim One: The Evidence Is Legally Insufficient to Support the Conviction of Capital Murder Because the Intervening Medical Care Rendered to Dennise Hayslip Was the True Cause of her Death**

**EXHAUSTION: This claim was presented in Points of Error One, Two, and Three of the first direct appeal, and Claims Four, Five, Six, and Seven of the First State Writ (Additional Claims related to the autopsy in this case are included as Claim 15)**

**A.     Legal Standards for Sufficiency of the Evidence**

In order to assess the legal sufficiency of the evidence, a court must consider whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 308, 99 S.Ct. 2781, 2789 (1979); *Staley v. State*, 887 S.W.2d 885, 888 (Tex. Crim. App. 1994); *Geesa v. State*, 820 S.W.2d 154, 156 (Tex. Crim. App. 1991) (en banc).

When conducting a legal sufficiency of the evidence review, an appellate court does "not weigh the evidence tending to establish guilt against the evidence tending to establish innocence." *Ex parte Elizondo*, 947 S.W.2d 202, 205 (Tex. Crim. App. 1997). Nor does the court seek to assess the credibility of the witnesses on either side. *See Id.* The court "view[s] the evidence in a manner favorable to the verdict of guilty . . . no matter how powerful the exculpatory evidence may seem . .

41

. or how credible the defense witnesses may appear." *Id.* So long as "the inculpatory evidence standing alone is enough for rational people to believe in the guilt of the defendant, [the court] simply [does] not care how much credible evidence is on the other side." *Id.* at 205-206.

### B.    Legal Standards for Sufficiency in the Sub-context of Death Resulting From Medical Malpractice

In the event that gross negligence or improper treatment by a physician causes the death, then the evidence is insufficient to sustain a conviction of murder. *Franklin v. State*, 128 S.W.2d 389 (Tex. Cr. App. 1939); *Barrera*, 756 S.W.2d 884 (Tex. App.–San Antonio 1988).  The generally accepted rule in such cases is that when a victim's death, "results from a series of events too extraordinary or too dependent on the acts of another to be attributed to [the defendant] . . . [he] ***should not suffer the penalty for murder***, nor should he be entirely free of criminal sanctions." LaFave and Scott, *Substantive Criminal Law* § 3.12 (1986) (citing cases) (emphasis added).

### C.    Trial Evidence

#### 1.    State's Witnesses

Thompson was indicted for Capital Murder under a theory of two homicides in one criminal episode pursuant to Section 19.03(a)(7)(A) of the Penal Code. CR p.51.

Thompson did not give a written statement to the investigating law enforcement agency, nor did he testify at any phase of his trial.

The actual events of the homicides are based upon statements made to a woman named Diane Zernia. In her testimony before the jury, she related that Thompson appeared in her home on the morning of April 30, 1998 with a black eye, RR Vol. 11, pp. 125-126, and fell asleep on her couch. RR Vol. 11, pp. 126-127. At 10 a.m., Thompson awoke and began to tell Zernia that he shot Darren Cain four times. RR Vol. 1, pp. 128-129. Thompson further explained to her that after the fight with Mr. Cain and the police arrived, he left to get a gun and returned to Hayslip's apartment. RR Vol. 11, pp. 129-130. Thompson went back to the apartment where he and Darren Cain argued over the gun. RR Vol. 1, p. 130. Thompson told Zernia that he shot Cain four times. RR Vol. 11, p. 130. He put a gun to Hayslip's cheek and fired. RR Vol. 11, p. 132. But Thompson explained that he did not mean to shoot Hayslip. RR Vol.1 1, p. 146.

Darren Cain was dead at the scene, but Hayslip was taken by Life Flight to Memorial Hermann Hospital in the care of Lynn Etheridge. RR Vol. 12, pp. 175-195. During this ride, Hayslip was sitting upright in the rear of an ambulance and breathing on her own. RR Vol. 12, pp. 182-183. Her blood pressure was within normal range during the ambulance ride. RR Vol.12, pp. 183-184. Hayslip arrived

at the hospital within six minutes and was transferred to the emergency room. RR Vol. 11, pp. 185-187.

Dr. Robert Martin, emergency room attending physician, testified that Hayslip was shot through the face and that fact caused him to consult with one Dr. Braddock, an oral surgeon. RR Vol. 12, p. 10.  As they prepared her for surgery, she appeared to have trouble breathing and a nasotracheal intubation was performed by them. RR Vol. 12, pp. 13-14. It became apparent that the intubation was faultily installed, and, as a result of insufficient oxygen flow, Hayslip sustained irreversible brain damage. RR Vol.12, p. 24.

By the time she left the operating room, Hayslip was in a coma. On May 6, 1998, the family of Dennise Hayslip asked that she be removed from life support and she died thereafter. RR Vol.12, p.24. Dr. Martin also related that he and the other physician who attended Ms. Hayslip were to be sued for a civil wrongful death matter as a result of the negligent medical care they rendered to Hayslip. RR Vol.12, p.77.

### 2. Thompson's Medical Expert Witnesses Confirmed That Hayslip Died From Medical Malpractice

Dr. Pat Radalat testified in Thompson's defense, having reviewed the hospital records of Dennise Hayslip and concluding that the facial wound of Ms.

Hayslip would not have been lethal had proper medical treatment had been performed at Memorial Hermann Hospital. RR Vol. 12, pp. 203- 257.

### D.    Argument

The death of Dennise Hayslip was the result of the intervening medical care that she received at Memorial Hermann Hospital. In the event that gross negligence or improper treatment of a physician causes the death, then the evidence is insufficient to sustain a conviction of murder. *Franklin v. State*, 128 S.W.2d 389 (Tex. Cr. App. 1939); *Barrera*, 756 S.W.2d 884 (Tex.App.–San Antonio 1988).

Professor LaFave states the rule generally observed as follows:

> It is generally held that A is guilty of murdering B, i.e. that A's act legally caused B's death, unless the doctor's treatment is so bad as to constitute gross negligence or intentional malpractice.

*Substantive Criminal Law*, supra, § 3.12 (5) (collecting cases).

Section 6.04(a) of the Penal Code does not hold criminal responsibility where the concurrent cause was clearly sufficient to produce the result and the conduct of the actor was clearly insufficient. *People v. Fite*, 627 P.2d 761, 767 (Colo. 1981) ("[M]ere negligence on the part of an attending physician does not amount to a supervening cause. Gross negligence, however, not being reasonably foreseeable, does constitute a defense under those circumstances where, but for the gross negligence, death would not have resulted.").

The death of Ms. Hayslip was the sole result of her loss of oxygen to the brain, which in turn caused her family to terminate her life one week after she was shot. This event was produced by the physicians' respective inability to properly provide competent medical assistance by way of a commonly performed hospital procedure.

### E.    Conclusion

The conviction of capital murder herein should be reversed and dismissed pursuant to the Texas Rules of Appellate Procedure, Rule 78(e).

**Claim Two: Thompson was Denied His Sixth Amendment Right to Counsel, Which is Made Applicable to State Felony Prosecutions by the Due Process Clause of the Fourteenth Amendment**

**Exhaustion: The CCA granted relief on this ground in the first direct appeal, but only as to the Punishment Phase. As a legal matter, no reasonable jurist can countenance the CCA's conclusion that the State's illegal recording did not affect the jury's verdict at the Guilt/Innocence Phase**

### A.    Legal Principles

The right to counsel is afforded an accused by the Sixth Amendment to the United States Constitution and applicable to state felony prosecutions by the Due Process clause of the Fourteenth Amendment. *Gideon v. Wainwright*, 372 U.S. 335 (1963). This right protects a citizen from the State with respect to a particular

crime. *McNeil v. Wisconsin*, 111 S.Ct. 2204, 2209 (1991) This right attaches at the initiation of adversarial proceedings, whether by way of formal charge, preliminary hearing, indictment, information, or arraignment, and no request for counsel need be made by the accused. *Brewer v. Williams*, 430 U.S. 387 (1977). Once the Sixth Amendment attaches, efforts to elicit information from the accused, including interrogation, represent critical stages at which the right to counsel will apply. *Michigan v. Jackson*, 106 S.Ct. at 1407-1408. Post indictment interrogations are not admissible unless the State can prove a voluntary, knowing, and intelligent waiver of the right to counsel. *Patterson v. Illinois*, 487 U.S. 285 (1988). Once the right to counsel has attached and been invoked, any subsequent waiver during police interrogation is ineffective unless counsel has first given permission for the interview. *Michigan v. Jackson*, 106 S.Ct. at 1411. Further, the right to counsel also attaches to any other offense that is very closely related factually to the offense charged. *State v. Frye*, 897 S.W.2d 324, 328-329 (Tex. Crim. App. 1995).

These rules precluded circumvention of the Sixth Amendment by charging a defendant with additional crimes after questioning him without counsel present or by charging predicate crimes with the purpose of questioning a suspect on an aggravated offense. *Upton v. State*, 853 S.W.2d 548, 556 (Tex. Crim. App. 1993).

### B.    Background Facts

Thompson was appointed counsel on May 19, 1998. C.R., pp.4-5.

Three months later**,** on July 6, 1998, an inmate at the Harris County Jail named Jack Reid informed Sheriff's Department Lieutenant Max Cox that Thompson needed someone to retrieve a gun that had shot Cain and Hayslip. RR Vol.14, p.116. Cox was aware that the gun had not been recovered by the investigating officers. RR Vol. 14, p. 117. A map of the location of the gun was received and forwarded to Gary Johnson, an Investigator for the Harris County District Attorney's Office. Lieutenant Cox sent Mr. Johnson to the jail in an undercover capacity to furtively interview Thompson outside the presence of his counsel. RR Vol.14, p.120, 128.

The next day, July 7, Johnson tape-recorded a conversation with Thompson. State's Exhibit 89.  Thompson averred to the location of the gun and possibly killing the woman at whose house he had slept after the shooting, Diane Zernia.

Prior to the admission of the taped conversation, counsel for Mr. Thompson objected and conducted a *voir dire* examination of Mr. Johnson. Johnson admitted that he was aware that Mr. Thompson was represented by counsel at the time of his meeting. Further, he did not notify counsel of his meeting with their client. Nor did Mr. Johnson "*Mirandize*" Mr. Thomson before taking the statement. RR Vol. 14, pp.168-169).

Thompson objected that such evidence be suppressed on the basis of his denial of counsel while in custody. RR Vol. 14, p. 169. The Court overruled the objection and admitted the evidence. *Id.*

### C.    Argument

The undercover interview was intertwined with the recovery of the murder weapon and the investigation of a solicitation of a homicide. The State of Texas did not make any attempt to delineate between the two events. The interview of Thompson without his counsels' knowledge was not a necessity to prevent a crime. It was a blatant attempt to circumvent the right to counsel and a direct affront to the Sixth Amendment of the United States Constitution.

The trial court constitutionally erred, and pursuant to *Chapman v. California*, 386 U.S. 18, 87 (1967), a harmless error analysis is to be applied. If there is a reasonable likelihood that the error materially affected the jury's deliberations, then the error was not harmless beyond a reasonable doubt. *Satterwhite v. Texas*, 108 S.Ct. 1792, 1797 (1988).

The record clearly demonstrates that Thompson's statements on the tape recording and to Gary Johnson were incriminating, both at guilt and punishment, and significantly aided the State of Texas in securing an affirmative answer to Special Issue Number 1. This Constitutional violation created future dangerousness

evidence for the State. Therefore, a reasonable likelihood exists that the admission of the statements in evidence materially affected the jury's deliberations.

### D.    Conclusion

The judgment of the trial court should be reversed and remanded for a new trial or a new punishment hearing pursuant to the Texas Rules of Appellate Procedure.

**Claim Three: The State Violated Thompson's Sixth and Fourteenth Amendment Rights Through Its "Deliberate Elicitation" of Incriminating Statements From A Career Informant Named Robin Rhodes**

**EXHAUSTION: This claim was not presented in the state direct appeal or in state habeas. The State's *Brady* violation, combined with the ineffectiveness of trial counsel for failing to make proper objections, and the ineffectiveness of state direct appellate counsel and state habeas counsel in failing to later raise the issue, serves as the "cause and prejudice" of any potential procedural default.**

A *Massiah* violation has three elements: (1) the Sixth Amendment right to counsel has attached; (2) the individual seeking information from the defendant is a government agent acting without the defendant's counsel being present; and (3) that agent "deliberately elicit[s]" incriminating statements from the defendant. *Creel v. Johnson*, 162 F.3d 385, 393 (5th Cir.1998).

There is no doubt that Thompson's right to counsel had long before attached. The questions therefore train on the agency status of Rhodes and his conduct vis-à-vis Thompson. *See* CR. at 51 (Indictment filed 7/29/98).

Robin Rhodes, the jailhouse informant in this case, already had a long history of cooperation with the Harris County District Attorney's office and local law enforcement. Robin Rhodes' extensive work with the Harris County District Attorney's Office, as well as local law enforcement, was detailed in the 1st District Court of Appeals case *Stephens v. State*, 59 S.W.3d 377, 381 (Tex. App.—Houston [1st Dist.] 2001, pet. ref'd):

> Rhodes testified before the jury that he was currently employed by the Harris County Organized Crime Narcotics Task Force, which included the Harris County District Attorney's Office, as a confidential informant in over 50 cases, more than 80 percent of which resulted in convictions; that he had twice testified for the State, including once in a capital murder prosecution; and that the State had not doubted him.
>
> Rhodes was not allowed to testify that (1) the Harris County District Attorney's Office paid him $30,000 for his participation in the capital murder case; (2) he received $300 from the Harris County District Attorney's Office about four weeks before this trial; (3) more than $1000 was pending for his help with a large narcotics transaction; (4) he had helped secure over 50 search warrants; and (5) the search warrants obtained solely on the basis of Rhodes's statements were "too numerous to count."

Indeed, Rhodes himself admitted during his testimony that "[he] was a full-time informant for the Harris County Organized Crime Task Force." *Id.* It was Rhodes'

understanding that this task force was part of the District Attorney's office. He had been paid to testify at the Edward John Benavides capital murder trial. *Id.* at 157. He apparently was paid $20-30,000 out of the forfeiture proceedings linked to that case. *Id.* at 158-59.

Despite his relationship with the Harris County District Attorney's Office, that office never notified the defense team of this material and relevant information. *See* CR 2 at 209-14. Had it not been for defense counsel overhearing a conversation of the Assistant DA handling the case, this information might never have come to light. *Id.* Indeed, the record suggests that the DA's office never came forward with any information related to Rhodes being a full-time paid informant. 17 RR2 at 163.

Also interesting is the fact that Rhodes apparently had met Max Humphrey, the informant involved in the Sixth Amendment violation from Thompson's first punishment trial. *See Id.* at 135 (Rhodes recognized a person by the name of Max); *see also Thompson*, 93 S.W.3d at 22-23 (explaining that Max Humphrey was the inmate informer related to the first punishment trial).

Rhodes explained that he is the type of person who is always trying to get himself out trouble. *Id.* at 136. With this in mind, while at recreation he started speaking with Thompson. *Id.* He represented himself to Thompson as the type of person who could find people, and help someone with their problems. *Id.* at 137.

52

He led Thompson to believe he "could find anybody, anywhere, anytime." *Id.* at 138. He agreed to do what he could to keep some witnesses from showing up at Thompson's trial. *Id.* at 139. Of course, he was also able to obtain a "hit list" from Thompson, which was entered into evidence at Thompson's trial. State's Ex. 92.

## I.     The "Deliberate Elicitation" Rule in Supreme Court Precedent

In *Massiah*, the defendant was free on bail following charges of violating federal narcotics laws. *See Massiah*, 377 U.S. at 201. A co-defendant, Colson, who unbeknownst to Massiah had decided to cooperate with government investigators, permitted an agent to install a radio transmitter in his automobile, which allowed an investigator to overhear conversations between Colson and Massiah carried on in Colson's car. *Id.* at 202-03. During one of these conversations, Massiah made incriminating statements. *Id.* at 203. At trial, those statements were used against Massiah over the objections of his counsel that the statements had been obtained in violation of Massiah's Sixth Amendment right to counsel. *Id.* at 203.

Justice Stewart, writing for a 6-3 majority, established the "deliberate elicitation" standard thereafter applicable to claims that a defendant's Sixth Amendment right to counsel had been violated by use of incriminating statements made to a federal agent or informant in the absence of counsel.

*Brewer v. Williams*

The next Supreme Court decision to address a "*Massiah* issue," *Brewer v. Williams*, 430 U.S. 387 (1977), involved contact between the defendant and a known government agent, not an undercover informant or co-defendant. Nevertheless, the Court found that *Massiah* was controlling, clarifying what constitutes "deliberate elicitation" that is "constitutionally indistinguishable" from impermissible "interrogation" as defined in Massiah.

In *Williams,* a young girl was abducted from the YMCA in Des Moines, Iowa, and a warrant was issued for a recently-escaped mental patient, Williams, who was a resident of the YMCA. *Williams*, 430 U.S. at 390. Williams telephoned a Des Moines attorney, Mr. McKnight, from Davenport asking for assistance, and McKnight advised Williams to turn himself in to Davenport police, which Williams d*Id. Id.* at 390. McKnight then arranged with Des Moines police that police officers, including a Detective Learning, would pick up Williams in Davenport, but would not interrogate him or mistreat him. *Id.* at 391. McKnight also instructed Williams that he was not to talk to the officers about the missing girl until after consulting with McKnight upon his return to Des Moines. *Id.* These conditions were reiterated to Detective Learning by the attorney who had represented Williams at his initial appearance in Davenport. *Id.* at 391-92. "At no time during the trip did Williams express a willingness to be interrogated in the absence of an attorney." *Id.* at 392. Notwithstanding the "no questions" agreement,

during the drive back to Des Moines, Detective Learning gave Williams what he called the "Christian burial speech," encouraging Williams to reveal where he had left the girl's body, so that she could get a "Christian burial," before an in-coming snowstorm made it too difficult to find her body ever again. *Id.* at 392-93. Thereafter, during the course of the trip, Williams revealed where he said he had left the child's shoes at one location and a blanket in which she had been wrapped at another—although these items were not discovered during stops at the specified locations—and, ultimately, where the girl's body could be (and was in fact) found. *Id.*

The Court once again granted relief from "deliberate elicitation" of incriminating statements in the absence of counsel, finding that the constitutionally significant fact was not whether the monitoring of the statements had been "surreptitious," or even whether the statements had been obtained by means of "formal interrogation," but whether the government agent had "*purposely sought during [the defendant's] isolation from his lawyers to obtain as much incriminating information as possible,*" such that the circumstances were "tantamount to an interrogation." 430 U.S. at 400-401 (footnotes and citations omitted) (emphasis added).

