IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| CHARLES VICTOR THOMPSON, § | |
| § | |
| Petitioner, § | |
| § | |
| v. § | CIVIL ACTION H-13-1900 |
| § | |
| WILLIAM STEPHENS, § | |
| § | |
| Respondent. § | |

**ORDER**

Charles Victor Thompson, an inmate on Texas' death row, seeks federal habeas corpus relief. Thompson was convicted of capital murder and sentenced to death in 1999. After the Texas Court of Criminal Appeals vacated his sentence, *Thompson v. State*, 93 S.W.3d 16 (Tex. Crim. App. 2001), a second penalty phase resulted in another death sentence. After unsuccessfully availing himself of state appellate and habeas remedies, Thompson filed a federal petition for a writ of habeas corpus. Dkt. 21. Thompson has moved for discovery. Dkt. 23. Thompson seeks to develop evidence relating to an informant's testimony in his second penalty phase. For the reasons discussed below, the Court will deny Thompson's discovery motion without prejudice.

**I. Background**

In his first penalty hearing, an undercover police officer testified that Thompson had attempted to solicit the murder of witnesses slated to testify against him. The Court of Criminal Appeals, however, found that the police had used the undercover officer to bypass Thompson's Sixth Amendment rights. *Thompson*, 93 S.W.3d at 22-29. In his second punishment phase, the State presented testimony about other attempts Thompson had made to arrange murders before his first trial. Robin Rhodes, who had been incarcerated with Thompson in 1998, testified that Thompson

"had a problem with some people that he wanted to, he said, Just go away. I don't care how it happens." Tr. Vol. 17 at 138. "The deal was that [Rhodes] would do what [he] could do" to keep them from coming to court. Tr. Vol. 17 at 138. When Rhodes "asked for some descriptions" of the intended victims, Thompson gave him a list of names. Tr. Vol. 17 at 140-41. Rhodes then contacted an officer with the Harris County Organized Crime Unit and gave him the list. Tr. Vol. 17 at 141.

The third claim in Thompson's federal petition alleges various constitutional violations relating to Rhodes' testimony. First, Thompson argues that the State used Rhodes to elicit incriminating statements in violation of *Massiah v. United States*, 377 U.S. 201 (1964).[1] Second, Thompson asserts that the State of Texas disregarded its duty under *Brady v. Maryland*, 373 U.S. 83 (1963) to disclose information about its relationship with Rhodes. Finally, Thompson maintains that his trial, appellate, and state habeas attorneys provided ineffective representation in their handling of Rhodes' testimony.

Together, Thompson's various constitutional arguments complain that the State failed to divulge important facts about its relationship with Rhodes. Thompson's petition describes the information he wishes that the State had disclosed:

- Rhodes was allegedly employed by the Harris County Organized Crime Narcotics Task Force, which included the Harris County District Attorney's Office;

- he had been a confidential informant in numerous cases and had twice testified for the State, including once in a capital murder prosecution;

---

[1] In *Massiah v. United States*, the Supreme Court held that a criminal defendant may not have "used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel." 377 U.S. 201, 206 (1964). "A *Massiah* violation has three elements: (1) the Sixth Amendment right to counsel has attached; (2) the individual seeking information from the defendant is a government agent acting without the defendant's counsel being present; and (3) that agent 'deliberately elicit[s]' incriminating statements from the defendant." *Henderson v. Quarterman*, 460 F.3d 654, 664 (5th Cir. 2006) (alteration in original) (quoting *Massiah*, 377 U.S. at 206).

- the Harris County District Attorney's Office paid him $30,000 for his participation in the capital murder case;

- he had previously received other payments for assisting police; and

- he had helped secure numerous search warrants.

Dkt. 23 at 51-52.

The defense, however, knew most – if not all – that information. Even though the State apparently did not disclose it to the defense, Thompson's attorneys learned about Rhodes' role as an informant soon before trial.[2] The prosecution's questioning and the defense's cross-examination extensively addressed Rhodes' prior interaction with the State and the manner in which he came to testify. Rhodes explained that he had "done a lot of work" for the State and had testified in two trials, including a capital-murder case. Tr. Vol. 17 at 152-54. He explained that he was paid "somewhere in the neighborhood of between 20 and $30,000" in that case "out of the money that was seized." Tr. Vol. 17 at 154, 159. He had also been paid "on many occasions" for being an informant. Tr. Vol. 17 at 132, 152-53. Rhodes admitted that the State would dismiss several misdemeanor charges against him in return for his testimony against Thompson. Tr. Vol. 17 at 132-33.

