# Appendix 2 - Documents Related to Shrode



Affidavit of Dr. Robert Pfalzgraf

State of Florida,



County of _Lee_, SS:

Dr. Robert Pfalzgraf, after being duly sworn according to law, states as follows:

1. I am a licensed medical doctor in the State of Florida. I am also a diplomat in the of Anatomic and Clinical Pathology as well as Forensic Pathology.

2. I graduated from the Ohio State University College of Medicine in 1984, complete my residency in forensic pathology at the University of Cincinnati Medical Center in 1988 an completed my post-graduate fellowship in forensic pathology at the University of New Mexic School of Medicine in 1989.

3. I have attached to this affidavit, as Exhibit A, my curriculum vitae and bibliography which accurately reflects all of the positions I have held since I became a medical doctor. In addition to my employment, my curriculum vitae also identifies my academic appointments, professional society memberships, as well as the publications I have authored and presentations have given at teaching seminars.

4. I was employed by the Hamilton County Coroner's Office in Cincinnati, Ohio from 1989 to 1992 as a Deputy Coroner. I worked as an Assistant Medical Examiner for District 13 in Tampa, Florida from 1992 to 1996. From 1996 to 2004, I was the Chief Deputy Coroner and Director of Forensic Pathology for the Hamilton County Coroner's Office.

5. As Chief Deputy Coroner, I supervised the fellows in the approach to developing cause and manner of death opinions on their cases, including the use of the autopsy, scene investigation and other information gathering to develop these opinions. In addition, I taught fellows techniques in special dissections, evidence collection and identification of unrecognizable bodies, all of which are unique to the field of forensic pathology.

6. Dr. Paul Shrode was a fellow under my supervision and training at the Hamilton County Coroner's Office from December 2, 1996 to June 27, 1997. In medical terms, a fellowship is the period of training that a physician may undertake after completing his or her residency.

7. I was requested by the Office of the Federal Public Defender for the Southern District of Ohio to review the testimony of Dr. Paul Shrode in _State v. Nields_, Hamilton C.P. No. B97-03305. The attorneys who asked me to review the testimony of Dr. Shrode did so because I was the senior doctor on the case and also signed the autopsy report for Patricia Newsome, the victim in _State v. Nields_.




8. This is the first time I have ever been contacted to review the testimony given by Dr. Shrode in *State v. Nields*. In reviewing the materials provided to me, I was not working for nor hired by the prosecution or defense counsel. I was simply asked to review the materials provided to me and answer the question of whether or not Dr. Shrode's testimony provided the jury with accurate information relating to the autopsy of Patricia Newsome.

9. To assist me in my review, the Office of the Federal Public Defender for the Southern District of Ohio provided me with the following materials:

> a) the October 7, 1998 affidavit of Dr. Michael Clark,
> b) trial testimony of Dr. Shrode,
> c) trial testimony of Dr. Von Loveren,
> d) crime scene photographs,
> e) crime scene video,
> f) the autopsy report of Patricia Newsome,
> g) photographs of Richard Nields' hands,
> h) autopsy photographs,
> i) excerpts from Harris County personnel records,
> j) Texas Medical Board complaint against Dr. Shrode,
> k) 2004 resume of Dr. Shrode,
> l) 2007 resume of Dr. Shrode prior to revisions,
> m) 2007 revised resume of Dr. Shrode.

10. At the time of Patricia Newsome's autopsy, I was the senior/supervising doctor on the case. I was one of the two doctors who signed the autopsy report for Patricia Newsome. The other doctor signing the autopsy was Dr. Shrode, who was under my training and supervision. At the time of the autopsy, Dr. Shrode was completing his fellowship with the Hamilton County Coroner's Office. For purposes of this affidavit, I have reviewed the autopsy report of Patricia Newsome and agree with all of the statements and conclusions contained therein.

11. Dr. Shrode was called as an expert witness by the prosecution in *State v. Nields*. Prior to testifying, Dr. Shrode never reviewed his proposed testimony with me. At the time he testified, Dr. Shrode had completed his fellowship with the Hamilton County Coroner and moved on to other employment. I was not in the courtroom when Dr. Shrode testified in the *Nields* case.

12. Dr. Shrode testified shortly after he completed his fellowship. Therefore, this may have been one of the first times he ever testified. Due to delays between arrest of suspects and subsequent criminal trials, fellows in forensic pathology ordinarily do not have many opportunities to testify during their training. When fellows testify, supervising pathologists often assist in the preparation for trial and observe the fellow during trial. As stated earlier, this did not occur in the *Nields* case.

13. Although I agree with Dr. Shrode's conclusions discussed in the autopsy report, I disagree with several of the findings he later testified to at trial. Specifically, I disagree with:



- Dr. Shrode's opinion that the trauma and swelling to the victim's head was inflicted fifteen minutes to six hours prior to her being strangled.

- Dr. Shrode's testimony about concussions and unconsciousness.

- Dr. Shrode's testimony regarding the fingernail scrapings of Patricia Newsome.



14. As the supervising doctor in this case, I would not have signed a version of the autopsy report that contained this information. I would not have signed my name to the findings and conclusions Dr. Shrode testified to because they were incorrect.

15. Dr. Shrode, in his testimony, opined that the head trauma and swelling inflicted on the victim occurred fifteen minutes to six hours prior to her death. This statement is incorrect, Dr. Shrode should have answered that he had "no idea when the victim sustained the injury to her eye." You can only age bruising or swelling by viewing evidence of healing. When the healing process begins, the wound will turn from purple to yellow.

16. Dr. Shrode testified that at the time of the autopsy, the bruising on the victim's head had a "black and blue appearance." This shows a lack of healing, making it impossible to age the wounds. No medical doctor can age a wound without evidence of healing. In this case there is no medical evidence to support the conclusion that the victim sustained the trauma and swelling to her head a substantial length of time prior to her death.

17. When testifying concerning the fifteen minute to six hour time period between the swelling and strangulation, Dr. Shrode cited to the issue of rigor mortis. This has no relevance to when the victim sustained the trauma to her head. Dr. Shrode could have possibly confused the issues concerning the time of the eye injury with the time of the death.

18. Dr. Shrode also testified about concussions, without specifically or correctly tying that testimony to the victim in this case. A person, including the victim in this case, could have sustained fractures or bruises to the head and not lost consciousness. That is not an uncommon occurrence. Fractures and bruises to the head are markers of impacts, not markers of lack of consciousness. There is no evidence in the present case that shows the victim sustained a concussion or was ever unconscious.

19. Dr. Shrode also testified about the fingernails of the victim in this matter. Although I have not personally seen the fingernail report, Dr. Shrode testified that the lack of scrapings on her nails supports the theory that she was already unconscious at the time of her death. That testimony is not correct. A lack of evidence on a victim's fingernails tells one nothing. It is actually very rare for a victim's fingernails to collect evidence during a crime.

20. The three issues that I have addressed in this affidavit; the infliction of the bruises and swelling preceding the victim's death by up to six hours, the victim's state of consciousness and the victim's fingernails being used as support for the victim's lack of consciousness were not addressed in the autopsy that I signed. I would not have signed a version of the autopsy that





contained this information because it was incorrect.

Further affiant sayeth naught.

Dr. Robert Pfalzgraf

Sworn and subscribed to me this _11_ day Of February 2010.

Pamela M. Dragich

PAMELA M. DRAGICH
MY COMMISSION # DD 693028
EXPIRES: August 19, 2011
Bonded Thru Notary Public Underwriters

# B



# HARRIS COUNTY

PLEASE RETURN APPLICATION TO:
1310 PRAIRIE, SUITE 200
HOUSTON, TEXAS 77002-1987
**APPLICATION FOR EMPLOYMENT**
*An Equal Opportunity Employer*

**Job Hotline**
**755-5044**
**Office 755-5250**
**TDD 755-6870**

*Position #79*

## PLEASE READ THE FOLLOWING BEFORE COMPLETING APPLICATION:

Harris County does not discriminate in hiring on the basis of race, color, religion, national origin, sex, ancestry, age, or on the basis of a mental or physical impairment. No question on this application is intended to secure information to be used for such discrimination, or to violate the provisions of the Immigration Reform and Control Act of 1986.

Thank you for applying for employment with Harris County. In preparing the application, we require you to use blue or black ink, write legibly and answer all questions.

NOTE: YOU MAY INCLUDE YOUR RESUME, BUT ALL QUESTIONS MUST BE ANSWERED.

In compliance with the Immigration Reform & Control Act of 1986 you will be requested to verify employment eligibility (Form I-9) if hired.

### YOUR APPLICATION WILL NOT BE FORWARDED WITHOUT A PERSONAL INTERVIEW

| Print Your Full Name | First PAUL | Middle W. | Last SHRODE | | Maiden Name |
|---|---|---|---|---|---|
| Present Address | Street | City | State/Zip TX | How Long 3½ yrs. | Home Phone |
| Previous Address | Street | City | State/Zip | How Long | Business/Alternate Phone |

| Are you between 18-21 yrs. old ☐ | Social Security No. | Are You: citizen or national | Or an alien lawfully admitted for permanent residence ☐ |
|---|---|---|---|
| Are you over 21 yrs. old ☒ | | of the United States ☒ | (Alien Number _____) |

Or an alien authorized by the Immigration and Naturalization Service to work in the United states ☐
(Alien Number or _____ Admission Number _____) Expiration of employment authorization, if any, _____

DATE OF BIRTH REQUIRED FOR BACKGROUND CHECK IF APPLYING FOR
JUVENILE PROBATION, PRE-TRIAL SERVICES OR
COMMUNITY SUPERVISION & CORRECTION      D.O.B. _____

**POSITION DATA**

| Date you can start | 01 JULY 1997 | Referred by |
|---|---|---|

### EDUCATION

| NAME AND ADDRESS OF INSTITUTIONS | DATES FROM Mo-Yr. | DATES TO Mo-Yr. | MONTH/YEAR GRADUATED | TYPE OF DEGREE/DIPLOMA RECEIVED |
|---|---|---|---|---|
| HIGH SCHOOL CLARKE Co. HIGH, ATHENS, GA. | 1/64 | 5/67 | 5/67 | LIB. ARTS |
| COLLEGE INDIANA CENT. UNIV. | 1/69 | 12/72 | 5/72 | BA |
| COLLEGE SOUTHWEST TX ST. UN. SAN MARCOS TX | 1/79 | 5/79 | 5/79 | PARALEGAL |
| OTHER TX. TECH UNIV. SCHOOL OF MED. LUBBOCK | 8/87 | 5/91 | 5/91 | MD |

Note: Transcripts from ALL Colleges may be Required.

MAJOR SPANISH LANG/HISTORY No. HOURS 24/EACH MINOR ENGLISH LIT No.HOURS 18

GPA 3.4 ON A 4.0 SCALE

LIST SCHOLASTIC HONORS, OFFICES HELD AND ACTIVITIES IN SCHOOL AND COLLEGE    Total College Hours: 124

EPSILON SIGMA ALPHA HONOR SOCIETY.   GRAD CUM LAUDE

## GENERAL DATA

Answer Items 1 through 6 by placing an "X" in the proper column. Give details in No. 12 below.

| | YES | NO |
|---|---|---|
| 1. Are you now working for or have you previously worked for Harris County? | | X |
| 2. Do you or does your spouse have any relatives presently working or holding office in Harris County Government? | | X |
| 3. Are you aware of any reason which would keep you from being bonded? | | X |
| 4. Are you licensed to operate a motor vehicle? If yes, give Driver's License No. and State in No. 12 below. (Will not be considered unless related to job for which you are applying) | X | |
| 5. Are you willing to work any hours assigned to you? | X | |
| 6. Have you ever been convicted of an offense? Please Include driving while intoxicated or driving under the influence of drugs (exclude minor traffic violations). Give details and date in No. 12 below. | | X |
| 7. FOREIGN LANGUAGE SKILLS        Speak ☒        Read ☒        Write ☒ | X | |

8. MACHINE AND EQUIPMENT SKILLS: (Word Processing, P.C.'s, etc)        Typing _50_ WPM        Shorthand _____ WPM
Give details in No. 12 below.

9. SPECIAL QUALIFICATIONS AND SKILLS. Use this space to Indicate any additional experience, skills, licenses or certificates, etc. which in your opinion would qualify you for the position you seek.
Give details in No. 12 below.

10. GENERAL REMARKS. You may wish to include civic or community activities, membership in professional or scientific societies, Publications, Copyrights, Patents or Inventions, Honors, Awards and Fellowships.
Give details in No. 12 below.

11. If you are a veteran, indicate branch served in: _____        N/A

Dates: From _____ To _____

Are you an orphan or surviving spouse of a veteran? _____ Yes __X__ No

### 12. SPACE FOR DETAILED ANSWERS, INDICATE ITEM NUMBER FOR WHICH ANSWERS APPLY

| LIST # | DETAILS | LIST # | DETAILS |
|---|---|---|---|
| 4 | TEXAS: ▮▮▮▮▮ | | |
| 7 | SPANISH | | |
| | | | |
| | | | |
| | | | |

## EMPLOYMENT HISTORY

Name of Last Employer (or Present ) Employer
HAMILTON CO. CORONER'S OFFICE

Supervisor and Title
CARL PARROTT, MD    CO. CORONER

Address: City/State/Zip (Include Street No. & Name)
3159 EDEN AVE; CINCINNATI, OH. 45219

Your Title
FORENSIC PATH FELLOW

| From: Month & Year | To: Month & Year | Starting Salary | Final Salary | No. of Persons Supervised |
|---|---|---|---|---|
| 9/96 | 7/97 | 36000 | 36000 | — |

Reason for Leaving
COMPLETED FELLOWSHIP TRAINING

Phone No.
513-221-4524

Describe Your Duties
DEPUTY CORONER FOR HAMILTON CO. PERFORMED POST MORTEM
EXAMINATIONS, SUPERVISED SCENE INVESTIGATIONS, FINALIZED DEATH REPORTS

| Name of Employer | Supervisor and Title |
|---|---|
| SCOTT & WHITE HOSPITAL | STEVE BEISSNER MD, PhD |

| Address: City/State/Zip (Include Street No.& Name) | Your Title |
|---|---|
| 2401 So. 31ST    TEMPLE  TX | PATHOLOGY RESIDENT |

| From: Month & Year | To: Month & Year | Starting Salary | Final Salary | No. of Persons Supervi |
|---|---|---|---|---|
| 7/91 | 7/96 | 26 000 | 32 000 | — |

| Reason for Leaving | Phone No. |
|---|---|
| COMPLETED PATHOLOGY RESIDENCY | 817·774·2111 |

Describe Your Duties
THE REQUIRED ANATOMIC & CLINICAL PATHOLOGY CORE CURRICULUM

| Name of Employer | Supervisor and Title |
|---|---|
| SCOTT & WHITE HOSPITAL | FRANCISCO PEREZ-GUERRA MD |

| Address: City/State/Zip (Include Street No.& Name) | Your Title |
|---|---|
| same | SLEEP DISORDERS LAB TE |

| From: Month & Year | To: Month & Year | Starting Salary | Final Salary | No. of Persons Supervi |
|---|---|---|---|---|
| 8/84 | 7/87 | 18000 | 21 000 | — |

| Reason for Leaving | Phone No. |
|---|---|
| BEGAN MEDICAL SCHOOL | |

Describe Your Duties
MONITORED & SCORED SLEEP PATTERNS OF PATIENTS

SUFFERING FROM APNEA, NARCOLEPSY, SEIZURES, IMPOTENCE, ETC.

| Name of Employer | Supervisor and Title |
|---|---|
| LEGAL AID SOCIETY OF CENTRAL TEXAS | NICOLAS SERNA |

| Address: City/State/Zip (Include Street No.& Name) | Your Title |
|---|---|
| 513 So. MAIN.  BELTON  TX. | PARALEGAL |

| From: Month & Year | To: Month & Year | Starting Salary | Final Salary | No. of Persons Supervis |
|---|---|---|---|---|
| 5/79 | 8/83 | 15000 | 18500 | — |

| Reason for Leaving | Phone No. |
|---|---|
| WENT BACK TO UNDERGRADUATE SCHOOL | |

Describe Your Duties
REPRESENTED CLIENTS IN ADMINISTRATIVE LAW CASES
(e.g. SOC. SECURITY, INS, AFDC), DREW UP WILLS & RESEARCHED CIVIL CASE

## REFERENCES

LIST THREE PERSONS WHO ARE NOT RELATED TO YOU AND WHO HAVE DEFINITE KNOWLEDGE OF YOU
QUALIFICATIONS FOR THE POSITION FOR WHICH YOU ARE APPLYING. **DO NOT REPEAT NAMES OF**
**SUPERVISORS** LISTED UNDER EMPLOYMENT HISTORY.

| FULL NAME | HOME OR BUSINESS ADDRESS AND PHONE NUMBER (NUMBER, STREET, CITY, STATE, ZIP) | BUSINESS OR OCCUPATION | YEA ACQUA |
|---|---|---|---|
| JOHN D. HOWARD MD | PIERCE CO. M.E. (206)·591·6494 3619 PACIFIC AVE; TACOMA WA. 98408·7929 | CHIEF MED EXAMINER PIERCE CO. WA. | 1½ |
| ROBERT BUX MD | BEXAR CO. FORENSIC GCL CENTER, (210)·615·2160 7337 LOUIS PASTEUR; SAN ANT. TX. 78229 | DEPT CHIEF M.E. BEXAR CO., TX. | 3 |
| SANDRA CONRADY MD | FOR. PATH SECTION, MED. UNIV. OF So. CAROLINA 171 ASHLEY AVE.  CHARLESTON. SC. (803)·792·3511 | PROF & DIR. FOR. PATH. | ~1 |

I AUTHORIZE INVESTIGATION OF ALL STATEMENTS CONTAINED IN THIS APPLICATION.
I certify that there are no willful misrepresentations, omissions or falsification in the foregoing statements and answers to questions. I am aware that should an investigation disclose any misrepresentation, omission or falsification, my application may be rejected, or if already employed, my employment may be terminated. References and previous employer will be contacted to confirm statements unless otherwise indicated.

YOUR APPLICATION WILL NOT BE CONSIDERED UNLESS SIGNED AND ALL QUESTIONS ANSWERED.

DATE _29 MAY 97_____ APPLICANT'S SIGNATURE _____

Date_____ Alpha_____ Num._____ Spell. _____   Date _____ WPM_____ / _____ Date _____ WPM _____ / _____

Date_____ Alpha_____ Num._____ Spell. _____   Date _____ WPM_____ / _____ Date _____ WPM _____ / _____

## VETERANS PREFERENCE INFORMATION

The "Veteran's Employment Preference" (Ch. 657 of the Texas Code) relates to the appointment or employment of veterans who served during a national emergency, an individual classified as surviving spouse who has not remarried or an orphan of a Veteran. To determine if you are entitled to the Veteran's Employment Preference, the following information must be answered.

A veteran qualifies for a veterans employment preference if the veteran:

Served in the military for not less than 90 consecutive days during a national emergency declared in accordance with federal law or was discharged from military service for an established service-connected disability; was honorably discharged, and is competent.

Do your qualify for this preference?

❑ Yes
❑ No

A veterans surviving spouse who is not remarried or an orphan of veteran qualifies for veterans preference if:

Veteran was killed while on active duty, veteran served in military not less than 90 days during a national emergency and spouse or orphan is competent.

Do you qualify for this preference?

❑ Yes
❑ No

"Veteran" means an individual who served in the Army, Navy, Air Force, Marine Corps, Coast Guard of the U.S. or in an auxiliary service of those branches.

If employed, employee will be asked to provide documents to verify preference

DATE                                        NAME

H-163 -F/R 8/96
A

C

DATE TYPED: May 14, 2010
DATE PUBLISHED: May 18, 2010

## IN RE: RICHARD NIELDS, OSP #A352-374

**STATE OF OHIO**
**ADULT PAROLE AUTHORITY**
**COLUMBUS, OHIO**

Date of Meeting: May 10, 2010

Minutes of the **SPECIAL MEETING** of the
Adult Parole Authority held at 770 West Broad Street,
Columbus, Ohio 43222 on the above date.

Richard Nields, A352-374
Death Penalty Clemency Report

## IN RE: Richard Nields, OSP #A352-374

| | |
|---|---|
| SUBJECT: | Death Sentence Clemency |
| CRIME, CONVICTION: | Aggravated Murder with specifications, Aggravated Robbery. |
| DATE, PLACE OF CRIME: | March 27, 1997 in Springfield Township, Ohio |
| COUNTY: | Hamilton |
| CASE NUMBER: | B9703305 |
| VICTIM: | Patricia Newsome |
| INDICTMENT: | 5/2/1997: Counts 1-2: Aggravated Murder with specification, Count 3: Aggravated Robbery. |
| TRIAL: | Found guilty by jury |
| DATE OF SENTENCE: | 12/22/1997 |
| SENTENCE: | Aggravated Murder with specifications: DEATH Aggravated Robbery: 10 years |
| | * Counts 1- 2 merged for purposes of sentencing. |
| ADMITTED TO INSTITUTION: | December 23, 1997 |
| JAIL TIME CREDIT: | 1 day |
| TIME SERVED: | 136 months |
| AGE AT ADMISSION: | 47 years old |
| CURRENT AGE: | 59 years old |
| DATE OF BIRTH: | May 19, 1950 |
| JUDGE: | Honorable Thomas C. Nurre |
| PROSECUTING ATTORNEY: | Joseph T. Deters |

Richard Nields, A352-374
Death Penalty Clemency Report

## FOREWORD:

Clemency in the case of Richard Nields, A352-374 was initiated by the Ohio Parole Board, pursuant to Section 2967.03 and 2967.07 of the Ohio Revised Code and Parole Board Policy #105-PBD-01.

On April 29, 2010, Mr. Nields was interviewed via video-conference by the Parole Board at the Ohio State Penitentiary. A Clemency Hearing was then held on May 10, 2010 with seven (7) members of the Ohio Parole Board participating. Arguments in support of and in opposition to clemency were then presented.

The Parole Board considered all of the written submissions, arguments, information disseminated by presenters at the hearing, prior investigative findings as well as judicial decisions and deliberated upon the propriety of clemency in this case. With seven (7) members participating, the Board voted four (4) to three (3) to provide a favorable recommendation for clemency to the Honorable Ted Strickland, Governor of the State of Ohio.