## II.    The "Agency" Status of Rhodes as an Informant

Unfortunately, "the Supreme Court has not formally defined the term 'government agent' for Sixth Amendment purposes. *Matteo v. Superintendent, SCI Albion*, 171 F.3d 877, 893 (3d Cir. 2002 (en banc).

An informant can be a "roving agent" or involved in a "symbiotic relationship" with the government, such that the informant's conduct can be attributed to the government for *Massiah* purposes, even in the absence of specific instructions to get information from a specific defendant. For example, in *United States v. York*, 933 F.2d 1343 (7th Cir. 1991), the Seventh Circuit Court of Appeals found that "both *Henry* and *Kuhlmann* focused more directly on whether the challenged statements had been deliberately elicited rather than the question of whether the informants were acting as government agents when the statements were made," and "in both cases, the Court concluded without discussion that the informants were agents." 933 F.2d at 1356.

*York* also considered whether "the government can send an informant on a reconnaissance patrol through the prison population to gather evidence as long as it does not target specific individuals for the informant's attentions," and concluded that the answer to the question was "No." *Id.*

Similarly, the government tried that tactic in *United States v. Sampol*, 636 F.2d 621, 638 (D.C. Cir. 1980), to no avail. In that case, the court held that where

there is a prearrangement between the government and an informant, the informant

is a government agent. *Id.*

> **ISSUE RESTATED**:    Under this line of cases, there can be no doubt that
> Rhodes was a government agent.  He knew the game, and anytime he was in
> jail, he was working as agent for the government.  His testimony makes it
> clear: sometimes he was paid in cash for his work, sometimes he was paid in
> favors, but there is no doubt that his aim, once in jail, was to get information
> and relay it to the government.  **In short, there was clear Sixth
> Amendment violation in Thompson's case.**

## II.    *Brady* Violation Predicated on the Withholding of Impeachment Evidence

In *Brady v. Maryland*, the Supreme Court held that suppression by the State

of "evidence favorable to the accused upon request violates due process where the

evidence is material either to guilt or punishment, irrespective of the good faith or

bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87; 83 S.Ct. 1193,

1197 (1963). In later cases, the Supreme Court extended *Brady* and held that the

prosecutor's duty to disclose such evidence applies even if there has been no

request by the defendant, *United States v. Agurs*, 427 U.S. 97 (1976), and that this

duty includes both impeachment and exculpatory evidence. *United States v.

Bagley*, 473 U.S. 667 (1985).

The Supreme Court has also decided the State is deemed to possess evidence

that is in the possession of any part of the prosecutorial team. *Kyles v. Whitley*, 514

U.S. at 437. Evidence withheld by the state is material, and a new trial is required,

if there is a reasonable probability that, had the evidence been disclosed to the defense, the outcome of the proceeding would have been different. *See, e.g.*, *Giglio v. U.S.*, 405 U.S. 150, 154 ("A new trial is required if the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury.") Thus, a due process violation occurs if: (1) the State fails to disclose evidence, regardless of the prosecution's good or bad faith; (2) the withheld evidence is favorable to the accused; and (3) the evidence is material, that is, there is a reasonable probability that had the evidence been disclosed, the outcome of the trial would have been different. *See Brady v. Maryland, supra.*

In this case, the defense counsel's motion for continuance, Rhodes' own testimony, and the later motion for a mistrial all show that the state failed to disclose to the defense that Rhodes was essentially a state employee—a full-time, and fully paid, snitch. This evidence is material because had it been disclosed, surely the defense team would have tried to have the hit list and Rhodes' testimony excluded pursuant to the Sixth Amendment.

### IV. Trial Counsel Failed to Provide Constitutionally-Required Effective Assistance of Counsel When He Failed to File a Motion to Preclude Rhodes' Testimony under the Sixth Amendment.

To trial counsel's credit, the affidavit he filed along with his motion for continuance makes it clear the evidence of Rhodes being a full-time informant

was suppressed by the State of Texas. However, it is equally clear that trial counsel had reason to believe that Rhodes' testimony would be inadmissible, as he was an agent of the state, and trial counsel failed to make a motion to have Rhodes' testimony excluded under the Sixth Amendment.  However, Thompson recognizes that some courts have held that a prosecutor's duty to disclose evidence is limited to information that the defendant or defense counsel could not have obtained exercising reasonable or due diligence. *See, e.g.*, *Parr v. Quarterman*, 472 F.3d 245, 254 (5th Cir. 2006). Also, if the evidence was equally accessible to the defendant, it is not subject to *Brady*. *Banks v. Dretke*, 540 U.S. 668, 691 (2004).  In the event his court believes Rhodes' status as a full-time informant would have been discovered through the use of due diligence,  then  Thompson's trial counsel was ineffective.

There are two venerable elements to an ineffective assistance of counsel claim. "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (2003).  Under *Strickland*, in order to show prejudice, a "defendant must show that there is a reasonable probability that, but for counsel's  unprofessional errors, the result of the

proceeding would have been different." *Strickland,* 466 U.S. at 694. As noted in *United States v. Bagley*, the prejudice test for *Strickland* is identical to the materiality test for *Brady* claims. 473 U.S. 667, 682 (1985). Prejudice has therefore been shown by proving that Rhodes' testimony reasonably affected the outcome of the trial.

By failing to raise the Sixth Amendment issue, Thompson's attorney rendered ineffective assistance of counsel. As discussed above, this failure to provide effective counsel prejudiced Thompson's case. The fact that the jury requested to review the "hit list" before returning their verdict makes it abundantly clear that the jury considered this damning evidence before returning their verdict.

### V. Direct Appeal Counsel was ineffective for failing to raise the *Brady* issue on direct appeal

Thompson understands that *Brady* claims are typically raised in a writ because they are the type of claims that generally cannot be based on the record. However, to the extent there was sufficient basis for the *Brady* claim available to appellate counsel, appellate counsel was ineffective. Thompson contends that appellate counsel owes him a duty of competent representation. This is particularly true in a capital case, because "there is a significant difference between the death penalty and the lesser punishments." *Beck v. Alabama*, 447 U.S. 625, 637 (1980).

The constitutional standard for judging the effectiveness of counsel under the Sixth Amendment is a two-prong test, requiring that the petitioner show: (i) counsel's performance was so "deficient" that counsel did not provide "reasonably effective assistance," and (ii) counsel's errors prejudiced the defense by depriving the defendant of a fair trial whose result is reliable.  An attorney is ineffective if he or she "fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 688 (1984).  The right to effective assistance of counsel at the appellate level is rooted in the Sixth Amendment right to effective assistance of counsel.  *Evitts v. Lucey*, 105 S.Ct. 830 (1985).

By failing to identify this claim, clear from the record, and failing to raise this *Brady* issue on direct appeal, direct appeal counsel rendered ineffective assistance in Thompson's direct appeal.

### VI.  State Habeas Counsel was ineffective for failing to investigate and raise the claims discussed above.

Recently, in *Trevino v. Thaler*, the Supreme Court held that the holding of *Martinez v. Ryan* applies to Texas:

> [A] procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.

*Trevino v. Thaler*, 133 S. Ct. 1911 (U.S. 2013) (*citing Martinez v. Ryan*, 132 S. Ct. 1309 (2012)).   Thompson asserts that state habeas counsel was ineffective for failing to raise the claims related to this issue and discussed above.

> **Claim Four: The Trial Court Committed Reversible Error by Restricting the Jury's Consideration to Only Punishment Issues During the Retrial of Thompson's Prosecution for Capital Murder Where the State Sought the Death Penalty, in Violation of Thompson's Federal Constitutional Right to Trial By Jury**

> **Exhaustion: This claim was raised as "Appellant's First Point of Error" in his second direct appeal.  *See Thompson v. State*, AP-73,431, 2007 WL 3208755 at 4 (Tex. Crim. App. Oct. 31, 2007).**

Thompson had a federal constitutional right to trial by jury in all felony prosecutions. U.S. Const. amends VI and XIV; *Duncan v. Louisiana*, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968). The trial court committed reversible error by restricting the jury's consideration to only punishment issues during the retrial of Thompson's prosecution for capital murder where the State sought the death penalty, in violation of Thompson's federal constitutional right to trial by jury.

Thompson was indicted for the offense of capital murder. CR Vol. I p. 51. Thompson was convicted of capital murder and sentenced to death on April 16, 1999. CR Vol. 1 p. 212. Thompson's conviction was reversed by this Court on January 29, 2003. *Thompson v. State*, 2003 WL 190819 (Tex. Crim. App. 2003) (unpublished). Thompson's conviction was reversed on the basis of error that occurred during the punishment phase of the jury trial. The Court of Criminal

Appeals reversed and remanded Thompson's case for a new trial on punishment only. CR Vol. 2 p. 240.

The record shows that Thompson's second trial commenced on October 24, 2005. CR Vol. 2 p. 264; RR Vol. 16 p. 11. After the jury was sworn, evidence was immediately heard on the issue of punishment. RR Vol. 16 p. 35. No formal statement was made to the jury at this time that Thompson had been convicted of capital murder, and that the jury's sole purpose was to determine punishment. RR Vol. 16 p. 11. However, later when the court's charge to the jury was submitted, the jury was instructed that Thompson had been previously found guilty of the offense of capital murder, and that the jury was required to answer certain questions. CR Vol. 2 p. 228.

The Code of Criminal Procedure contains separate provisions for the reversal of a conviction and remand for a new trial where error is committed during the punishment phase of a jury trial, depending upon whether the defendant received a death sentence. Tex. Code Crim. Proc. Art. 44.29(b), (c). The statutes are similar in that each provides that upon remand the jury is restricted to the issue of punishment only. *See Carson v. Slate*, 6 S.W.3d 536 (Tex. Crim. App. 1999).

Thompson's conviction and sentence to death was reversed on appeal for error occurring during the punishment phase of trial. The authority for the trial court to retry Thompson only on the issue of punishment is as follows:

63

> If any court sets aside or invalidates the sentence of a defendant convicted of an offense under Section 19.03, Penal Code, and sentenced to death on the basis of any error affecting punishment only, the court shall not set the conviction aside but rather shall commence a new punishment hearing under Article 37.071 or Article 37.0711 of this code, as appropriate, as if a finding of guilt had been returned. The court shall empanel a     jury for the sentencing stage of the trial in the same manner as a jury is to be empaneled by the court in other trials before the court for offenses under Section 19.03, Penal Code. At the new punishment hearing, the court shall permit both the state and the defendant to introduce evidence as permitted by Article 37.071 or Article 37.0711 of this code.

Art. 44.29(c), *supra*.

In *Bullard v. State*, 548 S.W.2d 12 (Tex. Crim. App. 1977), the Court of Criminal Appeals held that where reversible error took place during the punishment phase of a jury trial, the proper remedy on appeal was to remand and order a new trial on both guilt/innocence and punishment. This retrial on all issues was necessary because the statutes in effect at the time required the same jury to decide both guilt or innocence and punishment.

*Bullard v. Stale*, *supra*, also held that a defendant did not have a federal constitutional right to trial by jury on punishment issues. 548 S.W.2d at 19. *Bullard* set the stage for the legislation to follow. Before 1987, Texas law required that an entirely new trial be held on remand in all cases if an appellate court determined that reversible error occurred at any point in the trial and the jury had assessed punishment. *Carson v. State*, 6 S.W.3rd 536 (Tex. Crim. App. 1999); *Bullard v.*

*State*, 548 S.W.2d 12 (Tex. Crim. App. 1977). In 1987, the Texas Legislature enacted the first change to criminal appellate procedure in this area. *See* Acts 1987, 70th Leg., ch. 179 § 1, eff. Aug. 31, 1987. Tex. Code Crim. Proc. Art. 44.24(b) was enacted to provide that on remand from an appeal where reversible error occurred during the punishment phase of a jury trial, a jury on retrial was restricted to the issue of punishment. A corresponding provision, Art. 44.24(c), *supra*, was enacted to provide that on remand from an appeal where reversible error occurred during the punishment phase of a jury trial where the death penalty was assessed, a new trial would be provided on both guilt or innocence and punishment. *See Carson v. State*, 6 S.W.3rd at 541 (Keasler, J. dissent).

In 1991, the Legislature changed the law again. Art. 44.29(b), supra, continued to provide that where reversible error occurred during the punishment phase of a jury trial, the remedy on retrial is a jury trial restricted to punishment issues. However, for the first time, the Legislature provided for this same remedy where reversible error occurred during the punishment phase of a capital murder trial when the State had sought and obtained the death penalty. Art. 44.29(c), Acts 1991, 72nd Leg., ch. 838, § 2, eff. Sept. 1, 1991. Thus, starting in 1991, when the Court of Criminal Appeals reverses a capital murder conviction in which the death penalty was assessed based on error occurring during the punishment phase of trial,

by statute the jury on retrial is restricted to punishment issues only. *Penry v. State*, 178 S.W.3rd 782 (Tex. Crim. App. 2005).

The effect of arts. 44.29(b) and 44.29(c) is that when a defendant exercises his right to trial by jury, and his conviction is reversed on punishment errors, the defendant may be tried before a new jury, but only on the issue of punishment. On retrial, the judge and jury are prohibited from reconsidering the defendant's guilt or innocence. *Lopez v. State*, 18 S.W.3rd 637, 639 (Tex. Crim. App. 2000).

Thompson complains of the constitutionality of art. 44.29(c), *supra*, only. However, arts. 44.29(b) and 44.29(c) are similar in nature for purposes of Thompson's argument presented herein.  Both statutes appear to be premised on the second holding in *Bullard* that a defendant has no constitutional right to trial by jury on punishment issues.

Thompson had a federal constitutional right to trial by jury to determine his guilt or innocence for the alleged offense of capital murder. *Duncan v. Louisiana*, *supra*. The federal constitutional right to jury trial does not include the right to have a jury determine punishment as a general matter. *Hildwin v. Florida*, 490 U.S. 638 (1989). However, since *Hildwin* and *Bullard*, the federal constitutional right to trial by jury has been extended to include fact issues necessary to determine the range of punishment. Thompson would take this argument to the next level, and

66

urge that he had the federal constitutional right to have both guilt or innocence and punishment determined by the same jury.

In *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the defendant was charged with unlawful possession of a firearm. The State sought to increase the range of punishment under a "hate crime" enhancement provision. The allegation that the offense was racially motivated was neither alleged in the indictment nor considered by the jury. Concerning this second aspect, the Supreme Court wrote:

> Our answer to that question was foreshadowed by our opinion in *Jones v. United States* [citation omitted]. We there noted that under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt. The Fourteenth Amendment commands the same answer in this case involving a state statute.

530 U.S. at 476, 120 S.Ct. at 2355.

*Apprendi* clearly stands for the unremarkable proposition that punishment enhancement provisions must be pleaded in the indictment and proven to the jury. However, in *Ring v. Arizona*, 536 U.S. 584 (2002), the issue was presented concerning special punishment issues in the context of a capital murder prosecution. Under Arizona law, the trial judge sitting alone determines the presence or absence of aggravating factors which would authorize the death penalty. The Supreme Court had previously held that this arrangement did not

violate the federal constitutional right to trial by jury. *Walton v. Arizona*, 497 U.S. 639 (1990).

The jury in *Ring* never passed on the special punishment issues, since it was matter for the trial court alone. Nevertheless, the Supreme Court wrote:

> The dispositive question we said, "is one not of form, but of effect." If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact—no matter how the State labels it—must be found by a jury beyond a reasonable doubt. A defendant may not be "exposed . . . to a penalty exceeding the maximum he would receive if punished according to the facts reflected in the jury verdict alone.
>
> The right to trial by jury guaranteed by the Sixth Amendment would be senselessly diminished if it encompassed the fact finding necessary to increase a defendant's sentence by two years, but not the fact finding necessary to put him to death. We hold that the Sixth Amendment applies to both.

536 U.S. at 602, 609, 122 S.Ct. at 2439, 2443.

*Apprendi* and *Ring* explain that a defendant does have the constitutional right to a trial by jury at the punishment phase of a trial, at least on the issue of deciding facts necessary to increase the range of punishment.

In Texas, an indictment must set out all the elements of the offense necessary to secure a conviction for the offense. TEX. CODE CRIM. PROC. ART. 21.03. *Apprendi* and *Ring* stand for the proposition that facts in addition to the elements of the offense must be shown in order to increase the range of

punishment beyond the definition of the offense, and these additional facts must be submitted to the jury.

The punishment provided for the offense of capital murder is either life imprisonment or death. TEX. PENAL CODE § 12.31(a). Where the State does not formally seek the death penalty, once a jury finds the defendant guilty of capital murder, punishment is set by law at life imprisonment. § 12.31(a), *supra*; Tex. Code Crim. Proc. Art. 37.071 § 1. Before a defendant can be sentenced to death, the jury must find the special punishment issues true or not true as appropriate. TEX. CODE CRIM. PROC. ART. 37.071 §§ 2(b)(1), 2(d)(1). Thus, the facts contained within the special punishment issues under Art. 37.071, *supra*, constitute facts that increase the maximum punishment provided for the offense of capital murder under Texas law.