Thompson, however, argues that Rhodes was not just an informant, but a state agent. Thompson alleges that "the state failed to disclose to the defense that Rhodes was essentially a state employee – a full-time, and fully paid, snitch." Dkt. 23 at 12. Thompson bases this argument on inferences from Rhodes' trial testimony. After Thompson described how he had acted as a police

---

[2] The State discussed Rhodes' anticipated testimony in a pre-trial hearing, but did not mention his prior work as an informant. Tr. Vol. 2 at 27-29, 47-50.

3

informant while incarcerated, trial counsel asked Thompson to describe his "employment at that time[.]" Tr. Vol. 17 at 153. Rhodes responded: "I was a full-time – basically I was a full-time informant for the Harris County Organized Crime Task Force." Tr. Vol. 17 at 153.

Thompson wants to bolster his *Massiah* and *Brady* claims with broad discovery relating to Rhodes from numerous state and federal agencies, including: the Harris County District Attorney's Office,[3] at least nine enumerated police departments of various municipalities and counties, the Texas Highway Patrol, the Texas Rangers, and the Federal Bureau of Investigation. Dkt. 23, Appendix #2 at 2. Thompson asks for "[a]ll documents related to the forming, function, document retention policies, members, and subsequent closing of the Harris County Organized Task Force." Dkt. 23, Appendix #2 at 2. Thompson also wants disclosure of all documents pertaining to Rhodes' involvement in three cases, including his own. Dkt. 23, Appendix #2 at 5-6.

## II. Procedural Impediments to Discovery

"[A] habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997); *see also Reed v. Quarterman*, 504 F.3d 465, 471 (5th Cir. 2007). Under Rule 6 of the Rules Governing Section 2254 Cases in the United States District Courts, a court may authorize discovery only when a petitioner demonstrates "good cause." A court may authorize discovery only when a petitioner's substantive claims "establish[] a *prima facie* claim for relief," and his factual allegations are specific, "as opposed to merely speculative or conclusory[.]" *Murphy v. Johnson*, 205 F.3d 809, 814 (5th Cir.

---

[3] Thompson has sought evidence under Texas' public information act to verify Rhodes' relationship with the prosecution, but the Harris County District Attorney's Office has no record of employing Rhodes. Dkt. 23 at 8, n.2.

2000).[4] As a threshold matter, however, a court must also take into account the procedural posture of an inmate's claims. A petitioner cannot show good cause if a federal court cannot reach the merits of the disputed claims. *See Rucker v. Norris*, 563 F.3d 766, 771 (8th Cir. 2009); *Williams v. Bagley*, 380 F.3d 932, 975 (6th Cir. 2004).

Thompson acknowledges that he has not presented his constitutional arguments, and particularly the *Massiah* and *Brady* claims, in state court. Dkt. 23 at 10-11.[5] Federal law prohibits consideration of unexhausted issues except under limited circumstances. 28 U.S.C. § 2254(b). Thompson argues that he can overcome the default of his claims by "demonstrat[ing] *cause* for the default and *actual prejudice* as a result of the alleged violation of federal law[.]" *Coleman v. Thompson*, 501 U.S. 722, 750 (1991) (emphasis added).

Thompson makes two arguments to show cause. First, Thompson relies on *Martinez v. Ryan*, ___ U.S. ____, 132 S. Ct. 1309 (2012), where the Supreme Court recently held that ineffective assistance of state habeas counsel under certain circumstances could forgive the procedural bar of ineffective-assistance-of-trial-counsel claims. *See also Trevino v. Thaler*, ___ U.S. ____, 133 S. Ct. 1911, ___ (2013) (applying *Martinez* to cases arising from Texas courts). However, "[t]he *Martinez* exception is a narrow one[.]" *In re Threadgill*, 522 F. App'x 236, 237 (5th Cir. 2013). By its own terms, the *Martinez* exception applies only to defaulted ineffective-assistance-of-trial-counsel claims. Any deficiency in state habeas counsel's representation, therefore, cannot allow federal habeas

---

[4] Thus, for this Court to grant Thompson's discovery motion, (1) he must have "stated a *prima facie* case for relief based on the evidence sought to be discovered" and (2) he must premise his *prima facie* case on "specific allegations rather than speculative and bald accusations." *Shelton v. Quarterman*, 294 F. App'x 859, 864 (5th Cir. 2008).

[5] Thompson has not discussed whether an avenue of successive state habeas review remains open to him under TEX. CODE CRIM. PRO. art. 11.071 §5.

5

review of any issue unrelated to trial counsel's representation, such as Thompson's *Massiah* and *Brady* arguments.

Second, Thompson argues that the suppression of evidence under *Brady* should permit plenary federal review. *See Banks v. Dretke*, 540 U.S. 558, 691 (2004) (finding that evidence of a *Brady* violation shows cause and prejudice under the procedural bar doctrine). Three essential elements compose a valid *Brady* claim: "'The evidence must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.'" *Id.* (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)). Cases often add a fourth requirement: "nondiscovery of the allegedly favorable evidence was not the result of a lack of due diligence." *United States v. Walters*, 351 F.3d 159, 169 (5th Cir. 2003); *see also Graves v. Cockrell*, 351 F.3d 143, 153-54 (5th Cir. 2003). "When evidence is equally available to both the defense and the prosecution, the defendant must bear the responsibility for failing to conduct a diligent investigation." *Kutzner v. Cockrell*, 303 F.3d 333, 336 (5th Cir. 2002).