## DETAILS OF THE INSTANT OFFENSE (B):

The following account of the instant offense was obtained from the Ohio Supreme Court opinion, decided August 29, 2001:

On the night of March 27, 1997, Patricia Newsome was found strangled on her kitchen floor. Police arrested the subject, Richard Nields, Newsome's frequent live-in companion, at Newsome's home that night, not long after Springfield Township Police had transported him there. Nields was indicted for aggravated murder and aggravated robbery, found guilty as charged, and sentenced to death.

Prior to 1997, Nields and Patricia Newsome had an on-again, off-again relationship for approximately ten to twelve years. In the year leading up to the murder, they lived together at Newsome's home in Finneytown, Springfield Township, in Hamilton County. Newsome worked as a realtor in Fairfield, and Nields was a keyboard musician who was out of work most of the time. On March 27, 1997, Newsome had lunch with her friend, Dorothy Kiser. Newsome told Kiser that she asked Nields to move out. Even though subject had packed his clothes in his car in order to move out, "he kept coming back to the house."

In the weeks leading up to March 27, Nields would call Newsome with hostile messages. On one occasion, an angry call for Newsome was received by the office receptionist, Floanna Ziegler, from a man identifying himself as a musician. Newsome wrote the incident down and told Ziegler, "I'm trying to file charges against him and I want to document everything that he said to you."

During the afternoon of March 27, Dorothy Alvin had a conversation with subject, who was a stranger to her, at Lulu's bar in Springfield Township. Nields told Alvin that the

3

Richard Nields, A352-374
Death Penalty Clemency Report

lady whose house he lived in was throwing him out. Nields further told Alvin, "I'd like to kill her, but I guess I won't do that because I don't want to go to prison."

Later, during the evening of March 27, Barbara Beck and Patricia Denier were dining at the Briarwood Lounge on Hamilton Avenue. At approximately 10:30 p.m., Nields entered the bar and approached the two women, both of whom he knew. Both women noticed blood on his right hand and asked him what happened. Nields said to them, "You'll hear it on the news tomorrow." Nields also kept repeating, "I'm in serious, serious trouble." Both women thought that he was in shock and was acting strange. Neither smelled any alcohol on his breath.

As Beck and Denier left the lounge, subject walked them to their car and asked to go with them. After they declined to take subject with them, Nields told them, "I'm going to be driving home in a Cadillac." They saw subject walk across the street to a white Cadillac. Friends of Patricia Newsome testified that she owned a white Cadillac but never let anyone else drive it, especially subject, "because of the way he drank."

Anthony Studenka was at DJ's Pub on Winton Road on the night of March 27, a little before midnight and sat down next to a person at the bar who "told me he killed somebody." That person was Nields. Nields showed Studenka his hands, which had cuts on them, and told Studenka that he had killed some kid who was a drug pusher. Nields then suddenly became belligerent and started calling Studenka insulting names. Kimberly Brooks, a friend of Studenka, also heard subject declare that he had killed someone and noticed that subject had "dried blood all over" his hands. However, Nields then denied that he had killed anyone, and said that he had helped drag the body away. Brooks called 911 to report subject's statements.

Springfield Township Police Officer Greg Huber was in front of DJ's Pub when he heard a radio call that a male at the bar was bragging that he had killed someone. Huber encountered Nields inside the bar and asked him to step outside because of the noise. After initially refusing to do so, Nields went outside and spoke with Huber, who then noticed blood on both of subject's hands. When asked about the blood, Nields told Huber that he was in a fight across the street at Lulu's bar. At that time, Police Sgt. Ken Volz arrived on the scene. Huber then went to Lulu's to investigate and discovered that there had been no fight there.

Sgt. Volz and another officer, Clayton Smith, spoke with subject outside of DJ's Pub. Nields told the officers that the story of the killing he was telling inside the bar was really about a Clint Eastwood movie. Smith, who was familiar with such movies, asked subject questions to find out to which movie subject was referring. However, subject could not sufficiently answer any of his questions. Sgt. Volz then instructed Smith to drive subject home due to his "intoxication level."

Nields pointed to the white Cadillac across the way as "his girlfriend's car" that he drove, which Volz learned was registered to Patricia Newsome. Volz then went to Newsome's house on 8527 Pringle Avenue, "to check on her well being." When he peered through

4

Richard Nields, A352-374
Death Penalty Clemency Report

the front window, he could see that the television and some lights were on, and he could
hear the dog barking inside.

As Officer Smith drove up to the Pringle Avenue residence with Nields, Sgt. Volz was
standing on the front porch area. Nields "became very uptight and aggressive and verbal
and almost yelling" at Smith. Nields declared that they were not going into the house
without a search warrant. Nields eventually calmed down, and the officers let him enter
the house and hoped he would calm down for the night. However, after Nields entered
the house, the officers could see him through the front window "waving his hands in an
erratic fashion."

As the officers were leaving, they noticed the door on the attached garage was open.
Officer Smith entered the open lit garage and peered in a window that looked into the
kitchen. Smith saw "a female on the ground who was obviously deceased." The officers
went to the front door and saw the subject through the front window still waving his
arms. They knocked on the door, and as Nields opened the door, they grabbed his arm,
pulled him outside, and handcuffed him. Police arrested Nields and advised him of his
*Miranda* rights. Sgt. Volz entered the house to check on the victim but could not detect a
pulse.

While Nields was detained in the police cruiser, he kept asking Officer Smith, "Is she
alive?" During the arrest, police found fifteen traveler's checks in the subject's
possession, all of which bore Patricia Newsome's name. Police Chief David Heimpold
arrived at the scene and readvised Nields of his *Miranda* rights. Nields told Heimpold
that he and Newsome had been in an argument. She hit him with the telephone, he then
pushed her, and she hit her head on a bookcase. Nields also mentioned that someone
named "Bob" was also there, but shortly thereafter, he admitted that this was a lie. Nields
admitted that he had choked Newsome after they had had a fight. The assistant medical
examiner, who performed the autopsy on Newsome, concluded that she had died from
asphyxia due to manual strangulation.

Nields was incarcerated at the Hamilton County Justice Center. Two days after the
murder, he talked with Timothy Griffis, who was serving time that weekend for
nonpayment of child support. Nields told Griffis that "he had killed his girlfriend," that
they had argued, and that he "jumped on top of her, started beating her up." Nields said
that he then went to a bar. He came back to Newsome's home to see if she was breathing
and started strangling her. He laid the phone on top of Newsome's chest, called her either
"bitch" or "baby," and told her, "Call me from heaven." According to Griffis, the subject
at times appeared to be remorseful, but at other times, he exhibited a carefree attitude
while recounting the details of the murder. Nields also told Griffis that he took money,
jewelry, and traveler's checks out of Newsome's purse. According to Griffis, the subject
was kind of upset because he could not use the traveler's checks.

On May 2, 1997, the grand jury indicted Richard Nields for aggravated robbery,
aggravated murder with prior calculation and design, and aggravated felony-murder
during an aggravated robbery. A death penalty specification attached to the aggravated

Richard Nields, A352-374
Death Penalty Clemency Report

murder counts alleged that Nields had committed aggravated murder during the aggravated robbery and that he was either the principal offender or committed the aggravated murder with prior calculation and design. R.C. 2929.04(A)(7).

Prior to trial, a suppression hearing was held on the subject's motion to suppress his statement to police after he requested an attorney, his statements at DJ's Pub, and his statement to Timothy Griffis because the police entered the curtilage of Newsome's home without a warrant. The trial court denied the motion to suppress, holding that exigent circumstances justified the search of the home. The court further held that Richard Nields statements to police after he requested an attorney were freely and voluntarily given and that his statement at the Justice Center to Griffis and his statements at the pub were not suppressible.

The state called numerous witnesses to establish Nields' guilt before a jury. The defense conceded that Nields had killed Newsome but disputed that Nields had purposefully or "knowingly caused the death of Patricia Newsome" because he was "under the influence of sudden passion and rage." During the trial, Officer Nancy Richter testified that she discovered three pages of yellow legal paper entitled "Record of Abuse" at Newsome's residence while she and Newsome's children were looking for her will several days after the murder. A forensic document examiner with the coroner's office determined that the "Record of Abuse" pages were written by Newsome.

Also at trial, Springfield Township Police Officer Paul Rook testified that he responded to a "domestic call" at Newsome's residence on March 1, 1997. At that time, Newsome told Rook that she wanted Nields to leave her home and that she was afraid of him. Rook and another officer took Nields from Newsome's residence until he could find someone else who would come and get him. The defense called one witness.

After deliberation, the jury found Nields guilty as charged.

At the mitigation hearing, the defense presented three witnesses: Nields' sister, Rochelle Pittman; Dr. Emmett Cooper, psychiatrist and pharmacologist; and Assistant Public Defender James Slattery. Pittman chronicled Nields' family life, including the fact that Nields' father was an alcoholic who left the family when Nields was in high school. Pittman also testified that she became friends with Newsome and that a few weeks before the murder, they discussed having Nields committed at Newsome's suggestion.

Dr. Cooper testified that Nields was an alcoholic and reviewed the medical ailments that Nields suffered as a result of his alcoholism. Dr. Cooper observed that Nields' time in jail since his arrest represented his longest period of sustained sobriety since 1976. Slattery, an admitted alcoholic, testified as to the deleterious effects of alcohol and how his alcoholism interfered with his ability to do what was best for himself as well as his ability to practice law.

The jury recommended death, and the court imposed the death sentence on Nields.

Richard Nields, A352-374
Death Penalty Clemency Report

## CRIMINAL HISTORY:

**Juvenile:** Unknown

**Adult:** Richard Nields has the following known adult arrest record:

| Date | Offense | Location | Disposition |
|------|---------|----------|-------------|
| 2/2/1976 (Age 25) | Drunk Driving on Highway | Riverside, California | 3/8/1976: 1 year summary probation, $315 fine. |
| 6/2/1977 (Age 27) | Drunk Driving on Highway | Santa Ana, California | 7/26/1977: 24 months probation, 9 days jail, $316 fine. |
| 3/9/1981 (Age 30) | Drunk Driving on Highway | Santa Ana, California | 3 weekends |
| 12/20/1989 (Age 39) | Domestic Violence 89CRB039644 | Cincinnati, Ohio | 12/28/1989: $200 fine, 1 year probation; 12/28/1990: terminated. |
| 10/06/1991 (Age 41) | OVI – Alcohol and/or Drugs | Butler County, Ohio | 10/7/1991: Convicted |
| 3/27/1997 (Age 46) | Aggravated Murder, Aggravated Robbery (B973305) | Cincinnati, Ohio | INSTANT OFFENSE |

**Traffic Violations:** On 11/25/1985, Nields received a moving violation in Hamilton County for which he received a $100 fine.

**Institutional Adjustment:**

Richard Nields was admitted to the Department of Rehabilitation and Correction on December 23, 1997. His work assignments while incarcerated at the Mansfield Correctional Institution included Food Service Worker, Laundry Worker and Recreation Worker. He was assigned to the extended privilege unit while at this institution. Since his transfer to the Ohio State Penitentiary, his work assignment has been as a Porter. Nields is also currently assigned to the extended privilege unit at OSP.

Since his admission, Richard Nields has never been placed in disciplinary control for any conduct problems.

Richard Nields, A352-374
Death Penalty Clemency Report

Currently, Nields is actively involved in religious service programs, bible studies and worship services. He also assists in church musical programs where he plays the keyboard. Nields has also volunteered for community service projects both at the Mansfield Correctional Institution and at the Ohio State Penitentiary.

## APPLICANT'S STATEMENT:

On April 29, 2010, Nields was interviewed from the Ohio State Penitentiary via video-conference by the Parole Board. During this interview Nields shared with the Board that he is asking for life without the possibility of parole. Additionally, he expressed sorrow and shared that not a day goes by that he does not feel remorse for what he did to the victim. He further shared that he "loved Patty, still loves Patty, and prays for her family."

When questioned by the Board as to what his role was in the instant offense, Nields shared the following: Nields stated that things began in the morning after the victim left for work. He began by stating he had been intoxicated for a period of ten days. On the morning of the instant offense, Nields walked to the liquor store and purchased some alcohol. He then went to the bar where he claims to have consumed alcohol all day long. Eventually, he went back home and continued drinking.

When Nields arrived home, Ms. Newsome was sitting on the couch and was very upset with him about his drinking. Nields claims that Ms. Newsome was so upset that she began yelling at him, and things started to "go down hill real fast." Nields indicated that the victim threw the telephone, hit him in the head with it, and he "snapped." This was the point at which Nields said he pushed the victim hard against the bookcase causing her to fall and hit her head. Next, Ms. Newsome picked up the phone again, and Nields tore it out of the wall. Nields then followed her to the kitchen and "grabbed" her as she attempted to leave. It was at this time that Ms. Newsome slipped on a mat by the door and hit her head on the kitchen floor. Nields shared that he got on top of her after she fell and started to hit and choke her. Eventually, he realized the victim was not responding, and blood started to come out of her mouth so he stopped.

Nields, then stated that after beating and choking the victim, he sat there for a minute, started to drink again, and began to talk to the victim. He also checked to see if the victim had a pulse, but she was already dead. Nields also states that he prayed for the victim as he finished his bottle of liquor. Next, he got into the car and drove to the local bar. It was at this time Nields told people he did an "insane thing" and let them know they would hear about it on the news. Eventually, he came to his senses and went back home. Upon arriving back home, Nields realized that the victim had not moved. He checked her pulse again and listened for a heart beat. Once again, he began praying and talking to the victim and eventually left to go to another bar.

While at the second local bar, Nields shared that he confessed to another patron about killing his girlfriend. It was at this time that someone must have called the police. The police showed up at the bar, questioned Nields, and drove him back home. After police drove Nields to the house, he told them that they needed a warrant before they could

8

Richard Nields, A352-374
Death Penalty Clemency Report

search his house, and then he closed the door. Police knocked again, Nields opened the door, and he was arrested.

Nields shared that he and the victim met in 1985. He stated they had a "beautiful relationship, loved one another, and did fun things together." They were involved as a couple for 12 years and lived together for approximately ten years. He did disclose to the Board that the police were dispatched to the home earlier in the month because the victim was upset that he was drunk and had been smoking. In fact, Nields shared that he was not arrested by police when they arrived and stated that they removed him from the home by dropping him off at the local bar. He also admitted to being arrested in 1989 for domestic violence against the victim. Nields indicated that he had been drinking, he and the victim argued, and he smacked her with an "open hand." The victim telephoned police the next day, and Nields was arrested.

Other than the aforementioned arrest for domestic violence, Nields denied any other record of domestic violence. He shared that he had been an alcoholic since 1976, had been in and out of rehabilitation multiple times, and had attended Alcoholics Anonymous. He also indicted that he had never been sober for longer than five months prior to coming to prison. This upset him because he was never able to receive his six-month sobriety token from Alcoholics Anonymous. Inmate Nields shared that he has been completely sober for the last 13 years.

Upon further questioning by the Board, Nields denied that he and the victim had discussed him moving out or leaving the home. Furthermore, he couldn't recall stating to anyone prior to that time that he wanted to kill the victim. He did recall confessing to the murder to another inmate while he was held in the county jail for the murder of Ms. Newsome.

Nields admitted to taking money from Patricia Newsome's purse along with money orders or cashier checks as he was leaving to go the bar after killing the victim. He further admitted to taking the victim's car keys and driving the car to the local bar. Nields also shared that he drove the victim's car "quite a bit," especially when going to visit the victim's daughter. Nields indicated that he made a deal with the victim that he could drive her car as long as he was sober.

Nields shared that he is estranged from his sister. His friends are his Christian brothers in prison. When questioned by the Board as to whether or not he received a fair trial Nields indicated that he was not a lawyer, but he believed that he was over-indicted and over-sentenced. Rather, Nields believed that he should have received life in prison without the possibility of parole and stated that his attorney believed his case was closer to that of manslaughter. Nields believed that his crime was one of passion and did not deserve the death penalty.

The Board also asked Nields if he returned to the crime scene to kill the victim. He denied leaving and going back to strangle the victim. He stated that he went back to the crime scene because he was hoping for a miracle. Nields also denied that he stated that

9

Richard Nields, A352-374
Death Penalty Clemency Report

he went back to strangle the victim to Timothy Griffis while being held in the county jail.
Nields went on to add that he believed that Timothy Griffis was "speaking fiction when
he did that" and added, "It disgusts me and makes me sick that he got on the stand and
said that lie."

Nields was questioned as to why he did not get the victim help. He indicated that he did
not know why and said, "When someone's dead, you know she's dead." He went on to
state that he was not thinking clearly either. He admitted that it took approximately three
to four minutes to strangle Ms. Newsome to death. Nields indicated that his conscience
keeps this crime in the forefront of his mind, and he beats himself up over his actions as
they play like videotapes over and over in his head.

Inmate Nields also shared with the Board that he did not steal the victim's car. He
claimed that he took it because it was in the garage and that it was more convenient than
taking his car which was parked on the street. Nields stated that it was not unusual to
drive Ms. Newsome's car to the grocery store, and he was insured to drive her vehicle.
He also indicated that he did not know why he took her money but did know that he
would not be in prison if it were not for his alcohol abuse.

Nields adamantly denied ever being violent with anyone before the instant offense. He
did share that the police were called to his home three or four times throughout his 12-
year relationship with the victim. He further added that he has never been involved in a
fight and hates violence. At this time, Nields was confronted with a document he had
authored entitled *Anger-People I Harmed*. It is in this document that Mr. Nields describes
multiple episodes of violence involving at least eight separate women to include his first
and second wives, live-in girlfriend, roommate, and other female friends. Nields said
these accounts were probably true since he recorded them in his AA inventory. However,
he could not recall all of the descriptions listed in the inventory.

Nields shared that Ms. Newsome did not drink or do drugs. He also indicated that she
was not fearful of him and that she "loved him and was crazy about him." Nields was
then confronted with the fact that the victim kept a diary outlining her fears about him
and the fact that he made statements of killing her and her sister. He claims that those
statements were nothing more than figures of speech. In fact, Nields told the Board that
the victim kept the diary because she wanted to have him committed.

Nields shared that he has spent most of his time on death row studying the word of God,
and he knows that Jesus forgives him for the wretched life that he has lived. He finds
peace in Jesus, plays music on the keyboard, plays chess and reads. He has remained a
positive person over the last 13 years.

Nields concluded the interview by stating that he was grateful to have had the opportunity
to speak to the Board, and that no one has visited with him with the exception of his
attorneys. He said he told us the truth and has turned everything over to God. Nields
also wanted to let Ms. Newsome's family know that he is sorry for what he did, prays for

Richard Nields, A352-374
Death Penalty Clemency Report

them, and believes in the power of prayer. Finally, he told the Board he would be grateful if the Board would let him live.

## ARGUMENTS IN SUPPORT OF CLEMENCY:

A written application with exhibits outlining the arguments in support of clemency for Richard Nields was received by the Parole Board. On May 10, 2010, a hearing was conducted to further consider the merits of the application. Carol Wright and Justin Thompson of the Federal Public Defender's Office and Randall Porter of the Ohio Public Defender's Office represented Inmate Nields and presented oral arguments and witnesses in support of clemency.

Attorney Carol Wright shared with the Board that they are requesting life without the possibility of parole for Richard Neilds. She began the presentation by quoting from the United States Sixth Circuit Court of Appeals. In 2007, this was the last court to have an opportunity to examine Richard Nields'case. She pointed out that those justices involved cited the following in their decision: "Despite the weakness of Nields' legal arguments on appeal, we cannot help but note that the circumstances of this case just barely get Nields over the death threshold under Ohio law." They further added, "At the same time, however, we recognize that a determination of whether this particular murder fits within that narrow category is a policy matter initially delegated by the State of Ohio to the jury and eventually delegated by the State to its governor to resolve in a fair-minded and even handed manner."

Attorney Wright stressed that the last court to examine Nields' case was "bothered" by what it saw. She also told the Board that she was going to present information that the jury, trial judge, and reviewing courts did not have available to them. Specifically, they relied on incorrect medical testimony that was provided by Dr. Paul Shrode. Additionally, they did not have available to them evidence showing that Nields has a damaged brain.

Nields' attorney began with the videotaped testimony from Dr. Robert Pfalzgraf. Dr. Pfalzgraf was the Deputy Coroner who supervised Dr. Shrode at the time of Nields' case, and he signed off on the autopsy results of Patricia Newsome that were conducted by Dr. Shrode. Dr. Pfalzgraf began his testimony by stating that the results of the autopsy report are correct and that nothing is technically wrong with them. However, what Dr. Pfalzgraf did not agree with are the conclusions that Dr Shrode testified to in front of the jury during Nields' trial. It should be noted that Dr. Shrode did not review his testimony in advance with Dr. Pfalzgraf in that he had moved out of state to take a different position.

Dr. Pfalzgraf shared that the conclusions that Dr. Shrode testified to at trial were not "scientifically supported," and he outlined five specific areas where his conclusions were not correct. First, he pointed out that there was no scientific evidence available to support the age of the bruises on the victim in that there was no evidence of healing. However, Dr. Shrode narrowed the time frame of the bruising on the victim down to 15



11

Richard Nields, A352-374
Death Penalty Clemency Report

minutes all the way up to six hours. Dr. Pfalzgraf pointed out that bruises can appear within seconds and last for a day or more.

Second, Dr. Pfalzgraf stated that Dr. Shrode was also incorrect regarding his conclusions on the fingernail clippings that he examined. Dr. Shrode led the jury to believe that due to the lack of DNA evidence under the victim's fingernails, she was already rendered unconscious and was unable to fight back when she was being strangled to death. Dr. Pfalzgraf pointed out that one cannot scientifically conclude that the lack of DNA under the victim's fingernails means that she was not fighting back and/ or conscious during the attack. In fact, he has never had a case where there was DNA evidence left under the victim's fingernails in all of his years of experience as a pathologist. Dr. Pfalzgraf further pointed out that the lack of DNA cannot ensure that the victim was unconscious. In fact, he stated in his affidavit to the Board "that it is actually rare for a victim's fingernails to collect evidence during a crime."

Third, Dr. Shrode attempted to establish a gap in the victim's death between the beating and her strangulation when talking about rigor mortis. Dr. Pfalzgraf pointed out that the only thing that can be scientifically established from rigor mortis is that it occurs after a person is dead.

Fourth, Dr. Shrode's testimony in relation to petechia was also incorrect. Dr. Pfalzgraf pointed out that the only thing petechia can support in this case is that the victim was strangled. In no way can it assist in determining her time of death.

Finally, Dr. Pfalzgraf pointed out that there are no findings available to determine that the victim was unconscious when she was strangled to death. Again, Dr. Pfalzgraf pointed out that Dr. Shrode was incorrect to conclude that the victim was strangled to death 15 minutes up to six hours after being beaten. Rather, Dr. Pfalzgraf shared that this could have all occurred as a single act, and that no evidence exists to support two separate attacks.