The basis for Art. 44.29(c), *supra*, restricting a jury on remand to consider punishment issues only, is the belief that Thompson did not have a constitutional right to trial by jury on those punishment issues. *Ring* provides otherwise. Thompson would therefore urge that, at the moment the Court of Criminal Appeals remanded his case, regardless of the reason the court reversed his conviction, his constitutional right to trial by jury included the right to a new trial on both guilt or innocence and punishment. As noted above, Texas law has restricted jury trials on remand to punishment only since 1987. Needless to say, the procedure was not

69

used at common law. In *Wade v. Hunter*, the Supreme Court noted that an accused

had a "valued right to have his trial completed by a particular tribunal." 336 U.S.

684, 689 (1949). The Court also noted that this right "must in some instances be

subordinate to the public's interest in fair trials designed to end in just judgments."

*Id.* Thompson would urge that this valued right to have a single tribunal decide all

the issues translates into having a single jury decide both guilt or innocence as well

as all facts necessary to decide punishment. Thompson would further urge that the

public's interest in a fair trial designed to end in just judgments does not require

otherwise.

In *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978 (1976), the

Court wrote:

> This conclusion rests squarely on the predicate that the penalty of
> death is qualitatively different from a sentence of imprisonment,
> however long. Death, in its finality, differs more from life
> imprisonment than a 100-year prison term differs from one of only a
> year or two. Because of that qualitative difference, there is a
> corresponding difference in the need for reliability in the
> determination that death is the appropriate punishment in a specific
> case.

428 U.S. at 304-305, 96 S.Ct. at 2991.

Thompson urges the conclusion that this determination is simply not

possible without the jury having the authority to decide guilt or innocence as well

as punishment, even on remand from appeal.

70

In keeping with this need for heightened reliability is the doctrine of jury nullification. The right of a jury to disregard the law and find an accused not guilty ("Jury Nullification") is an established part of American criminal law jurisprudence. *See, e.g.*, *Ramos v. State*, 934 S.W.2d 358 (Tex. Crim. App. 1996); *Mouton v. State*, 923 S.W.2d 219 (Tex. App.—Houston [14th Dist.] 1996). In the context of a capital murder prosecution, the jury should have the option of finding the defendant not guilty regardless of the applicable penal law. Only after the State has jumped this hurdle can it be said that the jury has clearly found an accused death worthy.

Indeed, requiring the jury to reassess guilt or innocence before proceeding to punishment made sense to Venireman Aaron Polsek. RR2 Vol. 6 p. 144). During individual voir dire he expressed concern about the rush to punishment procedure on remand:

Q: . . . What about the death penalty?
A: I'm not opposed to the death penalty. My main concern regarding the sentences today is I don't believe I could impose the death sentence without having sat on the jury that tried the case to determine the guilt or innocence.

Q: Let's talk a little about that. That's going to be one of my questions. That is important.  Let me start by saying that you are absolutely correct. As the Judge told you in that prior hearing, [Thompson] has been convicted. That's something that is out of your power to determine absolutely . . .
 RR Vol. 6 p. 151.

71

Q: So, in other words, what you are saying is that the law says it is your duty, if you were a juror, to impose punishment, but are you saying you would not be able to follow the law in a situation where you didn't have the ability to determine guilt/innocence?

A: I would not be able to impose the death penalty. Now, as fair as following the law and imposing sentences, I would not be able to impose the death penalty in that situation.

Q: Is it fair to say that you could not consider the death penalty as a punishment offense in a situation like this where you couldn't determine guilt?

A: That's correct. Even if I was to try to say, well, as an attorney, I would try to be as unbiased as I am. Knowing the idea behind the justice system, I honestly believe, not that my integrity would be compromised, but I think subconsciously, at least on some level, I would have a strong opposition to imposing that sentence, even towards the guilt in the original trial.

Q: That's fair. I appreciate your honesty.

MS. ONCKEN: Judge, the State has a motion to strike for cause.

THE COURT: Let's be sure I understand and I think I do.

When the State begins to offer evidence at this punishment stage of trial, you understand that they're not going to tell you that the person is guilty. It may be two or three days' worth of testimony about the way the crime was committed. What they will cut out, like, predicates and things along that line, because don't need that. They just need to give you all the highlights of it. But some of the evidence would be cut out. Are you saying that even though you would have all the highlights or all the evidence, you would know exactly what happened on the dates the offense occurred, you still cannot consider the death penalty since you did not have any part in making the decision as to his guilt or innocence?

 VENIREMAN: That's correct.

RR. Vol. 6 pp. 153-154.

The trial court committed reversible error by restricting the jury's consideration to only punishment issues during the retrial of Thompson's prosecution for capital murder where the State sought the death penalty, in violation of Thompson's federal constitutional right to trial by jury. This Court should reverse the trial court's judgment of conviction entered against Thompson, and order a new trial. TEX. CODE CRIM. PROC. ART. 44.29(a); Tex. R. App. P. 43.2(d).

**Claim Five: The Trial Court Committed Reversible Error in Proceeding To Trial Before a Jury on the Special Punishment Issues Presented During a Capital Murder Prosecution Where the State Sought the Death Penalty, Where the Indictment Returned Against Thompson Did Not Allege Any Facts Pertaining to the Special Issues, in Violation of Thompson's Federal Constitutional Right to Due Process**

**Exhaustion: This claim was raised as "Appellant's Third Point of Error" in his second direct appeal.  *See Thompson v. State*, AP-73,431, 2007 WL 3208755 at 4-5 (Tex. Crim. App. Oct. 31, 2007).**

Any fact that increases the maximum penalty for a crime must be charged in the indictment, submitted to a jury, and proven beyond a reasonable doubt. U.S. Const. amend. XIV; *Apprendi v. New Jersey*, 530 U.S. 466 (2000). The trial court committed reversible error in proceeding to trial before a jury on the special punishment issues presented during a capital murder prosecution where the State sought the death penalty, where the indictment returned against Thompson did not

allege any facts pertaining to the special issues, in violation of the Thompson's federal constitutional right to due process of law.

In *Apprendi v. New Jersey*, the Supreme Court wrote:

> Our answer to that question was foreshadowed by our opinion in *Jones v. United States* [citation omitted]. We there noted that under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt. The Fourteenth Amendment commands the same answer in this case involving a state statute.

530 U.S. at 476, 120 S.Ct. at 2355. The appellant would urge this language in *Apprendi* commands that the special punishment issues under Art. 37.071, *supra*, be included in the indictment returned against him. If due process under the Fifth Amendment to the Constitution requires notice in the indictment of the facts essential for an increase in punishment, then it would follow that due process of law under the Fourteenth Amendment would dictate the same notice for indictments returned under state law.

The opinion in *Apprendi* was careful to note that the defendant in that case, unlike the defendant in *Jones v. United States*, had not specifically raised the omission of any reference to sentence enhancement in the indictment. *Apprendi*, 530 U.S. at 477 n3, 120 S.Ct. at 2355. However, the need for the facts necessary to

increase the maximum punishment to be pleaded in an indictment was clearly central to the opinion. The Court wrote:

> Any possible distinction an "element" of a felony offense and a "sentencing factor" was unknown to the practice of criminal indictment, trial by jury, and judgment by court as it existed during the years surrounding our Nation's founding. As a general rule, criminal proceedings were submitted to a jury after being initiated by an indictment containing "all the facts and circumstances which constitute the offense . . . stated with such certainty and precision, that the defendant . . . may be enabled to determine the species of offense they constitute, in order that he may prepare his defense accordingly . . . and that there may be no doubt as to the judgment which should be given, if the defendant is convicted."

530 U.S. at 478, 120 S.Ct. at 2356. Thus, the grand jury must clearly understand that under the indictment being presented, the judgment to be made upon conviction is that the defendant will be put to death.

Thompson objected to the trial court proceeding to the punishment phase of trial, where the indictment returned against him did not set out the special punishment issues, as violative of his right to a grand jury indictment and federal due process of law. CR Vol. 2 pp. 143, 160; RR Vol. 2 p. 10.

An indictment returned by a grand jury serves two purposes. One purpose, as noted in *Jones*, is to serve notice to a defendant of the nature and the cause of the accusation against him. However, even before the indictment functions as notice to a defendant, it must be approved by the grand jury. This approval serves a different function.

75

In *Wood v. Georgia*, 370 U.S. 375, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962), the

Court wrote concerning grand juries:

> Historically, this body has been regarded as a primary security to the
> innocent against hasty, malicious and oppressive persecution; it serves
> the invaluable function in our society of standing between the accuser
> and the accused, whether the latter be an individual, minority group,
> or other, to determine whether a charge is founded upon reason or was
> dictated by an intimidating power or by malice and personal ill will.

82 S.C.t at 1373. *See also United States v. Sells Engineering, Inc*., 460 U.S. 418,

422, 103 S.Ct. 3133, 3137 (1983); *Branzburg v. Hayes*, 408 U.S. 665, 92 S.Ct.

2646, 33 L.Ed.2d 626 (1972) at n23; *Hale v. Henkle*, 201 U.S. 43, 26 S.Ct 370, 50

L.Ed. 652 (1906). The function of the grand jury to stand between the State and

accused is underscored by the principle that neither the trial court nor the state may

make a substantial amendment to an indictment duly returned. *Ex parte Bain*, 121

U.S. 1, 7 S.Ct. 781, 30 L.Ed. 849 (1887).

Given that the Supreme Court in *Apprendi* found no distinction between

elements of the offense and sentencing enhancement factors, Thompson was

entitled to have the grand jury hear the special punishment issues before

authorizing the State of Texas to proceed on a capital murder prosecution where it

intended to put him to death.

Thompson recognizes that the Supreme Court has refused to hold that the

Fifth Amendment constitutional right to indictment by a grand jury applies to the

states as a matter of federal due process under the Fourteenth Amendment. *Alexander v. Louisiana*, 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972); *Hurtado v. California*, 110 U.S. 516, 4 S.Ct. 111 (1884). However, where a particular state does afford its citizens the protection of the grand jury in criminal prosecutions, it would seem that the logic under *Apprendi* would dictate that due process must require that the allegations of any indictment include any facts which would increase the maximum penalty for the crime charged.

The Court of Criminal Appeals has held that an indictment charging a defendant with capital murder under Texas law need not allege the special enhancement issues under Art. 37.071, *supra*, as a matter of notice. *Callins v. State*, 780 S.W.2d 176 (Tex. Crim. App. 1986); *Rosales v. State*, 748 S.W.2d 451 (Tex. Crim, App. 1987); *Sharp v. State*, 707 S.W.2d 611 (Tex. Crim. App. 1986). Thompson would urge that under *Jones* and *Apprendi*, these cases no longer state federal constitutional law. In addition, notice aside, it is urged that federal constitutional due process of law requires a grand jury to first hear the special punishment issues, where the state provides the right to indictment by grand jury.

The trial court committed reversible error in proceeding to trial before a jury on the special punishment issues presented during a capital murder prosecution where the State sought the death penalty, and where the indictment returned

against Thompson did not allege any facts pertaining to the special issues, in violation of Thompson's federal constitutional right to due process of law.

> **Claim Six: The Trial Court Committed Reversible Error in Allowing Michael Gene Donaghy to Testify to the Number and Types of People Who Attended Glenda Hayslip's Funeral, Where the Testimony Exceeded the Proposed Scope of Victim Impact Testimony, in Violation of Thompson's Constitutional Right Against Cruel and Unusual Punishment**

> **Exhaustion: This claim was raised as "Appellant's Sixth Point of Error" in his second direct appeal. *See Thompson v. State*, AP-73,431, 2007 WL 3208755 at 6 (Tex. Crim. App. Oct. 31, 2007).**

The Eighth Amendment to the United States Constitution does not generally prohibit victim impact testimony at the punishment phase of a capital murder trial. U.S. Const. amends VIII & XIV; *Payne v. Tennessee*, 501 U.S. 808 (1991). However, the trial court committed reversible error in allowing Michael Gene Donaghy to testify to the number and types of people who attended the complainant Glenda Dennise Hayslip's funeral, where the testimony exceeded the proper scope of victim impact testimony, in violation of Thompson's federal constitutional right against cruel and unusual punishment.

Michael Gene Donaghy testified for the State during punishment. RR Vol. 18 p. 5. Donaghy was Ms. Hayslip's brother. RR Vol. 18 pp. 6, 12. On direct examination he was asked:

> Q: How did you go about making the decision where to lay your sister to rest?

78

A: Through her church that she went to, Trinity Lutheran Cemetery.

Q: Was she active in her church?

A: Yes.

Q: Was that where you had her funeral service at?

A: Yes, sir.

Q: How many people showed up?

A: Hundreds. There was a lot of people.

Q: Did you even realize she had that many friends or that many people who knew her?

A: I knew my sister touched a lot of lives and everybody loved her and she loved everybody. I didn't know she knew that many people.

Q: Who showed up at the funeral? Social friends? Clients? Mixture of both?

MR. GAISER: I object to this. This goes beyond victim impact with this testimony.

THE COURT: Overruled.

MR. GAISER: Gets to the area of victim character evidence and we object to it.

THE COURT: Overruled.

RR. Vol. 18 p. 35).

The United States Supreme Court has held that the federal constitution does not bar the States from allowing victim impact testimony during the punishment phase of trial. *Payne v. Tennessee,* supra. However, the Court also cautioned:

Payne echoes the concern voiced in Booth's case that the admission of victim impact evidence permits a jury to find that defendants whose victims were assets to their community are more deserving of punishment than those whose victims are perceived to be less worthy. As a general matter, however, victim impact evidence is not offered to encourage comparative judgments of this kind—for instance, that the killer of a hardworking devoted parent deserves the death penalty, but that the murder of a reprobate does not. It is designed to show instead each victim's uniqueness as an individual human being.

501 U.S. at 823, 11 S.Ct. at 2607. In the Texas case, *Mosley v. State*, 983 S.W.2d

249 (Tex. Crim. App. 1998), a line was drawn marking where the State should not

be permitted to cross. This Court wrote:

> We take this opportunity to announce a consistent, if not always clear-cut rule to be followed in future cases: Both victim impact and victim character evidence are admissible, in the context of the mitigation special issue, to show the uniqueness of the victim, the harm caused by the defendant, and as rebuttal to the defendant's mitigating evidence. Rule 403 limits the admissibility of such evidence when the evidence predominately encourages comparisons based upon the greater or lesser worth or morality of the victim.

983 S.W.2d at 262. This Court went on to state:

> When the focus of the evidence shifts from humanizing the victim and illustrating the harm caused by the defendant to measuring the worth of the victim compared to other members of society then the State exceeds the bounds of permissible testimony.

983 S.W.2d at 262.

The State exceeded the scope of permissible victim impact when it sought

detailed testimony on the number and types of persons who appeared at the

complainant Hayslip's funeral. The testimony encouraged a moral comparison

between the complainant and Thompson. The evidence was clearly in the vein of

"a hard working parent," the type of evidence that the Supreme Court in *Payne*

envisioned victim testimony would not encompass.

The trial court committed reversible error in allowing Michael Gene

Donaghy to testily to the number and types of people who attended the

complainant Glenda Dennise Hayslip's funeral, where the testimony exceeded the proper scope of victim impact testimony, in violation of the appellant's federal constitutional right against cruel and unusual punishment.

> **Claim Seven: Thompson's Convictions Should be Reversed, and Punishment Imposed at Life Imprisonment, as the Texas Scheme for Executing Defendants by Lethal Injection is Cruel and Unusual, in Violation of Thompson's Federal Constitutional Protection Against Cruel and Unusual Punishment**

> **Exhaustion: This claim was raised as "Appellant's Eighth Point of Error" in his second direct appeal. *See Thompson v. State*, AP-73,431, 2007 WL 3208755 at 6 (Tex. Crim. App. Oct. 31, 2007). It was also included as "Ground for Relief One" in Thompson's Second State Writ.**

A criminal defendant has a constitutional right against cruel and unusual punishment. U.S. Const. amends VIII & XIV. Thompson's conviction should be reversed, and punishment assessed at life imprisonment, as the Texas scheme for executing defendant by lethal injection is cruel and unusual, in violation of Thompson's federal constitutional right against cruel and unusual punishment.

Texas law provides that a person convicted of a capital offense shall be punished either by life imprisonment or death. TEX. PEN. CODE. § 12.31(a). The method of execution is specified by statute law:

> Whenever the sentence of death is pronounced against a convict, the sentence shall be executed at any time after the hour of 6 p.m. of the day set for the execution, by intravenous injection of a substance of substances in a lethal quantity sufficient to cause death and until such convict is dead, such execution procedure to be determined and

81

supervised by the Director of the institutional division of the Texas Department of Criminal Justice.

Tex. Code Crim. Proc. Art. 43.14.

In *Ex parte Granviel*, 561 S.W.2d 503 (Tex. Crim. App. 1978), the Court of Criminal Appeals was first confronted the issue of whether death by lethal injection was unconstitutional. It wrote:

> The intravenous injection of a lethal substance as a means of execution has not been heretofore utilized in this nation and is now authorized in only two states. The fact that it is new and innovative would not, however, make it cruel and unusual. What is cruel and unusual "is not fastened to the obsolete but may acquire meaning as public opinion becomes enlightened by a humane justice" and "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society."

561 S.W.2d at 509.

The CCA concluded that the execution by lethal injection did not constitute cruel and unusual punishment:

> Petitioner, who had the burden of proof at the habeas corpus hearing, offered no persuasive proof that execution by intravenous injection of a lethal substance is inherently cruel and inhumane. He now argues, however, that possible complications in the intravenous injection procedure might cause additional pain to the condemned prisoner. We conclude that that possibility, should it arise, does not make the means of inflicting death inherently cruel. Rather, it could be characterized as a possible discomfort or suffering necessary to a method of extinguishing life humanely.

561 S.W.2d at 510.

Thompson contends that *Granviel* establishes that, at least in 1978, the CCA concluded that the method of execution THEN IN USE was not unconstitutional. *Id.*

Recently, Oklahoma considered this issue. *Malicoat v. State*, 137 P.3rd 1234 (2006). There the Court held that lethal injection as used by the state was not unconstitutional. However, the Court also noted:

> This Court does not intend to denigrate Malicoat's anecdotal examples of potential problems with executions in Oklahoma. We have previously noted that some eyewitness accounts of irregularities in past executions may create cause for concern.