The record shows that the defense knew much of the allegedly suppressed information before trial. The only information that trial court apparently lacked was a full disclosure of Rhodes' extensive interaction with state actors. Respondent argues that Thompson can only speculate that Rhodes' interaction meant that he "acted as a government agent." Dkt. 25 at 10. In response, Thompson points to a published decision by a Texas appellate court that discussed the extent of Rhodes' involvement with the State. Dkt. 26 at 3. In *Stephens v. State*, 59 S.W.3d 377, 381-82 (Tex. App.–Houston [1 Dist.] 2001), a Texas appellate court explained that Rhodes had:

> testified before the jury that he was currently employed by the Harris County Organized Crime Narcotics Task Force, which included the Harris County District

6

>Attorney's Office, as a confidential informant in over 50 cases, more than 80 percent of which resulted in convictions; that he had twice testified for the State, including once in a capital murder prosecution; and that the State had not doubted him.

*Stephens*, 59 S.W.3d at 381. However, the Texas appellate court issued its *Stephens* opinion years before Thompson's second punishment phase; Thompson has not shown how the State could have suppressed information in a published judicial decision. *See Parr v. Quarterman*, 472 F.3d 245, 254 (5th Cir. 2006) ("[T]he prosecution is not required to disclose evidence that could be discovered by exercising due diligence.").

Importantly, Thompson's briefing to date is not sufficient to show that the State suppressed evidence that would support a *Massiah* challenge. At its core, Thompson's third habeas claim raises two separate questions: (1) was Rhodes the equivalent of a state actor and (2) did the State deliberately use him to elicit incriminating statements? *See Kuhlmann v. Wilson*, 477 U.S. 436, 459 (1986) (finding that a defendant must show that "the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks."); *Creel v. Johnson*, 162 F.3d 385, 394 (5th Cir. 1998) (separating the question of whether an inmate was a government agent from the question of whether the inmate deliberately secured statements). Thompson's briefing extensively discusses Rhodes' interaction with State actors, including the payment of a large sum derived from forfeiture in another capital murder case. Yet Thompson's claims depend on showing that Rhodes "was acting *under instructions* as a paid informant for the Government[.]" *United States v. Henry*, 447 U.S. 264, 270 (1980) (emphasis added); *see also Wilson*, 477 U.S. at 459 ("[T]he primary concern of the *Massiah* line of decisions is secret interrogation by investigatory techniques that are the equivalent of direct police interrogation."). The question is not just Rhodes' interaction with the State, but "whether the challenged statements had

been deliberately elicited" and "whether the government had directed or steered the informant toward the defendant." *United States v. York*, 933 F.2d 1343, 1356 (7th Cir. 1991).  Rhodes' testimony, however, indicated that he did not act pursuant to any State instruction or order:

> The State: When you went back in jail did anybody from any law enforcement agency ask you to target Charles Victor Thompson and help us gather evidence against him?
>
> Rhodes: No, not at all.

Tr. Vol. 17 at 134-35.  Even accepting Thompson's argument that "there is no doubt that [Rhodes'] aim, once in jail, was to get information and relay it to the government," Dkt. 21 at 57, Thompson's briefing does not make a *prima facie* showing that the State instructed Rhodes to do so.  As it now stands, Thompson only speculates that Rhodes "was charged with obtaining information" from him.  *Henry*, 447 U.S. at 272 n.10.

For the reasons discussed above, Thompson has not shown good cause for discovery.

### III.  Overly Broad Discovery Request

The Court additionally observes that Thompson's discovery motion is overly broad.  Thompson asks for discovery from numerous police departments and other agencies without a strong showing that they possess information relating to Rhodes' involvement in this case.  The breadth of his discovery request leads Respondent to accuse Thompson of engaging in a "prohibited fishing expedition."  Dkt. 25 at 13.  The Court cannot authorize such wide-ranging discovery without good cause relating to each request.  *See Rector v. Johnson*, 120 F.3d 551, 562 (5th Cir. 1997) (stating that Rule 6 does not "sanction fishing expeditions based on a petitioner's conclusory allegations").

## IV.  Conclusion

For the reasons discussed above, the Court will **DENY** Thompson's motion for discovery **WITHOUT PREJUDICE**.

The Clerk will provide copies of this Order to the parties.

Signed at Houston, Texas on June 18, 2014.

                                            Gray H. Miller
                                   United States District Judge