Defense counsel pointed out that the jury relied on this incorrect medical information to conclude that the murder of Ms. Newsome was one involving prior calculation and design, in that the beating, then the strangulation, were two separate acts separated by at least 15 minutes up to 6 hours. The trial court also utilized this same factor in imposing the sentence of death.

Counsel next presented Dr. Doug Lehrer who is the Medical Director of Kettering Medical School to offer information about Nields' damaged brain. Dr. Lehrer is a Board Certified Forensic Pathologist. He obtained brain imaging tests in the form of an MRI and a Pet Scan on Nields. These scans were conducted by Dr. Lehrer's colleagues. The results showed that Inmate Nields does have a damaged brain. In fact, the tests concluded that almost every area of Nields' brain had less activity than that of the average normal person, and that this damage would impact every area of his cortex.

12

Richard Nields, A352-374
Death Penalty Clemency Report

The neurological tests that were performed on Nields were completed in 2010. Dr.
Lehrer pointed out that one could conclude that these same results would have been
worse in 1997 when the crime occurred due to Nields' chronic alcohol abuse. In closing,
he shared that these scans get better with prolonged remission from alcohol abuse.
Nields' damaged brain would have caused him to be highly impulsive with emotionally
driven behavior. While time has allowed for Nields' brain to heal, it is still damaged
today.

Jackie Votaw is one of Nields' ex-wives. She provided videotaped testimony to the
Board and highlighted the fact that Nields was a great guy who was a prankster and liked
to have a lot of fun. She also shared that "music was his whole life." Ms. Votaw states
that Nields was her first boyfriend and meant everything to her. They married in 1969,
and together they have one daughter.

Ms. Votaw heard about Nields' crime on the news and was shocked to hear what he had
done. She further shared that Nields was not shown love by his family and that his father
was a drinker and ended up leaving the family. In the end, Ms. Votaw understands why
Nields left their marriage. He wanted to be a famous drummer, and she did not want to
hold him back from that dream. She indicated that today, Nields' admits to her that his
biggest mistake was leaving her. In conclusion, Ms. Votaw said that she and her daughter
would be deeply impacted if he is executed and asked for the Board to grant him
clemency. She also pointed out that she never was called to testify at Nields' trial.

Nields' childhood friend Greg Mendell also gave videotaped testimony to the Board. He
stated that he and Nields were the best of friends in high school and that Nields ended up
being the best man in Mr. Mendell's wedding. Mr. Mendell shared that Nields was a nice
guy and was never mean-spirited. In fact, he was "shocked" to read about Nields' arrest
in the paper. He, too, was never contacted to testify at the trial.

Additionally, Mr. Mendell described Nields as being devoted to his music and often
witnessed him practice his music for hours at a time. Mr. Mendell ended his statement by
sharing that Inmate Nields has had sincere faith since the first grade and that this is what
keeps him going. He asked the Board to let Nields spend the rest of his life in prison and
"let God sort out his punishment."

Clinical Psychologist Dr. Robert Smith also presented videotaped testimony to the Board
regarding alcoholism. He shared that 90% of Americans drink, but only 10% become
alcoholics. He further stated that 10% become alcoholics due to biological or genetic
factors, psychological factors, and/or environmental factors. Nields met all three of these
factors.

Dr. Smith pointed out that Nields paternal and maternal grandfathers were alcoholics
along with his father and his paternal uncles. Thus, Nields did not have a choice in the
matter of becoming an alcoholic in that it was in his genetic make-up.

13

Richard Nields, A352-374
Death Penalty Clemency Report

Dr. Smith also pointed out that environmentally, Nields felt that it was "normal" to drink and watched multiple family members drink a great deal. Finally, Dr. Smith pointed out that 40% of all alcoholics have co-occurring depressive disorders along with a history of emotional trauma. In Nields' case, he was diagnosed with depression, had financial problems, and his father left him when he was 18 years of age.

Dr. Smith stated that nothing externally forced Nields to drink. However, he described his craving for alcohol as being caused by a chemical change in the reward center of the brain. Dr. Smith compared it to non-alcoholics having a similar craving for food and water. He further added that working in bars and taverns while playing music could have also been a big trigger to Nields' alcohol abuse.

Dr. Smith concluded by stating that Nields had been drinking heavily on the day of the instant offense and that he would have been acutely intoxicated. Thus, this situation impaired his brain, made him impulsive, and caused him to have incorrect perceptions. Ultimately, Nields reacted to what he felt inside. Rather than talking about his feelings, he acted them out with aggression.

Nields' attorney presented one final witness to the Board. Ms. Pam Ewen, a friend of Nields, shared that she met him in 1993 at the Briarwood Lounge. She was employed as a waitress, and Nields was employed as the musician. Ms. Ewen highlighted the fact that Nields "loved music." She described him as a good man who was liked by everyone. She did admit that he drank too much and that she did witness him make failed attempts to get assistance for his drinking. She further pointed out that he was only sober for very short periods of time.

Ms. Ewen recalled her own mother driving Nields home from work on several occasions because he was too intoxicated to drive. She also claimed that there were times when Nields would fail to show up to work on a Saturday night and would not change his clothes for several days at a time. She said it was not unusual for him to get paid with "alcohol" by the owner of the lounge for his performances.

Ms. Ewen stated that Nields "drank all the time." She witnessed him become a "sloppy, nasty drinker." However, she was surprised to learn of his crime. She felt sorry for him at the time of trial because he was all alone. Ms. Ewen further commented that she would be greatly impacted if Nields is killed. She said, "He has a disease like cancer. We should not put him away, and should let him help others."

Federal Public Defender Carol Wright emphasized that Nields' case barely meets the threshold for the death penalty as was pointed out by the court. The jury and the judge relied on incorrect medical testimony, and Nields was destined to be an alcoholic who suffered brain damage as a result of his drinking.

Ohio Public Defender Randall Porter pointed out that this case was first indicted as a murder, and it was not until one month later that it was re-indicted as a capital case. He argued that the re-indictment for Aggravated Murder was based on the receipt of the

14

Richard Nields, A352-374
Death Penalty Clemency Report

medical evidence Dr. Shrode would provide. It was not until then that the state believed it could establish prior calculation and design. Without the medical evidence provided by Dr. Shrode, the entire approach to this case would have been different. Although the case was technically eligible for the death penalty due to the aggravated robbery, the state relied heavily on the medical evidence to prove prior calculation and design. Likewise, the jury and sentencing court also relied on this evidence in making the recommendation and imposing the death sentence. The fact that the medical evidence is now refuted should not be considered as insignificant.

Finally, Attorney Porter pointed out that Nields was remorseful about his crime from the very beginning. He was tearful when telling his story to law enforcement and was upset and crying at times when sharing his story with Timothy Griffis, the jailhouse informant. It is also documented on his jail intake form that he was crying, saw no future for himself and was depressed. The jail ended up putting Inmate Nields on suicide watch.

## ARGUMENTS IN OPPOSITION TO CLEMENCY:

Arguments in opposition to clemency were presented by Assistant Hamilton County Prosecutor Phil Cummings, and Assistant Attorney General Justin Lovett. Assistant Prosecutor Cummings shared that Nields is not worthy of clemency and that the victim in this matter loved and supported him. He described Nields as a cold, calculated, premeditated murderer who continues to lie and minimize his culpability in this crime.

Prosecutor Cummings pointed out that no one knows the exact sequence of events from that evening, in that Nields has told multiple stories and customizes this story, depending on his audience. He pointed out that what we do know is that this was a cold and deliberate act. Patricia Newsome, the victim in this case, documented her fears in her own written document entitled "Record of Abuse." A common theme that she wrote about in this record was Nields' continued need for money as well as his threats to choke her. He also left her threatening voice mail messages at her place of employment, and the police were called to their home one month prior to her murder for a domestic dispute where Nields was removed from the home.

Prosecutor Cummings also shared with the Board that Inmate Nields told Ms. Dorothy Alvin three to four hours prior to the murder, "As a matter of fact, I'd like to kill her, but I guess I won't do that because I don't want to go to prison." He also disclosed during this conversation that he was a musician who could not obtain employment and was financially broke. He was upset with Patricia Newsome for throwing him out of her home. Prosecutor Cummings points out that Nields had murder on his mind for months, and this crime was not one that involved a sudden fit of rage.

Prosecutor Cummings shared that it takes approximately three to five minutes to strangle someone to death. He also argued that the jury did have the option of finding Inmate Nields guilty of manslaughter, but they chose not to do so, based on the evidence presented at trial.

Richard Nields, A352-374
Death Penalty Clemency Report

Prosecutor Cummings referenced testimony presented at trial from Timothy Griffis, who was another inmate being held at the Hamilton County Justice Center with Nields. Griffis was told details of the offense by Nields. Details such as how Nields and the victim argued over the telephone, how he grabbed her hair and pulled her to the floor, and thought that he knocked the victim unconscious or may have even killed her were reported by Nields. He also disclosed that he jumped on top of the victim, started beating her up and shared that "blood was coming out of the back of her head." Nields also admitted to knocking out the victim's teeth and said that "the little puppy she owned ran over and ate two of them." Nields also admitted to placing the phone near the victim's body and told her to "call me from heaven." He also bragged about a bloody handprint he left on a man after patting the man's shoulder. Nields also shared with Timothy Griffis that he made it a point to pull the blinds in the home to conceal the view of the victim's body and went back later to check on her.

Prosecutor Cummings shared that it really does not matter if the victim died from a single event or if Nields left and came back. He stressed that what is very clear is the fact that there is undisputed evidence that a robbery occurred, and that Nields' motive for this robbery was his financial dependence on Ms. Newsome. Nields realized that he would no longer have the victim's financial support. He stole the victim's money, travelers' checks, and her car after murdering her. In fact, Nields commented to his cellmate that he was upset that he was not able to use the travelers' checks.

Prosecutor Cummings pointed out that the Aggravated Robbery in this case was a key component to Nields' conviction. Furthermore, Cummings shared that the jury did have information available to them regarding Nields' brain damage by way of Dr. Cooper's testimony. Nields' sister also testified to her brother's battle with alcoholism. This testimony was presented during the penalty phase of Nields' trial.

Prosecutor Cummings also pointed out that because this case involves domestic violence that this should not diminish the inmate's culpability in this case. He believes that this case deserves more scrutiny than one not involving domestic violence.

The State also interviewed Dr. Pfalzgraf and provided a videotaped presentation of this interview. Dr Pfalzgraf shared that Dr. Shrode could not have determined a time frame between the beating and strangulation of the victim. Additionally, the autopsy of the victim would not assist in determining this time frame of the victim's death. He did share that it is "possible" that the crime happened the way that Dr. Shrode said it did as he testified at trial.

Assistant Attorney General Justin Lovett offered oral arguments to the Board during the clemency hearing. He began by stating that Dr. Shrode's testimony does not effect the second aggravated murder specification surrounding the robbery involved in this offense. He also shared that Nields had been a violent person for many years prior to this crime. We know this information by reading his own documentation of violence in Nields' AA inventory. The abuse dates back to 1970 when he abused his first wife Jackie.

16

Richard Nields, A352-374
Death Penalty Clemency Report

Assistant Attorney General Lovett also shared that the police brought this case to the prosecutor as a murder and domestic violence charge. However, upon further investigation, the State went back to the Grand Jury with additional evidence. Thus a second indictment involving capital specifications was sought.

Attorney Lovett also pointed out that Dr. Shrode's testimony was not the only evidence to "hook" the jury into believing that this case involved premeditation. He went on to state that this was not a passionate murder. Rather this was about money and that this case deserves the death penalty.

In terms of the recent brain scans submitted by the defense, Attorney Lovett shared that these scans do not give the Board any idea as to when Nields' brain was actually injured. He commented that Nields could have sustained a head injury while playing basketball in prison.

In closing, the State reiterated that this case deserves the death penalty. The statement that the facts "barely" meet the threshold to impose the penalty of death is simply not accurate.

## VICTIMS' REPRESENTATIVES:

Connie Brown, the victim's daughter, also presented testimony in opposition to clemency. She described her mother, Patricia Newsome, as a good woman who loved life, taught Sunday School and protected animals. She also had a very strong work ethic. Her mother showed Nields kindness. However, "the kindness was what Richard Nields took advantage of. He stole her kindness, her personal belongings, and ultimately her life."

Ms. Brown shared that three weeks prior to her mother's death, she visited with her in Cincinnati. During this visit, Patricia Newsome told her daughter that she should stay with her grandmother in that she has been having problems with Nields. Ms. Newsome shared that Nields had become very angry the previous night, and she became frightened and asked him to leave. When he refused to leave, Ms. Newsome called the police. Police arrived and escorted Nields off of the property. Ms. Brown stated that approximately one week prior to her mother's death, Ms. Newsome had shared with her that Nields had been threatening her, and she had been keeping a record of the incidents to give to the police. Ms. Newsome never had an opportunity to present these threats to the police.

Ms. Brown respectfully asked the Board to deny clemency to Nields. She shared that he has been able to publish a book, yet has never taken the time to apologize to her family.

Carol Young, the victim's sister also provided oral testimony to the Board opposing clemency. She began her statement by telling the Board that her sister was her best friend and that their parents taught them to value life, help others, and work hard.

Richard Nields, A352-374
Death Penalty Clemency Report

Ms. Young shared how she and her sister would go line dancing. They also went to real
estate school together, took the test together, and worked together. She also spoke about
how particular Ms. Newsome was about her Cadillac and shared that she never let anyone
drive her car.

Ms. Young said that Ms. Newsome was a kind and generous person and was always
willing to help others. She would often put the needs of others before her own. Ms.
Young never recalled Nields having a full-time job. Rather, her sister took care of him,
and when she finally had enough of his abuse, Nields killed her.

Ms. Young concluded by stating, "Richard Nields was given a sentence to pay for the
crime of murdering my sister, and I am only asking that his sentence be carried through
and clemency be denied."

The Office of Victim Services also read a letter from Ms. Newsome's son who is also
opposed to clemency in this matter.


## PAROLE BOARD'S POSITION AND CONCLUSION:

The Board reviewed documentary evidence presented both in support of and in
opposition to clemency. Four (4) of the seven (7) Parole Board Members found the
following factors pivotal in making a recommendation to commute Nields' sentence to
life without the possibility of parole:

- Those voting to commute Nields' sentence to life without the possibility of parole
  are concerned with the medical evidence that was testified to at the time of trial
  by Dr. Shrode and has since been called into question by his former supervisor
  Dr. Pfalzgraf. While Dr. Pfalzgraf does not question the accuracy of the autopsy
  results completed by Dr. Shrode, he does question the lack of scientifically-
  supported conclusions that he testified to at that time of trial.
- Specifically, the Board was concerned that Dr. Shrode testified to the fact that the
  two attacks on Ms Newsome were separated by a minimum of 15 minutes to a
  maximum of six hours. Dr. Shrode came to this conclusion from bruising on Ms.
  Newsome. However, Dr. Pfalzgraf pointed out that there was no scientific
  evidence available to support the age of the bruises on the victim in that there was
  no evidence of healing. In fact, the bruising could have occurred within seconds
  and last up to a day or more.
- Members also put much weight into the United States Sixth Circuit Court of
  Appeals' decision. Members of this court stated the following: "Despite the
  weakness of Nields' legal arguments on appeal, we cannot help but note that the
  circumstances of this case just barely get Nields over the death threshold under
  Ohio law." They further cite in their opinion: "At the same time, however, we
  recognize that a determination of whether this particular murder fits within that
  narrow category is a policy matter initially delegated by the State of Ohio to the
  jury and eventually delegated by the State to its governor to resolve in a fair-
  minded and even-handed manner."

18

Richard Nields, A352-374
Death Penalty Clemency Report

- Members also factored into their recommendation Justice Pfeifer's dissent in the Ohio Supreme Court decision. He stated in this dissent, "I do not believe that Nields' crime is the type of crime that the General Assembly did contemplate or should have contemplated as a death penalty offense." He further went on to state, "This case is not about robbery. It is about alcoholism, rage, and rejection and about Nields' inability to cope with any of them."

- Members give significant weight to Justice Pfeifer's opinion in that he was a member of the Ohio General Assembly in 1981, and was one of the leading forces who helped write and enact Ohio's current death penalty statute.

- Upon examining Judge Nurre's rationale for his decision to impose the ultimate sentence of death, it is clear that he did factor Dr. Shrode's medical conclusions into his decision to impose the death sentence. Judge Nurre cites the following: "The uncontroverted facts and exhibits reveal that the defendant first brutally beat the decedent, and at some time at least fifteen minutes later, the defendant returned to strangle Patricia Newsome to death." While this is not the only factor he lists, it is clear that it was considered. 

- Finally, prosecutors relied on the timing of the victim's death throughout the guilt phase of the trial. They made references to this timing during opening and closing statements.

- In conclusion, members voting favorable are concerned about the medical evidence that has been called into question and not refuted by the State during their clemency presentation. Members also respect the dissent of Justice Pfeifer as well as the concern that the Justices of the United States Sixth Circuit Court of Appeal had, in that the circumstances of this case just barely get Nields over the death threshold under Ohio law. For this reason, we believe that Nields' sentence should be commuted to that of life without the possibility of parole.

Three (3) of the seven (7) Parole Board Members found the following factors pivotal in making an unfavorable recommendation regarding clemency:

While it is troubling that the jury and the courts relied on information from the medical examiner that may have been incorrect, we find that the information presented to the Board during the course of its clemency review lead us to vote in the minority.

- Even though the medical examiner's testimony has been rightly called into question, there is plenty of evidence of prior calculation and design in this case. Nields had threatened Ms. Newsome in the past, including in the time leading up to the murder. Hours before the offense, he told Ms. Dorothy Alvin, a stranger, that, "I'd like to kill her, but I guess I won't do that because I don't want to go to prison."

- Even without the prior calculation and design in this case, the Aggravated Robbery would be sufficient to make Nields eligible for the death penalty. After he killed her, Nields took her car, money, and travelers' checks. Nields was unemployed, without money, and nearly homeless. He needed money, and he went to a person from whom he had stolen in the past. Ms. Newsome wrote in

Richard Nields, A352-374
Death Penalty Clemency Report

her diary, "I can't leave money in the house – he will steal it...I have to lock my purse in the car...He tells me every day to get rid of my car and asks for money..." Nields strangled Newsome and then made off with her valuables.

- Nields has been less than forthcoming about the details of the offense and his prior history of violence. He tried several times to mislead law enforcement while they were investigating the homicide. He said that he regularly drove Ms. Newsome's car when her family and her own notes indicate that he did not. He told the Parole Board that he had never been violent toward women in the past, in spite of his own notes in his AA Inventory.

- Nields has a history of violence against women, including a Domestic Violence conviction against Ms. Newsome after punching her in the face. He also recorded his own acts of violence against women in his AA Inventory. He had left harassing messages on her answering machine, and threatened her. He generated in her enough fear to cause her to keep a "Record of Abuse".

- Given all of these facts, we do not believe that the outcome of the case would have been any different had the court and jury heard more reliable medical testimony. We also believe that the aggravating circumstances in this case make death the appropriate sentence.


## RECOMMENDATION:

The Ohio Parole Board with seven (7) members participating, by a vote of four (4) to three (3), recommends to the Honorable Ted Strickland, Governor of the State of Ohio, that executive clemency be granted in the case of Richard Nields, A352-374 in the form of a commutation to life without the possibility of parole.

Richard Nlelds, A352-374
Death Penalty Clemency Report

Adult Parole Authority
Ohio Parole Board Members
Voting **Favorable**

Ohio Parole Board Members
Voting **Unfavorable**

_____
Cynthia Mausser, Chair

_____
R. F. Rauschenberg

_____
Robert Maszczynski

_____
Bobby J. Bogan, Jr.

_____
Kathleen Kovach

_____
Trayce Thalheimer

_____
Ellen Venters

D

ᵐᵉTimes.com (http://www.elpasotimes.com)

# NEWS

Weather:
(http://www.elpasotimes.com/weather)

EL PASO, TX  |  Now: 62°F
(http://www.elpasotimes.com/weather)  |  High: 72°F
☼ (http://www.elpasotimes.com/weather)  |  Low: 44°F
(http://www.elpasotimes.com/weather)  |  5-DayForecast

HOT TOPICS:   Consulate killings (http://www.elpasotimes.com/news/ci_26119432)   Queens of the Stone Age (http://www.elpasotimes.com/entertainment/ci_25119266/)

🖨 Print   ✉ Email

# County confirms medical examiner Paul Shrode's résumé issues; no action to be taken

**By Diana Washington Valdez / El Paso Times (mailto:dvaldez@elpasotimes.com?**
**subject=El Paso Times)**
POSTED: 02/23/2010 12:00:00 AM MST

EL PASO -- County Human Resources Director Betsy Keller said her staff found discrepancies in Chief Medical Examiner Paul Shrode's résumé.

She reported her department's findings at Monday's meeting of the County Commissioners Court.

The commissioners first discussed Shrode's résumé during a closed session. Then, once back in open session, they announced that no action would be taken at this time.

Shrode did not attend Monday's meeting and has not returned phone messages for comment.

Keller said Shrode does not have a graduate law degree from Southwest Texas State University, which he claimed he had on the résumé he submitted when he applied in El Paso.

"He took several graduate courses at Southwest Texas," Keller said.

He has a medical degree from Texas Tech University Health Sciences Center but no other graduate degree, the county confirmed.

In a previous job application -- for Harris County -- Shrode indicated he had a paralegal diploma or degree from Southwest Texas State University, now known as Texas State University. However, according to the registrar's office, he attended the school for only one semester in 1979 and was enrolled in political science courses.

Shrode also said on his résumé that he was a deputy medical examiner for the Lubbock County Medical Examiner's Office before coming to El Paso.

However, the Human Resources Department confirmed that he was actually an employee of Texas Tech in Lubbock, which had hired him as a professor of pathology.

At the time, Texas Tech was on contract with Lubbock County to perform medical examiner duties, and Shrode was one of the Texas Tech employees who did autopsies and was allowed to use the title of deputy medical examiner on the paperwork.

David Fisher, a government watchdog in Elgin, Texas, said Texas Tech was forced to dismantle its former medical examiner arrangement with Lubbock County because it was allegedly illegal.

"Shrode's previous supervisors at Texas Tech in Lubbock did not have the authority to confer the title of deputy medical examiner on anyone," Fisher said.