137 P.2d at 1238.

The Court of Criminal Appeals has also recently considered this issue. In *Ex parte Obrien*, 190 S.W.3rd 677 (Tex. Crim. App. 2006), the CCA lifted a temporary stay of execution. The Court did not publish an opinion. However, Judge Price wrote: "It is not clear to me that the lethal injection protocol we used in Texas to execute capital offenders does not constitute cruel and unusual punishment. It is evident enough from the applicant's pleadings that it might." 190 S.W.3rd at 685 (Price, J.).

A concurring opinion by Judge Cochran in *Obrien* suggested that the matter was pretty well settled. However, in *Hill v. McDonough*, 547 U.S. 573 (2006), the Supreme Court held that a criminal defendant sentenced to death by lethal injection

may challenge the constitutionality of the method of execution through a civil rights lawsuit. It does not appear that the matter has been pretty well settled.

Thompson conviction should be reversed, and punishment assessed at life imprisonment, as the Texas scheme for executing defendant by lethal injection is cruel and unusual, in violation of the appellant's federal constitutional right against cruel and unusual punishment.

### Claim Eight: Texas' Dual Track Habeas Application System Violates Due Process of Law, as Guaranteed by the Fourteenth Amendment to the United States Constitution

### Exhaustion: This claim was raised as "Ground for Relief Two" in Thompson's initial state writ of habeas corpus.

Thompson contends that TEX. CODE CRIM. PROC. ART. 11.071 is unconstitutional, on its face and as applied, because it distorts the historic purpose of a post-conviction application for writ of habeas corpus. The role of the writ of habeas corpus is so well established in American law that it should be regarded as part of the due process of law guaranteed by U.S. Const. amend. XIV.

### A.    Inherent Problem

We begin with the statute itself, as enacted in 1995. Prior to that time there was no fixed statutory timetable for filing a habeas application. As of the effective date of September 1, 1995, a habeas application must be filed within the time period specified by § 4 of Article 11.071. Two alternative provisions apply. An

84

application must be filed 180 days after appointment of counsel, or 45 days after the filing of the State's brief on direct appeal, whichever is later. Only one 90-day extension is permitted. Because this makes the direct appeal and habeas application time-periods overlap, rather than having the direct-appeal process precede the habeas process, Thompson will refer to the amended system as the "dual-track" system.

Under the statute, Thompson's first application for writ of habeas corpus became due on Monday, October 30, 2000, and was filed on that date, even though the direct-appeal process in Thompson's underlying case was not complete. By the time the writ was filed, there had not been any direct appeal opinion on Thompson's case. *Thompson v. State*, 93 S.W.3d 16 (Tex. Crim. App. 2001).

## B.    Importance of a Post-Conviction Habeas Process

The Great Writ is enshrined in the Constitution. In this context, "post-conviction" does not merely mean relief sought after the entry in the trial court of a judgment of conviction, but rather means relief sought after the direct appellate process became final.  There are two primary reasons for this.

First, post-conviction relief is needed in order to cure shortcomings inherent in the direct-appeal record. This consideration is illustrated by the three major sources of post-conviction habeas litigation: involuntary plea claims, ineffective assistance claims, and claims that exculpatory evidence was withheld. As to each

85

of those situations, a direct appeal generally cannot be efficacious because the appellate record is inadequate. The Court of Criminal Appeals recognized more than a hundred years ago that habeas relief was inappropriate as to issues which could be addressed adequately on direct appeal. *Ex parte Barfield*, 44 S.W. 1095 (Tex. Crim. App. 1898). The opposite side of that same coin, however, is the principle that a habeas remedy is necessary when a direct-appeal record is inadequate.

In theory, the dual-track system allows for development of an adequate record just as the old system did, but in practice something of great value is lost. The CCA sometimes finds an appellate record inadequate in ways that defense counsel on direct appeal might not foresee and that the State might not raise in response. For example, in *Sonnier v. State*, 913 S.W.2d 511, 518 (Tex. Crim. App. 1995), the CCA found an appellate record inadequate because a videotape of dead victims in a bathtub was not part of the appellate record, even though still photos of the scene were in the record. As another example, a majority of the Court of Criminal Appeals held in *Heiselbetz v. State*, 906 S.W.2d 500, 511-512 (Tex. Crim. App. 1995), that Heiselbetz had not brought forward an adequate record to show why denial of a continuance was harmful. Since two dissenting judges had no trouble discerning the harm from what was in the record, the trial attorney probably thought he had an adequate record. Without belaboring further examples,

86

Thompson believes the point is made: it is much easier for habeas counsel to make sure an adequate record is presented with the benefit of the Court of Criminal Appeals' assessment, on direct appeal, of the adequacy of the direct-appeal record.

Second, a mechanism that operates after the direct-appeal process is necessary because issues of ineffectiveness of counsel, either at trial or on direct appeal, probably cannot be developed adequately while the direct appeal is still in progress, and even if they can, the conflict generated is inherently damaging. There are several specific problems of this type, five of which are noted here.

(1)    Whether or not trial counsel was effective in preserving error, and whether or not that mattered, might not be clear until after a direct-appeal opinion is issued. For example, prior to *Jones v. State*, 982 S.W.2d 386 (Tex. Crim. App. 1998), most lawyers thought that stating why a particular juror was "objectionable," after peremptories were exhausted and a challenge for cause had been denied, was adequate to preserve reversible error. In *Jones* the Court of Criminal Appeals effectively held otherwise by applying a non-constitutional harm analysis, which meant that more had to be shown in the record in order for jury selection error to warrant reversal. What would appear to be adequate lawyering in *Jones* before the opinion was handed down became, in retrospect, inadequate.

(2)    In many instances the attorney on direct appeal may be trial counsel.  Although that is not the case here, it is a factor that should be considered in examining the whole picture. Either due to pride, or simply due to having been too close to a case for a long time, counsel functioning in the double role of both trial counsel and appellate counsel may fail to notice shortcomings such as failure to preserve error, resulting in an issue being shot down on direct appeal due to a mistake for which counsel, rather than an appellant, should take the blame. It is true that nothing inherently prevents habeas counsel in a dual-track system from pointing out this flaw, but the result may be a

destructive contradiction in the positions taken by direct-appeal counsel and habeas counsel—the former insisting that error is preserved (or that non-preservation is excusable), the latter insisting that error is not preserved due to inexcusable neglect by the trial/direct appeal attorney. This would be unseemly even in a non-capital case, but with a life at stake the creation of this dilemma borders on cruelty. This dilemma also cannot improve the image of the judicial system's treatment of the death penalty in Texas, which already has suffered precisely because of criticism of counsel.

(3)    Even if direct-appeal counsel is not the same attorney who tried the case, the same type of conflict as discussed in Paragraph (2) above can exist. That is, even with no personal stake in what may be said about trial counsel, the attorney on direct appeal naturally must argue either that error was preserved or that non-preservation is excusable, while habeas counsel must argue the opposite view in pursuing an ineffectiveness claim. This leads to the further question whether habeas counsel, disagreeing with direct-appeal counsel, must argue that direct-appeal counsel is ineffective, in the sense of impeding habeas counsel's function, when he tries to avoid a finding of procedural default. Again, the likely finger-pointing cannot be good for justice or the image of justice.

(4)    What if direct-appeal counsel simply misses an issue? Habeas counsel cannot raise it on its merits if it was available to direct-appeal counsel, under the principle that habeas review is not a substitute for direct appeal. Therefore habeas counsel, who must file an application while a direct appeal is pending, is compelled to argue that direct-appeal counsel is ineffective, in the hope of forcing a new direct appeal that includes the missed issue. Thompson has included such a claim in Ground Sixteen of this application. How does that make direct-appeal counsel look at a time when his persuasiveness on direct appeal and the Court of Criminal Appeals' confidence in his arguments could make a critical difference? How does that make the system look?

(5)    Normally money should not be a major consideration in questions of justice, but the adequacy of defense funding has continually been a problem in Capital Murder cases. Therefore at least

a latent conflict exists when both a direct appeal and a habeas application must be funded, even though the latter could turn out to be a complete waste of resources if the direct appeal succeeds. The financial resources for the representation of Capital Murder defendants are too scarce to be wasted. In this cause, for example, Thompson could spend a great deal of the taxpayers' money on development of the posttraumatic stress disorder topic, but as a matter of common sense, why should that money be spent before the direct appeal outcome is known?

No doubt this Court can postulate variations on these problems, but the illustrations should suffice to show that the Legislature has created a system for Capital Murder defense which inherently pits attorneys against one another when they should share a common goal of defending the condemned man. Any legislator who ever read the Bible should know that a "house divided against itself shall not stand," Matthew 12:25 (King James Version), but such a "divided house" is what the Legislature created for the defense of persons facing the death penalty when it took habeas representation out of its historic "post-conviction" context.

## C.    Due Process

Thompson also contends that a post-conviction habeas application, rather than a dual-track system, is a component of due process of law. It is true that not every procedural safeguard is automatically incorporated in due process, but some mechanisms are so well entrenched in the Anglo-American tradition of criminal procedure that they are incorporated in due process. The Interpretive Commentary to Vernon's Constitution of the State of Texas, Ann. p. 403, observed that the writ of habeas corpus is "regarded as a fundamental part of the English common law." It was incorporated in an English statute as early as 1697. The United States

Constitution provided for it even before the Bill of Rights was adopted. U.S. Const. art. I, § 9. Habeas has often been called the "Great Writ." While the writ of habeas corpus may be used in several contexts, all of them share one characteristic: the routine processes of the law are inadequate to provide redress. Nowhere is that more true than in the use of post-conviction habeas applications.

This Court should hold that the dual-track system is unconstitutional. The effect of that would be to restore prior law in Texas (and current law in non-capital cases) permitting the filing of a post-conviction application after a conviction became final through exhaustion of the direct appeal process.

> **Claim Nine: If The Evidence of Capital Murder Was Sufficient Based on Texas' Statutory Law Related to Concurrent Causation, That Law is Unconstitutional as Applied in This Case Because it Violates Due Process and Reduces the Reliability of a Guilt Determination, In Violation of the Eighth Amendment**
>
> **Exhaustion: This claim was raised as "Ground for Relief Six" in Thompson's initial state writ of habeas corpus.**

As an alternative claim to his sufficiency of the evidence claim, Thompson contends that TEX. PENAL CODE § 6.04 is unconstitutional to the extent it may be used here to make the evidence sufficient to sustain the conviction in this cause. The State urged the trial court and the jury to disregard the contributory role of apparent medical malpractice in causing Hayslip's death, based largely on two ideas: (a) if not treated at all, the wound could be fatal; and (b) Hayslip would not

have fallen into incompetent medical hands, but for Thompson's conduct. Thompson does not agree with that reading of the statute, but a third perspective on the statute is that the term "clearly insufficient" creates a burden of proof for defendants. A few Texas cases have referred to Section 6.04(a) as creating a "defensive issue." *See Nugent v. State*, 749 S.W.2d 595, 598 (Tex. App.—Corpus Christi 1988) and *Westbrook v. State*, 697 S.W.2d 791, 793 (Tex. App.—Dallas 1985). Thompson believes those decisions are incorrect in allocating the burden of proof, even as to non-death cases, but the allocation of a burden of proof to a defendant in a death penalty case adds another factor militating against such an allocation.

The allocation of a burden of proof to the defense on § 6.04(a) runs afoul of due process of law, as explained in *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881 (1975). In that case, the Supreme Court struck down a Maine law placing the burden of proof on a defendant to show that a killing was in the heat of passion or due to provocation. The issue under § 6.04(a) in this case (causation) is even more central to the State's claim than the issue considered in *Mullaney*. Furthermore, as in *Mullaney*, it is not unfairly burdensome on the State to have to show both the sufficiency of the defendant's own action and the exclusion of other possible causes of the victim's death. Indeed, a properly conducted autopsy should go a long way toward discharging such a burden for the State. The State's problem in this

case is that the autopsy on Ms. Hayslip was a sloppy job.  For example, the brain was not subjected to microscopic examination, which according to the assistant medical examiner who testified, was the only reliable way to determine the scope of the brain damage. 12 RR 121-123.  Furthermore, even with a bullet fragment left inside Hayslip's soft tissue by the doctors, no "blood culture" test was performed to determine whether infection contributed to death. 12 RR at 125. In other words, a colleague of the man who performed the autopsy said that he did not do what was necessary to determine the real cause of death by ruling out other possibilities.

Thompson further submits that the Eighth Amendment adds a heightened reliability requirement in a death penalty case that amplifies the need to place the burden of proof on the State with regard to § 6.04(a).  Thus, if that section of the Penal Code does place a burden of proof on the defendant, it should be struck down as unconstitutional, at least with respect to death penalty cases.

**Claim Ten: Thompson Received Ineffective Assistance of Counsel at Trial, in Violation of the Sixth and Fourteenth Amendments**

**Exhaustion: This claim was raised as "Ground for Relief 14" in Thompson's initial state writ of habeas corpus. (Note: Thompson raises additional ineffective assistance claims elsewhere in this writ, but includes these ineffective claims as a separate issue as they were raised that way during the state court proceedings).**

**A.     Ineffective Assistance of Counsel: Generally**

There are two venerable elements to an ineffective assistance of counsel claim. "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (2003). Under *Strickland*, in order to show prejudice a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. As noted in *United States v. Bagley*, the prejudice test for Strickland is identical to the materiality test for *Brady* claims. 473 U.S. 667, 682 (1985).

## B.    Counsel's Many Errors

The following errors of omission and commission by counsel amount to "unprofessional" mistakes:

### 1.    Failure to conduct effective *voir dire*

Thompson's counsel committed numerous errors during jury selection. Counsel's overall handling of voir dire was poor, as illustrated by the brevity of voir dire for most veniremen, but there also were some specific and significant errors. Prior to trial, Thompson's counsel filed a motion styled "Defendant Charles V. Thompson's Motion to Voir Dire on Parole Law - 40 Year Minimum." CR at

92. In this motion, Thompson's counsel stated that certain questions were "necessary in order to allow Thompson to intelligently exercise his peremptory challenges, as well as to have the effective assistance of counsel." CR at 82. The motion set forth the following specific questions which should be asked of "each venireman":

    a. Would the minimum length of time a defendant could serve in prison before he could be paroled be something that you would want to know in answering the special issues?

    b. On which special issue would this be important?

    c. How would this 40-year minimum sentence be important to you in answering the special issues?

    d. Would you be more likely, or less likely, generally, to view a defendant as a continuing threat to society if you knew he would not be paroled for a minimum of 40 years?

CR at 93. The trial court granted this motion, CR at 84, so counsel had judicial approval to ask the questions, as well as any follow-up questions that might be prompted by answers to the foregoing questions.

Thompson agrees with the observation made in the motion that these questions, or at least something like them, would be necessary parts of a proper defense voir dire. Nevertheless, defense counsel failed to present such questions to most of the veniremen, including eleven of the twelve people who served on the jury: Barbara Hevalow (3 RR 38–42); Jermaine Alexander Smith (3 RR 58-67); Kenneth Thomas (3 RR 93-96); Harrell Rogers (4 RR 70-77); Mrs. John Ellisor (5 RR 50-53); Ellen Breedin (5 RR 105-110); David Flowers (7 RR 52-59); Maria

94

Blasingame (7 RR 96-102); Suzanne Wright (7 RR 151-156); Orlando Alonzo (8 RR 79-82); and Kenneth Bauer (8 RR 96-105). With one juror, Devin Yeates, counsel asked whether Yeates thought a forty-year sentence was like getting off "scot free," and Yeates said "No," but that was the extent of the defense questioning on the topic. 8 RR at 42. This almost complete lack of questioning cannot be explained away as "strategy," because counsel's own signed pleading already stated that counsel needed to ask such questions and that judicial denial of such questioning would render counsel ineffective.

In theory, such questioning might not be necessary if venire members who were accepted as jurors had given answers to similar questions by the prosecutor or a judge that clearly favored the defense. That was not the case. The prosecutors usually touched on the topic only lightly. The questioning of Ms. Hevalow provides an example:

> Q (BY MR. WISNER): . . . [L]ife means the defendant has to serve a minimum of 40 years before he is eligible to receive parole. Does that sound fair to you?
> A. Yes.
> Q. You think that would impact your decision on how to answer those special issues [?]  It really doesn't fit into those special issues?
> A. It could.
> Q. In what way?
> A. Depending on the circumstances  of the crime and, you know, all the evidence behind it.

2 RR at 37. An obvious defense question would have been an inquiry into what circumstances, in Hevalow's view, would make the forty-year minimum relevant to—or "fit into," as the prosecutor said—the punishment-stage issues. In the case of juror Jermaine Alexander Smith, inconsistent and ambiguous answers on this topic were given during the prosecutor's voir dire:

> Q (BY MS. SIEGLER): What do you think a life sentence means in Texas today? How many years do you think a life sentence is worth on a capital murder case?
> A. Isn't it until you die [?]
> Q. Some people think that. That's why I asked you. We don't have in Texas life without parole. Okay. What it means in our case is the Judge will tell you 40 calendar years. Okay. Does that sound good enough for you?
> A. Yes, ma'am.
> Q. Or does that sound like too many years or not enough years where you would vote one way or the other because now you know life is worth 40 years?
> A. Yes, ma'am.

2 RR at 57. Smith's last answer was ambiguous as to which way he felt, but it definitely suggested the possibility that he would distort his answers (or his "vote," as the prosecutor put it) in light of the statute providing for parole eligibility, particularly since Smith seems to have expected that "life" meant imprisonment "until you die." Yet defense counsel did not ask Smith one question about this topic.

Juror Kenneth Thomas "guessed" that life really meant "thirty or forty years" 3 RR at 90. Asked by the prosecutor whether he was "okay" with a life

sentence meaning a forty-year minimum, Thomas replied "Yeah." 3 RR at 90. That question and answer revealed virtually nothing, but defense counsel made no effort to dig deeper.