Fisher has a complaint against Shrode pending before the Texas Medical Board.

Keller said Shrode received his undergraduate degree from Indiana Central University in world history and Spanish in 1972, and not in 1973, as his résumé indicated.

Keller also confirmed that Shrode passed only one of the two required exams to become board certified. "He is no longer eligible to sit for those boards (exams)," she said.

Elizabeth Gard, who also filed a complaint with the Texas Medical Board against Shrode, complained to commissioners about the way Shrode's office delayed releasing her late husband's autopsy report and death certificate, and about alleged errors in the documents.

County Assistant Attorney Holly Lytle defended how the county handled the release of the autopsy

## VIDEO NEWS FEED



28m
Ramon Renteria
In case you missed it, here's a preview of the GRAMMY Salute to the #Beatles, airing again tonight (Feb. 12) on CBS.

This comment is BLOCKED from showing in the widget.

This comment is APPROVED from showing in the widget.

Happening Around El Paso

News

report and death certificate.

Later, Gard said, "What Lytle presented was inaccurate because she did not have the complete information from my husband's medical records."

After the meeting, County Judge Anthony Cobos said, "I've lost confidence in Dr. Shrode. As time goes on, I believe a lot more is going to come to light regarding him."

County Commissioner Veronica Escobar said the district attorney and county attorney consider Shrode qualified to be the medical examiner. Under Texas law, the only requirement for a medical examiner is that he or she be a licensed medical doctor.

Escobar said Shrode did embellish his résumé, but commissioners already admonished him a couple of years ago.

"It would be irresponsible for the county to fire someone simply to do the politically expedient thing," said Escobar, referring to other politicians who've said the county should fire Shrode.

Lawyer Theresa Caballero, who is running for county attorney in the Democratic Party primary election, said she would have advised the commissioners to fire Shrode.

"I told the commissioners (Monday) I wanted this to go to a vote, and for everyone to be able to see how they voted," Caballero said. "Shrode is dishonest. I would like for him to be fired. Lives are at stake."

Lawyer Sergio Coronado, a county judge candidate and Canutillo ISD board member, also has called for Shrode's ouster.

County Attorney Jo Anne Bernal, who faces a challenge by Caballero for the county attorney's post, said Shrode is qualified to stay on as El Paso's chief medical examiner.

Diana Washington Valdez may be reached at dvaldez@elpasotimes.com; 546-6140.

🖨 Print   ✉ Email   ↥ Return to Top

### RELATED (HTTP://WWW.ELPASOTIMES.COM/NEWS)

El Paso City Council looking for proposals for full-service convention hotel Downtown (http://www.elpasotimes.com/news/ci_25118394/city-looking-proposals-full-service-convention-hotel-downtown)

Work to start on East El Paso projects (http://www.elpasotimes.com/news/ci_25118393/work-start-east-side-projects)

Drunk-driving crash survivor inspires El Paso students to make good decisions (http://www.elpasotimes.com/news/ci_25119412/drunk-driving-crash-survivor-sarah-csanzau-evans-inspires)

## Offers and articles from around the Web

ADVERTISEMENT


arrest records. Who do you know?


Discover Your Risk of a Heart Attack in Just Minutes. Take Dr. Crandall's Free Online Heart Test!


9 used-to-be homeless stars


Cumbersome CPAP machines or risky surgery are not the only answers to solving sleep apnea.

⌖ Texas Tribune
@TexasTribune

The @TexasTribune
(https://twitter.com/TexasTribune) TribCast,
sans @reevehamilton
(https://twitter.com/reevehamilton) but
including UT and non-endorsements, is
online: bit.ly/1eVaOaS
(http://t.co/kmSFCpxdMx) #txlege
(https://twitter.com/search?q=%23txlege)
#tx2014 (https://twitter.com/search?
q=%23tx2014)

Crowdynews

### Recommended for You


▸ West Palm Beach police seek El Pasoans' help in...
▸ El Paso tourism summit to highlight heritage...
▸ Beatles fans take magical history tour 50 years...
▸ Police arrest alleged Downtown El Paso hotel...


Time-Lapse Shows Multi-building Demolitio ...

E

04/23/04  09:00 FAX 713 796 6644          HARRIS CTY MED EXAMINER                              ☒ 008

STEPHEN D. ALLEN, M.D.,
INDIANAPOLIS, INDIANA
PRESIDENT

DEBORAH E. POWELL, M.D.,
MINNEAPOLIS, MINNESOTA
VICE PRESIDENT

M. DESMOND BURKE, M.D.,
NEW YORK, NEW YORK
SECRETARY

JEFFREY McCULLOUGH, M.D.,
MINNEAPOLIS, MINNESOTA
TREASURER

DAVID B. TROXEL, M.D.,
LAFAYETTE, CALIFORNIA
IMMEDIATE PAST PRESIDENT



# The American Board of Pathology

• A Member Board of the American Board of Medical Specialties •

Please address all communications to:

Office of The American Board of Pathology

WILLIAM H. HARTMANN, M.D.
EXECUTIVE VICE PRESIDENT

Mailing address:                    Express address:

P.O. Box 25915                      One Urban Centre, Suite 690
Tampa, Florida 33622-5915           4830 West Kennedy Boulevard
Tel: 813/286-2444                   Tampa, Florida 33609-2574
FAX: 813/289-5279
web site: http://www.abpath.org

BARBARA F. ATKINSON, M.D.
KANSAS CITY, KANSAS

REBECCA L. JOHNSON, M.D.,
PITTSFIELD, MASSACHUSETTS

JAMES L. MADARA, M.D.,
CHICAGO, ILLINOIS

ROBERT W. McKENNA, M.D.,
DALLAS, TEXAS

DWIGHT K. OXLEY, M.D.,
WICHITA, KANSAS

JUAN ROSAI, M.D.,
MILAN, ITALY

ROBB H. ZUMWALT, M.D.,
ALBUQUERQUE, NEW MEXICO

October 28, 2003

Dr. Paul W. Shrode
9627 Randon Lane
Missouri City, TX 77459

Dear Dr. Shrode:

The Trustees of The American Board of Pathology are pleased to inform you that you have been successful in the 2003 Forensic Pathology portion of the combined Anatomic Pathology and Forensic Pathology examination.

Pursuant to Board policy, an individual seeking certification in combined Anatomic Pathology and Forensic Pathology must be successful in all portions of both examinations to receive the combined certificate and to become a Diplomate of the American Board of Pathology. Accordingly, you are not certified by the Board and therefore are not a Diplomate of the American Board of Pathology.

Sincerely yours,

William H. Hartmann, M.D.
Executive Vice President

F




**EL PASO COUNTY**
**EXIT INTERVIEW**

Name: Paul W. Shrode Employment Date: 11/28/05

Title: Medical Examiner Termination Date: 2/24/10

Department: M.E.          Length of Service in Present Job: 4 yrs. 3 months

Supervisor: Commun. Ct.
*A copy of this exit interview will be sent to the appropriate parties to help make El Paso County a great place to work.

Why are you leaving El Paso County? _____
                    TERMINATED

What do you think about what you were paid?_____
              OK

What do you think about the County benefits you received?_____
              OK

What do you think about the County's holidays and leave benefits? _____
              OK

Do you think you received adequate job training? _____
              N/A

What do you think about your Supervisor & his/her skills & effectiveness? _____
              N/A

What do you think about your coworkers & their skills & effectiveness? _____
              EXCELLENT

Was your job represented correctly when you were hired?  If no, please explain? _____
              YES

Were conditions of work, salary and other benefits, hours of work, etc. clearly explained
to you when you were hired? _YES_____

Do you feel your work was appreciated?  If so, please tell us how this was achieved.  If
not, please tell us what would have communicated our appreciation to you._____
              NO  COMMENT

Were working conditions satisfactory? If not, please explain. _____
YES

Was over-all treatment fair and impartial? If no, please explain. _____
NO COMMENT

Did you have sufficient opportunity to develop your capabilities in your job? _____
NO COMMENT

Do you feel your job was important to the overall operation? _____
YES

How was morale in your area? Please explain/give examples. _____
VERY HUGH

Do you think you were fairly rated on your performance reviews? _____
NO COMMENT

Do you have another job? If so, where? __NO_____

How does it compare to the position you are leaving? _____ RECEIVED
N/A.

What is the rate of with your new employer? __N/A.    MAY 25 2010

What do you like about your new job? _____

What could have been done to prevent your leaving? _____
NO COMMENT

What suggestions do you have which will make El Paso County a better place work? __
NO COMMENT

Would you consider working for El Paso County in the future? NO _____

Any additional comments you would like to share: __NO_____

Date: 24 MAY 2010    Signature: _____

HR Comments: _____

Exit Interview Conducted By: ___Betsy Keller___    Date: 5.24.2010
Copies sent to: ___County Judge Cobos Jr. Commr.___
Ct. Members

# G

1

```
 1
 2                      REPORTER'S RECORD
                 TRIAL COURT CAUSE NO. 2006CM4085
 3                    VOLUME 2 OF    VOLUMES
 4
 5  IN THE INTEREST OF:           )   IN THE 65TH JUDICIAL
                                  )
 6  ANGEL RENAI DOMINGUEZ, AKA    )
    ANGEL RENAI SILVA,            )
 7  DAMIEN JOSEPH RAMOS,          )   DISTRICT COURT OF
    ELLIE NICHOLE RAMOS and       )
 8  ALICIA DANIELLE RAMOS,        )
                                  )
 9  Minor Children.               )
                                  )   EL PASO COUNTY, TEXAS
10        ********************************
11
                        JURY TRIAL
12
          ******************************
13
14                      COPY
15
16
17              On the 13th day of August, 2007, the
18  following proceedings came on to be heard in the
19  above-entitled and numbered cause before the Honorable
20  ALFREDO CHAVEZ, Judge Presiding, held in El Paso, El Paso
21  County, Texas:
22              Proceedings reported by machine shorthand
23  utilizing computer-assisted realtime transcription.
24
25
```

2

```
 1                      APPEARANCES

 2   For Child Protective Services:

 3   BRUCE YETTER
     SBOT # 22153500
 4   RICHARD DECK
     SBOT # 00785812
 5   Assistant County Attorneys
     500 San Antonio, 5th Floor
 6   El Paso, Texas  79901

 7
     For Respondent Mother Alicia Silva:
 8
     THERESA CABALLERO
 9   SBOT # 03569625
     300 E. Main, Ste. 1136
10   El Paso, Texas  79901

11
     For Respondent Father David Ramos:
12
     CHRISTOPHER T. COX            ROSENDO TORRES
13   SBOT # 00787296               SBOT # 20144550
     6006 N. Mesa, Ste. 220        1220 Montana, Ste. 201
14   El Paso, Texas  79912         El Paso, Texas  79902

15
     For Angel Renai Dominguez:
16
     BERNARDO GONZALEZ
17   SBOT # 081245100
     7362 Remcon
18   El Paso, Texas  79912

19
     For Ramos Children:
20
     CELIA A. VILLASENOR
21   SBOT # 24043975
     1112 Montana Avenue
22   El Paso, Texas  79902

23
     DEBORAH BABERS
24   Court Appoint Special Advocate

25
```

3

CHRONOLOGICAL INDEX.

8/13/07

|  | Page | Vol. |
|---|---|---|
| Motion to withdraw By Mr. Cox | 4 | 2 |
| Jury Instructions | 10 | 2 |
| Opening Statements |  |  |
| By Mr. Yetter | 15 | 2 |
| By Mr. Cox | 29 | 2 |
| By Ms. Caballero | 38 | 2 |
| By Mr. Gonzalez | 46 | 2 |
| By Ms. Villasenor | 49 | 2 |

| Witness | Direct | Cross | Redir. | Recro. | VD | Vol. |
|---|---|---|---|---|---|---|
| DAVID RAMOS |  |  |  |  |  |  |
| By Mr. Cox | 6 |  |  |  |  |  |
| By Mr. Yetter | 56 |  | 123 |  |  | 2 |
| By Ms. Caballero |  | 113 |  | 127 |  | 2 |
| By Mr. Gonzalez |  | 113 |  |  |  | 2 |
| By Ms. Villasenor |  | 117 |  |  |  | 2 |
| PAUL W. SHRODE, M.D. |  |  |  |  |  |  |
| By Mr. Yetter | 130,165 |  |  |  | 152 | 2 |
| By Mr. Cox |  | 181 |  |  | 137 | 2 |
| By Ms. Caballero |  | 203 |  |  | 146 | 2 |

EXHIBITS

| No. |  | Marked | Admitted | Vol. |
|---|---|---|---|---|
| Ramos 1 | Letter from David Ramos | 9 | 10 | 2 |
| CPS-4 | Indictment | 104 | 105 | 2 |
| CPS-5 | Del Sol Medical Records | 106 | 110 | 2 |
| CPS-6 | Sierra Medical Center Records | 111 | 111 | 2 |
| CPS-12 | Autopsy Report |  | 180 |  |
| CPS-12a | CV of Dr. Shrode | 131 | 165 | 2 |

DIANE J. MARQUEZ, OFFICIAL COURT REPORTER
65th District Court, 500 E. San Antonio, Rm. 1105
El Paso, Tx. 79901   (915) 546-2102

1  want to miss anything. If I assume this is a natural

2  death, then I'm not going to think about an accident

3  other a homicide or anything like that.

4      Q.   Why do you assume anything?

07:37:44  5      A.   Well, you know, the law assumes a person is

6  innocent until proven guilty. Why can't I assume some

7  things?

8      Q.   Do you think there is a burden in medicine

9  because there are burdens in the law -- are you telling

07:37:54  10  the ladies and gentlemen of the jury that like the law,

11  that medicine has burdens? And if you are telling me

12  that medicine has burdens, then I'd like you to show me

13  what medical book outlines that.

14      A.   No, I'm not going to tell you that.

07:38:10  15      Q.   Let's talk about your CV, Doctor. You have down

16  on your resume your educational background. You have a

17  graduate law degree from school of political science

18  Southwest Texas University, San Marcos, Texas 1979. You

19  are saying you have a graduate law degree?

07:38:38  20      A.   It's from the school of political science. It's

21  not from the school of law.

22      Q.   Do you have a law degree, Doctor?

23      A.   Not in the sense of a law degree from a school

24  of law, not like you.

07:38:52  25      Q.   Not like me. Do you have a diploma, a

1    certificate, anything that hangs on your wall that you
2    can show the ladies and gentlemen of the jury that says I
3    Dr. Shrode have a law degree?  Not just a law degree, a
4    graduate law degree?
5         A.   No, I do not have that.
6         Q.   And so in fact you don't have a law degree,
7    graduate or otherwise?
8         A.   Well, I have a degree in law from the graduate
9    school of political science.  As I mentioned, it was the
10   first year of law school in this school that did not get
11   eventually accredited.
12        Q.   First year of law school.  How many years did
13   you attend?
14        A.   One.
15        Q.   Do you know how long law school is?
16        A.   Three.
17        Q.   Three.  So you got a law degree in one year from
18   the school that is not an accredited law school?
19        A.   Well, the school of law was not accredited.
20   Everything was done under the -- it wound up being under
21   the school of political science.
22        Q.   Are you -- I want to understand what you're
23   telling me.  Are you saying that you have a law degree?
24        A.   I do not have a law degree.
25        Q.   So your CV is misleading.  Graduate law degree,

1    am I reading that incorrectly?

2        A.    No, that's what it says.

3        Q.    So that's not what you have though, is it?

4        A.    Well --

07:40:32    5        Q.    That's a "yes" or a "no".

6        A.    I have a law degree from the graduate school of

7    political science.

8        Q.    Is that different from you have a graduate law

9    degree?

07:40:46    10        A.    In terms of having a law degree from a school of

11    law, I do not have that.  And if you want me to say I

12    don't have a law degree, I do not have a law degree.

13        Q.    I want you to just tell me what you have,

14    Doctor.  It's not I want you to say this or I want you to

07:41:02    15    say that.  I see you have said in plain English graduate

16    law degree from school of political science.

17        A.    Okay.  I have a degree from the graduate school

18    of political science.

19        Q.    And what does that degree entail?

07:41:20    20        A.    It's law.  We studied a year of law.  We studied

21    contracts and all the things that you do in first year

22    law.

23        Q.    Are you aware there is a criminal justice

24    program at UTEP and students can go take contracts and

07:41:36    25    torts and civil procedure and criminal procedure at that

```
 1   criminal justice program, but they don't call them a law
 2   degree?
 3        A.    No, I am not aware of that.
 4        Q.    Do you think that that is perhaps misleading?
 5        A.    Well, if it is misleading it can be looked at.
 6        Q.    Looked at or changed, rectified, corrected?
 7        A.    Corrected, whatever.
 8        Q.    In fact, didn't you say earlier it was a
 9   paralegal degree?
10        A.    I worked as a paralegal.
11        Q.    I didn't ask you that.  Didn't you say earlier
12   it was really a paralegal degree?
13        A.    It was paralegal studies.
14        Q.    And the paralegal in the legal profession would
15   be what a medical assistant is in the medical profession?
16        A.    I can't make that correlation.  I don't know.
17        Q.    Is a medical assistant the same as a doctor?
18        A.    No.
19        Q.    Could a medical assistant who studied medicine
20   for one year say that she has a graduate medical degree?
21             MR. GONZALEZ:  Judge, I'm sorry.  It's time
22   to object.  This is argumentative and totally irrelevant.
23   That's not why we're here today.
24             THE COURT:  Sustained.
25        Q.    (BY MS. CABALLERO)  And in fact, you have under
```

1  your qualifications profile that you were a member of the

2  State Bar of Texas from 1979 to 1983, correct?

3            MR. GONZALEZ:  Same objection.

4            THE COURT:  Sustained.  Move on.

07:42:08  5  Q.    (BY MS. CABALLERO)  Is there anything else on

6  here, Doctor, that needs to be corrected?  Anything else

7  under your qualifications?

8  A.    You're saying I was not a member of the State

9  Bar?

07:43:16  10  Q.    Sorry?

11  A.    You're saying I was not a member of the State

12  Bar?

13  Q.    I didn't say that.  I asked you if you said

14  that?

07:43:20  15  A.    I was a member of the State Bar of Texas.

16  Q.    Is there anything else on your CV that you think

17  isn't entirely accurate or would be misleading to a jury

18  that takes this back to read it?

19  A.    No, I don't believe so.

07:43:36  20  Q.    And there was a supplemental report generated by

21  Rex K. Parsons investigator, correct?

22  A.    Yes.

23  Q.    And that supplemental report was generated

24  because in fact the case numbers were mixed up, correct?

07:44:04  25  A.    Yes, the case numbers were incorrect.

221

1       Q.    So they were using a camera and shots are taken

2   and they put case number 06-0219 on some information.

3   And as it turns out that should have been 06-0220,

4   correct?

07:44:32   5       A.    Correct.

6       Q.    Any other mistakes that we need to know about

7   here?

8       A.    I am not aware of any.

9             MS. CABALLERO:   I pass the witness.

07:44:56   10            THE COURT:   Let's brake for the day.   Ladies

11   and gentlemen of the jury, at this time we are going to

12   recess for the day.   The instructions I've given you

13   previously continue.   Do not discuss this case with

14   anyone.   Anyone attempts to discuss the case with you,

07:45:06   15   inform us immediately.

16            I need you in the jury room at 8:30 tomorrow

17   morning so we can continue this case.   Good night.

18            (Proceedings adjourned for the day.)

19

20

21

22

23

24

25

222

1  STATE OF TEXAS                    )

2  COUNTY OF EL PASO                 )

3

4       I, Diane J. Marquez, Court Reporter in and for the

5  65th Judicial District Court of El Paso County, State of

6  Texas, do hereby certify that the above and foregoing

7  contains a true and correct transcription of ~~all~~ *excepts of* portions

8  of evidence and other proceedings requested in writing by

9  counsel for the parties to be included in this volume of

10 the Reporter's Record, in the above-styled and numbered

11 cause, all of which occurred in open court or in chambers

12 and were reported by me.

13      I further certify that this Reporter's Record of the

14 proceedings truly and correctly reflects the exhibits, if

15 any, offered by the respective parties.

16      I further certify that the total cost for the

17 preparation of this Reporter's Record is $_____ and was

18 paid/will be paid by _____.

19      WITNESS MY OFFICIAL HAND this the _21_ day of

20      _Sept._ , 2007.

21

22

23      DIANE J. MARQUEZ, Texas CSR# 3160

24      65th District Court
        El Paso, TX  79901 (915) 546-2102

25      Expires:  December 31, 2008

# H

The American Board of Pathology

October 19, 2009

Bonnie
Oaks Drive
League City, TX 77573

Dear Ms.

Paul Wayne Shrode, M.D. is not a diplomate of the American Board of Pathology and has not been certified by the Board.

Dr. Shrode was qualified to sit for the combined Anatomic Pathology and Forensic Pathology examination. Dr. Shrode's period of Board Qualification for Combined Anatomic Pathology and Forensic Pathology terminated on 12/31/2008.

Sincerely,

Betsy D. Bennett, M.D., Ph.D.
Executive Vice President

BDB/kh

SEAL



Times.com (http://www.elpasotimes.com)

# NEWS (/NEWS)

Weather:
(http://www.elpasotimes.com/weather)

EL PASO, TX | Now: 57°F
(http://www.elpasotimes.com/weather) | High: 60°F
° (http://www.elpasotimes.com/weather) | Low: 33°F
(http://www.elpasotimes.com/weather) | 5-Day Forecast

HOT TOPICS:   Heroin seizure (http://www.elpasotimes.com/news/ci_24903389)   Facebook contest (http://www.elpasotimes.com/latestnews/ci_24898353)

**BREAKING NEWS:** Daniel Villegas released after judge sets $50K bond     **× (x)**
(http://www.elpasotimes.com/latestnews/ci_24908384)

🖨 Print   ✉ Email

# Testimony in child death trial brings up fired coroner; closing arguments expected today

by Adriana M. Chávez \ El Paso Times (mailto:achavez@elpasotimes.com?subject=El Paso Times: )

POSTED: 11/19/2010 12:00:00 AM MST

Clos[    ]ments are scheduled to begin this morning in the trial of a [    ]ort Bliss soldier accused in the beating death of her you[  Tweet  ]

Mon[  ]ces Tyson, 27, faces life in prison without parole if convicted of capital murder. She has been jailed since her arrest in Janua..., 2009, more than a month after the death of her 22-mon[  ]on, Jayceon Tyson.