Without belaboring further examples, Thompson notes that in some instances defense counsel accepted a juror even though neither the prosecutor nor the judge had touched on the forty-year minimum. This was particularly perilous with juror Flowers, who said his brother had "served eight months exactly" on a felony sentence and attributed the early release in part to his family's contact with the Board of Pardons and Paroles. 7 RR at 44. Based on personal experience, Flowers might have thought there was a comparable amount of flexibility in a Capital Murder life sentence, particularly if some pressure was applied to the Board of Pardons and Paroles.

A similar pattern of omission in voir dire occurred with respect to victim-impact evidence. The trial judge granted a pretrial motion permitting defense counsel to ask at least four specified questions about such evidence. CR at 85-87. For the most part, however, counsel failed to ask any such questions. Not one person who sat on the jury was asked any question along those lines. 3 RR 38-42, 58-67, 93-96; 4 RR 70-77; 5 RR 50-53, 105-110; 7 RR 52-59; 8 RR 39-44, 79-82, 96-105.

Defense counsel also made some incompetent choices in allowing at least two venirepersons to serve on the jury, given the availability of unused peremptory strikes. First, Harrell Rogers absolutely should have been excluded with a peremptory strike. Rogers was married to an employee of the District Attorney's office who was "involved in trying capital murder cases," according to Mr. Wisner, and Rogers knew Wisner personally. 4 RR 61, 65-66, 71. What conceivable defense "strategy" would call for leaving Rogers on the jury? It is tough enough to overcome a neutral juror's natural tendency to side with the police and prosecutors without seating someone who is on a first-name basis with the trial prosecutor and takes a "community property" share out of another district attorney's paycheck.

Second, Maria Blasingame went through a personal experience similar to the abuse suffered by Hayslip, and in her case the justice system was lenient for the offender:

> Q. (BY MR. McCULLOUGH) What is this incident where you were harmed by your intoxicated landlord's boyfriend?
> A. Actually, I was a single parent. 20 And I rented a duplex with a lady that her home was also adjoining.  She came over one Saturday morning to pick up my rent. ... We were arguing over that and her boyfriend came in there looking - guess he expected her to have collected the money from me by now or he needed it and he began to argue with me. I kept saying it doesn't involve you, it involves her . . . So he got pretty aggressive and started pushing, hit me right in the nose. I was wearing glasses and they broke and I had a cut. And the police came out and made a report. And I went in and I filed charges on him-
> Q.  What happened after you filed charges?

98

> A.  They just fined him and he was back at the house again where I lived.

7 RR 96-97. Nor was that all. Blasingame also "used to date" a man who became violent when he drank. 7 RR at 97. Furthermore, her first husband was abusive, and she doubted he had changed over time:

> Q (BY MS. SIEGLER): You told us in your questionnaire that you know someone who's been involved in an abusive relationship before. Who was that?
> A.  That was myself.
> Q.  Tell us about that?
> A.  My first marriage. I just had an abusive husband.
> Q.  How long did that marriage last?
>  A. A year and a half.
> Q.  How did it end?
> A.  I left. I went home with my parents.
> Q.  Do you think he has ever stopped abusing women?
> A.  No.

7 RR 90-91. It was virtually guaranteed that Ms. Blasingame would identify strongly with Hayslip, who was trying to get away from an abusive relationship by taking Cain into her life and pushing Thompson out. Yet defense counsel did not exclude her.  The error in letting Mrs. Blasingame sit as a juror can be compared to the seating of the man whose puppies were stolen in *Jackson v. State*, 850 S.W.2d 834 (Tex. App.—Corpus Christi 1993), rev 'd 877 S.W.2d 768 (Tex. Crim. App. 1994). Neither the Corpus Christi court nor the Court of Criminal Appeals disagreed with Jackson's contention that the venireman would sympathize with the burglary victim in Jackson'' trial, but the Court of Criminal Appeals held that the

direct-appeal record was inadequate to rule out the possibility that leaving that man on Jackson's jury was "strategy." The lesson of *Jackson* and most other direct-appeal decisions on ineffectiveness is that a hearing in the post-conviction writ process is necessary. Thompson urges that such a hearing be conducted in this case.

For what it is worth, counsel also failed to preserve any voir dire error with respect to defense challenges by exhausting peremptory strikes and requesting additional strikes, which at least had to be done before Mr. Bauer was accepted as a juror. CR at 169; 15 RR at 105. Not having asked the questions likely to uncover possible bias against the most critical aspect of the law on punishment, i.e., the forty-year minimum, it should come as no surprise that challenges for cause were not made (and therefore could not be denied) on most veniremen. Nor, when people like Harrell Rogers or Mrs. Blasingame are accepted by counsel, is it any surprise that peremptory strikes were not exhausted.

## 2. Defense counsel failed to attempt to keep out evidence of extraneous bad acts until the evidence already was before the jury.

Thompson's counsel permitted substantial evidence of extraneous misconduct to come before the jury at the guilt stage without objection. Texas law imposes strong restrictions on extraneous offense evidence, based on TEX. R. EVID. 403, TEX. R. EVID. 404(b), and case law such as *Rogers v. State*, 853 S.W.2d 29

(Tex. Crim. App. 1993). None of this legal protection does a defendant any good, however, unless it is invoked by counsel.

This error by counsel occurred during the testimony of Lisa Gonzalez, who worked with Ms. Hayslip and had shared an apartment with her. 11 RR 185-187. Gonzalez was introduced to Thompson when Hayslip began to date him, and she said Thompson treated Hayslip well during that time. *Id.* at 189. Thompson moved into the house which Hayslip and Gonzalez shared. *Id.* at 190. Gonzalez said Thompson became more "possessive" and had arguments with Hayslip. *Id.* That was not relevant, but the lack of a relevancy objection at that point probably did not matter. The prosecutor soon moved into a topic which should have been excluded, however. Defense counsel's response was too little, too late:

> Q. At first - the first few months that he lived at your house, what would he do when he got angry?
> A. A- at one point he went out in the garage and threw a lot of things around a broke a couple of things. I mean, nothing expensive. But, you know, he did - that's how he would take his anger out. He kicked our refrigerator and put a dent in it. And then throughout the time he was there, I think there was a total of-
> MS. RICHARDSON: Object to narrative.
> THE COURT: Sustained.
> Q (BY MR. WISNER) When the defendant would get angry, would he do anything to the walls?
> A. Yes. He put like five holes in the walls.
> Q. And you were about to say something else?
> MS. RICHARDSON: Objection, and ask that we approach at this time.
> THE COURT: All right.
> (Bench discussion)

MS. RICHARDSON: Judge, I have a motion in limine on file we should take up if we're going to head down the road of extraneous bad acts. We were going to take that up outside the presence of the jury and find out if it was going to be relevant to what we have going on today.

MR. WISNER: I'm done with this, Judge. I'll move on.

THE COURT: Are you done?

MR. WISNER: I'm done with that.

11 RR 190-92. The destruction of items in the garage might not have been an offense, since they could have been items belonging to Thompson. Gonzalez's mention that the items were not "expensive" implied that they were hers, but that was not really clear. On the other hand, the record was clear that neither the refrigerator nor the walls of the house belonged to Thompson. In less than a minute the State introduced six offenses of Criminal Mischief.

Defense counsel made no objection until the six horses were out of the barn, even though the prosecutor's leading questions telegraphed the imminent revelation of the extraneous offenses. After the damage was done, defense counsel pointed out that a motion *in limine* had been on file. It is well established, however, that filing a motion *in limine*, or even getting a ruling on it, is not sufficient. In Texas, a timely objection must be made. *Goss v. State*, 826 S.W.2d 162, 168 (Tex. Crim. App. 1992). This case illustrates why that is the rule: the motion *in limine* was filed and ruled upon over nine months earlier. CR at 33-34. No judge can be expected to recall every pretrial ruling in a complex case.

What is even more perplexing is that counsel asserted that the topic was to be addressed outside the presence of the jury. Gonzalez already had been on the stand outside the jury's presence to discuss a different extraneous offense, i.e., a telephone threat, and the trial judge ruled that it would be inadmissible. The likelihood is that the judge would have ruled the same way on the six acts of Criminal Mischief if brought to his attention at that point. Why did counsel not raise the matter at that time? It is inexplicable.

### 3. Lack of Objection to the Characterization of Defense Witness' Testimony

Thompson next submits that much of the benefit of Radalat's testimony was lost because counsel did not object to the prosecutor's argument which mischaracterized Radalat's testimony.

A careful reading shows that Dr. Radalat did not quite go so far as to concede that the shooting did cause death. He said that the gunshot wound, if not treated at all, could be fatal. Nevertheless, this nuance probably was lost on the jury when the prosecutor opened his argument at guilt with this comment:

> MR. WISNER: Folks, this part of the trial is commonly referred to as argument. I don't think that's an appropriate term, especially in this case since the defense expert about 5:30 yesterday evening admitted the defendant was guilty.

13 RR 210. The prosecutor developed this theme further as his argument went on, again without objection:

MR. WISNER: Few words about Doctor Radalat. If I could, though, in some respects, I'm kind of hesitant to criticize him too much because he finally did admit the defendant is guilty.

. . .

But he finally admitted to you that the wounds would be fatal if left untreated. You got causation. The defendant is guilty.

12 RR 30-31. That mischaracterized Radalat's testimony, but defense counsel did not object. The lack of objection might have been brushed off as "strategy" if counsel had simply waited until it was defense counsel's turn to speak, and then stated that the prosecutor had misstated Radalat's answer, but that was not done either.

### 4.     Failure to request lesser included offense instruction as to Hayslip

As stated in Thompson's Grounds Eight from his initial state writ, the trial court failed to submit any lesser included offense with respect to injury caused to Hayslip. Defense counsel should have requested such an instruction. The failure to do so cannot be dismissed as strategy, since counsel demonstrated an awareness of the value of lesser offenses by asking that the jury only convict for the lesser offense, which was included in the charge. 13 RR 39.

There can only be conjecture as to whether the trial court would have given any such instruction if asked, but counsel should have asked. At the very least, defense counsel's failure puts Thompson in a less favorable position on appellate

review, in that an objection would only have required "some harm" in order to require reversal. *Almanza, supra; Jimenez, supra.*

### (5)    Lack of preparation for State's punishment witnesses; lack of objections

### (6)    Counterproductive defense expert witness

## C.    Prejudice at the Guilt/Innocence Stage

For purposes of the second prong of *Strickland*, concerning prejudice or harm, it is useful to first analyze the guilt/innocence stage separately, in that an entire new trial would be justified by ineffectiveness as to this stage of trial. The three areas of ineffectiveness which need to be considered here are counsel's ineffectiveness during *voir dire*, ineffectiveness in excluding extraneous offenses, and ineffectiveness in failing to obtain any lesser included offense relating to Ms. Hayslip.

*Voir dire* error is extremely hard to evaluate, in that there is no way to know what a different set of jurors would have done. It would be difficult, however, to end up with jurors any less sympathetic to Thompson than Mr. Rogers, the spouse of a prosecutor and Mr. Wisner's personal friend, and Mrs. Blasingame, who probably saw some of her own experiences in Ms. Hayslip's history of abuse by Thompson.

Rogers and Blasingame probably were not the only jurors, however, who were affected by the extraneous offense evidence admitted at the guilt/innocence stage of trial. A Pennsylvania appellate court summarized this problem well in *Commonwealth v. Wetzel*, where counsel claimed to have a "strategy" in admitting extraneous offenses. 419 A.2d 541 (1980). Rejecting that specious excuse, the *Wetzel* court noted: "[e]vidence that the accused was guilty of prior criminal activity is probably only equaled by a confession in terms of prejudicial impact on a jury." *Id.* at 543.

Considering both the evidence of Ms. Hayslip's suffering after she was shot, as well as the extraneous damage inflicted on the home where she and Ms. Gonzalez had lived (and had provided Thompson a place to stay), no jury would want to return a verdict that failed to hold Thompson accountable for the misery he inflicted on Hayslip, even though it was not his conduct which actually killed her. Accordingly, defense counsel guaranteed a capital murder conviction when they failed to seek any lesser included offense relating to Hayslip. If this does not "undermine confidence" in the outcome, what could?

**Claim Eleven: The Trial Court's Denial of Thompson's Request For a Continuance Deprived Thompson Of Due Process of Law and Effective Assistance, In Violation of the Sixth and Fourteenth Amendments**

**Exhaustion: This claim was raised as "Grounds for Relief Two and Three" in Thompson's second state writ of habeas corpus.**

106

**(Note: Thompson raises additional ineffective assistance claims elsewhere in this writ, but includes these ineffective claims as a separate issue as they were raised that way during the state court proceedings.)**

**N.B.: These grounds for relief and their state counterparts were argued together at the state level because they are related aspects of the same overall problem. Simply stated, the trial court forced defense counsel to trial before the attorneys were ready, despite a motion for continuance which sought additional preparation time.**

### A.    The Request for a Continuance

When Thompson returned to the district court for a retrial on punishment, attorney Ellis McCullough was appointed as first-chair counsel and attorney Terry Gaiser was appointed as second-chair counsel. A *pro se* motion filed by Thompson a few weeks before retrial was scheduled to begin pointed out that Mr. McCullough was not on the then-existing list of counsel qualified to try death-penalty cases. CR2 at 3.

On September 14, 2005 McCullough was relieved of duty as counsel, and attorney Gaiser was appointed to be first-chair counsel. Attorney Kyle Johnson was appointed as second-chair counsel on that date CR2 at 172.

Thompson filed a motion for a continuance on September 29, 2005, the day before voir dire was set to commence. CR2 at 171. The motion plainly stated that "counsel for the defendant cannot be ready." *Id.* The motion went on to explain:

> There is a virtual mountain of information to assimilate in this case including the record of the first trial where there was a perfunctory

107

mitigation case presented by the defense. There are files of numerous extraneous offense, medical records, and prison records. There are numerous issues requiring legal research. There are investigator's reports, expert witness reports and numerous other documents to be scrutinized. There are witness interviews to be conducted and expert witnesses to be prepared for testimony.

CR2 at 172.

The motion pointed out that the new second-chair counsel, Mr. Johnson, "has had a limited time to prepare for this trial, has not been able to read the file, has not had time to read materials of the case other than parts of the record of the previous trial and in no sense can be deemed ready to proceed other than in the role of a factotum." CR2 at 173. At this point, it is worth noting that State Bar of Texas guidelines, of which more will be said later, specifically require the appointment of two counsel. Therefore, a complaint about the inadequate time for a second attorney to prepare is categorically a valid complaint in a death-penalty case, regardless of whatever first-chair counsel is able to accomplish.

The continuance motion made it clear that the greatest need for more time was related to the development of mitigating evidence. The motion indicated that "no mitigation case" had been developed by Mr. McCullough and that Mr. Gaiser had tried to work on that aspect of the case, but much remained to be done:

Counsel has learned of several factors that require further investigation before a mitigation case can be presented. These include evidence of previous psychiatric hospitalizations, closed head injuries, documentation of substance abuse, previous mischaracterization of

108

> psychiatric conditions and the omission of relevant evidence from the
> guilt innocence phase of the first trial in this case.

CR2 at 173.  Despite the clear indication that more preparatory work was needed, the district court judge denied the motion on the same day that it was filed. *Id.* at 175.

The attorneys did what they could with the scant time remaining, and they were aided by a mitigation specialist. On October 5, 2005, Thompson gave notice of four potential expert witnesses. CR2 at 184.[4] As late as October 17, 2005—with voir dire underway—the defense attorneys were asking for a more flexible jail visitation schedule so that the attorneys and the mitigation specialist could "sit down face to face" with Thompson "in order to evaluate and prepare the defendant's defense" *Id.* at 191. On October 24, 2005, with voir dire well underway, Thompson filed another motion for continuance focusing on the need to investigate the background of State's witness Robin Rhodes, who testified about a jailhouse plot to eliminate witnesses. *Id.* at 209. Although mitigation evidence was not discussed in that motion, it represented one last chance for the trial court to give Thompson the time needed for mitigation investigation. Unfortunately that motion also was denied.

---

4 The four experts designated were Paul Radelat, M.D. of Houston, Katherine McQueen, M.D. of Houston, Carl Gacono, Ph. D of Austin, and Daneen Milam, Ph.D. of San Antonio.

**B.    The Role of a Continuance as the Safeguard of Other Constitutional Rights**

In Texas, requests for a continuance are provided for by statute, specifically Chapter 29 of the Code of Criminal Procedure. Under the statutory provisions, a continuance may be granted if "sufficient cause" is stated in a motion. Tex. Code Crim. Proc. art. 29.03. The denial of a requested continuance is reviewable for an abuse of discretion. *Janecka v. State*, 937 S.W.2d456, 468 (Tex. Crim. App. 1996), cert. denied 522 U.S. 825, 118 S.Ct. 86, 139 L.Ed.2d 43 (1997).

Even though there are specific statutory provisions, the denial of a requested continuance is really constitutional error, because of the role of a continuance in protecting other rights. *Crane v. Kentucky* recognized that the Constitution guarantees defendants a "meaningful opportunity to present a complete defense." 476 U.S. 683 (1986). *Crane* dealt with the exclusion of evidence relating to a purported confession.  *Crane* further stated that the "right to put on a complete defense" had roots in both the Sixth Amendment's confrontation clause and the due process clause of U.S. Const. amend. XIV. *Crane* cited *Chambers v. Mississippi*, 410 U.S. 283, 93 S.Ct. 1038, 90 L.Ed.2d 636 (1973) and *Washington v.Texas*, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967).

This case presents a variation on the concern in *Crane* because the Fourteenth Amendment due process issue is not primarily one of "confrontation,"

or meeting the State's evidence, although that certainly was a factor. For example, more time could have been helpful to counsel's ability to impeach Rhodes or discover the true extent of his ongoing relationship with the State of Texas. Rather, the main issue at this punishment-only proceeding had to do with the balance between aggravating and mitigating evidence. The issue is not entirely coextensive with Sixth Amendment analysis on an ineffective-assistance claim, but the issues are so closely related that they can be discussed together. In the Sixth Amendment ineffective assistance context there is a focus on pretrial investigation, and the need for adequate pretrial investigation time was the main theme of Thompson's motion for continuance in this cause.