Defe[  ]rneys Dolph Quijano and Leonard Morales rested their case Tuesday afternoon soon after the testimony of County Com[  ]er Anna Perez, who was subpoenaed by Quijano to testif[  ]why commissioners fired El Paso County medical exam[  ]. Paul Shrode in May.

Shr[  ]cted Jayceon's autopsy and ruled his death a homicide, but Dr. Juan Contín, the county's interim medical examiner, testified during Tyson's trial.

Outside the presence of jurors, Perez told District Judge Sam Medrano Jr. that she couldn't testify about the reasons for Shrode's firing because of "executive session privilege."

When jurors were allowed back into the courtroom, Perez testified that in her personal opinion, she didn't think Shrode was truthful. Commissioners fired Shrode after allegations surfaced that he lied about having a law degree on the résumé he submitted to the county when he was hired.

During cross-examination by Assistant District Attorney Penny Hamilton, Perez said her decision was not based on any of Shrode's autopsies.

Dr. Karen Griest, a defense witness who works as a private pediatric forensic pathology expert, testified Wednesday that Jayceon's death might have been caused by sepsis, a blood infection, that stemmed from pneumonia.

Griest testified that she learned Jayceon was treated for a cold for several days before his death. She said it was also possible Jayceon hit his head while playing in an unfinished playground near his East Side home, which would account for the bump on his left temple, and that other markings on his body were not bruises, but benign skin discolorations.

She testified Shrode should have described the condition of Jayceon's intestines in his autopsy

## RELATED STORIES

**Nov 19:**
- Ex-Fort Bliss soldier cleared in son's death (http://www.elpasotimes.com/news/ci_16652198?source=pkg)

**Nov 18:**
- Update: Tyson found not guilty in death of 22-month-old son (http://www.elpasotimes.com/news/ci_16648200?source=pkg)

**Nov 17:**
- Medical examiner testifies in child death trial (http://www.elpasotimes.com/news/ci_source=pkg)

**Nov 16:**
- Mother on trial in death of 22-month-old son (http://www.elpasotimes.com/news/ci_source=pkg)

**Nov 13:**
- Murder trial to open for ex-soldier (http://www.elpasotimes.com/news/ci_source=pkg)

⊡ ×
UP TO
**70%** OFF
*home décor*

Today's Promotion
Joss&Main
SHOP NOW

But during Hamilton's cross-examination, Griest said she wasn't aware that paramedics were treating Jayceon that the boy had been healthy until the time Tyson found him, that he was unresponsive in his bedroom on Dec. 6, 2008.

Griest testified she also wasn't aware that police detectives who examined Tyson's computer found she allegedly searched the keywords "head injury" and "abuse" on a medical website.

Griest said a blood sample taken from Jayceon's body would have been missing results because Jayceon received a blood transfusion while hospitalized.

Closing arguments are scheduled to begin at 8:30 a.m today in the 210th District Court.

Adriana M. Chávez may be reached at achavez@elpasotimes.com; 546-6117.

Print    Email    Return to Top

## MOST POPULAR (/POPULAR)

DAY (/POPULAR)   HOUR (/POPULAR)   NEWS (/POPULAR)
SPORTS (/POPULAR)   BIZ (/POPULAR)   A&E (/POPULAR)
EMAIL (/POPULAR)   LIFESTYLE (/POPULAR)

'Huge' heroin seizure made on the El Paso border
(http://www.elpasotimes.com/news/ci_24903369/huge-heroin-seizure-made-el-paso-border?source=most_viewed)

Cyberbullying: El Paso girl's suicide puts spotlight on social media da
(http://www.elpasotimes.com/news/ci_24895008/activist-lawmakers-battle-increasing-threat-cyber-bullying?source=most_viewed)

El Paso City Council to review 2014 federal legislative agenda
(http://www.elpasotimes.com/news/ci_24905697/city-council-review-2014-federal-legislative-agenda?source=most_viewed)

» More most-popular news stories (/popular#pop-news)

Offers and articles from around the Web          ADVERTISEMENT


This Olympian is hot enough to melt gold, silver and bronze all at once.


Controversy over new skinny pill – is it too strong for store shelves?...


Silsbee arrest records. Who do you know?


Electricity "conspiracy" exposed. 1 weird trick to slash your power bill. Watch now before banned!

## VIDEO NEWS FEED

Got a tip? (/form/news.room)

Send us a photo
(mailto:webdesk@elpasotimes.com)

Have a correction?
(mailto:borderland@elpasotimes.com?subject=Correction%20on%20http://www.elpasotimes.com/news/ci_166423742&source=pkp)

Text alerts (/mobile/alerts)

### TAKE ACTION

0 new Touts - Watch now


35m

After being released on bond Daniel Villegas' first stop was St Pius Church in central El Paso. #Villegas

This comment is BLOCKED from showing in the widget.

This comment is APPROVED from showing in the widget.

## Happening Around El Paso

News

El Paso History
@EP_history

Photo: Jan 15, 1962 Hotel Dieu School of Nursing was notified of its accreditation by the National League for Nursing
pic.twitter.com/vm0xUGUlKO
(http://t.co/vm0xUGUlKO)

56m

(http://twitter.com/EP_history/status/423180137794476

El Paso
Crowdynews

## Recommended for You

▶ Live coverage: Roswell school shooting
▶ Volcano erupts more than 30 times in one day
▶ Traffic update: Traffic call at Yarbough and...
▶ Fox announces premiere dates for new '24',

UP TO 70% OFF home décor   Joss&Main   SHOP NOW »

③

elPasoTimes.com (http://www.elpasotimes.com)

# NEWS

Weather
(http://www.elpasotimes.com/weather)

EL PASO, TX | Now: 57°F
(http://www.elpasotimes.com/weather) | High: 60°F
(http://www.elpasotimes.com/weather) | Low: 33°F
(http://www.elpasotimes.com/weather) | 5-Day Forecast

HOT TOPICS:   Heroin seizure (http://www.elpasotimes.com/news/ci_24803369)   Facebook contest (http://www.elpasotimes.com/latestnews/ci_24898353)

**BREAKING NEWS:** Daniel Villegas released after judge sets $50K bond (http://www.elpasotimes.com/latestnews/ci_24908384)   × (x)

🖨 Print   ✉ Email

# Ex-Fort Bliss soldier cleared in son's death

**by Adriana M. Chávez \ El Paso Times (mailto:achavez@elpasotimes.com?subject=El Paso Times: )**
POSTED: 11/19/2010 12:00:00 AM MST

Jurors acquitted a former Fort Bliss soldier Thursday afternoon of charges that she beat her 22-month-old son to death almost two years ago.

Monea Frances Tyson, 27, was found not guilty of capital murder in the 409th District Court. The jury of six men and six women delivered the verdict after about four hours of deliberations.

After Judge Sam Medrano Jr. read the verdict, Tyson jumped from her chair at the defense table and screamed.

"Thank you, Jesus!" Tyson shouted before detention officers and her attorneys, Dolph Quijano and Leonard Morales, held her still and attempted to calm her.



Click photo to enlarge

(//portlet/article/html/render/gallery.jsp?
articleId=16652198&siteId=545&startImage=1)

Monea Frances Tyson, 27, (El Paso Police Dept.)

### RELATED STORIES

Police arrested Tyson in January 2009, more than a month after the Dec. 7 death of her son, Jayceon Tyson. Police detectives testified that they obtained a capital murder warrant for Tyson's arrest based on the opinion of former El Paso County medical examiner Dr. Paul Shrode, who ruled Jayceon's death a homicide caused by blunt-force trauma to the head.

County commissioners fired Shrode in May after determining that he lied on his résumé about having a law degree, and after the majority of the Ohio Parole Board recommended clemency for a death-row inmate, citing problems with testimony Shrode gave against him in 1997.

Shrode didn't testify during Tyson's trial, a fact that defense attorneys objected to.

"We always believed in her innocence," Quijano said after the verdict was read in court. "She was railroaded by Doctor Shrode."

During the trial, jurors heard from a defense witness and independent pediatric medical examiner, Dr. Karen Griest, who testified she determined that Jayceon actually died of sepsis, not of abuse.

Griest also testified that the marks on Jayceon's body were actually skin discolorations, not bruises as reported by police.

**Nov 18:**
- Update: Tyson found not guilty in death of 22-month-old son (http://www.elpasotimes.com/news/ci_16648200?source=pkg)
- Testimony in child death trial brings up fired coroner, closing arguments expected today (http://www.elpasotimes.com/news/ci_16642374?source=pkg)

**Nov 17:**
- Medical examiner testifies in child death trial (http://www.elpasotimes.com/news/ci_16531300?source=pkg)

**Nov 16:**
- Mother on trial in death of 22-month-old son (http://www.elpasotimes.com/news/ci_16623617?source=pkg)

**Nov 13:**
- Murder trial to open for ex-soldier (http://www.elpasotimes.com/news/ci_16600455?source=pkg)



head while playing at an unfinished playground near his East Side home, it wasn't the cause of his death.

Tyson's mother, Arlene Ayers, cried with joy when she heard the jury's verdict.

"I don't know why they did this to her," Ayers said outside the courtroom, and added that she was happy to know her daughter was going home. Tyson has been jailed since her arrest in 2009.

Assistant District Attorney Penny Hamilton, who heads the rape and child abuse unit and prosecuted the case along with Assistant District Attorney Beto Acosta, said she was disappointed with the verdict.

"I really felt we had some very strong evidence," Hamilton said. "I think when you have all the medical professionals that treated this child and all the other people involved in this case seeing how clear it was to them, I really felt like we would have been and should have been successful."

Adriana M. Chávez may be reached at achavez@elpasotimes.com; 546-6117.

⊟ Print    ✉ Email    ⊞ Return to Top

RELATED (HTTP://WWW.ELPASOTIMES.COM/NEWS)

Auditors begin review of EPISD curriculum (http://www.elpasotimes.com/news/ci_24905844/auditors-begin-review-episd-curriculum)

Survey: Payday lenders of poor record of information disclosure (http://www.elpasotimes.com/news/ci_24905845/survey-payday-lenders-poor-record-information-disclosure)

'Huge' heroin seizure made on the El Paso border (http://www.elpasotimes.com/news/ci_24903368/huge-heroin-seizure-made-el-paso-border)

## Offers and articles from around the Web

ADVERTISEMENT

  

Surprisingly simple solution to help your joints. See why these ingredients are flying off shelves

Controversy over new skinny pill -- Is it too strong for store shelves?...

Here are 25 of the most gorgeous cheerleaders on NFL sidelines.

Lumberton arrest records. Who do you know?

## Recommended for You

▸ "Huge" heroin seizure made on the El Paso border
▸ Restaurant review: El Toro Bronco
▸ El Pasoans help Mexican soccer team reach U-17...
▸ UTEP women's basketball: Jenzel Nash's...
▸ First Blake's Lotaburger in Texas to open in El...
▸ Auditors begin review of EPISD curriculum

– SPONSORED LINK –


Powered by newstogram

» Learn more about our new commenting system: FAQ: Article commenting (ci_18375505)



Add comment...

☑ Also post on Facebook

Posting as Jade Ortego (Not you?)    Comment

Facebook social plugin

J

# CARLSBAD CURRENT-ARGUS
(http://www.currentargus.com)

Weather
(http://www.currentargus.com/carlsbad-

CARLSBAD, NM  |  Now: 62°F
(http://www.currentargus.com/carlsbad-weather)  |  High:
60°F (http://www.currentargus.com/carlsbad-weather)  |
Low: 32°F (http://www.currentargus.com/carlsbad-weather)

**HOT TOPICS:**  Carlsbad Caverns (http://www.currentargus.com/caverns)   Oil & Gas (http://www.currentargus.com/oil-gas)

🖶 Print    ✉ Email

# Carlsbad: Mistrial declared in Curtis Jones case

*By Taryn Walker*
*twalker@currentargus.com*

POSTED: 02/04/2013 11:12:47 AM MST

The trial for a 26-year-old Carlsbad man accused in the death of a 20-month-old girl in 2004 has been declared a mistrial.

District Court Judge Jane Shuler Gray said Monday morning that new findings and a lack of credible testimonies required her to declare the mistrial. She said there were questions about the credibility of the doctor who performed the autopsy. As a result, Jones' attorney, Gary Mitchell, said the entire autopsy performed by Dr. Paul Shrode of Lubbock are in question.

The announcement took both defense and prosecuting attorneys by surprise.

"It all goes to the issue of if he did the dissections correctly or even the autopsy correctly," Jones' attorney, Gary Mitchell said."We're speculating and guessing on projectory," he said.

According to Judge Shuler Gray, it's all an issue of due process and she admitted she was reluctant to have the case mistried.

Jones was accused in the 2004 death of 20-month-old Amy May. Though an autopsy showed her death was the result of blunt force trauma to the head, medical examiners also believe May was raped.

Mitchell also argued against the testimony given by Dr. Sridhar Nataranjan, who testified Wednesday that he was not the one who actually performed the autopsym but was a part of the review b— -l -lthough Nataranjan did form his own opinion based on the autopsy results, and allegedly [ 2 ] n in the autopsy suite at one point, his testimony was found non-valid by Shuler Gray. [ Tweet ]

"We don'[ 13 ] a lab tech to come in here and testify if he didn't do the lab work," Mitchell said with a st  Like e, later adding that he admired the work by the prosecuting attorneys.

Share

"These prosecuters did everything they could, this isn't their fault, it is the fault of the Lubbock County M  0  Board," Mitchell said.

Judge Shu [ g+1 ]  mplimented the attorneys on their hard work and apologized to the jury for not being gb  0  e to a verdict. One juror, who didn't want to be identified, said she was happy she didn't ha   ke a decision on the verdict.

Share

Jones smiled as he shook Mitchell's hand before leaving the courtroom. Jones will continue to be supervised with an ankle bracelet as he awaits a new trial, with a new jury. The date of the future trial hasn't yet been scheduled.

BHLDN Wedding Dresses

bhldn.com

Romantic and Vintage-Inspired Gowns From BHLDN's 2013 Collection

## Happening Around Carlsbad

News

**Brandon Bowers**
@brandonbowers
Current-Argus reporter

@zackponce12
(https://twitter.com/zackponce12)
says he's learned it was principal
of the school who got shooter to
put weapon down.
#roswellshooting
(https://twitter.com/search?

Crowdynews

K

STATE OF TEXAS &#125;
COUNTY OF HARRIS &#125;

I, Joye M. Carter, M.D., Chief Medical Examiner of Harris County do hereby certify that

(Autopsy)

the within and foregoing is a true and correct copy of the (Inquest) Proceedings had on

the body of _____ Glenda Dennis Hayslip _____.

Witness my hand at office in Houston, Texas, this ____ 27th ____ day of ____ July ____

19 __98

_____
Chief Medical Examiner, Harris County, Texas

Subscribed and sworn to before me this ____ 27th ____ day of ____ July ____ 19 __98



KATHRYN L. RAMSEY
NOTARY PUBLIC, STATE OF TEXAS
MY COMMISSION EXPIRES
APRIL 4, 2000

_____
Notary Public, Harris County, Texas

oye M. Carter, M.D., FCAP
Chief Medical Examiner



(713) 796-9292
(713) 796-6815
FAX: (713) 796-6842

OFFICE OF THE MEDICAL EXAMINER OF HARRIS COUNTY
JOSEPH A. JACHIMCZYK FORENSIC CENTER
1885 OLD SPANISH TRAIL
HOUSTON, TEXAS 77054-2098

AUTOPSY REPORT

Case 98 - 1240

May 7, 1998

ON THE BODY OF

Glenda Dennis Hayslip
14777 Wonderlick St.
Houston, Texas

CAUSE OF DEATH:    Gunshot wound of face.  ←

MANNER OF DEATH:  Homicide.   ←

25 JUNE 98

Paul W. Shrode, M.D.                    Date
Assistant Medical Examiner

POSTMORTEM EXAMINATION ON THE BODY OF

Glenda Dennis Hayslip
14777 Wonderlick St.
Houston, Texas

HISTORY:  This 39 year old Caucasian female was shot at approximately
6:00 a.m., on April 30, 1998, at the above address.  She was
transported by Life Flight to Hermann Hospital, arriving at 7:19
a.m., on April 30, 1998, and was pronounced dead at 9:25 p.m., on May
6, 1998.  See companion case 98-1179.

AUTOPSY:  The autopsy was performed in the Joseph A. Jachimczyk
Forensic Center of Harris County by Assistant Medical Examiner Paul
W. Shrode, M.D., pursuant to Article 49.25, Texas Code of Criminal
Procedure, beginning at 1:30 p.m., on May 7, 1998.

ML CASE:  The name and medical legal case number on the Investigators
Report corresponded to the name and number on the toe tag.

CLOTHING:  At first view the deceased was not dressed.

EXTERNAL EXAMINATION:  The body was that of an adult Caucasian
female   measuring   67   inches,   weighing   129   pounds,   and   whose
appearance was consistent with the stated age of 39 years.  Rigor
mortis was moderate in the upper and lower extremities.  Lividity
was   pink,   blanched   to   pressure,   and   present   posteriorly.
Decompositional changes were not present.  The body was cold to touch
and had been refrigerated.  The scalp was covered by straight brown
hair approximately 4 to 5 inches in length.  The ears were normally
positioned.  The eyes had slightly cloudy corneae, brown irides, and
round, equally dilated pupils at 0.4 centimeter.  Both palpebral and
bulbar  conjunctivae  were  mildly  congested.   The  nasal  bone  was
intact.   The   nostrils   contained   edema   fluid.   The   jaws   were
edentulous.   The auditory canals were free of blood or exudate.  The
earlobes contained a single piercing.  The oral cavity was without
blood or vomitus; the gums were pink.  The neck had no palpable
adenopathy.  The trachea was in the midline.  The chest and abdomen
were symmetrically formed.  The abdomen was flat.  The external
genitalia were those of a normally developed female; however, there
was a moderate amount of swelling of the labia.  The back and
buttocks were symmetrical.  There were external hemorrhoids.  The
anus showed otherwise normal anatomic features without trauma.  The
upper and lower extremities were symmetrically formed.  The nail beds
were pink on the fingers.  The toenails had been painted a bright
pink.

EXTERNAL EVIDENCE OF INJURY:  The deceased had a history of a recent
gunshot wound of the right side of the face, the exact entry point of
the gunshot wound could not be ascertained as the area was healed and

Glenda Dennis Hayslip                          Case 98 - 1240
                                                   -3-

there was a large surgical incision of the right side of the face.
There were irregular resolving contusions of the right lateral thigh,
the left inguinal area, both ankles and both feet.

EXTERNAL EVIDENCE OF MEDICAL CARE:    There were large bandages over
incisions for chest tubes.    There was a tracheostomy above which was
a sutured tracheotomy incision.    There was a healing curvilinear
incision of the right jaw and anterior superior neck, approximately 9
inches in length.    There was an intravenous line in the right
inguinal area.    There were contusions over the backs of both hands
consistent with IV placement.

INTERNAL EVIDENCE OF MEDICAL CARE:    The tip of the tracheostomy tube
was at the carina.

INTERNAL EXAMINATION: Section:    The usual Y-shaped incision exposed
the organs of the thorax and abdomen to be in their normal anatomic
relationships.    There was moist subcutaneous abdominal fat averaging
1-1/2 inches at the level of the umbilicus.    The pericardium and
diaphragm were intact.    The serosal surfaces were wet, smooth, and
glistening.    There were approximately 550 milliliters of dark brown
ascitic fluid in the peritoneal cavity.

CARDIOVASCULAR SYSTEM: The 300 gram heart was normally positioned
with a smooth, glistening, and intact epicardium.    The chambers were
of a proportionate capacity.    The coronary arteries had a left
dominant distribution, pursued normal courses, and were patent.    The
coronary ostia were normally located and were patent.    The valve
leaflets were thin and translucent.

The valve measurements were as follows:
     tricuspid valve  11.0 centimeters
     pulmonary valve   7.0 centimeters
     mitral valve     10.0 centimeters
     aortic valve      5.5 centimeters.

The great vessels were normally formed and positioned.    The heart
musculature was uniformly tan-brown and without focal abnormality.
The chordae tendineae were without abnormality.    The aorta was of
normal caliber and followed a normal course through the thoracic and
abdominal cavities.    All major branches of the aorta were visibly
patent.    The large veins were normally distributed, thin-walled, and
patent.

RESPIRATORY SYSTEM:    The 900 gram right lung and the 700 gram left
lung were normally formed.    The tracheobronchial tree contained a
light tan mucus in both mainstem bronchi.    The visceral pleurae were
dark red to brown with anthracotic stippling.    The parenchyma was
diffusely congested and demonstrated light gray areas in both
superior lobes consistent with bronchopneumonia.    The pulmonary

Glenda Dennis Hayslip                                   Case 98 - 1240
                                                        -4-

vasculature was free of thromboemboli. Hilar lymph nodes were soft and not enlarged.

HEPATOBILIARY SYSTEM: The 1675 gram liver was normally formed. Glisson's capsule was intact. The parenchyma was soft to palpation and compression. It was uniformly dark brown and of a normal lobular architecture. The extra-hepatic biliary tree was patent. The gallbladder was thin-walled and contained approximately 20 milliliters of bile. No calculi were present.

ENDOCRINE SYSTEM: The pituitary gland rested normally within the sella turcica. The adrenal glands were in normal positions and configurations and had tan-brown cortical and thin gray medullary zones. The lobes of the thyroid were symmetrical without focal change. The 125 gram pancreas was normally positioned without lesion, and the ducts were patent.

HEMATOPOIETIC SYSTEM: The 100 gram spleen was normally formed and was covered by an intact dusky-gray capsule. Its parenchyma had the usual trabecular and follicular markings. The thymus appeared involuted. Bone marrow, where visualized, appeared normal.

GENITOURINARY TRACT: The 150 gram right kidney and the 140 gram left kidney were normally formed and positioned. The cortical regions were smooth and brown, and had clear demarcation of the cortical and medullary regions. The renal pelves were nondilated. The ureters followed normal courses to the bladder. The bladder contained no measurable urine. The uterus and adnexa lay in normal positions. The vaginal mucosa was intact.

GASTROINTESTINAL TRACT: The esophagus followed a normal course through the thoracic cavity and was intact; its mucosa was gray-white. The stomach contained approximately 25 milliliters of a dark brown, watery fluid. The stomach lining was hyperemic. It continued in the usual fashion into a normally positioned small bowel and colon. The appendix was not identified.

MUSCULOSKELETAL SYSTEM: The general musculature was normally formed. There was a fracture of the right mandible.