When defense counsel has not had an adequate opportunity to assemble evidence and then evaluate how to use it at trial, a continuance becomes crucial, because a continuance is the accepted method for obtaining that opportunity to bring the evidence to court. The constitutional importance of a continuance, as a necessary aid to trial rights, was recognized in *Ungar v. Sarafite*, 376 U.S. 575, 589, 84 S.Ct. 841, 849, 11 L.Ed.2d 921 (1964), as quoted in *Rosales v. State*, 841 S.W.2d 368, 374 (Tex. Crim. App. 1992):

> [The granting of a continuance] is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel. Contrariwise, a myopic insistence upon expeditiousness in the face of a justifiable request for

> delay can render the right to defend with counsel an empty formality. There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly the reasons presented to the trial judge at the time the request is denied.

That passage contains several important ideas which merit further individual discussion.

First, *Ungar* and *Rosales* establish that the denial of a continuance can sometimes be a violation of Fourteenth Amendment due process of law. Thompson is not relying on any "new rule" here.

Second, the cases recognized the close connection between a continuance and effective assistance, in that denying a continuance may drastically reduce the ability of defense counsel to defend his client. The phrase "empty formality" does not go too far in describing the role of counsel who goes to trial without critical evidence. Thompson's motion similarly pointed out that second-chair counsel, being forced to trial so quickly, would be a mere "factotum." Actually Mr. Johnson rose to the occasion where he could, such as in closing argument, but as will be seen, an ounce of evidence could have been worth a pound of argument.

Third, a trial court's need to proceed "expeditiously" must be weighed against the need for a continuance. Such a balancing test provides guidance in determining whether the ruling on a continuance request amounts to an abuse of judicial discretion. In conducting such a balancing test, factors which were

112

mentioned in *Rosales*, *supra*, and had previously been recognized in *Ex parte Windham*, 634 S.W.2d 718, 720 (Tex. Crim. App. 1982) are instructive, but in the end it is more important to focus on the big picture than to apply a checklist.

Fourth, the reasons presented to the trial court as justifying a continuance are particularly important. Defense counsel will know better than the court what defense evidence will be needed. Where defense counsel is forced to make a rushed judgment as to the need for more evidence, the trial court ought to accommodate counsel if the reason given is plausible. There are other and better ways to deal with the matter if counsel's stated reasons for the request turn out to be mendacious.

What process is "due"—including the time allowed to prepare—may depend on the gravity and complexity of the case. In a death penalty case, of course, the utmost care must be taken to assure a fair and reliable trial. A concurring opinion in *Furman v. Georgia*, 408 U.S. 238, 306 (1972) says all that need be said as to the significance of the death penalty:

> The penalty of death differs from all other forms of criminal punishment, not in degree but in kind. It is unique in its total irrevocability. It is unique in its rejection of rehabilitation of the convict as a basic purpose of criminal justice. And it is unique, finally, in its absolute renunciation of all that is embodied in our concept of humanity.

It follows that a continuance is likely to be more important in a death penalty case than in any other kind of case.

## C.    The Need for Pretrial Preparation

The actual trial impact of the denial of a continuance cannot be known with a high degree of certainty. It may be useful to start with some modern thinking on what defense counsel is expected to do.  Increasingly, capital murder defense is becoming a science rather than an art, with the focus being on development of punishment-stage evidence that could lead to a life sentence rather than the death penalty. Two types of structural changes have helped to define a standard method or pattern for pretrial preparation. Those changes are:

### 1.    Professional Standards

In 1989, the American Bar Association developed a set of guidelines for carrying out the defense function in a death-penalty case. At first, these guidelines, which would require relatively large amounts of money to be accomplished, may have been viewed as a "wish list" by many judges and attorneys. As will be discussed in Section (2) below, the ABA guidelines eventually became incorporated into judicial understanding of what was necessary to provide adequate representation, especially at the Supreme Court.

In response to a variety of shortcomings in the indigent defense system, the Texas Legislature passed a bill commonly called the "Fair Defense Act." Among

other things, the legislation required counties to develop a list of attorneys, qualified by experience and continuing education, to try death penalty cases. The legislation has some flaws, but at least shows the legislative intent to provide adequate representation.

Whether spurred by the ABA guidelines, or caselaw, or both, the State Bar of Texas adopted extensive guidelines, similar to those of the ABA, in 2006. That was after Thompson's trial, but the State Bar guidelines are a distillation of modem thinking in this area. The most prominent feature of the guidelines is the specific provision for adjunct members of the defense team whose main role is case preparation, especially the preparation of punishment-stage defense. The point is that the guidelines place such an emphasis on pretrial preparation that the defense team is structured around the preparation phase, not around trial maneuvers.

### 2.    Case Law

Constitutional case law also has come to place the emphasis for effective representation on pretrial preparation. While this is sometimes viewed as a modem phenomenon, its roots go at least back to the l930s. As the Court of Criminal Appeals recognized in *Ex parte Duffy*, 607 S.W.2d 507, 516 (Tex. Crim. App. 1980):

> A criminal defense lawyer must have a firm command of the facts of
> the case as well as the governing law *before* he can render reasonably
> effective assistance to his client - in or out of the courtroom [Five

> citations omitted.] In the seminal decision of *Powell v. Alabama*, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed.158 (1932), the Supreme Court recognized that a thorough factual investigation is the foundation upon which effective assistance of counsel is built (emphasis added).

*Duffy*, drawing upon *Powell*, observed that "it may not be argued that a given course of conduct was within the realm of trial strategy unless and until the trial attorney has conducted the necessary legal and factual investigation which would enable him to make an informed, rational decision." *Id.* at 520.

The modern standard for ineffective assistance claims is a two-pronged test which was articulated in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984). First, Thompson must show that trial counsel's performance was "deficient" as measured against professional norms. This first prong is the equivalent of a determination of error. At least in Texas courts, the first prong of *Strickland* is applied to trial error in a way that strongly supports trial counsel out of deference to "strategy," but as will be seen, inadequate preparatory work is a different story. The Supreme Court stated that counsel must investigate until he reaches a point that he can make a reasonable judgment that further investigation is not necessary. 466 U.S. at 691, 104 S.Ct. at 2066. The second prong of *Strickland* requires that Thompson show that the deficient performance was prejudicial, which is the equivalent of a showing of harm. *Strickland* calls for reversal if there is a "reasonable probability" that, but for counsel's unprofessional representation, the

116

result would have been different. This actually means a probability sufficient to "undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

The need for pretrial preparation took on greater importance as the Supreme Court began to recognize the importance of mitigating evidence in a line of capital cases which included, but was not limited to, *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d  973 (1978), *Eddings  v. Oklahoma*, 455 U.S.  I, 102 S.Ct. 869, 71 L.Ed.2d  I  (1982), and *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). Among defense attorneys this focus on mitigation was bolstered by the failure in appellate courts of constitutional arguments attempting to knock  down Article 37.071 via the "future danger" issue. After *Penry*, the search for mitigating evidence became as important for effective death penalty representation as was preparation for the guilt phase of trial.

Eventually the Supreme Court came to grips with the question of whether inadequate pretrial preparation relating to mitigation evidence constituted ineffective assistance of counsel.  In  *Williams v. Taylor*, 529 U.S. 362 (2000) and *Wiggins v. Smith*, 539 U.S. 510 (2003), the Supreme Court pointed out a comment in *Strickland* which had remained obscure and under-appreciated: "Prevailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable." 466 U.S. at 688. In *Williams* and *Wiggins* the Court recognized that effective representation in a death penalty case

117

included a need to thoroughly investigate mitigating evidence. In *Wiggins*, the Court found that a decision to not conduct a complete mitigation investigation was unreasonable, citing American Bar Association guidelines calling for "efforts to discover all reasonably available mitigating evidence[.]" Wiggins, 123 S.Ct. at 2537.

Subsequently, in *Rompilla v. Beard*, 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005), the Supreme Court addressed the question of harm and made it clear that the facts the jury might have heard, as opposed to what it actually heard, is what matters in the end. The true test was whether what went undiscovered "might well have influenced the jury's appraisal" of Rompilla's personal moral culpability. *Id.*

It is a very small step from *Rompilla* to the present cause, where the specific issue does not concern an undiscovered mitigation theme, but rather concerns the development of adequate information to support a mitigation theme already chosen. Stated another way, it is not just important for defense counsel to know what horse to ride; it also is important to keep the horse moving. Either way, if defense counsel is not given enough time to gather the necessary information because a continuance is denied, then that denial is harmful.

### D. The Inadequate Opportunity for Pretrial Preparation on the Mitigation Theme

Because confidentiality must be maintained during legal representation, the starting point to determine how well prepared an attorney should be is that attorney's own opinion of the matter. In this instance both attorneys made it clear that they believed more time was needed. The motion could not have been clearer on that.

Gaiser had been associated with the case for a fairly long time, but he only assumed first-chair responsibility a few weeks before trial was set to begin. That step piled on additional responsibilities, not the least of which was responsibility for the ultimate decisions on strategy. It was like taking the chief engineer of a ship out of the engine room and demanding that he navigate the ship when the ship was already close to the rocks. Second-chair counsel Johnson was given so little time before trial that, according to the motion for continuance, he had not even read all of the record of the guilt-stage proceedings.[5] While Johnson could finish reading the record during *voir dire*, he could not be in court for *voir dire* and out of court doing research or witness preparation at the same time. By the time *voir dire* was conducted, it was much too late for Johnson to be involved in the necessary pretrial preparation.

The correct development of a mitigation case follows this order:

---

5 As anyone who lived in the Houston area will remember, the short time before retrial in Thompson's case included the landing of Hurricane Rita. Like many workaday Houstonians, Mr. Johnson was worrying about moving his family to safety during this time, not preparing for trial.

(1)     Hiring a mitigation specialist to guide the research;

(2)     Gathering of background information;

(3)     Determination, based on that information, of what type of expert could be helpful to the defense;

(4)     Expert evaluations, reported back to counsel;

(5)     Attempts to negotiate a life sentence; and

(6)     Strategic decisions as to what defensive theories and what witnesses to use.

That protocol requires months of time, not days or weeks.

Steps one, two, and three had been undertaken by Gaiser while he was second-chair counsel, but as will be seen, work still needed to be done on steps four, five, and six, and neither Gaiser nor Johnson had the necessary time. As a result, defense counsel did not have all of the expert knowledge needed, did not have it in time to make a mitigation pitch to the prosecutors, and did not have all of the witnesses or evidence that were needed for trial.

The defense chose two mitigation themes, namely substance abuse and brain damage. Plainly, the defense was on solid ground in arguing that Thompson was a substance abuser, given a history going back to when Thompson was eleven years old. Yet jurors do not always view substance abuse as mitigating. The more important component of the mitigation case was the determination, by a neuropsychologist from San Antonio, that Thompson had brain damage. Taken

120

together, those two factors could have constituted a strong mitigation case if the brain- damage concept had been adequately presented. An adequate presentation not only required an initial presentation of the evidence, but as with any expert testimony, necessarily included upholding that testimony against a challenge to its reliability.

Daneen Milam, Ph.D., the neuropsychologist from San Antonio, spent "nine or ten hours" administering the Halstead-Reitan Battery of neuropsychological tests to Thompson in jail. 19 RR 49. This set of tests constituted the "gold standard" for neuropsychological testing, Milam sa*Id. Id.* at 49. Milam concluded from the testing that Thompson suffered from "diffuse and mild" brain damage. *Id.* at 50–51. "Diffuse" meant that "everything is affected, but it is not affected to the point where they can't function." *Id.* at 51–52. This problem had existed for a long time: "This has always been here and was never diagnosed." *Id.* at 52. In other words, Thompson had brain damage that would cause problems but was not at the level where he would have to have been under someone else's supervision, supervision which might have prevented this crime (and perhaps some of his earlier crimes) from occurring.

Milam also offered some explanation of how brain damage affects behavior. The "quick mental shifts" needed to function in society are difficult for brain-damaged individuals, Milam sa*Id.* "When someone has their brain damaged, they

can't make those quick mental shifts. They get stuck." 14 RR at 54. Although Milam did not get to specifically apply this principle to the facts of the crime, those facts provide a good example of how an inability to "shift" a mode of thinking could be dangerous. Thompson was humiliated late at night in a love triangle, was hurt in a fight with his rival, and was ordered to leave by the officer who investigated the disturbance.  As badly as those things must have stung, a normal mind would shift away from rage and anger at some point before pulling a trigger, especially with a time period in which to "cool down." While a "nexus" for mitigating evidence is no longer required, this "diffuse" brain damage, aggravated by drug abuse and not held in check by someone else's supervision, easily could satisfy any "nexus" requirement which the jurors might have wanted to impose. It could have, that is, if defense counsel had been prepared to protect Dr. Milam's work from an unjustified attack.

At the trial, Dr. Milam came under fire on cross-examination because she was not a neurologist, had not conducted any anatomical examinations (such as an MRI), and did not think such testing was necessary to validate her conclusion. 19 RR 67. Milam had tried to explain on direct examination why no physical testing for anatomical damage was needed: "Because it is two different things and they are complementary. They are not in competition with each other. The instruments that you just said, it's a location question" *Id.* at 60. That meant that instrumental

examination such as MRI testing would show where a brain surgeon might operate if the objective was therapy, but given that Thompson would either get a life sentence or the death penalty, brain surgery for him would have been a "waste of money." Id at 60–61.

Even though Milam gave that explanation, the absence of physical testing, interpreted by a medical doctor, was blown up into a big issue by the prosecutor. Several questions during cross-examination hypothesized various ailments or injuries and elicited Milam's agreement that, in those instances, a medical examination would be appropriate. The implication during cross-examination was that the Halstead-Reitan Battery was not of much use without validation by such procedures as an MRI.

That implication blossomed in prosecutor Wisner's final argument, with Milam being called a high-priced "apologist" for Thompson. 20 RR at 23. "For $5000," the prosecutor said, "she'll give a defense any excuse they need." *Id.* at 24. The prosecutor argued:

> Who of you would ever, ever send anybody you cared about to be diagnosed for a brain injury to Dr. Milam? You know, we're five miles north of the best medical center the world has ever known. No physician there will ever come in and tell you that this defendant has a brain injury.

*Id.* at 23–24.

The insinuation was that defense counsel must have failed to bring the jury MRI or CAT scan results because those results would undercut Milam's testimony. The prosecutors even ridiculed Milam's reference to the Halstead-Reitan Battery as the "gold standard." 20 RR at 23. In the final argument, prosecutor Oncken pressed the same themes: "Finally, Dr. Milam, psychologist, I guess, or Ph.D. in psychology, no medical training, no CAT scan or MRI, no x-rays, no nothing . . . I think you know why they didn't want to do an MRI" *Id.* at 57–58.

It should be apparent from what actually happened at trial that the fourth step in the preparation was deficient, in that defense counsel did not have what was needed to protect Milam's evaluation against criticism.  If defense counsel had been given enough time to think through that step, it would have dawned on them that they either needed to (1) shore up Milam's opinion as to the stand-alone significance of the Halstead-Reitan Battery, or (2) obtain expert opinions from other experts to head off the prosecutor's eventual line of attack on Milam.

The defense should have reached that point weeks before trial, when it still would have been possible to implement step five: attempting to negotiate a life sentence. It is possible, with adequate mitigating evidence developed well in advance of trial, to persuade many prosecutors that it would be unjust, wasteful, or both to spend resources on seeking the death penalty. Some might say that would be a tall order in this case, given such factors as a conspiracy to eliminate a

124

witness, but the beauty of mitigating evidence is that it often explains the mind which is behind extraneous misconduct as well as the primary offense. In any event, the one thing for certain is that the defense never even got the chance to pitch a cogent mitigation case to the prosecutors before trial.

Where the defense really came to grief, however, was in trying to save Thompson's life with Milam's testimony but not being able to defend Milam against attack. This was not because Milam's testimony was weak, for it was not. Rather, the defense attorneys were not prepared to fend off criticisms of Milam's work, which could have been done if counsel had been adequately prepared. The motion for continuance had mentioned the need to prepare witnesses for trial. Experienced counsel had to realize that the prosecutors, unable to duel with Milam on her own turf, would look for an Achilles Heel, and the likely line of attack would be that Milam was not a medical doctor and did not do tests that medical doctors conduct or interpret. Necessary preparation would include making sure that Milam' s work had stand-alone value. No doubt counsel could have seen that, and acted accordingly, if given more time.

As mentioned earlier, Milam administered a group of tests called the Halstead-Reitan Battery. The on-line Encyclopedia of Mental Disorders describes the battery as "a fixed set of eight tests used to evaluate brain and nervous system

functioning in individuals aged 15 years and older.  *See* State Writ, B, CR at 77-84.

The history of its development is described as follows:

> Ward Halstead and Ralph Reitan are the developers of the Halstead-Reitan battery. Based on studies of patients with neurological impairments at the University of Chicago, Halstead recognized the need for an evaluation of brain functioning that was more extensive than intelligence testing. He began experimenting with psychological tests that might help identify types and severity of brain damage through observation of a person's behavior in various tasks involving neuropsychological abilities. Initially he chose a set of ten tests; all but three are in the current Halstead-Reitan battery.
>
> Ralph Reitan, one of Halstead's students, contributed to the battery by researching the tests' ability to identify neurological problems. In a remarkable study, Reitan diagnosed 8,000 patients using only their test results - without meeting the patients or knowing anything about their background. This provided strong support for the battery's effectiveness. Reitan adapted the original battery by including additional tests.
>
> The Halstead-Reitan has been researched more than any other neuropsychological test battery. Research continues to support its ability to detect impairment accurately in a large range of neuropsychological functions.