NECK: The neck was dissected in layers. There was no discoloration of its soft tissues. The hyoid bone and thyroid cartilage were intact. The laryngeal mucosa was gray-tan and focally hyperemic. There were no petechiae of the larynx or trachea.

HEAD AND CENTRAL NERVOUS SYSTEM: The galeal and subgaleal tissues contained no focal discoloration. The skull was intact without evidence of fracture. There was no epidural, subdural, or subarachnoid hemorrhage. The leptomeninges were translucent and covered an underlying slightly flattened gyral architecture

Glenda Dennis Hayslip                                    Case 98 - 1240
                                                              -5-

consistent with moderate cerebral edema.    The cerebral hemispheres,
brain stem, and cerebellum were symmetrical.    All anatomic midline
structures remained midline.    The vessels of the circle of Willis
were normal.    The dura was stripped revealing normal bony features of
the calvaria and cranial fossae.    The first portion of the spinal
cord    viewed    through    the    foramen    magnum    had    normal    anatomic
relations.    Serial examination of the 1575 gram brain demonstrated
that the ventricles were of normal size and had a glistening
ependymal lining and a watery content.    The cerebral hemispheres had
a normal cortical ribbon without lesion or atrophy.    The pigmented
areas of the substantia nigra and locus ceruleus were normal.    The
basal ganglia were intact without lesion.    The midbrain, pons, and
medulla appeared normal.

DESCRIPTION OF INJURY:    GUNSHOT WOUND OF FACE.
          ENTRANCE:    In    the    right    jaw,    centered    at
approximately 6 inches from the top of the head and 2-1/2 inches to
the right of midline was a healing laceration.    As the area was
healing no discernible abrasion collar was present.
          EXIT:    None.
          PATH:    The    projectile    passed    through    skin,
musculature, and bone of the right jaw.    It transected the tongue
producing diffuse hemorrhage and lacerations, and impacted the soft
tissue of the left side of the mouth.
          RECOVERY:    A flattened lead projectile was recovered
in the soft tissue of the left side of the mouth, approximately 6
inches below the top of the head and 1-3/4 inches to the left of
midline.
          RANGE:    Not discernible.
          DIRECTION OF FIRE:    Right to left.

IN ATTENDANCE:    Pathology Assistants Roland and Alex Escobar; Dr.
Oliver; and Forensic Photographer Marlene Suarez.

                         PATHOLOGICAL FINDINGS

          1.    Gunshot wound of right side of face
               with resultant fracture of the right
               mandible and laceration of the tongue.
          2.    Evidence of surgical reparation of the
               gunshot wound with history of acute
               anoxic event.
          3.    Bilateral bronchopneumonia.

Feb. 12. 2014 11:23PM

L

**Joye M. Carter, M.D., FCAP**
Chief Medical Examiner



(713) 796-9292
(713) 796-6816
FAX: (713) 796-6842

**OFFICE OF THE MEDICAL EXAMINER OF HARRIS COUNTY**
**JOSEPH A. JACHIMCZYK FORENSIC CENTER**
1885 OLD SPANISH TRAIL
HOUSTON, TEXAS 77054-2098

_9-12-2000_
(Date)

Dr. _Shrode_

On _9.12.2000_ , _J. P. Ferris, Walker Co.,_
(Date)                    (Name)
called ☑ wrote ☐ concerning your case # _OC 00-149_ , DOD _5-25-2000_.
As of _9.12.2000_ , this case has not been completed.
(Date)

Doctors are reminded that it is <u>expected</u> that homicide cases be completed in
30 days (1 month) and non-homicide cases within 60 days (2 months). This
is a reasonable amount of time for completion of your cases.

If there is a legitimate reason why a case cannot be completed within these
time frames, it should be brought to the attention of Joye M. Carter, M.D.,
Chief Medical Examiner, so that the family can be called and given a reason
for the delay in processing their loved one's case.

Please call to schedule an appointment to go over any case you may be
having problems with.

In your absence this case was reviewed and completed.

_Joze M Carter MD_
Joye M. Carter, M.D.
Chief Medical Examiner

JMC/jlr

# M

**Harris County Medical Examiner's Office**
**1885 Old Spanish Trail**
**Houston, Texas 77054**

**<u>COUNSELING WORKSHEET</u>**

Dr. Paul W. Shrode                                    10-5-01
NAME                                                   DATE

1. ( ) Unreported Absence
2. ( ) Tardiness
3. ( ) Drinking on duty
4. ( ) Insubordination
5. ( ) Dishonesty
6. ( ) Failure to obey orders
7. ( ) Fighting on premises
8. ( ) Leave without permission

9. ( ) Improper conduct
10. ( ) Reporting under the influences of alcohol
11. ( ) Violation of rules
12. (✓) Defective and improper work
13. ( ) Carelessness
14. ( ) Destruction of property
15. (✓) Other: Wrong determination of cause of death.
    Case - MLO1. 2587

**REMARKS:** Set forth all facts relating to the above. Please use 2nd page if necessary.

The determination of cause of death was incorrect and
case was not completed on time despite all pertinent
information available since August 23, 2001.

The appropriate cause of death, manner of death and "How
injury occurred" determinations were changed on
numerous occasions including the staff meeting
on August 22, 2001.

Correct ruling:
COD: Acute Toxic effects of cocaine and heroin
MOD: Accident
How injury occurred: Consumed drug mixture of cocaine and heroin

_____          10/08/01
Signature of Supervisor                          Date

**RECEIVED**
Kathy Ramsey

OCT 0 8 2001

MEDICAL EXAMINER'S OFFICE

_____          10·08·01
Signature of Employee                    Date

_____

The above has been noted and is made a part of the above employee's record, as of this date.

09/93

## COUNSELING WORKSHEET

NAME _____    DATE _____

REMARKS:  Please continue information from page one of Counseling Worksheet.

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**RECEIVED**
Kathy Ramsey

OCT 0 8 2001

**MEDICAL EXAMINER'S OFFICE**

**Signature of Supervisor** _____    **Date**

**Signature of Employee** _____    **Date**

The above has been noted and is made a part of the above employee's record, as of this date.



**OFFICE OF THE MEDICAL EXAMINER OF HARRIS COUNTY**

JOSEPH A. JACHIMCZYK FORENSIC CENTER
1885 OLD SPANISH TRAIL
HOUSTON, TEXAS 77054-2098

Dr. Shrode.

**RECEIVED**
Kathy Ramsey

OCT 0 8 2001

MEDICAL EXAMINER'S OFFICE

N

# Memorandum

**To:** Dr. Shrode

**CC:** Dr. Joye M. Carter

**From:** Dr. Luis A. Sanchez

**Date:** 11/30/2001

**Re:** Child Fatality Review Cases

---

Please prioritize the following cases. The cause and manner of death must be rendered before the end of the year.

| M/L#01-2101 | DOD: 07/05/01 |
| M/L#01-2299 | DOD: 07/22/01 |
| M/L#01-2487 | DOD: 08/07/01 |
| M/L#01-2524 | DOD: 08/09/01 |
| M/L#01-3208 | DOD: 10/11/01 |

No leave will be granted until these cases are finalized. If you need to discuss any of these cases, please schedule an appointment with Ms. Gates as soon as possible.

# Memorandum

**To:**    Dr. Shrode

**CC:**    Dr. Joye M. Carter

**From:** Dr. Luis A. Sanchez

**Date:** 12/18/2001

**Re:**    **Child Fatality Review Cases**

---

As of the above reference date the following cases are on a pending status. Please review the cases and determine what information or additional testing is needed to finalize these cases.

| | |
|---|---|
| M/L#01-2101 | DOD:  07/05/01 |
| M/L#01-2299 | DOD:  07/22/01 |
| M/L#01-2487 | DOD:  08/07/01 |
| M/L#01-2524 | DOD:  08/09/01 |
| M/L#01-3208 | DOD:  10/11/01 |

If you need to discuss any of these cases with Dr. Sanchez, please schedule an appointment with Ms. Gates as soon as possible.



# Harris County
## Medical Examiner's Office
# EMPLOYEE PERFORMANCE EVALUATION

RECEIVED

JUL 2 0 1999

MEDICAL EXAMINER

| Employee Name | (Last) _Shrode_ | (First) _Paul_ | Middle _Wayne_ |
|---|---|---|---|

| Social Security Number | Employment Date |
|---|---|

| Section | | | Position Number |
|---|---|---|---|

| Position Title _Assistant Medical Examiner_ | | Classification |
|---|---|---|

| Job Description | Date of Last Evaluation | Date of this Evaluation _19 July 1999_ |
|---|---|---|

| **Purpose of this Performance Evaluation** | To take a personal inventory, to pinpoint strengths and weaknesses, and to review past objectives and corresponding accomplishments so as to identify areas where performance can be improved for the benefit of both the employee and the company; and to formulate and agree a practical improvement program of specific challenges. |
|---|---|
| **Instructions for Sections A, B, and E.** (Section E for Supervisory Personnel Only) | Sections A, B, and E require rating the employee on characteristics pertinent to job performance. Carefully evaluate each of the characteristics, separately based on day-to-day performance since the last review. For each characteristic, rate the employee poor, fair, average, good, or excellent using these rating definitions and check the appropriate box. |
| | **Poor:** Definitely below acceptable standards; performance of job requirements is consistent deficient. |
| | **Fair:** Improvement is needed to meet acceptable standards: performance of job requirement is inconsistent. |
| | **Average:** Meets acceptable standards; performance of job requirements is consistent. |
| | **Good:** Above acceptable standards; performance usually exceeds requirements. |
| | **Excellent:** Outstanding unquestionable above acceptable standards; performance consistently exceeds job requirements. |
| | Two common mistakes in rating are: (1) A tendency to rate nearly everyone as "average" on every characteristic instead of being more critical in judgment. The evaluator should use the ends of the scale as well as the middle. (2) The "halo effect" i.e., a tendency to rate the same individual "excellent" on every characteristic or "poor" on every characteristic based on the overall picture one has of the person being evaluated. However, each person has strong and weak points and these should be indicated on the rating scales. |

| Section A: Work Performance | Poor | Fair | Average | Good | Excellent |
|---|---|---|---|---|---|
| **Knowledge:** Understanding of fundamentals, skills, methods, and procedures required in present job. | ☐ | ☐ | ☐ | ☐ | ☒ |
| Observations and Comments | | | | | |
| Suggestions for Further Development | | | | | |
| **Planning:** Development of methods and work organization to efficiently perform overall work load. | ☐ | ☐ | ☐ | ☐ | ☒ |
| Observations and Comments | | | | | |
| Suggestions for Further Development | | | | | |
| **Application:** Insure consistent job performance to complete overall work load. | ☐ | ☐ | ☐ | ☐ | ☒ |
| Observations and Comments | | | | | |
| Suggestions for Further Development | | | | | |
| **Accuracy:** Absence of mistakes and errors in job performance. | ☐ | ☐ | ☐ | ☐ | ☒ |
| Observations and Comments | | | | | |
| Suggestions for Further Development | | | | | |
| **Thoroughness:** Attention to requisite detail, to completeness; avoidance of superficiality. | ☐ | ☐ | ☐ | ☐ | ☒ |
| Observations and Comments | | | | | |
| Suggestions for Further Development | | | | | |
| **Quality:** Overall quality of work. | ☐ | ☐ | ☐ | ☐ | ☒ |
| Observations and Comments | | | | | |
| Suggestions for Further Development | | | | | |
| **Quantity:** Overall quantity of work. | ☐ | ☐ | ☐ | ☐ | ☒ |
| Observations and Comments | | | | | |
| Suggestions for Further Development | | | | | |

| Section B: Factors Affecting Job Performance | Poor | Fair | Average | Good | Excellent |
|---|---|---|---|---|---|
| **Adaptability:** Alteration of activities, plans, etc. to accommodate new or changed situations. | ☐ | ☐ | ☐ | ☐ | ☑ |
| Observations and Comments | | | | | |
| **Analysis:** Examination of a problem leading to identification of its component parts and their relations. | ☐ | ☐ | ☐ | ☐ | ☑ |
| Observations and Comments | | | | | |
| **Attendance:** | ☐ | ☐ | ☐ | ☑ | ☐ |
| Observations and Comments  *Communicate absenses* | | | | | |
| **Attitude:** Constructive attitude toward the organization, policies, and assignments. | ☐ | ☐ | ☐ | ☐ | ☑ |
| Observations and Comments  *Over whelmed at times by workload* | | | | | |
| **Teamwork:** Working effectively with others to achieve common goals. | ☐ | ☐ | ☐ | ☐ | ☑ |
| Observations and Comments | | | | | |
| **Creativeness:** Improvements of methods, procedures, etc. by new ideas. | ☐ | ☐ | ☐ | ☑ | ☐ |
| Observations and Comments | | | | | |
| **Expression:** Oral and written presentation of ideas. | ☐ | ☐ | ☐ | ☐ | ☑ |
| Observations and Comments | | | | | |
| **Health:** | ☐ | ☐ | ☐ | ☐ | ☑ |
| Observations and Comments | | | | | |
| **Initiative:** Self-confident, enthusiastic performance of a task with minimum of instructions. | ☐ | ☐ | ☐ | ☑ | ☐ |
| Observations and Comments | | | | | |
| **Judgement:** Formation of a sound opinion by careful study of available facts and options. | ☐ | ☐ | ☐ | ☑ | ☐ |
| Observations and Comments | | | | | |
| **Reliability:** Dependability; instills full confidence. | ☐ | ☐ | ☐ | ☑ | ☐ |
| Observations and Comments | | | | | |

## Section C: Overall Evaluation In Present Position

The supervisor should discuss the incumbent's strong points as well as limitations with a view toward improving the employee's performance. Objectives - concentrating on the fundamentals, skill, methods, and procedures required in the present job - should be presented and accepted as challenges, and these challenges should be clearly understood by supervisor and employee through effective fact-to-fact discussion.

**Major Strengths:** Excellent autopsy skills, Expansive Knowledge Sense of humor

**Major Weakness:** Needs more self confidence in managing Caseload.

**Past Objectives and Accomplishments:** (The specific major challenges that were set with the employee for the past evaluation period and the corresponding accomplishments. Indicate any factors outside the employee's control that affected accomplishments).

**Past Objectives:** Develop residency rotation

**Accomplishments:** Done

## Section D: Potential and Future Objectives

| | Poor | Fair | Average | Good | Excellent |
|---|---|---|---|---|---|
| **Potential:** | ☐ | ☐ | ☐ | ■ | ☑ |

Observations and Comments

Future objectives (The specific major challenges that have been agreed with the employee for the next period.)
Improve pathology residency rotation when more staff are available
Implement slide review for forensic trainees
Participate more in staff meetings

**Prepared By**

Name (Typed or Printed) Jaye M Carter MD

Position Title Chief Medical Examiner

Signature Jaye M Carter MD

Date 14 July 1999

Employee's Comments (After you have reviewed this form and discussed it with your supervisor, please state briefly your comments regarding this evaluation. If you have no comments please state "none".)

Comments

Employee's Signature

Date 19 July 99.

N/A

| Section E: Supervisory Performance (as applicable) | Poor | Fair | Average | Good | Excellent |
|---|---|---|---|---|---|
| **Planning & Organization:** Planning work effectively and division of total operation into efficient interdependent components. | ☐ | ☐ | ☐ | ☐ | ☐ |
| Observations and Comments | | | | | |
| Suggestions for Further Development | | | | | |
| **Personnel Selection:** Identification of job-required characteristics in prospective employees. | ☐ | ☐ | ☐ | ☐ | ☐ |
| Observations and Comments | | | | | |
| Suggestions for Further Development | | | | | |
| **Training:** Development of personnel efficiency. | ☐ | ☐ | ☐ | ☐ | ☐ |
| Observations and Comments | | | | | |
| Suggestions for Further Development | | | | | |
| **Follow-up:** Monitoring that instructions, schedules, etc. are being followed. | ☐ | ☐ | ☐ | ☐ | ☐ |
| Observations and Comments | | | | | |
| Suggestions for Further Development | | | | | |
| **Economy:** Minimization of controllable costs: optimum utilization of resources. | ☐ | ☐ | ☐ | ☐ | ☐ |
| Observations and Comments | | | | | |
| Suggestions for Further Development | | | | | |
| **Delegation:** Willingness to train subordinates to share in job duties. | ☐ | ☐ | ☐ | ☐ | ☐ |
| Observations and Comments | | | | | |
| Suggestions for Further Development | | | | | |
| **Leadership:** Establishment of personnel team effort toward common objectives. | ☐ | ☐ | ☐ | ☐ | ☐ |
| Observations and Comments | | | | | |
| Suggestions for Further Development | | | | | |

P

# Harris County
## Medical Examiner's Office
## EMPLOYEE PERFORMANCE EVALUATION

| Employee Name | (Last) Shrode | | (First) Paul | | Middle |
|---|---|---|---|---|---|
| Social Security Number | Employment Date | | | | |
| Section | | | | Position Number | |
| Position Title Assistant Medical Examiner | | | Classification | | |
| Job Description | | Date of Last Evaluation | | Date of this Evaluation 11-20-00 | |

| | |
|---|---|
| **Purpose of this Performance Evaluation** | To take a personal inventory, to pinpoint strengths and weaknesses, and to review past objectives and corresponding accomplishments so as to identify areas where performance can be improved for the benefit of both the employee and the company; and to formulate and agree a practical improvement program of specific challenges. |
| **Instructions for Sections A, B, and E.** (Section E for Supervisory Personnel Only) | Sections A, B, and E require rating the employee on characteristics pertinent to job performance. Carefully evaluate each of the characteristics, separately based on day-to-day performance since the last review. For each characteristic, rate the employee poor, fair, average, good, or excellent using these rating definitions and check the appropriate box. |
| | **Poor:** Definitely below acceptable standards; performance of job requirements is consistent deficient. |
| | **Fair:** Improvement is needed to meet acceptable standards; performance of job requirement is inconsistent. |
| | **Average:** Meets acceptable standards; performance of job requirements is consistent. |
| | **Good:** Above acceptable standards; performance usually exceeds requirements. |
| | **Excellent:** Outstanding unquestionable above acceptable standards; performance consistently exceeds job requirements. |
| | Two common mistakes in rating are: (1) A tendency to rate nearly everyone as "average" on every characteristic instead of being more critical in judgement. The evaluator should use the ends of the scale as well as the middle. (2) The "halo effect" i.e., a tendency to rate the same individual "excellent" on every characteristic or "poor" on every characteristic based on the overall picture one has of the person being evaluated. However, each person has strong and weak points and these should be indicated on the rating scales. |

| Section A: Work Performance | Poor | Fair | Average | Good | Excellent |
|---|---|---|---|---|---|
| **Knowledge:** Understanding of fundamentals, skills, methods, and procedures required in present job. | ☐ | ☐ | ☐ | ☒ | ☐ |
| Observations and Comments | | | | | |
| Suggestions for Further Development | | | | | |
| **Planning:** Development of methods and work organization to efficiently perform overall work load. | ☐ | ☐ | ☐ | ☒ | ☐ |
| Observations and Comments | | | | | |
| Suggestions for Further Development | | | | | |
| **Application:** Insure consistent job performance to complete overall work load. | ☐ | ☐ | ☐ | ☒ | ☐ |
| Observations and Comments | | | | | |
| Suggestions for Further Development | | | | | |
| **Accuracy:** Absence of mistakes and errors in job performance. | ☐ | ☐ | ☐ | ☒ | ☐ |
| Observations and Comments | | | | | |
| Suggestions for Further Development | | | | | |
| **Thoroughness:** Attention to requisite detail, to completeness; avoidance of superficiality. | ☐ | ☐ | ☐ | ☐ | ☐ |
| Observations and Comments | | | | | |
| Suggestions for Further Development   Consultation on difficult or questionable cases with Chief. | | | | | |
| **Quality:** Overall quality of work. | ☐ | ☐ | ☐ | ☐ | ☒ |
| Observations and Comments | | | | | |
| Suggestions for Further Development | | | | | |
| **Quantity:** Overall quantity of work. | ☐ | ☐ | ☐ | ☐ | ☒ |
| Observations and Comments | | | | | |
| Suggestions for Further Development | | | | | |

| Section B: Factors Affecting Job Performance | Poor | Fair | Average | Good | Excellent |
|---|---|---|---|---|---|
| **Adaptability:** Alteration of activities, plans, etc. to accommodate new or changed situations. | ☐ | ☐ | ☒ | ☐ | ☐ |
| Observations and Comments | | | | | |
| **Analysis:** Examination of a problem leading to identification of its component parts and their relations. | ☐ | ☐ | ☐ | ☒ | ☐ |
| Observations and Comments | | | | | |
| **Attendance:** | ☐ | ☐ | ☒ | ☐ | ☐ |
| Observations and Comments  High number of sick days. | | | | | |
| **Attitude:** Constructive attitude toward the organization, policies, and assignments. | ☐ | ☐ | ☒ | ☐ | ☐ |
| Observations and Comments | | | | | |
| **Teamwork:** Working effectively with others to achieve common goals. | ☐ | ☐ | ☒ | ☐ | ☐ |
| Observations and Comments | | | | | |
| **Creativeness:** Improvements of methods, procedures, etc. by new ideas. | ☐ | ☐ | ☐ | ☒ | ☐ |
| Observations and Comments | | | | | |
| **Expression:** Oral and written presentation of ideas. | ☐ | ☐ | ☐ | ☒ | ☐ |
| Observations and Comments | | | | | |
| **Health:** | ☐ | ☐ | ☒ | ☐ | ☐ |
| Observations and Comments | | | | | |
| **Initiative:** Self-confident, enthusiastic performance of a task with minimum of instructions. | ☐ | ☐ | ☐ | ☒ | ☐ |
| Observations and Comments | | | | | |
| **Judgement:** Formation of a sound opinion by careful study of available facts and options. | ☐ | ☐ | ☐ | ☒ | ☐ |
| Observations and Comments | | | | | |
| **Reliability:** Dependability; instills full confidence. | ☐ | ☐ | ☒ | ☐ | ☐ |
| Observations and Comments | | | | | |

## Section C: Overall Evaluation in Present Position

The supervisor should discuss the incumbent's strong points as well as limitations with a view toward improving the employee's performance. Objectives - concentrating on the fundamentals, skill, methods, and procedures required in the present job - should be presented and accepted as challenges, and these challenges should be clearly understood by supervisor and employee through effective fact-to-fact discussion.

**Major Strengths:** Very interested in chosen field of forensic pathology. Good teaching skills.

**Major Weakness:** Lack of board certification. Poor communicator when dissatisfied with work (discussed already with employee).