Dr. Milam vouched for the reliability of the battery, calling it the "gold standard" for this type of evaluation. Despite the prosecutor's cross-examination, and the nearly abusive argument that denounced Milam as a high-priced "apologist," Milam was correct in defending the reliability of her work. In fact, as the foregoing encyclopedia indicates, the Halstead-Reitan Battery is a widely accepted testing method when it comes to determining whether some sort of brain impairment has occurred. From a clinical standpoint it would be highly important

126

to know the origin of the brain damage, but from a forensic standpoint that is not nearly as important as knowing that brain damage had occurred.

Who says the Halstead-Reitan Battery is reliable? For starters, Dr. Reitan himself is still around, in Arizona, with a private lab that focuses on providing testing materials. Rather than having his life's work denigrated by two prosecutors with a result-oriented agenda, Reitan might have been willing to hop Southwest Airlines to Houston and set the record straight. *See* State Writ, B, Cl. R. at 85-90.

Even without going to the guru himself, defense counsel with adequate time could have obtained a large number of publications about the Halstead-Reitan Battery, either over the Internet or at the M.D. Anderson Library in the Texas Medical Center. As the Encyclopedia of Mental Disorders indicated, this is the most researched testing methodology in neuropsychology. That easily could have been pointed out if counsel had been prepared. Two examples of such research illustrate the point. One scholarly article (found on the Internet with a Google search) showed that, back in 1981, a test on reliability  of the Halstead-Reitan Battery was conducted  at the Austin State Hospital. That study found that "the reliability of the HRB was relatively high." *See* the abstract of Tucker et al, "Reliability of the Halstead-Reitan Battery in Individuals Displaying Acutely Psychotic Behavior," 3 Journal of Psychopathology and Behavioral Assessment (Dec. 1981); State Writ, B, Cl. R. at 91-94.

127

More contemporaneously, a psychology professor at the University of Southern Alabama tried to show that a "flexible" battery (drawing the best from several sources) was a better approach, but he left no doubt as to the widespread professional acceptance of the Halstead-Reitan Battery. *See* Rohling et al., "Using the Halstead-Reitan Battery to Diagnose Brain Damage: A Comparison of the Predictive Power of Traditional Techniques to Rohling's Interpretive Method," 17 The Clinical Neuropsychologist 53 I (2003); *See* State Writ, B, Cl. R. at 95-108. Rohling stated:

> Standard empirical batteries have developed several strategies to minimize the statistical biases inherent in the administration of multiple tests. In addition, they seek to minimize clinical judgment problems by providing clearer guidelines upon which to base diagnostic decisions. One of the main strategies has been the development of global indices such as the General Neuropsychological Deficit Scale (GNDA: Reitan & Wolfson, 1988) and the Halstead-Russell Average Impairment Rating (AIR: Russell, Neruinger, & Goldstein, 1970). These global indices were designed to describe the severity of overall impairment across multiple measures. For example, the General Neuropsychological Deficit Scale summarizes 42 variables, right-left comparisons, pathognomic signs, and level of performance (Reitan & Wolfson, 1993). Cutoffs are then generated for the summary index. Diagnostic reliability and validity are enhance because clinicians rely on a single sensitive indicator of brain damage rather than by sifting through multiple test scores and their patterns (Rojas & Bennett, 1995).

*Id.* at 532. It also is interesting that Milam's defense of the Halstead-Reitan Battery as the "gold standard" was not just hyperbole on her part, although the prosecutor's

mocking use of that term in argument implied that it was. Rather, it was Rohling who applied that phrase, in a peer-reviewed journal:

> Several studies have demonstrated that the Average Impairment Rating and the General Neuropsychological Deficit Scale currently represent the "gold standard" in the field of diagnostic accuracy and efficiency (e.g. Kolitz-Russell et al. 1998; Vanderploeg, Axelrod, Sherer, Scott & Adams, 1997).

The remainder of Rohling's article provides a vigorous argument for a more "flexible" approach, particularly Rohling's own proposed system, but no suggestion is made therein that testing for anatomical abnormalities is needed.

In short, Milam's opinion that the Halstead-Reitan Battery testing of Thompson reliably indicated brain damage, without the need to bolster the testing with instrument testing for anatomical evidence, is well supported in the field of neuropsychology. Thompson's problem was that his attorneys were not prepared to show that when they needed to show that. Jurors easily could have been misled by the prosecutors' unwarranted attack on Milam's work because defense counsel did not have a witness, articles, or other authorities to back up Milam's position.

There can be no doubt that, with more time, defense counsel could have taken steps to prevent the misleading appearance of a meltdown of the mitigation evidence. As shown in the appendices to this application, a great deal of material that would back up Milam is available. Without adequate time to prepare, the

defense attorneys did not anticipate the need to gather such back-up material or, better still, line up another live expert witness to reinforce Milam's expression of confidence in the test's reliability. Alternatively, with enough time defense counsel could have sought funds to conduct an MRI just to blunt the likely argument from the prosecutor, even though, as Milam pointed out, identifying a particular location of damage within the brain, or failing to find one that showed up, would not change the neuropsychological conclusion.

### E.    Thompson was harmed by his counsel's ineffectiveness

As explained above, Thompson's trial counsels were not able to properly investigate and prepare the mitigation case for his second trial.  Further, this failure to investigate clearly harmed Thompson, as it is likely that trial counsel's failure to prepare for the mitigation case allowed the jury to completely discount the testimony of his expert witness.  For these reasons Thompson's death sentence should be reversed.

### Claim Twelve: The Use of Evidence of Youthful Misconduct at the Punishment Stage of Trial Violated the Eighth Amendment

### Exhaustion: This claim was raised as "Grounds for Relief Six" in Thompson's second state writ of habeas corpus.

### A.    The Constitutional Background

The Eighth Amendment was interpreted in *Roper v. Simmons*, 543 U .S.551, 125 S.Ct. 125, 1183, 161L.Ed.2d1 (2005) as forbidding the execution of offenders who committed their crimes when they were seventeen years old or younger. While execution of such youthful offenders had been permitted previously, the age-based proscription was imposed under the "evolving standards of decency," which guide Eighth Amendment jurisprudence, in much the same way that execution of the mentally retarded was banned due to evolving standards even though *Penry v. Lynaugh*, 492 U.S. 302 (1989) had declined to take that step. A major part of the Court's rationale in *Roper* was the recognition that persons seventeen or younger are not as intellectually mature as adults in their twenties. *Roper*, 125 S.Ct. at 1195-1196. The question presented here is a variation on the issue considered in *Roper v. Simmons*. When the State, in order to obtain the death penalty, relies heavily on evidence of other misconduct committed while a defendant was a juvenile, does that also compromise the Eighth Amendment because conduct for which a defendant was less morally blameworthy, due to his young age, was used?

In *Matthews v. State*, S.W.3d  (Tex. Crim. App. 2006), the Court of Criminal Appeals rejected a similar argument, reasoning that Tex. Code. Crim. Proc. art. 37.071, § 2(a)(l) permits admission of "any matter that the court deems relevant to sentence, including evidence of the defendant's background or character." To the

extent the statute, as applied, conflicts with U.S. Const. amend. VIII, it is the application of the statute which must yield, given the supremacy of the United States Constitution. The word "any" does not insulate Texas practice from constitutional restrictions. Nor does a broad view of what is "character," for the Supreme Court stressed in *Roper v. Simmons* that the "character" underlying youthful conduct is transient and may change over time. Thus it cannot be equated with a mature adult's "character" on the question of "moral culpability."

The *Matthews* Court also stated that "youth is neither a mitigating nor an aggravating factor as a matter of law," and its significance is left to the jury to determine. Slip opin., pp. 14-15. That is not entirely correct in light of *Roper v. Simmons*, where youth was deemed mitigating as a matter of law. The real question is whether that principle should extend to all of the evidence which the jury relies upon in answering the special issues.

While *Roper v. Simmons* relied in part on the emerging consensus among states against the death penalty for crimes committed by persons under eighteen, the survey of states was not the whole rationale. The Supreme Court noted that it ultimately had to make its own evaluation. To accomplish that, the Court focused on certain characteristics of adolescents, drawing on empirical evidence concerning intellectual development. Nothing about that empirical analysis indicates that it is valid only as to the particular crime charged in the indictment, as

132

opposed to extraneous offenses urged as reasons to assess the death penalty. The opinion in *Mathews* offered no answer to that empirical evidence, and realistically, there is none.

### B.    The Unconstitutional Evidence

In Thompson's retrial, the State's opening statement made it clear that the State wanted the jury to consider youthful crimes, as well as adult crimes, in order to give answers that would dictate assessment of the death penalty. The prosecutor specifically mentioned an "extensive series of crimes" where Thompson and a friend severely damaged homes and vehicles in Colorado 16 RR2 14. Gary Robinson of the Douglas County, Colorado Sheriff's Office testified at length about "an unusual series of crimes that were really impacting the public" in 1984. 17 RR2 61.  An extreme amount of damage was done to people's homes and other property. This crime spree was the work of Thompson and one of his friends as juveniles. *Id.* at 69. While those property crimes might not loom as large as a double shooting or efforts to rub out a witness, the fact that the youthful crimes provided one "bookend" for a life of crime was highly useful to the prosecutor.  It was even more useful in light of the fact that Thompson's family seemed, at least on the surface, not to be "disadvantaged."

### C.    Harm

In determining whether there was at least some harm, in the sense that Thompson's misdeeds when he was seventeen or younger probably carried some weight, it is useful to look at the prosecutor's closing arguments. The prosecutors plainly wanted the jury to consider Thompson's youthful conduct. Prosecutor Wisner argued that Thompson had "an idyllic childhood" which was tainted only by Thompson's own crimes. 20 RR 22. Prosecutor Oncken argued that Thompson "shamed his parents and it didn't seem to bother him," adding that Thompson "had no respect for all those people, those homes there. No respect for those people. No respect for their property." *Id.* at 51. She reminded the jury that Thompson had been to a juvenile correctional facility and had committed "tons and tons of felonies" but "none of that fazed him." *Id.* at 56. In fairness to the State, the prosecutors also mentioned adult crimes, but there was more than enough emphasis on events occurring while the appellant was seventeen or younger to raise doubt as to harm. This is more than sufficient to find that Thompson was harmed by the use of his juvenile actions against him.

**Claim Thirteen: The Jury Instructions Violated Thompson's Due Process Rights by Failing to Instruct the Jury that the State Had the Burden of Proof Beyond a Reasonable Doubt on the Mitigation Issue at The Punishment Stage of Trial, In Violation of the Fourteenth Amendment**

**Exhaustion: This claim was raised as "Grounds for Relief Seven" in Thompson's second state writ of habeas corpus.**

134

Prior to Thompson's second trial, Thompson filed a motion arguing, in Part I thereof, that the assessment of the death penalty was unconstitutional because TEX. CODE CRIM. PROC. art. 37.071, § 2(e) fails to assign the State the burden of proof (CR2- 35-36). The motion specifically cited *Apprendi v. New Jersey*, 530 U.S. 466 (2000). The motion was denied. CR2 at 44. Thompson also filed another motion, styled Motion to Hold Article 37.071, Sec. 2(e) and (f) Unconstitutional on Burden of Proof. *Id.* at 63. That too was denied. *Id.* at 65. At trial the jury charge did not assign a burden of proof to the State on the mitigation issue, let alone assigning the State a burden of proof beyond a reasonable doubt.

A.    **The *Apprendi* Rule**

In *Apprendi*, the Supreme Court reviewed a New Jersey state prosecution where a judge had increased the maximum punishment for possession of a firearm under a New Jersey statute which allowed an increased punishment if a defendant "acted with a purpose to intimidate an individual or group of individuals because of race . . . " *Apprendi* drew upon a footnote in *Jones v. United States*, 526 U.S. 227 (1999), which stated that "under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in the indictment, submitted to a jury, and proven beyond a reasonable doubt." *Apprendi*, 120 S.Ct. at 2355, *citing Jones*, 526 U.S. at 243, n. 6,

119 S.Ct. at 1215, n. 6. *Apprendi* carried the rule from the *Jones* footnote into

Fourteenth Amendment due process, articulating a three-part rule:

> Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt. With that exception, we endorse the statement of the rule set forth in the concurring opinions in [*Jones*]: "[I]t is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed. It is equally clear that such facts must be established beyond a reasonable doubt. 526 U.S. at 252-253, 119 S.Ct. 1215 (opinion of Stevens, J.); *see also Id.* at 253, 119 S.Ct. 1215 (opinion of Scalia, J.).

120 S.Ct. at 2363. Although most of the cases applying *Apprendi* have focused on

the question of judges supplanting jurors in making some critical factual decision

affecting punishment, all three prongs of *Apprendi*—pleading, proof, and jury

determination—are constitutionally important, especially in death penalty cases.

Four dissenters argued that *Apprendi* was effectively overruling *Walton v.

Arizona*, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), concerning

factors used to support the death penalty. *See Apprendi*, 120 S.Ct. at 2387-2388

(O'Connor, J., dissenting).  That step followed with respect to a portion of *Walton*

in *Ring v. Arizona*, 536 U.S.584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).  There

the Supreme Court, relying on *Apprendi*, overruled Part II of *Walton* as to the

judge/jury dichotomy. That part of *Walton* had received majority support. In

contrast, Part III of *Walton*, which addressed a burden-of- proof question, was only

supported by a plurality.  That is to say, *Ring* knocked out the stronger part of *Walton*.

*Ring* effectively disposed of the notion that death is necessarily the relevant "maximum" for *Apprendi* purposes, pointing out "*Apprendi*'s instruction that 'the relevant inquiry is not one of form, but of effect.'" 530 U.S., at 494, 120 S.Ct. 2348. What mattered was that the required finding of an aggravated circumstance exposed *Ring* to a greater punishment than that authorized by the jury's guilty verdict. That same perception of *Apprendi* underlay the decisions in *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004) and *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621(2005), both holding that *Apprendi* applied to incremental increases within a guidelines-type system based on facts not determined by a jury. As will be discussed next, Texas' death penalty statute is really a simple "guidelines" system, consisting of only a handful of considerations.

## B.    The Texas Mitigation Issue

In Texas the imposition of the death penalty depends on a jury's answers to the special issues submitted under Tex. Code Crim. Proc. art. 37.071. On its face the statute makes death the maximum possible penalty, but that is so only if certain facts are determined in the State's favor. The decision whether or not the death

penalty is imposed hinges on TEX. CODE CRIM. PROC. art. 37.071, § 2(e)(l), which

requires a jury to decide:

> Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

If ten or more jurors answer the special issue in the affirmative, life imprisonment

is imposed. Tex. Code Crim. Proc. art. 37.071, § 2 (f)(2). If the jurors stalemate

and cannot agree, life imprisonment is imposed. Tex. Code Crim. Proc. art. 37.071,

§ 2(g).  That is, the absence of a jury decision on this issue automatically caps

punishment at life imprisonment.  Only if all twelve jurors answer in the negative

may the death penalty be imposed. Article 37.071, § 2(f)(2). Thus § 2(e)(l) plainly

fits the mold of an issue on which a factual determination raises the maximum

punishment which is available.

An instructive comparison may be made to California law, as discussed in

footnote 14 of *People v. Anderson*, 25 Cal.4th 543, 106 Cal.Rptr.2d 575, 22 P.3d

347 (2001). The California Supreme Court found *Apprendi* inapplicable to the

California death-penalty with this reasoning:

> But under the California death penalty scheme, once the defendant has been convicted of first degree murder and one or more special circumstances has been found true beyond a reasonable doubt, death is no more than the prescribed statutory maximum for the offense; the

only alternative is life imprisonment without possibility of parole . . . Hence, facts which bear upon, but do not necessarily determine, which of these two alternative penalties is appropriate do not come within the holding of *Apprendi*.

Under Texas law, by contrast, even when the "future danger" issue is answered in the State's favor, the factual determination to be made under the mitigation issue does determine whether the punishment is death or life imprisonment. The reasoning of *Anderson* implies that *Apprendi* does apply to the Texas mitigation issue.

In cases decided prior to *Apprendi*, the Court of Criminal Appeals held that there is no burden of proof with respect to the mitigation issue, at least on the face of the statute. *Lawton v. State*, 913 S.W.2d 542, 557 (Tex. Crim. App. 1995). In practice, *Lawton* recognized, "the burden is implicitly placed upon appellant to produce and persuade the jury that circumstances exist which mitigate against the imposition of death in his case." *Id.* In Lawton the Court went on to state that it was "unaware of any constitutional requirement that the burden of proof regarding mitigating evidence be placed on either party, and to the extent that the burden is on appellant, we note that it is not unconstitutional to so place the burden." The authority cited for that conclusion was *Walton v. Arizona*, specifically Part III of *Walton*. As stated earlier, that part of *Walton* did not even get as much support as the portion overruled in *Ring*.

Arguments based on *Apprendi* have been rejected several times, usually by opinions characterizing the Texas mitigation issue  as  one  which  potentially reduces punishment.   Illustrative of that approach is the Fifth Circuit's *Rowell* opinion, which stated that Rowell's claim "turns *Apprendi*  on its head" by applying *Apprendi* to mitigating circumstances, rather than aggravating circumstances. "Mitigation is not a factor that potentially increases a penalty," the district court held. "It can only increase it." *Id.* That view misconstrues what the Texas statute actually does. The jury is not merely called upon to determine whether any mitigating factors exist.  The jury also has to weigh those factors to determine whether they are sufficient to overcome the fact that the defendant has committed the worst crime on the books and has been determined to constitute a "future danger." *Rowell*, *supra* at 378.  The Court of Criminal Appeals suggested that footnote 16 of *Apprendi* approved of drawing a distinction between aggravating factors and mitigating factors, and that *Apprendi* limited its holding to the former. Reasonable jurists could disagree whether that is the thrust of footnote 16 in *Apprendi*, for in part of that footnote, the Supreme Court stated:

> If facts found by a jury support a guilty verdict of murder, the judge is
> authorized by that jury verdict to sentence the defendant to the
> maximum sentence provided by the murder statute. Ifthe defendant
> can escape the statutory maximum by showing, for example, that he is
> a war veteran, then a judge that finds the fact of veteran status is
> neither exposing the defendant to a deprivation of liberty greater than
> that authorized by the verdict, nor is the judge imposing upon the

defendant a greater stigma than that accompanying the jury verdict alone.