**Past Objectives and Accomplishments:** (The specific major challenges that were set with the employee for the past evaluation period and the corresponding accomplishments. Indicate any factors outside the employee's control that affected accomplishments).

| Past Objectives: Work with residents. | Accomplishments: Developed resident teaching program. |
|---|---|

| Section D: Potential and Future Objectives | Poor | Fair | Average | Good | Excellent |
|---|---|---|---|---|---|
| **Potential:** | ☐ | ☐ | ☐ | ☒ | ☐ |

Observations and Comments    Better communication.

Future objectives (The specific major challenges that have been agreed with the employee for the next period.)
Obtain board certification.

**Prepared By**

| Name (Typed or Printed) Joye M. Carter, M.D. | Position Title Chief Medical Examiner |
|---|---|
| Signature | Date 11-20-00 |

Employee's Comments (After you have reviewed this form and discussed it with your supervisor, please state briefly your comments regarding this evaluation. If you have no comments please state "none".)

| Comments | |
|---|---|
| Employee's Signature. | Date 12-6-00 |

Feb. 12. 2014 11:28PM

| Section E: Supervisory Performance (as applicable) | Poor | Fair | Average | Good | Excellent |
|---|---|---|---|---|---|
| **Planning & Organization:** Planning work effectively and division of total operation into efficient interdependent components. | ☐ | ☐ | ☐ | ☐ | ☐ |
| Observations and Comments | | | | | |
| Suggestions for Further Development | | | | | |
| **Personnel Selection:** Identification of job-required characteristics in prospective employees. | ☐ | ☐ | ☐ | ☐ | ☐ |
| Observations and Comments | | | | | |
| Suggestions for Further Development | | | | | |
| **Training:** Development of personnel efficiency. | ☐ | ☐ | ☐ | ☐ | ☐ |
| Observations and Comments | | | | | |
| Suggestions for Further Development | | | | | |
| **Follow-up:** Monitoring that instructions, schedules, etc. are being followed. | ☐ | ☐ | ☐ | ☐ | ☐ |
| Observations and Comments | | | | | |
| Suggestions for Further Development | | | | | |
| **Economy:** Minimization of controllable costs; optimum utilization of resources. | ☐ | ☐ | ☐ | ☐ | ☐ |
| Observations and Comments | | | | | |
| Suggestions for Further Development | | | | | |
| **Delegation:** Willingness to train subordinates to share in job duties. | ☐ | ☐ | ☐ | ☐ | ☐ |
| Observations and Comments | | | | | |
| Suggestions for Further Development | | | | | |
| **Leadership:** Establishment of personnel team effort toward common objectives. | ☐ | ☐ | ☐ | ☐ | ☐ |
| Observations and Comments | | | | | |
| Suggestions for Further Development | | | | | |

Q

# Harris County
# Medical Examiner's Office
## EMPLOYEE PERFORMANCE EVALUATION

| Employee Name | (Last)<br>Shrode | | (First)<br>Paul | Middle |
|---|---|---|---|---|
| Social Security Number | Employment Date | | | |
| Section | | | | Position Number |
| Position Title<br>Assistant Medical Examiner | | | Classification | |
| Job Description | | Date of Last Evaluation | | Date of this Evaluation<br>10/16 /02 |

| **Purpose of this Performance Evaluation** | To take a personal inventory, to pinpoint strengths and weaknesses, and to review past objectives and corresponding accomplishments so as to identify areas where performance can be improved for the benefit of both the employee and the company; and to formulate and agree a practical improvement program of specific challenges. |
|---|---|
| **Instructions for Sections A, B, and E.** *(Section E for Supervisory Personnel Only)* | Sections A, B, and E require rating the employee on characteristics pertinent to job performance. Carefully evaluate each of the characteristics, separately based on day-to-day performance since the last review. For each characteristic, rate the employee poor, fair, average, good, or excellent using these rating definitions and check the appropriate box. |

**Poor:**      Definitely below acceptable standards; performance of job requirements is consistent deficient.

**Fair:**      Improvement is needed to meet acceptable standards: performance of job requirement is inconsistent.

**Average:**      Meets acceptable standards; performance of job requirements is consistent.

**Good:**      Above acceptable standards; performance usually exceeds requirements.

**Excellent:**      Outstanding unquestionable above acceptable standards; performance consistently exceeds job requirements.

Two common mistakes in rating are: (1) A tendency to rate nearly everyone as "average" on every characteristic instead of being more critical in judgement. The evaluator should use the ends of the scale as well as the middle. (2) The "halo effect" i.e., a tendency to rate the same individual "excellent" on every characteristic or "poor" on every characteristic based on the overall picture one has of the person being evaluated. However, each person has strong and weak points and these should be indicated on the rating scales.

RECEIVED

Kathy Ramsey

OCT 17 2002

MEDICAL EXAMINER'S OFFICE

| Section A: Work Performance | Poor | Fair | Average | Good | Excellent |
|---|---|---|---|---|---|
| **Knowledge:** Understanding of fundamentals, skills, methods, and procedures required in present job. | ☐ | ☐ | ☐ | ☒ | ☐ |
| Observations and Comments | | | | | |
| Suggestions for Further Development | | | | | |
| **Planning:** Development of methods and work organization to efficiently perform overall work load. | ☐ | ☐ | ☐ | ☒ | ☐ |
| Observations and Comments | | | | | |
| Suggestions for Further Development | | | | | |
| **Application:** Insure consistent job performance to complete overall work load. | ☐ | ☐ | ☐ | ☒ | ☐ |
| Observations and Comments | | | | | |
| Suggestions for Further Development | | | | | |
| **Accuracy:** Absence of mistakes and errors in job performance. | ☐ | ☐ | ☐ | ☒ | ☐ |
| Observations and Comments | | | | | |
| Suggestions for Further Development | | | | | |
| **Thoroughness:** Attention to requisite detail, to completeness; avoidance of superficiality. | ☐ | ☐ | ☐ | ☒ | ☐ |
| Observations and Comments | | | | | |
| Suggestions for Further Development | | | | | |
| **Quality:** Overall quality of work. | ☐ | ☐ | ☐ | ☒ | ☐ |
| Observations and Comments | | | | | |
| Suggestions for Further Development | | | | | |
| **Quantity:** Overall quantity of work. | ☐ | ☐ | ☐ | ☐ | ☒ |
| Observations and Comments | | | | | |
| Dr. Shrode performed approximately 448 autopsies during 2001 | | | | | |
| Suggestions for Further Development | | | | | |

| Section B: Factors Affecting Job Performance | Poor | Fair | Average | Good | Excellent |
|---|---|---|---|---|---|
| **Adaptability:** Alteration of activities, plans, etc. to accommodate new or changed situations | ☐ | ☐ | ☐ | ☐ | ☒ |
| Observations and Comments | | | | | |
| | | | | | |
| **Analysis:** Examination of a problem leading to identification of its component parts and their relations. | ☐ | ☐ | ☐ | ☒ | ☐ |
| Observations and Comments | | | | | |
| | | | | | |
| **Attendance:** | ☐ | ☐ | ☐ | ☒ | ☐ |
| Observations and Comments | | | | | |
| Number of sick days has decreased substantially from previous years | | | | | |
| **Attitude:** Constructive attitude toward the organization, policies, and assignments. | ☐ | ☐ | ☐ | ☒ | ☐ |
| Observations and Comments | | | | | |
| | | | | | |
| **Teamwork:** Working effectively with others to achieve common goals. | ☐ | ☐ | ☐ | ☐ | ☒ |
| Observations and Comments | | | | | |
| | | | | | |
| **Creativeness:** Improvements of methods, procedures, etc. by new ideas. | ☐ | ☐ | ☐ | ☒ | ☐ |
| Observations and Comments | | | | | |
| | | | | | |
| **Expression:** Oral and written presentation of ideas. | ☐ | ☐ | ☐ | ☒ | ☐ |
| Observations and Comments | | | | | |
| | | | | | |
| **Health:** | ☐ | ☐ | ☐ | ☒ | ☐ |
| Observations and Comments | | | | | |
| | | | | | |
| **Initiative:** Self-confident, enthusiastic performance of a task with minimum of instructions. | ☐ | ☐ | ☐ | ☐ | ☒ |
| Observations and Comments | | | | | |
| | | | | | |
| **Judgement:** Formation of a sound opinion by careful study of available facts and options. | ☐ | ☐ | ☐ | ☒ | ☐ |
| Observations and Comments | | | | | |
| | | | | | |
| **Reliability:** Dependability; Instills full confidence. | ☐ | ☐ | ☐ | ☐ | ☒ |
| Observations and Comments | | | | | |
| | | | | | |

## Section C: Overall Evaluation in Present Position

The supervisor should discuss the incumbent's strong points as well as limitations with a view toward improving the employee's performance. Objectives - concentrating on the fundamentals, skill, methods, and procedures required in the present job - should be presented and accepted as challenges, and these challenges should be clearly understood by supervisor and employee through effective fact-to-fact discussion.

**Major Strengths:**
Interested in teaching
Quite flexible

**Major Weakness:**
Lack of board certification

**Past Objectives and Accomplishments:** (The specific major challenges that were set with the employee for the past evaluation period and the corresponding accomplishments. Indicate any factors outside the employee's control that affected accomplishments).

| Past Objectives: | Accomplishments: |
|---|---|
|  |  |

| Section D: Potential and Future Objectives | Poor | Fair | Average | Good | Excellent |
|---|---|---|---|---|---|
| **Potential:** | ☐ | ☐ | ☐ | ☐ | ☒ |

Observations and Comments

Teaching

Future objectives (The specific major challenges that have been agreed with the employee for the next period.)
Obtain board certification

Prepared By

| Name (Typed or Printed) | Position Title |
|---|---|
| Luis A. Sanchez, M.D. | Senior Deputy Chief Medical Examiner |

| Signature | Date |
|---|---|
|  | 10/16/02 |

Employee's Comments (After you have reviewed this form and discussed it with your supervisor, please state briefly your comments regarding this evaluation. If you have no comments please state "none".)

Comments

| Employee's Signature | Date |
|---|---|
|  | 16 OCTOBER 02 |

R

# Harris County
# Medical Examiner's Office
# EMPLOYEE PERFORMANCE EVALUATION

| Employee Name | (Last) Shrode | (First) Paul | Middle W. |
|---|---|---|---|
| Social Security Number | Employment Date | | |
| Section | | | Position Number |
| Position Title Asstant Medical Examiner | | Classification | |
| Job Description | | Date of Last Evaluation 10/16/02 | Date of this Evaluation |

| **Purpose of this Performance Evaluation** | To take a personal inventory, to pinpoint strengths and weaknesses, and to review past objectives and corresponding accomplishments so as to identify areas where performance can be improved for the benefit of both the employee and the company; and to formulate and agree a practical improvement program of specific challenges. |
|---|---|
| **Instructions for Sections A, B, and E.** (Section E for Supervisory Personnel Only) | Sections A, B, and E require rating the employee on characteristics pertinent to job performance. Carefully evaluate each of the characteristics, separately based on day-to-day performance since the last review. For each characteristic, rate the employee poor, fair, average, good, or excellent using these rating definitions and check the appropriate box. |
| | **Poor:** Definitely below acceptable standards; performance of job requirements is consistent deficient. |
| | **Fair:** Improvement is needed to meet acceptable standards: performance of job requirement is inconsistent. |
| | **Average:** Meets acceptable standards; performance of job requirements is consistent. |
| | **Good:** Above acceptable standards; performance usually exceeds requirements. |
| | **Excellent:** Outstanding unquestionable above acceptable standards; performance consistently exceeds job requirements. |
| | Two common mistakes in rating are: (1) A tendency to rate nearly everyone as "average" on every characteristic instead of being more critical in judgement. The evaluator should use the ends of the scale as well as the middle. (2) The "halo effect" i.e., a tendency to rate the same individual "excellent" on every characteristic or "poor" on every characteristic based on the overall picture one has of the person being evaluated. However, each person has strong and weak points and these should be indicated on the rating scales. |

| Section A: Work Performance | Poor | Fair | Average | Good | Excellent |
|---|---|---|---|---|---|
| **Knowledge:** Understanding of fundamentals, skills, methods, and procedures required in present job. | ☐ | ☐ | ☐ | ☒ | ☐ |

Observations and Comments

Suggestions for Further Development

| | Poor | Fair | Average | Good | Excellent |
|---|---|---|---|---|---|
| **Planning:** Development of methods and work organization to efficiently perform overall work load. | ☐ | ☒ | ☐ | ☐ | ☐ |

Observations and Comments   Needs to work more efficiently (or spend more time) to reduce large pending case list (103 as of early December); must reduce backlog of incomplete autopsy reports (approximately 178 as of early December).

Suggestions for Further Development

| | Poor | Fair | Average | Good | Excellent |
|---|---|---|---|---|---|
| **Application:** Insure consistent job performance to complete overall work load. | ☐ | ☒ | ☐ | ☐ | ☐ |

Observations and Comments

Suggestions for Further Development

Needs to reduce pending case backlog

| | Poor | Fair | Average | Good | Excellent |
|---|---|---|---|---|---|
| **Accuracy:** Absence of mistakes and errors in job performance. | ☐ | ☐ | ☐ | ☒ | ☐ |

Observations and Comments

Suggestions for Further Development

| | Poor | Fair | Average | Good | Excellent |
|---|---|---|---|---|---|
| **Thoroughness:** Attention to requisite detail, to completeness; avoidance of superficiality. | ☐ | ☐ | ☐ | ☒ | ☐ |

Observations and Comments

Suggestions for Further Development

| | Poor | Fair | Average | Good | Excellent |
|---|---|---|---|---|---|
| **Quality:** Overall quality of work. | ☐ | ☐ | ☐ | ☒ | ☐ |

Observations and Comments

Suggestions for Further Development

| | Poor | Fair | Average | Good | Excellent |
|---|---|---|---|---|---|
| **Quantity:** Overall quantity of work. | ☐ | ☒ | ☐ | ☐ | ☐ |

Observations and Comments   From Dr's log book: Autopsies: 340; 103 pending cases; 178 autopsy reports incomplete (in MRs). Cases testified: 32 (av 24; range 14-46).

Suggestions for Further Development

| Section B: Factors Affecting Job Performance | Poor | Fair | Average | Good | Excellent |
|---|---|---|---|---|---|
| **Adaptability:** Alteration of activities, plans, etc. to accommodate new or changed situations. | ☐ | ☐ | ☐ | ☐ | ☒ |
| Observations and Comments | | | | | |
| | | | | | |
| **Analysis:** Examination of a problem leading to identification of its component parts and their relations. | ☐ | ☐ | ☐ | ☒ | ☐ |
| Observations and Comments | | | | | |
| | | | | | |
| **Attendance:** | ☐ | ☐ | ☐ | ☐ | ☒ |
| Observations and Comments | | | | | |
| His punctuality at the morning report is appreciated! | | | | | |
| **Attitude:** Constructive attitude toward the organization, policies, and assignments. | ☐ | ☐ | ☒ | ☐ | ☐ |
| Observations and Comments | | | | | |
| | | | | | |
| **Teamwork:** Working effectively with others to achieve common goals. | ☐ | ☐ | ☐ | ☐ | ☒ |
| Observations and Comments | | | | | |
| No hesitance to take on additional cases to maintain overall case flow in the office. | | | | | |
| **Creativeness:** Improvements of methods, procedures, etc. by new Ideas. | ☐ | ☐ | ☐ | ☒ | ☐ |
| Observations and Comments | | | | | |
| | | | | | |
| **Expression:** Oral and written presentation of ideas. | ☐ | ☐ | ☐ | ☒ | ☐ |
| Observations and Comments | | | | | |
| | | | | | |
| **Health:** | ☐ | ☐ | ☐ | ☐ | ☒ |
| Observations and Comments | | | | | |
| | | | | | |
| **Initiative:** Self-confident, enthusiastic performance of a task with minimum of instructions. | ☐ | ☐ | ☐ | ☐ | ☒ |
| Observations and Comments | | | | | |
| | | | | | |
| **Judgement:** Formation of a sound opinion by careful study of available facts and options. | ☐ | ☐ | ☐ | ☒ | ☐ |
| Observations and Comments | | | | | |
| | | | | | |
| **Reliability:** Dependability; instills full confidence | ☐ | ☐ | ☐ | ☒ | ☐ |
| Observations and Comments | | | | | |
| | | | | | |

## Section C: Overall Evaluation in Present Position

The supervisor should discuss the incumbent's strong points as well as limitations with a view toward improving the employee's performance. Objectives - concentrating on the fundamentals, skill, methods, and procedures required in the present job - should be presented and accepted as challenges, and these challenges should be clearly understood by supervisor and employee through effective fact-to-fact discussion.

**Major Strengths:**
Concise well-organized autopsy reports
Willingness and interest in teaching
Team player

**Major Weakness:**
Lacks board certification
Large pending case backlog
Large backlog of incomplete autopsy reports

**Past Objectives and Accomplishments:** (The specific major challenges that were set with the employee for the past evaluation period and the corresponding accomplishments. Indicate any factors outside the employee's control that affected accomplishments).

| Past Objectives: | Accomplishments: |
|---|---|
| Obtain board certification | Took forensic and anatomic pathology boards (results pending) |

| Section D: Potential and Future Objectives | Poor | Fair | Average | Good | Excellent |
|---|---|---|---|---|---|
| **Potential:** | ☐ | ☐ | ☐ | ☐ | ☒ |

Observations and Comments

Future objectives (The specific major challenges that have been agreed with the employee for the next period.)
Obtain anatomic and forensic pathology board certification
Reduce large list of pending cases
Reduce large backlog of incomplete pending and classified autopsy reports

Prepared By

| Name (Typed or Printed) | Position Title |
|---|---|
| Dwayne A. Wolf, M.D., Ph.D. | Deputy Chief Medical Examiner |

Signature _____ Date 12/16/03

Employee's Comments (After you have reviewed this form and discussed it with your supervisor, please state briefly your comments regarding this evaluation. If you have no comments please state "none".)

Comments

Employee's Signature _____ Date 16 DEC 2003

| Section E: Supervisory Performance (as applicable) | Poor | Fair | Average | Good | Excellent |
|---|---|---|---|---|---|
| **Planning & Organization:** Planning work effectively and division of total operation into efficient interdependent components. | ☐ | ☐ | ☐ | ☐ | ☐ |
| Observations and Comments | | | | | |
| Suggestions for Further Development | | | | | |
| **Personnel Selection:** Identification of job-required characteristics in prospective employees. | ☐ | ☐ | ☐ | ☐ | ☐ |
| Observations and Comments | | | | | |
| Suggestions for Further Development | | | | | |
| **Training:** Development of personnel efficiency. | ☐ | ☐ | ☐ | ☐ | ☐ |
| Observations and Comments | | | | | |
| Suggestions for Further Development | | | | | |
| **Follow-up:** Monitoring that instructions, schedules, etc. are being followed. | ☐ | ☐ | ☐ | ☐ | ☐ |
| Observations and Comments | | | | | |
| Suggestions for Further Development | | | | | |
| **Economy:** Minimization of controllable costs; optimum utilization of resources. | ☐ | ☐ | ☐ | ☐ | ☐ |
| Observations and Comments | | | | | |
| Suggestions for Further Development | | | | | |
| **Delegation:** Willingness to train subordinates to share in job duties. | ☐ | ☐ | ☐ | ☐ | ☐ |
| Observations and Comments | | | | | |
| Suggestions for Further Development | | | | | |
| **Leadership:** Establishment of personnel team effort toward common objectives. | ☐ | ☐ | ☐ | ☐ | ☐ |
| Observations and Comments | | | | | |
| Suggestions for Further Development | | | | | |

S

**Luis A. Sanchez, M.D.**
Chief Medical Examiner



(713) 796-9292
FAX: (713) 796-6844

## JOSEPH A. JACHIMCZYK FORENSIC CENTER

*file*

# MEMORANDUM

TO:        Paul Shrode, M.D.
           Assistant Medical Examiner

FROM:      Dwayne Wolf, M.D., Ph.D.
           Deputy Chief Medical Examiner

RE:        Case Log

DATE:      December 15, 2003

A review of your cases from 2003 reveals a large number of remaining pending cases (103 cases), uncompleted (classified and pending) autopsy reports (178 cases currently in the medical records area). In order to allow you time to diminish these backlogs you will be relieved of any responsibility from performing autopsies on Wednesday, December 17, Thursday, December 18, and Friday, December 19.

During this period of time, you will need to maintain a log of cases completed (number unpended, and number of autopsies released for final form). These numbers should be forwarded to me at the conclusion of each day.

Cc:    Luis A. Sanchez, M.D.

DAW/bg

**1885 Old Spanish Trail, Houston, Texas 77054**

T

Feb. 12. 2014 11:32PM

## Sanchez, Luis (MEO)

| | |
|---|---|
| **From:** | Shrode, Paul (MEO) |
| **Sent:** | Tuesday, April 27, 2004 9:10 AM |
| **To:** | Sanchez, Luis (MEO); Wolf, Dwayne (MEO) |
| **Subject:** | Resignation Notice |

Dr. Luis A. Sanchez:

I will resign my position as assistant medical examiner with the Harris County Medical Examiner's Office effective 14 May 2004.

Thank you,
Paul W. Shrode, MD

**RECEIVED**

**APR 2 7 2004**

Medical Examiner's Office
Monica Joseph

1

U

 **TEXAS TECH UNIVERSITY HEALTH SCIENCES CENTER**

RICHARD V HOMAN, M.D.
Vice President for
Clinical Affairs and
Dean, School of Medicine

3601 4th Street STOP 6207
Lubbock, Texas 79430-6207
(806) 743-3000
Fax (806) 743-3021
E-Mail: Richard.Homan@ttuhsc.edu

April 30, 2004

Paul W. Shrode, M.D.
9627 Randon Lane
Missouri City, Texas 77459

Dear Dr. Shrode:

I am pleased to offer you an appointment as Assistant Professor (non-tenure track) in the Department of Pathology at the Texas Tech University Health Sciences Center School of Medicine in Lubbock effective May 18, 2004.

The Faculty Appointments Committee has cleared your application and Dr. Dale Dunn, Chair, Department of Pathology, has formally requested me to tender this official offer. Terms and conditions of this appointment are set forth in the attached Employment Agreement that should be signed and returned no later than May 14, 2004. If you are unable to respond by this date, I would appreciate you informing my office and the department chair.