530 U.S. at 490, 120 S.Ct. at 2363.

Thus footnote 16 was premised on the idea that the jury's verdict authorized a particular maximum. This is critical. Under Article 37.071, the jury's verdict of guilty, plus a finding that a defendant poses a danger of future acts of violence, will not authorize the death penalty. *Only* with a negative answer to subsection 2(e)(l) is death available as a punishment. Footnote 16 in *Apprendi* actually supports Thompson's position rather than undermining it.

### C.    Harmful Effect on Thompson's Case

The error discussed above probably made a difference in Thompson's trial. Mitigating factors, as discussed in *Penry v. Lynaugh supra*, unquestionably include brain damage. Considering the unjustified battering which Dr. Milam took, the assignment of the burden of proof could have made a big difference. That is, if jurors understood that Thompson only had a duty to raise some evidence of brain damage, combined with drug abuse, and the State then had the burden to show that aggravating factors outweighed those mitigating factors, then it is likely that at least some of the jurors would have wanted to answer the special issue in the appellant's favor. In the absence of unanimity on an answer favoring the State, the appellant's life would have been spared.

141

Based on a recent development, this Court should also consider whether *Apprendi* might apply in a more limited manner to Thompson's case. Specifically, should the State have the burden of proof as to mitigating factors that arise from the offense itself? That matters here because reasonable jurors could find certain aspects of the offense to be mitigating. There has long been a popular notion, reflected in some statutory provisions, that murders arising from lovers' quarrels and love triangles may involve less personal moral culpability.[6] While the prosecutors argued that the applicant's crime was predatory, jurors might see some mitigating significance in what preceded the shooting. Thompson's romantic hopes were dashed when, following a late-night fight with his rival, Thompson was told to "hit the road" by Hayslip and the police. Even for a person without brain damage, this would have been an emotionally devastating experience. It is easy to say that Thompson should not have gone back with a gun, but the question here is not whether Thompson is blameworthy. The question is whether, based on the facts, one or more jurors might think he had reduced moral culpability to the degree that the death penalty was not justified.

That leads to a recent development in the Supreme Court, namely the dissenting opinion by Justice Kennedy and Justice Breyer in *Cunningham v.*

---

6. The "paramour statute" is gone, but it lasted into the second half of the Twentieth Century. The concept of "sudden passion arising from an adequate cause" remains, although in altered form.

*California*, 127 S.Ct. 856 (2007). That dissenting opinion introduced a new interpretation of *Apprendi v. New Jersey*, 530 U.S. 466 (2000), offered by justices who had been steadfast foes of *Apprendi* and its progeny. Justices Kennedy and Breyer formulated a compromise position which could be directly applicable to this case. Justice Kennedy wrote in Cunningham:

> In my view, the *Apprendi* line of cases remains incorrect. Yet there may be a principled rationale permitting those cases to control within the central sphere of their concern, while reducing the collateral, widespread harm to the criminal justice system and the corrections process now resulting from the Court's wooden, unyielding insistence on expanding *Apprendi* doctrine far beyond its necessary boundaries.
> The Court could distinguish between sentencing enhancements based on the nature of the offense, where the *Apprendi* principle would apply, and sentencing enhancements based on the nature of the offender, where it would not.

127 S.Ct. at 872. Later in the opinion, after discussing some of his reasons for disagreement with *Apprendi* doctrine, Justice Kennedy stated:

> This system of guided discretion would be permitted to a large extent if the Court confined the *Apprendi* rule to sentencing enhancements based on the nature of the offense. These would include, for example, the fact that a weapon was used; violence was employed; a stated amount of drugs or other contraband was involved; or the crime was motivated by the victim's race, gender, or other status protected by statute. Juries could consider these matters without serious disruption because these factors often are part of the  statutory  definition  of  an aggravated crime in any event and because the evidence to support these enhancements is likely to be a central part of the prosecution's case.

*Id.* at 872-873.

As applied in Texas, the reference to "enhancements" would not be limited to a checklist of aggravating factors, because of the nature of the Texas mitigation special issue.   The mitigation special issue explicitly recognizes a distinction between "circumstances of the offense" and personal character or background factors. As Justice Kennedy observed, the evidence favoring the State's position when the jury evaluates "circumstances of the offense" is "likely to be a central part of the prosecution's case." Therefore it creates no unfair burden on the State to require that the State bear a burden of persuasion on a "circumstances of the offense" factor once some evidence is introduced to suggest that such a factor may be mitigating.

The Court of Criminal Appeals has not yet had an opportunity to consider the limited application of *Apprendi* doctrine to "circumstances of the offense" in light of the position taken by two erstwhile *Apprendi* foes in Cunningham. Perhaps the analysis proposed by Justices Kennedy and Breyer could be decisive. This is so not only because particular judges of the Court of Criminal Appeals may agree with Justices Kennedy and Breyer, but also because what was written in *Cunningham* signals a stronger consensus on the Supreme Court in favor of utilizing *Apprendi* with respect to a "circumstances of the offense" factor. Past denials of the writ of certiorari on the application of *Apprendi* to the Texas mitigation issue are not legally considered decisions on the merits, but everyone

144

understands that the goal is to get four Supreme Court justices to agree that there is a possibility of a petitioner winning five votes on full consideration. The compromise on *Apprendi* suggested by two justices in Cunningham obviously brightens that prospect for cases where the factor under debate is part of the circumstances of the offense.

The district court actually would be at liberty to rely on the *Cunningham* dissent in its conclusions of law. Nothing in the case law directly prohibits a limited reliance on *Cunningham*, even though that would call for a degree of speculation about what higher courts would do. That might be controversial, but in a death penalty case, what is not controversial?

> **Claim Fourteen: Texas Capital Sentencing Scheme Violates the Eighth Amendment With Respect to the Burden of Proof on the Mitigation Issue, Because the Instructions Gave the Jury Mixed Signals as to How the Mitigation Issue is to be Applied**

> **Exhaustion: This claim was raised as "Grounds for Relief Eight" in Thompson's second state writ of habeas corpus.**

## A.    The Error

The due process analysis in *Apprendi* is supplemented by the Eighth Amendment analysis in *Penry v. Johnson*, 532 U.S. 782, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001). That case is commonly called "*Penry II*" to distinguish it from *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), the case

where the Supreme Court required Texas to provide a discrete mechanism for consideration of mitigation without having to shoehorn the concept into other special issues. *Penry II* held that it was not sufficient to merely instruct a jury to "nullify" what would otherwise be a factually correct determination that a defendant probably would be dangerous in the future.

This particular constitutional argument, that is, an Eighth Amendment argument as opposed to a due process argument, was not included in the discussion at trial of a group of defense objections to the punishment charge. At the time of Thompson's trial, the argument was, at best, obscure, and could fairly be characterized as "novel." Where a point of error is "novel" in light of existing law, the failure to object at trial may be excused. *Black*, *supra*; *Reed v. Ross*, *supra*.

*Penry II* discussed the various possibilities which might arise under a "nullification" instruction. The Court was particularly concerned that jurors might perceive a conflict between their oaths to render a true verdict and their desire to express a finding of mitigating circumstances, with the former prevailing. A careful reading of the opinion, however, shows that the Court never found that *Penry's* jury (or any jury, for that matter) actually had abstained from nullifying an affirmative answer because of their faithfulness to their oath as jurors. It was enough, the *Penry II* majority found, that court's instruction sent "mixed signals" to the jury. 532 U.S. at 802. The majority opinion in *Penry II* never actually took a

146

position on whether the jurors violated their oaths as jurors, and did not even find that the jurors actually read the "nullification" instruction in a way that created that risk. The one rationale in the majority opinion which was unassailable was the finding of "mixed signals," even when the full charge and the explanatory function of counsels' arguments were considered. While the *Penry II* dissenters put up a spirited fight on other aspects of the majority opinion, their only response to the "mixed signals" rationale was to accuse the majority of sending mixed signals. 532 U.S. at 809.

The problem of "mixed signals" goes to the heart of the "heightened reliability" requirement incorporated in Eighth Amendment jurisprudence, since confusion of the jury by a jury charge is antithetical to an increase in reliability. The question then becomes whether the statutory "mitigation" issue, submitted in this cause and many others, suffers from the flaw of sending "mixed signals." As was already acknowledged in *Lawton*, the statute itself is unclear as to the burden of proof regarding mitigation. A Texas jury is told to consider various mitigating factors and then weigh them against aggravating factors, but the jury is not told what it ultimately should do with the comparison. The jury is not told in straightforward language where the burden lies. It is not told the quantum of proof which constitutes the standard, apart from the vague reference to "sufficient" mitigating evidence.

**Claim Fifteen: Additional Claims Presented Related to the Autopsy Performed by Dr. Shrode**

These claims are included to satisfy the requirements of AEDPA, and will be further developed in the forthcoming amended writ. At the time of filing, Thompson's Funding Motion for the services of a pathologist remains pending with this Court.

### I.    The State of Texas Violated *Brady v. Maryland*, by withholding information related to Dr. Shrode and the incomplete autopsy performed in this case.

Thompson asserts that the state of Texas violated *Brady* by failing to notify him or his defense team of the problems associated with Dr. Shrode, which have been identified in the fact section of the initial writ.  Further, Thompson believes that Dr. Shrode's incomplete autopsy, which resulted in an incorrect determination of the cause of death, also violated Thompson's due process rights as identified by *Brady* and its progeny.

### III.    Thompson's trial counsel were ineffective for failing to object the testimony of Dr. Moore, on Confrontation Clause Grounds.

Thompson's trial counsel did object to Dr. Moore testifying concerning the findings of Dr. Shrode's autopsy.  However, the objection was based on the rules of evidence, and not on the confrontation clause.  Had the proper objection been made, the testimony and autopsy related to Hayslip's death would not have been

148

admissible, without Dr. Shrode himself coming to testify to it. Counsel's was

deficient for failing to object, and counsel's performance prejudiced Thompson.

### III. Thompson's writ counsel was ineffective

Thompson's state writ attorney was ineffective for failing to research,

discover, and present all of the claims related to Dr. Shrode's incomplete and

factually incorrect autopsy, as well as the impeachment evidence related to Dr.

Shrode himself. This deficient performance prejudiced Thompson in his state writ.

### IV. The State violated Thompson's due process rights by presenting materially false and misleading information to the jury

Thompson asserts this claim based on his belief that the autopsy report

created by Dr. Shrode and admitted into evidence was at a minimum incomplete,

and possibly completely wrong. Constitutional due process prohibits the state

from securing a conviction or death sentence through the use of false or highly

misleading evidence. *See Napue v. Illinois*, 360 U.S. 264, 269 (1959) (holding

that "a conviction obtained through use of false evidence, known to be such by

representatives of the State, must fall under the Fourteenth Amendment"). "The

same result [is obtained] when the State, although not soliciting false evidence,

allows it to go uncorrected when it appears." *Id.* at 79. Importantly, it is not

necessary that the prosecution actually knew that the testimony in this case was

false, it is enough that the prosecution should have known as much. *See, e.g.,*

*United States v. Agurs*, 427 U.S. 97, 103(1976) (explaining that error occurs with the use of false evidence where the "evidence demonstrates that the prosecution's case includes perjured testimony and that the prosecution knew, or should have known, of the perjury"). Convictions based on false evidence must be reversed if the false evidence "may have had an effect on the outcome of the trial." *Napue*, 360 U.S. at 272 (1959).

Thompson believes this doctrine applies to his case because the autopsy created by Dr. Shrode and admitted into evidence was materially misleading and reached the wrong conclusion.

### Claim Sixteen: Trial Counsel Rendered Ineffective Assistance of Counsel

In addition to the claims raised above, trial counsel was ineffective in the following ways:

1. Counsel failed to conduct an adequate pretrial investigation into the State's case and the potential defenses available to Petitioner, including, but not limited to, defenses involving Petitioner's psychological and neurological mental state before, during, and after the murders for which he was charged. There is a reasonable probability that these defenses, if properly raised, would have been able to overcome the government's contention that Petitioner possessed the requisite mental state to intentionally and with premeditation kill the victims and that would

supported the defenses of lack of mental responsibility and lack of a specific intent to kill, based on the combined effects of organic brain damage and Petitioner's traumatic childhood;

2. Counsel failed to develop and present compelling mitigation evidence available to Petitioner, including, but not limited to, evidence of Petitioner's history of psychological, physical, and emotional abuse and neglect, a disruptive and chaotic family history, a long history of mental health problems, including organic brain damage, and humanizing evidence of Petitioner's good character and positive personality traits. Had such evidence been presented, there is a reasonable probability that Petitioner would not have been sentenced to death;

3. Counsel failed to seek the appointment of proper experts and investigators, including a mitigation specialist, a trauma expert, and others, to evaluate Petitioner's psychological, educational, neurological and social history, as well as that of his family. Further, trial counsel failed to have the proper neurological testing completed in spite of the fact that trial counsel was aware that Davila showed signs of frontal lobe damage;

4. Counsel failed to develop and provide to its own mental health expert the available records and information regarding Petitioner's family and his psychological, educational, neurological and social history which were necessary to perform a thorough and accurate evaluation;

5. Counsel failed to adequately prepare for the sentencing phase of the trial and failed to ensure the presence of necessary witnesses for Petitioner's mitigation presentation;

6. Counsel failed to adequately prepare the witnesses he did call to the stand during Petitioner's mitigation presentation;

7. Counsel failed to request the appropriate jury instructions at the guilt/innocence and penalty phases and failed to object to erroneous instructions given by the trial court.

8. Counsel failed to adequately investigate Petitioner's medical and mental health history and status. Counsel also failed to ensure that Petitioner was afforded a competent mental health evaluation, which would have conclusively revealed that Petitioner suffered from organic brain damage and trauma throughout his life and at the time of the crimes, which impaired Petitioner's ability to form the requisite intent to convict on the murder charges and would have mitigated his culpability for the offenses;

9. Counsel failed to ensure that appropriate diagnostic testing was performed by its mental health experts;

10. Counsel failed to develop and present evidence which would have indicated that Petitioner was remorseful for his crimes and had accepted responsibility for his actions.

12. Thompson was prejudiced by these failures, and is entitled to Habeas Relief.

### Claim Seventeen: State Habeas Counsel Rendered Ineffective Assistance Counsel

1.   Thompson incorporates all claims from claim sixteen, and asserts that state writ counsel was ineffective for failing to raise any and all of these claims. Further, state habeas counsel was ineffective for failing to identify, develop, and present the arguments in claims twelve and thirteen, below.

2.   Thompson was prejudiced as a result of the state writ counsel's deficient performance.

### CONCLUSION

As this petition demonstrates, Petitioner Thompson's rights under the federal constitution were violated, unremedied by the Texas courts.

### RELIEF REQUESTED

Prayer for Relief

WHEREFORE, Petitioner respectfully prays this Court:

1.    Order that Petitioner be granted leave to conduct discovery pursuant to Rule 6 of the Rules Governing § 2254 Cases and permit Thomson to utilize the processes of discovery set forth in Federal Rules of Civil Procedure 26-37, to the extent necessary to fully develop and identify the facts supporting his petition, and any defenses thereto raised by the Respondents' Answer;

2.    Order that upon completion of discovery, Petitioner be granted leave to amend his petition to include any additional claims or allegations not presently known to him or his counsel, which are identified or uncovered in the course of discovery and that Thompson be granted to leave to expand the record pursuant to Rule 7 of the Rules Governing § 2254 Cases to include additional materials related to the petition;

3.    Grant an evidentiary hearing pursuant to Rule 8 of the Rules Governing § 2254 Cases at which proof may be offered concerning the allegations of this petition;

4.    Issue a writ of habeas corpus to have Thompson brought before it to the end that he may be discharged from his unconstitutional confinement and restraint;

5.    In the alternative to the relief requested in Paragraph 4, if this Court should deny the relief as requested in Paragraph 4, issue a writ of habeas corpus to have Thompson brought before it to the end that he may be relieved of his unconstitutional sentences;

6.    Grant such other relief as may be appropriate and to dispose of the matter as law and justice require.

WHEREFORE, PREMISES CONSIDERED, the Applicant THOMPSON asks this Court to hold hearings, make its findings of fact and conclusions of law, and find that he was denied rights.  He requests the Court to vacate his conviction and issue a writ to the Respondent, or the warden of the Polunsky Unit, ordering release of Thompson from custody, or alternatively, to reverse Thompson' conviction and order a new trial, or alternatively, to vacate his sentence of death and order a new trial on sentencing.

Respectfully submitted,

LAW OFFICE OF SETH KRETZER
The Lyric Center
440 Louisiana Street
Suite 200
Houston, TX 77002
155

(713) 775-3050 (work)
(713) 224-2815 (FAX)

seth@kretzerfirm.com


/s/ Jonathan Landers

_____

Jonathan Landers
2817 W T.C. Jester
Houston Texas 77018
(713) 301-3153 (work)
(713) 685-5020 (FAX)

jonathan.landers@gmail.com

COURT APPOINTED LAWYERS FOR
PETITIONER CHARLES THOMPSON

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing Petition for Writ of

Habeas Corpus was served on all counsel of record by filing on the ECF System on

this 15th day of April, 2014.


_____

Seth Kretzer


## VERIFICATION

156

As a representative for the petitioner, I verify that the foregoing is true and correct to the best of my knowledge.

Respectfully submitted,

LAW OFFICE OF SETH KRETZER
The Lyric Center
440 Louisiana Street
Suite 200
Houston, TX 77002
(713) 775-3050 (work)
(713) 224-2815 (FAX)

G


/s/ Jonathan Landers
_____

Jonathan Landers
2817 W T.C. Jester
Houston Texas 77018
(713) 301-3153 (work)
(713) 685-5020 (FAX)

jonathan.landers@gmail.com

157