Continuation of this appointment is contingent upon your possession of a valid license to practice medicine in the State of Texas. If you are not currently licensed in the State, you are urged to proceed immediately with this process by contacting the Board of Medical Examiners in Austin to obtain the necessary application forms. The address and telephone number is: P.O. Box 2029, Austin, Texas 78768-2029, telephone (512) 305-7130.

I look forward to having you become a part of our academic community.

Sincerely,

Richard V. Homan, M.D.
Vice President for Clinical Affairs and
Dean, School of Medicine

RVH/cc

xc:    Dr. Dunn
       SOM Administration
       Faculty Records
       File

V

PAUL W. SHRODE, MD
9627 RANDON LANE
MISSOURI CITY, TX. 77459

08 APRIL 2004

DR. SRIDHAR NATARAJAN
LUBBOCK CO. MEDICAL EXAM. OFFICE
LUBBOCK, TEXAS

DEAR DR. NATARAJAN:

ENCLOSED PLEASE FIND A COPY OF MY RESUME. I OFFER IT FOR YOUR REVIEW
AND RESPECTFULLY REQUEST TO BE CONSIDERED A CANDIDATE FOR THE
POSITION OF ASSISTANT MEDICAL EXAMINER.

IN MY PRESENT POSITION AT THE HARRIS COUNTY MEDICAL EXAMINER'S
OFFICE, I NOT ONLY PERFORM FORENSIC EXAMINATIONS BUT I ALSO AM
INVOLVED WITH THE TEACHING OF RESIDENTS. LAST YEAR I PERFORMED
OVER 350 AUTOPSIES PLUS OVER 100 EXTERNAL EXAMINATIONS, I TESTI-
FIED IN OVER 30 CRIMINAL CASES IN HARRIS AND SURROUNDING COUNTY
DISTRICT COURTS, AND I HAVE BEEN ACTIVELY INVOLVED IN TEACHING
BAYLOR AND U.T. RESIDENTS WHO ROTATE THROUGH OUR FACILITY.

I ENJOY THE DIVERSITY OF MY PROFESSION. I FEEL I OFFER MUCH IN THE
WAY OF EXPERIENCE, CREATIVITY, AND MATURITY. I BELIEVE IN A TEAM
APPROACH TO ACCOMPLISHING GOALS AND ENJOY HELPING OTHERS, BUT
I LIKE WORKING ALONE WHEN NECESSARY.

AS YOU KNOW A RESUME IS ONLY A FRAMEWORK OF MY CAREER TO DATE.
I WOULD APPRECIATE THE OPPORTUNITY TO INTERVIEW AND HAVE THE
TIME TO GATHER DETAILS AND DISCUSS SOME OF MY CAREER ACCOMPLISH-
MENTS. I REMAIN CONFIDENT THAT I CAN BE AN ASSET TO YOUR FORENSIC
CENTER AND LOOK FORWARD TO AN EXCITING TIME IN THE DEVELOPMENT
OF ITS POTENTIAL.

YOU MAY REACH ME BY MAIL, BY E-MAIL (VLSHRODE@AOL.COM), OR BY
PHONE: 281-7789848 (H)   281-610-2392 (C)  713-796-6800 (W)
THANK YOU,

SINCERELY,

PAUL W. SHRODE, MD



# PAUL W. SHRODE, MD

*9687 Raaden Lane, Missouri City, Tx. 77469*
*281-778-9648 . pkshrode@aol.com*

## Qualifications Profile

Licensed to practice medicine in Texas and Ohio and in good standing with Medical Exam Boards
Bi-lingual in English and Spanish
Passed Forensic Pathology Boards (2003)
Graduate Degree in Law (1979)

## Professional Experience

**Harris County Medical Examiner's Office**, Houston, Texas          1997–Present
Assistant Medical Examiner
Performed 3000 + autopsies, testified in 100's of criminal cases, established
residency education program, and designed case review protocol for office.

**Hamilton County Coroner's Office**, Cincinnati, Ohio          1996–1997
Forensic Pathology Fellow
Studied Forensic Pathology under Dr. John Howard & Dr. Robert Pfalzgraf
during this fellowship program

**Scott & White Hospital**, Temple, Texas          1991–1997
Pathology Resident
Pathology resident in both Clinical and Anatomic Pathology.  Did Forensic
rotations in Bexar Co.,Tx. and Columbia, South Carolina

**Texas Tech University Health Science Center**, Lubbock, Tx.          1987–1991
Medical Student
Medical School first two years in Lubbock, last two years in El Paso.

**Scott & White Hospital**, Temple, Texas          1984–1987
Sleep Disorder Technician
Conducted sleep studies on patients and issued reports on those studies.
Helped establish this lab and maintain the business aspects.

**Legal Aid Society of Central Texas**, Belton, Texas          1979–1983
Paralegal
Prepared legal court briefs, drafted wills, and represented clients
in employer–employee hearings, social security hearings, and small claims appearances.

**Educational Service Center Region XIII**, Waco, Texas          1978–1983
Bi-lingual Consultant
Evaluated migrant children for education in program for english as a second language.

**Columbus School**, Medellin, Colombia, South America          1975–1978
Teacher
Taught middle school grades. Subjects included Math, Science, and English.
This is a Bi-National School which was sponsored by Colombia and America.

## Educational Background

Forensic Path Fellowship (1997)
Cincinnati, Ohio

Pathology Residency (1996)
Temple,Texas

Medical School (1991)
Lubbock, Texas

Pre-Med Requirements, Baylor U. (1984)
Waco, Texas

Graduate Law Degree, Southwest Texas State U. (1979)
San Marcos, Texas

BA Degree: Majors (English Lit/ World History) Minor(Spanish Language)
Indiana Central University (1973)
Indianapolis, Indiana

W

Paul W. Shrode, M.D.

3 Stirrup Lane, Ransom Canyon, Texas 79366
(806) 748-6746 vlshrode@aol.com

## Qualifications Profile

*Licensed to practice medicine in Texas and Ohio and in good standing with Medical Exam Boards*
*Bi-lingual in English and Spanish*
*Passed Forensic Pathology Boards (2003)*
*Graduate Degree in Law (1979)*

## Professional Experience

Lubbock County Medical Examiner's Office, Lubbock, Texas          2004 - Present
Deputy Medical Examiner

Harris County Medical Examiner's Office, Houston, Texas          1997 – 2004
Assistant Medical Examiner
Performed 3000 + autopsies, testified in 100's of criminal cases, established
Residency education program, and designed case review protocol for office.

Hamilton County Coroner's Office, Cincinnati, Ohio          1996-1997
Forensic Pathology Fellow
Studied Forensic Pathology under Dr. John Howard and Dr. Robert Pfalsgraf
During this fellowship program.

Scott & White Hospital, Temple, Texas          1991-1997
Pathology Resident
Pathology resident in both Clinical and Anatomic Pathology. Did Forensic
Rotations in Bexar Co., Tx. And Columbia, South Carolina.

Texas Tech University Health Science Center, Lubbock, Texas          1987-1991
Medical Student
Medical School: first two years in Lubbock, last two years in El Paso.

Scott & White Hospital, Temple, Texas          1984-1987
Sleep Disorders Technician
Conducted sleep studies on patients and issued reports on those studies.
Helped establish this lab and maintain the business aspects.

Legal Aid Society of Central Texas, Bolton, Texas          1979-1983
Paralegal
Prepared legal court briefs, drafted wills, and represented clients
In employer-employee hearings, social security hearings, and small claims appearances.

Educational Service Center Region XIII, Waco, Texas          1978-1983
Bi-lingual Consultant
Evaluated migrant children for education in program for English as a second language.

<u>Columbus School</u>, Medellin, Colombia, South America                                1975-1978
Teacher
Taught middle school grades. Subjects included Math, Science, and English.
This is a Bi-National School which was sponsored by Colombia and America.

Educational Background

Forensic Path Fellowship (1997)
Cincinnati, Ohio

Pathology Residency (1996)
Temple, Texas

Medical School (1991)
Lubbock, Texas

Pre-Med Requirements, Baylor U. (1984)
Waco, Texas

Graduate Law Degree, Southwest Texas Stat U. (1979)
San Marcos, Texas

BA Degree: Majors (English Lit/World History)  Minor (Spanish Language)
Indiana Central University (1973)
Indianapolis, Indiana

Presentations, Papers and Articles:

"Suicide by BB Gun: A Case Report", American Academy of Forensic Sciences, New York City,
New York, February 1997.

"A New Look at the Death in Custody Autopsy", American Academy of Forensic Sciences, Colorado
Springs, Colorado, February 1999.

"Postmortem Distribution of the MK81 (Dizocilipine), A Legal Mimic of Phencyclidine". TIAFT
Scientific Program, Paris, France, August 2002.

Postmortem Distribution of the Novel Ant, Psychotic Drug Quetiapine", Journal of Analytical
Toxicology ISSN 0146-4760  Vol. 28 # 4, April 2004.  Pp. 264-68.

"Dextromethorphan: Recreational Abuse of an Over-The-Counter Drug: 13 cases at Houston County
Medical Examiner".  Southwestern Association of Toxicologists, Fall 2002 Meeting, Galveston, Texas.

"Diltiazem: Effects and Toxicity in a Geriatric Patient", Southwestern Association of Toxicologist,
Spring 2003, Albuquerque, New Mexico.

"Increasing Popularity of Heroin and Carisoprodol in Abuse", Southwestern Association of
Toxicologists, Spring 2003, Albuquerque, New Mexico.

X

# Paul W. Shrode, MD

El Paso address: 12220 Pellicano Drive   El Paso, Texas 79936

## Qualifications Profile

Ten years experience as a Forensic Pathologist
Chief Medical Examiner, El Paso County, currently
Licensed to practice Medicine in Texas and in good standing with Medical Exam Board
Forensic Pathology Boards (2003)
Surgical Pathology Board Eligible
Board Certifications in AP/FP pending
Degree in Law (Graduate School of Political Science); Not a Law Degree
Bi-lingual in English & Spanish
Member of State Bar of Texas, as a Paralegal (1979-83)
Indiana State Teacher's License (1973-80)

## Professional Experience

Office of the Medical Examiner and Forensic Laboratory,
El Paso, Tex.   Chief Medical Examiner.                      11/2005 - Present
Act as Senior FP and Administrator of 15 member office.

Lubbock County Medical Examiner's Office,
Lubbock, Tex.   Deputy Medical Examiner.                     05/2004-11/2005
Deputy ME.

Harris County Medical Examiner's Office,
Houston, Tex.   Assistant Medical Examiner.                  1997-2004

Hamilton County Coroner's Office                             1996-1997
Cincinnati, Ohio.   Forensic Pathology Fellowship.
Studied under Dr. John Howard (Chief ME Tacoma, Wa)

Scott & White Hospital                                       1991-1996
Temple, Tex.   Pathology Resident in Clinical & Anatomical Pathology.
Did forensic rotations in Bexar County, Tex.  & Columbia, SC

Do not
Know
when this
version
was ready,
or how or
from whom

Texus Tech University Health Science Center      1987-91
Lubbock & El Paso, Tex.   Medical Student

Scott & White Hospital,                          1984-87
Temple Tex.  Sleep Disorders Technician

Legal Aid Society of Central Texas               1979-83
Belton, Tex.    Paralegal

Educational Service Center, Region XIII          1978-79
Waco, Tex.   Bilingual Consultant

Columbus School,                                 1975-78
Medellin, Colombia, South America;  Teacher

## Educational Background

Forensic Pathology Fellowship (1996-1997)
Cincinnati, Ohio

Pathology Residency (1991-1996)
Temple, Tex.

Medical School (1987-1991)
Lubbock, Tex.

BS requirements Baylor (1984)
Waco, Tex.

Southwest Tex. State University,
Graduate School of Political Science (1979)

Evelyn Wood Reading Dynamics; Reading Comprehension Techniques & Speed
Reading Instructor (1978)

University of Southern Alabama, Course work on Masters
In Secondary Education (1977)

BA Degree: Double Major (Spanish Language/ World History)
          With Secondary Education License Requirements
          Minor (English Literature)
Indiana Central University, Indianapolis, Indiana      (1973)

Y



*Document from El Paso Co.*

**Paul W. Shrode, MD**



## Qualifications Profile

Chief Medical Examiner, El Paso County, currently
Licensed to practice Medicine in Texas and in good standing with Medical Exam Board
Forensic Pathology Boards completed (2003)
Surgical Pathology Board Eligible
Board Certifications in AP/FP pending
More than 10 years experience performing medical death investigations

## Professional Experience

**Office of the Medical Examiner and Forensic Laboratory,**
El Paso, Tex.   Chief Medical Examiner.                           11/2005 - Present
Act as Senior FP and Administrator of 15 member office.

**Lubbock County Medical Examiner's Office,**
Lubbock, Tex.   Assistant Medical Examiner,                       05/2004-11/2005
Deputy ME.

**Harris County Medical Examiner's Office,**
Houston, Tex.   Assistant Medical Examiner.                       1997-2004

**Hamilton County Coroner's Office**                              1996-1997
Cincinnati, Ohio.  Forensic Pathology Fellowship.
Studied under Dr. John Howard (Chief ME Tacoma, Wa.)

**Scott & White Hospital**                                        1991-1996
Temple, Tex.  Pathology Resident in Clinical & Anatomical Pathology.
Did forensic rotations in Bexar County, Tex.  & Columbia, SC

**Texas Tech University Health Science Center**                   1987-91
Lubbock & El Paso, Tex.   Medical Student

*Document FBM*
*ElPaso Co*



## Educational Background

Forensic Pathology Fellowship (1996-1997)
Cincinnati, Ohio

Pathology Residency (1991-1996)
Temple, Tex.

Medical School (1987-1991)
Lubbock, Tex.

BS requirements Baylor (1984-5)
Waco, Tex.

Indiana Central University (1969-73)
BA Degree: Majors (Spanish Language/ World History)
          With Secondary Education License Requirements

Z

UP TO
70% OFF
Rome décor

Joss & Main
SHOP NOW »

eⁿ°Times.com (http://www.elpasotimes.com)

# NEWS

Weather:
(http://www.elpasotimes.com/weather)

EL PASO, TX  |  Now: 59°F
(http://www.elpasotimes.com/weather)  |  High: 57°F
» (http://www.elpasotimes.com/weather)  |  Low: 38°F
(http://www.elpasotimes.com/weather)  |  5-Day Forecast

HOT TOPICS:   Bridge delay (http://www.elpasotimes.com/news/ci_24895008)   ICE informant arrested (http://www.elpasotimes.com/living/ci_24898817)

🖨 Print   ✉ Email

# County fires Chief Medical Examiner Paul Shrode: Ohio Parole Board's ruling spurs decision

By Marty Schladen \ EL PASO TIMES (mailto:mschladen@elpasotimes.com?subject=El Paso Times)
POSTED: 05/25/2010 12:00:00 AM MDT

» Shrode resume
(http://extras.mnginteractive.com/live/media/site525/2010/0110/20100110_053846_Shroderesume.pdf)
» Transcript: Cross examination of Shrode
(http://extras.mnginteractive.com/live/media/site525/2010/0110/20100110_053811_Shrodecase.pdf)
» Richard Nields clemency report

(http://extras.mnginteractive.com/live/media/site525/2010/0522/20100522_124000_Richard_Nields_case.pdf)

EL PASO -- A majority of the County Commissioners Court stuck by Chief Medical Examiner Paul Shrode through three conflicting résumés and more than two years of questions about his credibility. All that changed Monday when court members fired Shrode on a 3-1 vote.

They acted after the Ohio Parole Board voted 4-3 last week to recommend clemency for a death-row inmate, citing problems with testimony Shrode gave against him in 1997.

County Judge Anthony Cobos and Commissioners Anna Perez and Veronica Escobar voted to dismiss Shrode immediately. Commissioner Dan Haggerty voted to keep him on the job. Commissioner Willie Gandara was absent on county business.

Now the commissioners must begin the search for another medical examiner.

District Attorney Jaime Esparza also is reviewing cases involving Shrode to see if convicts are likely to challenge his testimony.

"I don't think we'll see a rush to review his cases," Esparza said.

But Shrode probably is not done testifying in El Paso County courts. Defendants could call him in cases in which Shrode produced autopsy reports, Esparza said.

If Shrode testifies, taxpayers will be on the hook to pay his time and expenses, Esparza said.

He declined to say whether he still had confidence in Shrode. Esparza had publicly supported Shrode when his credentials were questioned in prior public meetings before the commissioners court.

Escobar said the Ohio case had little to do with her decision. Rather, she said, it was an accumulation of evidence -- some of it discussed in a lengthy closed-door session Monday -- that made her lose confidence in Shrode.

Perez said she believed there was little chance that people were wrongfully convicted in El Paso County based on Shrode's testimony.

Shrode, the county's highest-paid employee at more than $254,000 a year, declined to comment before or after the vote.

His troubles in El Paso began in August 2007, when Assistant County Attorney Bruce Yetter called Shrode to testify in a child protection case. Yetter introduced Shrode's résumé as a court exhibit. One entry on the résumé Shrode prepared said he had a "graduate law degree" from Southwest Texas State University.

Attorney Theresa Caballero cross-examined Shrode. She remembered that Southwest Texas State had no law school, so she asked: "Do you have a law degree, doctor?"

"Not in the sense of a law degree from a school of law, not like you," Shrode said.

He then admitted under oath that he had no law degree or diploma.

But in the résumés Shrode had submitted to El Paso and Harris counties, he claimed to hold a "graduate degree in law."

Later, after being questioned by Caballero, Shrode produced another résumé. That one said that he had a degree in law from a school of political science and that he was a member of the State Bar of Texas from 1979 to 1983. A third résumé by Shrode said that he had a "degree in law ... not a law degree" and that his bar membership was as a paralegal.

The State Bar of Texas had no record of Shrode being a member, either as an attorney or a paralegal.

When the commissioners court reviewed discrepancies on Shrode's résumés in November 2007, Escobar, Cobos and Haggerty all supported him.

The commissioners began new discussions about Shrode early this year, after a government watchdog named David Fisher filed a complaint against Shrode with the Texas Medical Board. Fisher said Shrode had lied on his résumés to obtain well-paying public jobs.

The El Paso County government did not authorize a check of all entries on Shrode's résumé until this year, nearly five years after the commissioners court hired him. In February, county Human Resources Director Betsy Keller told the court that Shrode had taken a semester's worth of political science courses at Southwest Texas State but had not received a graduate degree of any kind.

Caballero, speaking to the commissioners court Monday, said what happened with Shrode went beyond mistakes. It even went beyond Shrode, she said.

"It isn't about Dr. Shrode," Caballero said. "It's about elected officials and life and death."

Medical examiners frequently testify in felony trials.

Cobos said he wanted to fire Shrode early this year but did not have the support of the rest of the court.

"Nothing has changed for me," Cobos said Monday. "I was ready to act four or five months ago."

In its clemency recommendation last week, the Ohio Parole Board cited problems with Shrode's testimony in urging Gov. Ted Strickland to take Richard Nields off death row but keep him in prison for life.

Shrode testified that he knew from his autopsy that Nields beat Patricia Newsome in Cincinnati in 1997, left for 15 minutes to six hours, then came back and strangled Newsome. Shrode's supervisor later told the parole board that Shrode had no scientific basis for the claim, which helped establish to jurors that Nields acted in cold blood.

Perez said the Ohio ruling helped her change her mind about Shrode, "but it happened a long time ago."

Perez, an attorney, said she had no reason to believe that Shrode testified to any unsupported



Dash camera video of a police chase in Douglas...

## El Paso Local Guide (http://mylocal.elpasotimes.co

Featured Businesses

El Paso Cosmetic Surgery
(http://mylocal.elpasotimes.com/el-paso-TX/medical/plastic-surgery/El-Paso-Cosmetic-Surgery-915-351-1116)
Haskins House Bar & Grill
(http://mylocal.elpasotimes.com/el-paso-TX/restaurants/bar-food/Haskins-House-Bar-and-Grill-915-533-3366)
Gael Auto Sales
(http://mylocal.elpasotimes.com/el-paso-TX/auto/auto-dealers/Gael-Auto-Sales-915-779-1288)

conclusions in his testimony as El Paso County medical examiner. She said she was not concerned that anybody in El Paso might have been wrongly convicted based on Shrode's testimony.

Escobar and Perez would not say what they were told about Shrode in Monday's executive session, but they indicated that new information came to light about the medical examiner.

Esparza and County Attorney Jo Anne Bernal also would not divulge what was said. They said it was up to the commissioners to determine Shrode's fitness to be medical examiner.

Haggerty was the only commissioner to stick by Shrode, characterizing what Shrode did as "mistakes."

"Do people make mistakes?" he asked. "Yes."

Marty Schladen can be reached at mschladen@elpasotimes.com; 546-6127.

🖨 Print    ✉ Email    🔁 Return to Top

### RELATED (HTTP://WWW.ELPASOTIMES.COM/NEWS)

Delayed Tornillo-Guadalupe international bridge to be done by summer (http://www.elpasotimes.com/news/ci_24899151/mexican-government-has-begun-construction-new-tornillo-guadalupe)

All EPISD campuses to get review of curriculum (http://www.elpasotimes.com/news/ci_24899147/el-paso-isd-will-begin-curriculum-audit-partnering)

Former ICE informant arrested; Juarez 'House of Death' insider held in Missouri jail (http://www.elpasotimes.com/living/ci_24898817/peyro)

## Offers and articles from around the Web

ADVERTISEMENT

  

She's Recently Single After 12 Years. To Celebrate, Here are 28 Stunning Photos of Anna Kournikova

Beaumont arrest records. Who do you know?

New Rule in Texas: If you pay for car insurance you better read this...

Americas top doctors claim this weird ingredient may kill Blood Pressure and stop Heart Disease...



### Recommended for You

▶ Seahawks refuse to sell NFC title game tickets...
▶ Gary G. Godsey: Texas school funds must be more...
▶ $78 million sale gives new life to El Paso auto...
▶ Protect yourself against flu outbreak
▶ Pizza Hut to test 'by the slice' amid...
▶ Trish Long: Soldier of fortune wasn't dead yet

— SPONSORED LINK —    Powered by newsiogram

Stage Coach

(http://mylocal.elpasotimes.com/el-paso-TX/transportation/freight-transportation/Stage-Coach-915-779-8315)
Tito's Restaurant
(http://mylocal.elpasotimes.com/el-paso-TX/restaurants/restaurants/Titos-Restaurant-915-593-0039)

Find El Paso Attractions

Search for a business

Search by keyword or Zip    🔍

Add your business here +
(http://mylocal.elpasotimes.com/#add_busines

 » Learn more about our new commenting system: FAQ: Article commenting (/ci_18375505)