IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CHARLES VICTOR THOMPSON, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | No. 4:13-cv-1900 |
| | § | (CAPITAL CASE) |
| LORIE DAVIS, Director, | § | |
| Texas Department of Criminal | § | |
| Justice, Correctional Institutions | § | |
| Division, | § | |
| Respondent. | § | |

**RESPONDENT'S ANSWER AND RESPONSE TO PETITIONER'S
MOTION FOR A HEARING**

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

ADRIENNE MCFARLAND
Deputy Attorney General for Criminal
Justice

EDWARD L. MARSHALL
Chief, Criminal Appeals Division

GEORGE A. D'HEMECOURT*
Assistant Attorney General
State Bar No. 24082888
Southern Id. No. 2533916
P. O. Box 12548, Capitol Station
Austin, Texas 78711
(512) 936-1400
(512) 936-1280 (Facsimile)

* Counsel of Record

*Counsel for Respondent*

# TABLE OF CONTENTS

ANSWER ................................................................................................. 1

THOMPSON'S ALLEGATIONS ........................................................... 1

STATEMENT OF THE CASE ................................................................ 4

STATEMENT OF FACTS ....................................................................... 6

    I.    Facts Relating to Guilt/Innocence .................................... 6

        A.    The State's punishment evidence ........................... 9

        B.    The defense's case in mitigation. ......................... 10

STANDARD OF REVIEW ................................................................... 14

ARGUMENT .......................................................................................... 22

    I.    The State Court Reasonably Determined that the Evidence Was Sufficient to Support the Jury's Verdict that Thompson Caused the Death of Dennise Hayslip (Claim 1). ........................................ 22

    II.    Thompson's Claim that the Texas Concurrent Causation Statute is Unconstitutional is Procedurally Barred and Meritless (Claim 8). ................................................................. 28

    III.    The CCA Reasonably Determined that Thompson Was Not Entitled to a Retrial on Guilt/Innocence Based on a Sixth Amendment Violation. ................................................................. 32

        A.    The CCA's rejection of this claim is entitled to AEDPA deference; alternatively, the claim is procedurally barred. ................................................................. 32

        B.    The use of Gary Johnson as an informant did not constitute error, or harm Thompson, at the guilt/innocence phase of his trial. ......................... 36

        C.    Any error was harmless. ....................................... 40

    IV.    Thompson's *Massiah*-related Claims Are Procedurally Barred and Meritless (Claim 3). ......................................................... 42

        A.    Relevant Facts ........................................................ 42

**B.    The claims are procedurally barred.** .................................. 47

    **1.    The CCA's dismissal was not a merits determination on these claims.** ................................................. 48

    **2.    Thompson fails to show cause and prejudice.** ............. 49

    **3.    *Martinez/Trevino* does not excuse Thompson's default.** 53

**C.    Even if the claim were not procedurally barred, Thompson fails to demonstrate a *Massiah* violation.** ...... 55

    **1.    Thompson fails to show that Rhodes was acting as an agent of the state.** .................................................. 58

    **2.    Thompson's assertion that the evidence obtained by Rhodes should have been excluded at punishment is *Teague*-barred.** ......................................................... 65

    **3.    Any error was harmless.** .................................. 72

**D.    Even if his claim were not procedurally defaulted, Thompson fails to demonstrate that the State committed a *Brady* violation by failing to disclose impeachment evidence related to Rhodes's informant status.** ................ 76

**E.    Even if it were not procedurally defaulted, Thompson's claim that his trial counsel was ineffective lacks merit because no *Massiah* violation occurred.** ............................ 78

**F.    Even if it were not procedurally defaulted, Thompson's appellate counsel was not ineffective for failing to raise *Brady* and *Massiah* claims on direct appeal.** ..................... 82

**G.    The court should not hold an evidentiary hearing on these claims.** ............................................................ 84

**V.    The State Court Reasonably Denied Thompson's Claim that *Apprendi* Required the State to Allege Facts Relating to the Texas Death Penalty Special Issues.** ............................... 90

VI.    Thompson's Claim that the Trial Court Violated His Eighth Amendment Rights by Allowing Impermissible Victim Impact Testimony Is Procedurally Defaulted, In Part, and Entirely Meritless.............................................................. 93

VII.   Thompson's Claim That the Texas Scheme for Executing Defendants by Lethal Injection Constitutes Cruel and Unusual Punishment Is Not Cognizable on Federal Habeas Review; Alternatively, It Was Reasonably Denied by the State Court... 97

    A.    This claim is not cognizable in a § 2254 habeas petition because it must be raised under § 1983............................... 97

    B.    The state court's disposition is entitled to deference...... 98

    C.    Thompson's request for discovery on this basis should be denied. ............................................................... 101

VIII.  The State Court Reasonably Rejected Thompson's Claim that the Texas Dual-Track Habeas Application System Violates Due Process of Law................................................................ 102

XI.    The State Court Reasonably Rejected Thompson's Claims that His Trial Counsel Was Ineffective During the Guilt/Innocence Phase of His Trial. ............................................................ 106

    A.    Thompson fails to show prejudice resulting from any these allegations because there was overwhelming evidence of his guilt............................................... 106

    B.    Trial counsel was not constitutionally ineffective for failing to properly use challenges and ask questions during jury selection.......................................... 108

        1.    Thompson's deficient performance claims related to punishment issues in the first trial are moot because he was granted a retrial on punishment; alternatively, counsel was not ineffective for failing to properly question prospective jurors.................................. 108

iii

2.    Counsel was not constitutionally ineffective for failing to exercise peremptory strikes on jurors Rogers and Blassingame................................................... 110

C.    Trial counsel was not constitutionally ineffective for failing to object to the admission of extraneous offense evidence. ................................................................... 113

D.    Trial counsel was not constitutionally ineffective for failing to object during closing argument to the prosecution's characterization of Dr. Radalat's testimony. .............................................................. 116

E.    Trial counsel was not constitutionally ineffective for failing to request a lesser-included offense instruction as to the murder of Dennise Hayslip. ..................................... 119

F.    Thompson's claim that his trial counsel was ineffective for failing to object to the admission of the murder weapon is procedurally barred and meritless................. 125

X.    The State Court Reasonably Rejected Thompson's Claim that the Trial Court's Denial of his Request for a Continuance Prior to His Retrial on Punishment Deprived Him Of Due Process of Law and His Right to Effective Counsel..................................... 126

A.    Relevant Timeline................................................................. 127

B.    Thompson's argument that the trial court's denial prevented him from excluding Rhodes's testimony is procedurally barred. .......................................................... 129

C.    The state court reasonably denied this claim. ................. 130

D.    Thompson's renewed request for funding must be denied. ................................................................................ 138

XI.    Thompson's Claim Challenging the Use of Evidence of Youthful Misconduct at the Punishment Stage of Trial is Procedurally

Barred; Alternatively, the State Court Reasonably Denied This
Claim. ................................................................................................ 140

XII.  The State Court Reasonably Rejected Thompson's Claim that
the Trial Court Violated *Apprendi* by Failing to Instruct the
Jury to Apply a Beyond a Reasonable Doubt Standard to the
Mitigation Issue. .............................................................................. 141

XIII.  Thompson's Claim That the Texas Capital Sentencing Scheme
Violates the Eighth Amendment Because the Instructions Give
the Jury Mixed Signals as to How the Mitigation Issue is to be
Applied Is Procedurally Barred and Lacks Merit. .................... 142

A.   Thompson's claim is procedurally barred because he
failed to properly raise the issue on direct appeal. ......... 143

B.   Alternatively, the state court reasonably determined that
this claim is meritless. ........................................................... 144

XIV.  Thompson's Claims Relating to Dr. Shrode's Autopsy Report
Are Procedurally Barred and Lack Merit. ................................. 146

A.   The claims are procedurally barred. ................................... 147

B.   Even if the claim were not procedurally defaulted,
Thompson fails to show that the State committed a *Brady*
violation. .................................................................................. 148

C.   Even if the claim were not procedurally defaulted,
Thompson fails to show that his trial counsel was
ineffective for failing to object to the testimony of Dr.
Moore on Confrontation Clause grounds. ......................... 151

D.   Even if the claim were not procedurally defaulted,
Thompson fails to demonstrate that the State committed
a due process violation under *Giglio/Napue*. ................... 154

CONCLUSION .................................................................................................. 155

CERTIFICATE OF SERVICE ........................................................................ 157

# ANSWER

Petitioner Charles Victor Thompson was convicted of and received the death penalty for killing his ex-girlfriend, Dennise Hayslip, and Darren Cain.[1] He now challenges that presumptively valid conviction and sentence in this Court pursuant to 28 U.S.C. §§ 2241 and 2254. Although Thompson seeks habeas relief, some of his claims are procedurally barred because they were not properly raised in state court, and he has failed to show that any of his claims have merit or that he is entitled to further factual development. Accordingly, the Director respectfully requests that Thompson's petition for a writ of habeas corpus be denied with prejudice.[2]

# THOMPSON'S ALLEGATIONS

The Director understands Thompson to assert the following claims in support of federal habeas relief:

1.  The evidence is legally insufficient to support the conviction of capital murder because the intervening medical care rendered to Dennise Hayslip was the true cause of her death. Petition at 43–53.

2.  Thompson was harmed by a Sixth Amendment violation at the guilt/innocence phase of his trial when Harris County District Attorney Investigator Gary Johnson conducted an

---

[1]   Copies of Thompson's state court records have been previously filed with the Court.

[2]   The Director's answer also serves as a response to Thompson's opposed motion for a hearing. ECF 56.

1

undercover investigation of Thompson in prison. *Id*. at 53–60.

3.   The State committed a *Brady*[3] violation and violated Thompson's Sixth Amendment rights when, using inmate Robin Rhodes, it deliberately elicited incriminating statements from Thompson and failed to disclose that Rhodes was a state agent; in addition, Thompson's trial counsel was ineffective for failing to suppress Rhodes's testimony on Sixth Amendment grounds, and his direct appeal counsel was ineffective for failing to raise the *Brady* and Sixth Amendment issues. *Id*. at 60–109.

4.   The imposition of the death penalty violated Thompson's due process rights because the indictment did not allege any facts germane to the special issues in the Texas death penalty statute. *Id*. at 110–17.

5.   Thompson's Sixth and Eighth Amendment rights were violated when the trial court allowed Michael Donaghy to testify regarding the number and types of people who attended Dennise Hayslip's funeral. *Id*. at 118–21.

6.   The Texas scheme for executing defendants by lethal injection is cruel and unusual in violation of the Eighth Amendment. *Id*. at 121–40.

7.   Texas's dual track habeas application system violates due process of law, as guaranteed by the Fourteenth Amendment. *Id*. at 141–47.

8.   If the evidence of capital murder was sufficient based on Texas's statutory law related to concurrent causation, that law is unconstitutional as applied in this case because it violates due process and reduces the reliability of a guilt determination in violation of the Eighth Amendment. *Id*. 148–51

---

[3]   *Brady v. Maryland*, 373 U.S. 83 (1963).

9.  Thompson's trial counsel was ineffective during the guilt/innocence phase of trial for:

    a.  failing to ask proper questions and properly use challenges during jury selection, *id*. at 156–65;
    b.  failing to object to the admission of extraneous offense evidence, *id*. at 165–69;
    c.  failing to object to the prosecution's characterization of Dr. Radalat's testimony during opening argument, *id*. 169–72;
    d.  failing to request a lesser included offense instruction as to the murder of Dennise Hayslip, *id*. at 172–78;
    e.  failing to object to the admission of the murder weapon into evidence, *id*. at 178–79.

10. The trial court's denial of Thompson's request for a continuance prior to his retrial on punishment deprived him of due process of law and effective assistance of counsel, in violation of the Sixth and Fourteenth Amendments. *Id*. at 183–216.

11. The use of evidence of youthful misconduct at the punishment stage of trial violated the Eighth Amendment. *Id*. at 216–22.

12. The jury instructions violated Thompson's due process rights by failing to instruct the jury that the State had the burden of proof beyond a reasonable doubt on the mitigation issue at the punishment stage of trial. *Id*. at 222–30.

13. The Texas capital sentencing scheme violates the Eighth Amendment because the instructions give the jury mixed signals as to how the mitigation issue is to be applied. *Id*. at 230–36.

14.   The State committed *Brady* and *Giglio*[4] violations through the admission of Dr. Shrode's autopsy report of Dennise Hayslip, and trial counsel was ineffective for failing to object to testimony about the autopsy report on Confrontation Clause grounds. *Id*. at 236–44.

## STATEMENT OF THE CASE

Thompson was convicted on April 14, 1999, of capital murder committed on April 30, 1998. Clerk's Record (CR) 212–13. Pursuant to the jury's answers to the special issues on future dangerousness and mitigation, the trial court sentenced Thompson to death. *Id*. The Texas Court of Criminal Appeals (CCA) affirmed Thompson's conviction on direct appeal. *Thompson v. State*, 93 S.W.3d 16 (Tex. Crim. App. 2001). However, based on its finding that the State admitted evidence at Thompson's punishment hearing that was obtained pursuant to a violation of Thompson's Sixth Amendment rights, the court also vacated Thompson's sentence and remanded the case for a new hearing on punishment.[5]

At retrial on punishment, the jury answered the special issues on future dangerousness and mitigation as before, and Thompson was again sentenced to death. Clerk's Record-Retrial (CR-R) 238–39. The CCA affirmed Thompson's

---

[4]   *Giglio v. United States*, 405 U.S. 150 (1972).

[5]   The CCA granted Thompson's first ground for rehearing in which he maintained that the CCA failed to fully consider his fourth point of error on original submission; however, on further consideration, the CCA concluded that its decision was improvident and withdrew the order granting rehearing. *Thompson v. State*, No. 73,431, 2003 WL 190819 (Tex. Crim. App. Jan. 29, 2003).

sentence on direct appeal. *Thompson v. State*, No. AP-73,431, 2007 WL 3208755 (Tex. Crim. App. Oct. 31, 2007).

Thompson filed a state application for writ of habeas corpus following his first conviction and sentence, raising seventeen claims. (State Habeas Clerk's Record) SHCR-01 2–92. He filed a second application following the retrial on punishment that raised fourteen claims. SHCR-02 2–117. The trial court did not hold a live evidentiary hearing. As to all of the allegations, the trial court entered findings of fact and conclusions of law recommending that relief be denied. SHCR-01 224–65; 266–67 (order adopting findings of fact); SHCR-02 218–259, 260–61 (order adopting findings of fact). Based on the trial court's findings and conclusions, and on its own review, the CCA issued a combined order denying habeas relief. *Ex parte Thompson*, Nos. WR-78,135-01 & WR-78,135-02, 2013 WL 1655676 (Tex. Crim. App. April 17, 2013).

On April 15, 2014, Thompson filed a federal habeas petition. ECF No. 21. He subsequently amended the petition. ECF No. 38. This Court granted Thompson's unopposed motion to stay and abate the proceedings in order to allow Thompson to seek state court relief on previously unexhausted claims. ECF No. 52.

Thompson filed a subsequent application for writ of habeas corpus in the convicting court on September 24, 2015. SHCR-03 2–486. After reviewing the application and finding that it failed to satisfy the requirements of Texas's

successive writ statute, the CCA dismissed it "as an abuse of the writ without considering the merits of the claims." *Ex parte Thompson*, No. WR-78,135-03, 2016 WL 922131(Tex. Crim. App. March 9, 2016) (citing Tex. Code Crim. Proc. art. 11.071, § 5(c)). Thompson then filed a second amended federal petition in this Court, and this proceeding followed. ECF No. 57 (Petition).

## STATEMENT OF FACTS

### I.    Facts Relating to Guilt/Innocence

On direct appeal, the CCA provided the following summary of the evidence of Thompson's capital crime:

> Around June of 1997, [Thompson] began dating Dennise Hayslip and subsequently moved into the home she shared with her son, her co-worker Lisa Gonzalez, and Gonzalez'[s] two daughters. While living there, [Thompson] grew increasingly jealous, possessive, and angry. During fits of anger, [Thompson] would throw things, kick the refrigerator, and punch or kick the walls, often leaving holes in them. [Thompson] rarely worked, relying on Hayslip and Gonzalez to pay the bills. [Thompson] became irate when Gonzalez asked him to contribute.

> On one occasion, Gonzalez heard [Thompson] screaming at Hayslip and calling her names and saw him shaking her. When Gonzalez tried to stop [Thompson] from hurting Hayslip, [Thompson] grabbed Gonzalez and threw her to the ground. Gonzalez thereafter attempted to call the police, but the telephone went dead. She later discovered that the telephone cord had been ripped out of the wall. [Thompson] eventually moved out and Hayslip moved into her own apartment.

> On March 16, 1998, Gonzalez accompanied Hayslip and [Thompson] to a local pub. [Thompson] became sullen and angry during the evening and told Hayslip he wanted her to sit with him and not dance with anyone else. When Gonzalez saw Hayslip three

6

days later, one side of her face was bruised, her lip was split, and there were bruises on her neck.

At some point in time, Hayslip met Darren Cain at a local bar where he worked as a bartender and they became friends. On the evening of April 29, 1998, Cain called his best friend, Tony Alfano, and asked him to meet him at the bar to watch the Rockets game, but Alfano declined. At 2:30 the next morning, Cain again called Alfano and told him that [Thompson] had threatened him over the telephone. Cain told Alfano that [Thompson] was beating up or "messing with" Hayslip and he was going over to her apartment to help her.

Kathryn Page, one of Hayslip's neighbors, woke up around 3:00 a.m. on the morning of April 30th to the sound of her dog barking and someone screaming. She heard loud voices, including a female voice saying, "stop," and "help." Page called the police and walked outside to check Hayslip's apartment number. She saw Hayslip and Cain standing outside, but neither appeared to be hurt or wounded in any way. However, Hayslip was agitated and apologizing to Cain "for all of this." [Thompson] then walked out of Hayslip's apartment yelling, cussing, and calling Hayslip a "whore." Page noticed at that time that [Thompson] had a black eye. Cain told [Thompson] to "chill," and [Thompson] responded, "[D]o you want to die, mother fucker?"

Responding to the disturbance call, Deputy William Coker saw Cain, Hayslip, and [Thompson] standing outside and all appeared to be calm. Coker saw that [Thompson's] face was swollen from being in a fight, but learned that [Thompson] had started the fight. Because no one wanted to file charges, Coker told [Thompson] to leave the complex and followed him as he exited the property. Coker warned [Thompson] that he would be committing criminal trespass if he returned.

About 6:00 a.m. that same morning, Page's son heard gunshots as he was leaving for school. Shortly thereafter, Page heard someone beating on her door. When she walked outside, Page saw Hayslip sitting on the ground bleeding from the mouth and gasping for breath. Hayslip made a sign with her hands like someone shooting a gun.

7

When Coker arrived back at the apartments, he found Hayslip sitting in a pool of blood with a bullet hole in her right cheek and a great amount of blood draining from her mouth. Coker asked her if [Thompson] had shot her and she nodded. Coker found Cain's dead body in Hayslip's apartment.

Hayslip was taken by Life Flight to Hermann Hospital. While Hayslip was awaiting surgery, her brother asked her, "[D]id Chuck do this?" Hayslip nodded emphatically in response.

In the meantime, [Thompson] went to Diane Zernia's home. Zernia was getting her daughter ready for school, so [Thompson] waited for her in the living room; however, he soon fell asleep. After her daughter left for school, Zernia watched the news while [Thompson] slept. As she watched, she saw a story about the shooting. When [Thompson] woke up a couple of hours later, Zernia joked about his black eye stating, "I hope the other guy looks worse." [Thompson] replied, "He does. I shot him." [Thompson] told Zernia that he had been beaten up in a fight so he left the apartments where it happened to get a gun. Upon [Thompson's] return, he kicked in the apartment door and shot Cain four times. [Thompson] told Zernia that he shot Hayslip also. Zernia testified that [Thompson] said he told Hayslip, "I can shoot you too, bitch," and then he put the gun to her cheek and pulled the trigger. [Thompson] told Zernia that he threw the gun in a creek after leaving the scene.

[Thompson] asked Zernia if he could call his father, and his father came and picked him up from Zernia's home. [Thompson's] father took [Thompson] to the police station where he turned himself in for the shooting. [Thompson] later called Zernia from jail in an apparent attempt to influence her to change her testimony about why he returned to the apartments.

During surgery, doctors were unable to secure an airway and Hayslip fell into a coma. A few days later, her family was told she was brain dead and they agreed to remove life support systems. Hayslip continued to live for four more days, ultimately dying a week after she was shot. The medical examiner testified that,

according to the doctor who performed Hayslip's autopsy, the cause of death was a gunshot wound to the face.

A deputy with the Harris County Sheriff's Office testified that the murder weapon was eventually recovered with the help of an informant. The firearms examiner testified that, after evaluating the weapon and the evidence found at the scene of the shooting, the weapon must have been reloaded during the incident. [Thompson] was charged with committing capital murder by murdering more than one person during the same criminal transaction. *See* Tex. Penal Code Ann. § 19.03(a)(7)(A).

*Thompson v. State*, 93 S.W.3d at 18–20.

## A.    The State's punishment evidence

After the case was remanded for retrial on punishment, multiple witnesses testified regarding the facts of the crime as set out above, and the CCA summarized the remainder of the State's case for future dangerousness as follows:

[Thompson] also attempted, from prison, to solicit someone to kill Zernia and was later indicted for solicitation to commit capital murder. The State also presented evidence that [Thompson] was associated with the Aryan Brotherhood gang in prison. A fellow jail inmate testified that [Thompson] gave him a list of people who [Thompson] believed were potential witnesses and told the inmate that he would pay him to "eliminate" the witnesses or otherwise make sure that they would not appear in court. The inmate turned the list over to the police.

The State also presented evidence that [Thompson] began committing crimes as a juvenile. In 1984, while living with his parents in an upper-middle-class neighborhood in Colorado, [Thompson] committed a string of crimes that resulted in over $60,000 of damage to homes and property. While on probation from the youth center, [Thompson] stole his father's motorcycle, ran away, and committed a variety of crimes. He was arrested again

9

in 1987 and sentenced to a juvenile facility. [Thompson] had problems with drugs and alcohol from an early age. He married, but later abandoned his wife and two children. In 1996, [Thompson] was arrested for transporting illegal immigrants from Mexico.

*Thompson v. State*, 2007 WL 3208755, at *1–2.

## B.    The defense's case in mitigation.

In its response to Thompson's second state habeas application, the State's brief described Thompson's case in mitigation at his retrial on punishment as follows:

[Thompson]'s father, Steven Thompson, III, testified for the defense at trial that [Thompson], the middle child of three boys, was a warm and loving child ([18 Reporter's Record-Retrial (RR-R) 269, 279]). [Thompson]'s father worried about [Thompson] when he was a baby because [Thompson] did not talk until he was three years old and slept a lot ([18 RR 275]). [Thompson] also had learning problems from a young age and seemed to be dyslexic ([18 RR-R 276]). [Thompson] was a poor student who was held back in the second or third grade and did not do his homework or participate in class ([18 RR-R 278]).

[Thompson]'s family moved to Colorado when [Thompson] was approximately eleven years old and lived in a nice home with plenty of recreational activities ([18 RR-R 274, 280]). However, it was in Colorado that [Thompson] vandalized houses and attended school intoxicated ([18 RR 283–84]). In the sixth grade, [Thompson] was expelled from school for smoking marijuana ([18 RR 285]). [Thompson] broke into cars with his brother and stole his father's motorcycle ([18 RR 293; 19 RR-R 11]). [Thompson] also became rebellious and developed an attitude ([19 RR-R 5]).

After the vandalizing incidents and [Thompson]'s release to his parent's custody, the family attended counseling ([18 RR-R 291]). The counselor advised [Thompson]'s father and mother that they needed to be consistent in their punishment of [Thompson];

10

[Thompson]'s father was too strict and [Thompson]'s mother tended to be more permissive ([18 RR-R 292]). However the attempts of [Thompson]'s father to discipline [Thompson] were not successful ([18 RR-R 293]). [Thompson]'s father felt that [Thompson] was out of control and that [Thompson]'s older brother was a bad influence ([19 RR-R 10]).

[Thompson]'s older brother, Steven Thompson, IV, testified for the defense at punishment regarding the poor example that he set for his younger brothers, including [Thompson], while they were growing up ([18 RR-R 128]). Steven Thompson, IV, testified that he began purchasing drugs when he was twelve or thirteen years old, which lead to him burglarizing houses ([18 RR 121–22]). [Thompson]'s brother introduced [Thompson] to marijuana when [Thompson] was thirteen or fourteen years old ([*Id.*]). At the time of the instant trial, Steven Thompson, IV, was imprisoned in Texas for burglary of a habitation ([18 RR-R 119–120]). Previously, he served time in state jail for five cases of burglary and one case of possession of less than one gram of cocaine ([18 RR-R 119–120]). At one time, he was on probation for illegal use of a motor vehicle ([18 RR 124–25]).

Through [Thompson]'s brother and Mitchell Heck, who was involved with [Thompson] in the Colorado vandalizing incidents, the defense elicited testimony regarding the discipline of [Thompson] by his father. Steven Thompson, IV, testified that their father was sometimes too strict in his discipline ([18 RR-R 126–27]). Mitchell Heck testified that he became aware that [Thompson] was being disciplined by his father and noticed that [Thompson]'s body had been manhandled with black and blue marks ([18 RR-R 241–42]).

Tamra Collier, [Thompson]'s ex-wife and mother of his two children, testified that she met [Thompson] in Colorado when she was fifteen years old, and [Thompson] was seventeen or eighteen years old ([18 RR-R 249–253]). At that time, [Thompson] had full time employment ([18 RR-R 251]). Collier married [Thompson] three or four years later in 1991, and the couple had their first child the same year ([18 RR-R 253–54, 256]). By the time their second child was born in 1995, Collier had separated from [Thompson] and moved from Houston, Texas, back to Colorado ([18

RR-R 253–54, 256]). Collier testified that she left [Thompson] because [Thompson] was unable to settle down and act responsibly ([18 RR-R 257]). [Thompson] drank quite a bit, used drugs, and came home only when he felt like it ([18 RR-R 258–61]). Since their divorce, [Thompson] did not send Collier money to help raise their children, and the children's contact with [Thompson] was limited to when they visited their grandparents in Houston ([18 RR-R 262–63]).

David Rutherford and Debra French described [Thompson]'s drinking and drug use as an adult and its effect on his ability to maintain steady employment. Rutherford testified that [Thompson]'s drug use included the intravenous injection of cocaine, and Rutherford was not successful in his attempt to train [Thompson] to sell swimming pools because [Thompson] did not come to work ([18 RR-R 104, 111]). Debra French, owner of A-1 Advance Moving and Storage, testified that [Thompson] worked for her in 1998 ([18 RR-R 208–09]). French counseled [Thompson] on his work habits, specifically [Thompson]'s drinking because [Thompson] did not report for work after drinking the night before ([18 RR-R 212]).

William Jordan and Lauren Missy Cook described the relationship between [Thompson] and Dennise Hayslip. [Thompson] lived with Jordan for two and a half months after [Thompson] and Hayslip broke up ([18 RR-R 198]). While living with Jordan, however, [Thompson] and Hayslip resumed their relationship and Jordan observed that Hayslip paged [Thompson] constantly ([18 RR-R 199–200]). Jordan saw [Thompson] and Hayslip together the evening of April 29, 1998, and observed that the couple got along well ([18 RR-R 204]). Lauren Missy Cook, a bartender at a neighborhood bar that [Thompson] and Hayslip frequented, asserted that [Thompson] and Hayslip were sometimes in love and then fighting at other times ([18 RR-R 141–44]). Hayslip and [Thompson] were at the bar on the evening of April 29, 1998, and Cook observed that they drank, but not a lot, and that they both seemed to be in a very good mood ([18 RR-R 148–49]).

Several witnesses described [Thompson]'s demeanor immediately after the instant offense. David Rutherford testified

that [Thompson] came to Rutherford's house after the instant offense and confessed to shooting Hayslip and Cain ([18 RR-R at 109–10]). Rutherford asserted that [Thompson] was upset and hysterical and that [Thompson] said that he could not believe that he committed the instant offense ([*Id.*]). Alana Lancaster testified that she doctored [Thompson]'s gunshot wound after the instant offense ([18 RR-R 244]). [Thompson] told Lancaster that he had shot his girlfriend and the man that was with her and Lancaster described [Thompson]'s demeanor as that of a shocked and scared individual ([18 RR-R 244–46]).

Finally Debra French talked to Diane Zernia the day of the instant offense after [Thompson] came to Zernia's house and Zernia reported that [Thompson] was very remorseful regarding the instant offense ([18 RR-R 214–15]). Katherine McQueen, M.D., a physician of internal medicine and an addictionologist, testified that [Thompson] had a family history of substance dependence and [Thompson] was alcohol and cocaine dependent; however, both dependencies were in remission due to [Thompson]'s controlled environment ([18 RR-R 165]). According to McQueen, [Thompson] also had dependencies for marijuana and stimulants during his lifetime, and [Thompson] needed substance abuse treatment as a juvenile ([18 RR-R 191]).

Neuropsychologist Daneen Milam, Ph.D., testified that while [Thompson] was very bright with an IQ in the 85th or 86th percentile, her evaluation and review of [Thompson]'s records indicated that [Thompson] had mild and diffuse brain damage, meaning that all parts of his brain were affected but not to the extent that [Thompson] could not function ([19 RR-R 45, 51–52]). [Thompson]'s brain damage affected his ability to evaluate cause and effect ([19 RR-R 56]). Milam noted that [Thompson] did not speak until he was three years old and had significant learning disabilities by the time [Thompson] was in the third or fourth grade; however [Thompson] did not [receive] the help that he needed as a child ([19 RR-R 44]). School records indicated that academic professionals wanted to place [Thompson] in special education for his learning disabilities, but [Thompson]'s father did not want [Thompson] to be in classes with dummies ([19 RR-R 46]). As a consequence, [Thompson] read at a fourth grade level and his

reasoning abilities were on a third grade level when [Thompson] was seventeen years old ([19 RR-R 45]).

[Thompson] did not testify during the instant retrial on punishment.

SHCR-02 134–38.

## STANDARD OF REVIEW

Confined pursuant to a presumptively valid state court judgment, Thompson is entitled to relief "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Thus, any claims he raises that are based solely on alleged violations of state law should be denied as a matter of law.

Habeas relief is also inappropriate for claims that are either unexhausted and procedurally defaulted or claims that are exhausted yet were dismissed in a successive state habeas application and, thus, are also procedurally defaulted. Indeed, under the AEDPA, a federal habeas petition shall not be granted unless:

  (A)  the applicant has exhausted the remedies available in the courts of the State; or

  (B)  (i)  there is an absence of available State corrective process; or

        (ii)  circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1). Moreover, a writ may be denied on the merits, notwithstanding any failure to exhaust available state court remedies. 28 U.S.C. § 2254(b)(2).

Regarding exhausted claims that were adjudicated on the merits, federal habeas relief cannot be granted unless that adjudication:

(1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d). The Supreme Court has explained that a state court decision is "contrary to" clearly established federal law if the state court "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or confronts facts that are "materially indistinguishable" from relevant Supreme Court precedent but reaches an opposite result.[6] (*Terry*) *Williams*, 529 U.S. at 405-06.

---

[6]    "Clearly established Federal law" refers to the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state court decision. *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003) (citing (*Terry*) *Williams v. Taylor*, 529 U.S. 362, 412 (2000)). "In other words, 'clearly established federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court reaches its decision." *Id.* at 71–72 (citing (*Terry*) *Williams*, 529 U.S. at 405, 413, and *Bell v. Cone*, 535 U.S. 685, 698 (2002)).

A "run-of-the-mill" state court decision applying the correct Supreme Court rule to the facts of a particular case is to be reviewed under the "unreasonable application" clause. *Id*. at 406. To this end, a state court unreasonably applies Supreme Court precedent *only if* it correctly identifies the governing precedent but unreasonably applies it to the facts of the particular case. *Id*. at 407–09. And as the Court recently described this deferential standard, in order to determine if the state court made an unreasonable application, a federal court "must determine what arguments or theories supported or … *could have supported*, the state court's decision; and then it must ask *whether it is possible fairminded jurists could disagree* that those arguments or theories are inconsistent with the holding in a prior decision of this Court." *Harrington v. Richter*, 562 U.S. 86, 102 (2011) (emphasis added). Indeed, this is the "only question that matters under § 2254(d)(1)." *Id*.

Thus, "a state court's only decision that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree'" on the correctness of the state court's decision. *Id*. (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2002)); *see also Woodford v. Visciotti*, 537 U.S. 19, 27 (2002) (federal habeas relief is only merited where the state court decision is both incorrect *and* objectively unreasonable, "whether or not [this Court] would reach the same conclusion"). Moreover, "evaluating whether a rule application

16

was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway the courts have in reaching outcomes in case-by-case determinations." *Alvarado*, 541 U.S. at 644. This is particularly true when reviewing a state court's application of *Strickland v. Washington*,[7] that when analyzed in conjunction with § 2254(d) creates a difficult and "doubly" deferential assumption in favor of the state court denial. *Richter*, 562 U.S. at 105.

Under this standard, even a strong case for relief does not mean the state court's contrary conclusion was unreasonable. *Id* at 102–03.

> If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops just short of imposing a complete bar on federal litigation of claims already rejected in state court. It preserves the authority to issue the writ in cases where there is *no possibility fairminded jurists could disagree* that the state court's decision conflicts with [the Supreme] Court's precedents. It goes no farther. [28 U.S.C. §] 2254(d) reflects the view that habeas corpus is a "guard against *extreme malfunctions* in the state court criminal justice systems, *not a substitute for ordinary error correction through appeal*."

*Id.* (emphasis added, internal citations omitted).

Further, it is a state court's "ultimate decision" that is to be tested for unreasonableness," "not every jot of its reasoning." *Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir. 2001); *see also Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc) (holding that a federal court's "focus on the 'unreasonable

---

[7]    466 U.S. 668 (1984).

application' test under [§] 2254(d) should be on the ultimate legal conclusion the state court reached and not on whether the state court considered and discussed every angle of the evidence"); *Catalan v. Cockrell*, 315 F.3d 491, 493 (5th Cir. 2002) ("[W]e review on the state court's decision, not its reasoning or written opinion[.]"). And a state court's decision need not expressly cite any federal law or *even be aware of* applicable Supreme Court precedent in order to be entitled to deference. *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003); *Early v. Packer*, 537 U.S. 3, 8 (2002) (state court decision must be upheld so long as the result does not contradict Supreme Court precedent). A state court's decision also need not specifically address the federal constitutional claim. *See Johnson v. Williams*, 133 S. Ct. 1088, 1096 (2013) ("When a state court rejects a federal claim without expressly addressing the claim, a federal court must presume that the federal claim was adjudicated on the merits—but that presumption can in some limited circumstances be rebutted.").

If the Supreme Court has not "broken sufficient legal ground to establish [a] . . . constitutional principle, the lower federal courts cannot themselves establish such a principle with clarity sufficient to satisfy the AEDPA bar" under either the "contrary to" or "unreasonable application" standards. (*Terry*) *Williams*, 529 U.S. at 381; *see also Lopez v. Smith*, 135 S. Ct. 1, 4 (2014) (explaining that circuit "precedent cannot refine or sharpen a general principle of Supreme Court jurisprudence into a specific rule that this Court has not

18

announced[]") (internal quotation marks and citation omitted); *Marshall v. Rodgers*, 133 S. Ct. 2446, 1450–451 (2013) ("Although an appellate panel may, in accordance with its usual law-of-the-circuit procedures, look to circuit precedent to ascertain whether it has already held that the particular point in issue is clearly established Supreme Court precedent, . . . , it may not canvass circuit decisions to determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to this Court, be accepted as correct." (citations omitted)).  Stated differently,

> As a condition for obtaining habeas corpus relief from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there *was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.*

*Richter*, 562 U.S. at 103 (emphasis added). And a federal court must be wary of circumstances where it must "extend a [legal] rationale" of the Supreme Court "before it can apply it to the facts at hand" because such a process suggests the proposed rule is not "clearly established." *Alvarado*, 541 U.S. 666; *see also White v. Woodall*, 134 S. Ct. 1697, 1706 (2014) (explaining that § 2254(d) "provides a remedy for instances in which a state court unreasonably *applies* [the] Court's precedent; it does not require state courts to *extend* that precedent or license federal courts to treat the failure to do so as error.").

Regarding questions of fact, federal courts must presume correct the factual findings of the state courts unless the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. §2254(e)(1). "This presumption not only applies to explicit findings of fact, but it also applies to those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact." *Valdez v. Cockrell*, 274 F.3d 941, 948 n.11 (5th Cir. 2001).

Additionally, except for the narrow exceptions contained in § 2254(e)(2), the evidence on which a petitioner would challenge a state court finding must have been presented to the state court. *Cullen v. Pinholster*, 563 U.S. 170, 181–82 (2011) (explaining that § 2254(d)(1) "refers, in the past tense, to a state court adjudication that 'resulted in' a decision that was contrary to, or 'involved' an unreasonable application of, [clearly] established law. This backward-looking language requires an examination of the state-court decision at the time it was made. It follows that the record under review is limited to the record in existence at the time, i.e., the record before the state court."). Further, because a federal habeas court is also prohibited from granting relief unless a decision was based on an "unreasonable determination of the facts in light of the evidence *presented in the state court proceeding*," it follows that demonstrating the incorrectness of a state court finding of fact based on evidence not

20

presented to the state court would be of no use to a habeas petitioner. 28 U.S.C. § 2254(d)(2) (emphasis added).

Finally, where a habeas petitioner has failed to fully develop the factual bases of his claims in state court, he is precluded from further factual development in federal court unless (1) his claims rely on a new rule of constitutional law or a factual predicate previously undiscoverable through the exercise of due diligence; *and* (2) he establishes by clear and convincing evidence that, but for constitutional error, no reasonable fact finder would have found him guilty. 28 U.S.C. § 2254(e)(2). A failure to meet this standard of "diligence" will bar a federal evidentiary hearing in the absence of a convincing claim of actual innocence that can only be established by newly discovered evidence. (*Michael*) *Williams v. Taylor*, 529 U.S. 420, 436 (2000); *Beazley v. Johnson*, 242 F.3d 248, 272–73 (5th Cir. 2001). For example, a petitioner's failure to present controverted, previously unresolved factual issues to the state court is sufficient to constitute "failure" under the plain meaning of § 2254(e)(2). (*Michael*) *Williams*, 529 U.S. at 433; *Beazley*, 242 F.3d at 273. But even if a petitioner can meet the foregoing standard, it is within this Court's discretion to deny a hearing if sufficient facts exist to make an informed decision on the merits. *See Schriro v. Landrigan*, 550 U.S. 465, 474–75 (2007) ("It follows that if the record refutes applicant's factual allegations or otherwise

precludes habeas relief, a district court is not required to hold an evidentiary hearing."); *see also Clark v. Johnson*, 227 F.3d 273, 284-85 (2000).

## ARGUMENT

### I.    The State Court Reasonably Determined that the Evidence Was Sufficient to Support the Jury's Verdict that Thompson Caused the Death of Dennise Hayslip (Claim 1).

Thompson contends that the evidence is insufficient to support a jury finding that Thompson caused the death of Dennise Hayslip. Petition at 41–52. Thompson claims that the only rational conclusion supported by the evidence was that Hayslip's death was the result of intervening medical care, which occurred after Thompson shot her in the face at point blank range. *Id*. However, the state court reasonably denied this claim.

In *Jackson v. Virginia*,[8] the Supreme Court enunciated the standard of review when a state prisoner challenges the sufficiency of the evidence in a federal habeas corpus proceeding. 443 U.S. 307 (1979). The Court stated the issue to be "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson,* 443 U.S. at 319. In applying this standard, "all of the evidence is to be considered in the light most favorable to the prosecution." *Id*. "This familiar standard gives full play to the

---

[8]    443 U.S. 307 (1979).

responsibility of the trier of fact fairly to resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id*.

Additionally, sufficiency of the evidence must be gauged in light of applicable state law, *Jackson*, 443 U.S. at 324; *McGee v. Estelle*, 732 F.2d 447, 451 (5th Cir. 1984), and federal courts should defer to state evidentiary rules. *Moore v. Duckworth*, 443 U.S. 713, 714–15 (1979); *Turner v. McKaskle*, 721 F.2d 999, 1003 (5th Cir. 1983). Circumstantial evidence alone will satisfy the *Jackson* standard. *Schrader v. Whitely,* 904 F.2d 282, 287 (5th Cir. 1990). Finally, the question is whether the state court's ultimate resolution of the claim was reasonable — not simply whether it was correct. (*Terry*)*Williams v. Taylor*, 529 U.S. at 411–12.

Under Texas Penal Code Section 6.04, "[a] person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient." Further, in situations where the victim dies from complications following a gunshot wound, the defendant is not relieved from responsibility merely because doctors are unable to save the victim even if the complications could have been diagnosed earlier. *See e.g. Wright v. State*, 388 S.W.2d 703, 706 (Tex. Crim. App. 1965).

23

The CCA rejected this claim on Thompson's initial direct appeal, reasoning as follows:

> The shot to Hayslip's face went through her cheek and nearly severed her tongue. According to the State's medical evidence, because the tongue is especially "well vascularized" (contains more blood per gram of tissue than other parts of the body), Hayslip was at risk of bleeding to death or of bleeding down into her lungs which also could have resulted in death similar to drowning. The doctor in charge of Hayslip's care further testified that, without any medical attention, the swelling of Hayslip's tongue could have eventually obstructed her airway entirely, resulting in suffocation. He stated that without medical intervention, Hayslip would not have survived her injuries. [Thompson]'s medical expert agreed that the injury to Hayslip's tongue was life threatening and also agreed that Hayslip "probably" would have died without medical intervention. Thus, viewing the evidence in the light most favorable to the verdict, even assuming, arguendo, that the conduct of the doctors was clearly sufficient to cause Hayslip's death, the conduct of [Thompson] was not "clearly insufficient" so as to absolve him of criminal responsibility under [Section] 6.04.

*Thompson v. State*, 93 S.W.3d at 21.

Indeed, there was no evidence presented at trial to establish that the medical treatment given to Hayslip concurrently caused her death; nor was there evidence that any actions taken in the attempts to save her life were clearly sufficient to kill her. To the contrary, according to the evidence, Hayslip was having difficulty breathing and was unable to speak at the scene. 11 Reporter's Record (RR) 59–62; 85. She was bleeding so profusely from such a dangerous place that she was unable to lean back during the trip to the

24

hospital.[9] 12 RR 22. Hayslip's condition was serious enough that Life Flight transported her to a major trauma center; Dr. Marvin explained that Life Flight is reserved to situations "when it's something pretty bad." 12 RR 7. Even Thompson's retained medical expert Dr. Radalat agreed that Hayslip had suffered a critical injury that immediately threatened her life.

The surgeons tried to establish and maintain an airway using four different "advanced" techniques one of which ultimately succeeded. 12 RR 17–24. Doctor Marvin testified that the nasotracheal tube assists a patient in breathing, but a patient who is breathing on their own can continue to breathe on their own once the tube is inserted. 12 RR 45, 47. Likewise, after reviewing the surgical notes and autopsy report, Dr. Moore testified that Hayslip would not have survived had no medical care been rendered, and that the autopsy report concluded that the cause of death was a gunshot wound to the face.[10] 12 RR 110.

Nonetheless, Thompson contends that it was the doctors' faulty installation of the intubation tube that caused loss of oxygen to Hayslip's brain

---

[9]    In his petition, Thompson appears to suggest that the fact that Thompson was able sit up indicates that she was not critically wounded. Petition at 47–48. To the contrary, the testimony at trial was that Hayslip was leaning forward so that her swollen tongue would not fall back and block her airway.  12 RR 9.

[10]    In a subsequent claim, Thompson contends that the autopsy was inadmissible. However, in conducting a sufficiency review, courts must consider the entire record, including allegedly inadmissible evidence. *United States v. Marshall*, 762 F.2d 419, 423 (5th Cir. 1985).

and ultimately her death. Petition at 44. He cites to a portion of the record indicating that Thompson died from insufficient delivery of oxygen to the brain; however, there was significant evidence that Hayslip was bleeding profusely from her tongue which was flowing down into her lungs and that Hayslip's tongue was so swollen it was restricting her airway; further, Thompson's retained medical expert, Dr. Radalat, agreed that Hayslip had swallowed blood and that "they did suck some blood out of the lower trachea at one point which is, of course, not a good thing." 12 RR 14–16; 215. Moreover, Dr. Marvin stated that they attempted numerous methods to establish an airway. 12 RR 17–24; 45. However, Thompson is unable to point to any of Doctor Marvin's testimony that indicates that the intubation caused Hayslip to stop breathing. In addition, Dr. Radalat, Thompson's own expert explicitly testified that he could not say that the actions of the doctors caused Hayslip's death. 12 RR 256. Thompson argues that this characterization of Dr. Radalat's testimony is a misstatement. Petition at 44. However, Dr. Radalat clearly answers "no" when asked if the doctor's actions caused Hayslip's death. 12 RR 256. In addition, both Thompson, in his petition, and Thompson's trial counsel, in his state habeas affidavit, admit that Dr. Radalat did not perform well on cross-examination. Petition at 17–18; SHCR-01 170. Indeed, he did not perform well because, given the evidence in the record, he was unable to testify that the actions of the doctors caused Hayslip's death.

26

Regardless, to any extent Dr. Radalat or Dr. Marvin's surgical notes contradicted Dr. Marvin's testimony as to the cause of death, it was within the province of the jury to determine which doctor to believe and resolve any potential inconsistencies. *See Jackson*, 443 U.S. at 319. Here, there was clearly sufficient evidence for the jury to find that the actions of the doctors were not even a concurrent cause of Hayslip's death.

And even assuming *arguendo* that the placement of the breathing tube, in part, caused the death, it was Thompson's action in shooting Hayslip in the face that required the doctors to attempt to use "advanced" procedures in order to be able perform surgery to attempt to save Hayslip's life after she had been flown via "life flight" to a specialized trauma center.[11] Again, Dr. Radalat agreed that the importance of establishing an airway was caused by the fact that Hayslip was bleeding and had swallowed blood. *Id*. at 215. As such, even affording Thompson the most generous interpretation of the facts, his actions were sufficient under Texas law to cause Hayslip's death, and any subsequent

---

[11]    Thompson contends that *Franklin v. State* establishes that under Texas law, evidence is insufficient to sustain a conviction for murder if there is gross negligence by a physician. Petition at 51 (citing 128 S.W.2d 389 (1939)). This 1939 case, which ultimately held that the jury did not have to be instructed on intervening cause when a physician refused to continue to treat a patient, relied on two former statutes that no longer exist. *Id*. at 391. What is clear is that under current Texas law, regardless of the actions of a concurrent actor, the conduct must render the defendant's conduct clearly insufficient. Tex. Penal Code § 6.04. Perhaps more importantly, there is no indication whatsoever that the doctors in this case acted with gross negligence while attempting to save Hayslip's life after Thompson had critically injured her.

medical care in the attempt to save Hayslip's life did not render Thompson's actions clearly insufficient. *See* Tex. Penal Code § 6.04; *Wright*, 388 S.W.2d at 706. Accordingly, Thompson fails to show that the state court's adjudication on this issue was unreasonable, and this court must deny Thompson's claim 1.

## II.    Thompson's Claim that the Texas Concurrent Causation Statute is Unconstitutional is Procedurally Barred and Meritless (Claim 8).

Thompson alternatively contends that if the evidence was sufficient to show that he caused Hayslip's death, then the Texas concurrent causation statute, Texas Penal Code Section 6.04, is unconstitutional as applied to his case. Petition at 148. As an initial matter, this claim is barred by the contemporaneous objection bar. As the state habeas court found:

> At trial, counsel objected to the trial courts charge on concurrent causation but not on the basis urged in the instant habeas application. *See* Tex. R. App. P. 33.1a; *Hughes v. Johnson*, 191 F.3d 607, 614 (5th Cir. 1999) (holding that defendant's failure to comply with Texas contemporaneous objection rule constituted adequate and independent state-law procedural ground sufficient to bar federal habeas); *Cantu v. State*, 939 S.W.2d 627, 646 (Tex. Crim. App. 1997) (holding lack of contemporaneous objection waived error).

SHCR-01 223 (¶ 19).[12] The court then explicitly held that because he did not object to the court's charge on the basis that Section 6.04 was unconstitutional

---

[12]    Because the state habeas court's findings of fact in SHCR-01 and SHCR-02 are identical, the Director, for the sake of convenience, cites only the findings of fact listed in SHCR-01.

as applied to his case, Thompson "is procedurally barred from advancing the instant claims." SCHR-01 at 257–58 (citing *Hodge v. State*, 631 S.W.2d 754, 757 (Tex. Crim. App. 1978)). Because the denial of Thompson's claim was based upon the contemporaneous objection bar, an adequate and independent state procedural rule, it is procedurally barred on federal habeas review. *See Styron v. Johnson*, 262 F.3d 438, 453–54 (5th Cir. 2001).

In addition, the state habeas court found that Thompson's failure to cite law in support of this claim constituted a briefing waiver. SHCR-01 228 (¶ 20), 258 (¶ 3) (citing *McDuff v. State*, 939 S.W.2d 607, 613 (Tex. Crim. App. 1997) (failure to cite authority constitutes waiver of alleged error on appeal)); *see also* Tex. R. App. P. 38.1. The Fifth Circuit has held that a finding that a claim is inadequately briefed under Texas law is a valid procedural bar to federal habeas relief in a death-penalty case. *Roberts v. Thaler*, 681 F.3d 597, 607 (5th Cir. 2012).

Thompson has failed to allege, much less show cause and prejudice for either default or that he is actually innocent of the crime for which he was convicted. *Coleman v. Thompson*, 501 U.S. 722, 749–50 (1991) (explaining that the federal procedural default doctrine precludes federal habeas corpus review unless the petitioner establishes cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrates that failure to consider the claim will result in a fundamental miscarriage of justice).

Accordingly, Thompson's claim is procedurally defaulted on federal habeas review because it was barred from consideration by two adequate and independent state procedural rules. *Id.* at 729. (explaining that federal review of a claim is procedurally barred if the last state court to consider the claim expressly and unambiguously based its denial of relief on a state procedural default).

Moreover, Thompson fails to show that the application of the Texas concurrent causation statute in his case was unconstitutional under Supreme Court precedent. In his federal habeas petition, Thompson argues that § 6.04(a) shifted the burden of proof to Thompson to prove that he did not cause the death of Dennise Hayslip. Petition at 148–50. Thompson relies on the case *Mullaney v. Wilbur*, in which the Supreme Court struck down a Maine law placing the burden of proof on a defendant to show that a killing was in the heat of passion or due to provocation. 421 U.S. 684 (1975). Here, at all times, the burden was on the state to prove beyond a reasonable doubt that the evidence was sufficient to show that Thompson was, at least, the concurrent cause of her death. In order to achieve this, the state presented evidence showing that by shooting Dennise Hayslip in the face, Thompson caused Hayslip's death. *See above*, Section I. The jury was then properly instructed that the burden of proof was on the state to prove all elements of the offense.

CR 191. Accordingly, there is no indication that the burden of proof was impermissibly shifted to Thompson.

In addition there is no existing Supreme Court precedent indicating that Section 6.04 (or any similar statute) or its application in this case is unconstitutional. *See White v. Woodall*, 134 S. Ct. 1697, 1706 (2014) ("Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error."). Thompson's argument that *Mullaney*'s prohibition on shifting the burden of proof to establish a defense extends to the Texas concurrent causation statute is barred by the non-retroactivity rule of *Teague v. Lane*.[13] Under *Teague*, "[t]he question is 'whether a state court considering [the defendant's] claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule [he] seeks was required by the Constitution.'" *Goeke v. Branch*, 514 U.S. 115, 118 (1995) (quoting *Caspari v. Bohlen*, 510 U.S. 383, 390 (1994) (internal quotations omitted)). Here, Thompson's interpretation of *Mullaney* would constitute a "new rule." *Id*. Thus, the non-retroactivity doctrine of *Teague* bars relief. For the foregoing reasons, Thompson is not entitled relief on this claim.

---

[13]     489 U.S. 288 (1989).

31

### III. The CCA Reasonably Determined that Thompson Was Not Entitled to a Retrial on Guilt/Innocence Based on a Sixth Amendment Violation.

In response to Thompson's initial direct appeal, the CCA found that at the punishment phase of Thompson's original trial, the State improperly admitted a recording of a conversation that took place after Thompson's right to counsel had attached, in which the State's investigator, Gary Johnson, deliberately elicited statements from Thompson about his attempts to have witnesses in his case murdered. *Thompson v. State*, 93 S.W.3d at 22–29. The court therefore determined that the State committed a Sixth Amendment violation under *Massiah v. United States*,[14] which prohibits the State from deliberately eliciting incriminating information from a defendant without access to an attorney after the defendant's right to counsel has attached. Based on this finding, the CCA ordered a retrial on punishment. *Id*. However, Thompson contends that he was also entitled to a retrial on his guilt on this basis.

### A. The CCA's rejection of this claim is entitled to AEDPA deference; alternatively, the claim is procedurally barred.

As an initial matter, Thompson contends that he raised this claim on direct appeal but that the CCA "refused" to rule on it. Petition at 53. Indeed, while, on direct appeal, Thompson's challenge primarily focused on the

---

[14]    377 U.S. 201 (1964).

admission of the taped conversation with Gary Johnson at the punishment phase of his trial, he did generally contend that the information obtained by Johnson was "material as to the location of the murder weapon" and that "statements made on the tape recording and to Gary Johnson were incriminating, both at [guilt] and punishment." Appellant's 2000 Brief at 26, 28. Further, in a supplemental post-submission brief in response to the State's argument that the Johnson's interview with Thompson was only for the purposes of obtaining information relating to a separate solicitation offense for which Thompson was not in custody, Thompson argued that the meeting between Johnson and Thompson "was for the purpose of obtaining the gun used in the charged Capital Murder case"; thus, the Sixth Amendment violation was reversible error because "the State did not attempt to separate the recovery of the murder weapon [(presumably from Johnson's interview)]. It was obligated to do so, and did not." Supplemental Appellant's Brief to Point of Error No. 4 at 2. In a pro se motion for rehearing, Thompson further claimed that he had argued that the *Massiah* violation affected him "throughout trial" and that the CCA erred by failing to undertake a harm analysis regarding the effect the violation at guilt/innocence. While the motion was initially granted, it was subsequently dismissed as improvidently granted. *Thompson v. State*, 108 S.W.3d at 269.

As explained above, the CCA ultimately affirmed Thompson's conviction but reversed Thompson's death sentence and remanded for a new trial on punishment. *Thompson v. State*, 93 S.W.3d at 29. There is no merit to Thompson's assertion that by failing to specifically address his conclusory and inadequately briefed claim that the *Massiah* violation extended to the guilt/innocence portion of his trial, the CCA "refused" to rule on this claim. Instead, the CCA's affirmance of Thompson's conviction represented a rejection of all of Thompson's properly raised guilt/innocence claims.[15] *See Richter*, 562 U.S. at 99 (holding that "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary"); *Johnson*, 133 S. Ct. at 1094 (explaining that "we see no reason why the *Richter* presumption should not also apply when a state-court opinion addresses some but not all of a defendant's claims").

---

[15]    In support of the contention that he is entitled to a de novo review of this claim, Thompson cites *Cone v. Bell*, 556 U.S. 449, 452, (2009), in which the Supreme Court reviewed the merits of a petitioner's *Brady* claim de novo. In *Cone*, the state disposed of petitioners claim pursuant to a procedural bar and explicitly refused to review the merits of his claim. 556 U.S. at 459. The Supreme Court held that the procedural ruling did not qualify as an adequate state ground for denying federal review. *Id.* at 469. The court did not hold that a petitioner is entitled to a de novo review when a state court denies all of a petitioner's claims on the merits but its reasoning is silent as to one particular assertion.

Alternatively, if this Court were to determine that CCA did not make a merits adjudication on the harm at guilt-innocence flowing from the admission of Thompson's statements to Gary Johnson, it should find that it was because the issue was not properly raised and therefore unexhausted and now procedurally defaulted. "To have exhausted his state remedies, a habeas petitioner must have fairly presented the substance of his claims to the state courts." *Rodriguez v. McKaskle*, 724 F.2d 463, 466 (5th Cir. 1984) (citing *Vela v. Estelle*, 708 F.2d 954, 958 (5th Cir. 1983)); *Wilder v. Cockrell*, 274 F.3d 255, 259 (5th Cir. 2001). "A federal court claim must be the 'substantial equivalent' of one presented to the state courts if it is to satisfy the 'fairly presented' requirement." *Whitehead v. Johnson*, 157 F.3d 384, 387 (5th Cir. 1998) (citing *Picard v. Connor*, 404 U.S. 270, 275–78 (1971)).

Here, while Thompson did generally assert that he was harmed at guilt/innocence because the recovery of the gun was "intertwined" with the *Massiah* violation, as explained below, this claim makes little sense as he never asserted that the gun was inadmissible; nor, did he explain how the gun was recovered as a direct result of the *Massiah* violation, or cite law showing how the violation in any way extended to his guilt/innocence trial. *See below*, Section III(B). Accordingly, to the extent this court may find that the CCA did not adjudicate this claim, it should determine that it was not "fairly presented" for review. *See Whitehead*, 157 F.3d at 387.

Moreover, the normal rule that a state court must explicitly apply a procedural bar to preclude federal review does not apply to those cases where a petitioner has failed to exhaust his state court remedies, and the state court to which he would be required to present his unexhausted claims would now find those claims to be procedurally barred. *See Coleman*, 501 U.S. 722, 735 n.1. In such cases, the federal procedural default doctrine precludes federal habeas corpus review. *Id*.; *see Nobles v. Johnson*, 127 F.3d 409, 423 (5th Cir. 1997) (finding an unexhausted claim, which would be barred by the Texas abuse of the writ doctrine if raised in a successive state habeas petition, to be procedurally barred). Here, the Texas CCA would find Thompson's claim to be procedurally barred under the Texas abuse of the writ doctrine. Because Thompson has failed to argue, much less establish cause and prejudice or a miscarriage of justice, this claim is procedurally barred to the extent that it was not ruled upon in state court. *Coleman*, 501 U.S. at 749–50. Accordingly, this court should either apply AEDPA to the state court's adjudication of this claim or hold that it is procedurally defaulted.

## B. The use of Gary Johnson as an informant did not constitute error, or harm Thompson, at the guilt/innocence phase of his trial.

Thompson's claim that the CCA unreasonably failed to grant a retrial on guilt/innocence entirely lacks merit. Thompson appears to argue that the gun was recovered as a result information obtained by Johnson, and that the State

used evidence related to the gun to help prove that Thompson intended to murder Hayslip. However, trial counsel did not object to the admission of the gun or argue that it was inadmissible at any point during trial; and Thompson does not presently contend that the gun was inadmissible. Instead, Thompson curiously seems to assert that the admission of evidence of Gary Johnson's testimony at trial harmed him at punishment because evidence of the gun was admitted absent any claim that the gun was actually inadmissible. The state court's denial of this claim was therefore reasonable.

To any extent Thompson now contends that the gun and testimony related to the gun should not have been admitted into evidence based on a Sixth Amendment violation, this claim is unexhausted, and as explained above procedurally barred. *See Coleman*, 501 U.S. at 735 n.1. Accordingly, this court should not consider his claim as a challenge to the admissibility of the gun.[16]

Nonetheless, there is no indication that the gun was inadmissible. Importantly, Thompson fails to allege much less demonstrate that the gun was recovered as fruit of the poisonous tree. *See Nix v. Williams*, 467 U.S. 431, 442 (1984) (explaining that the "fruit of the poisonous" doctrine applies to Sixth

---

[16]    As explained above, Thompson did not present an argument to the trial court that the gun was inadmissible pursuant to a *Massiah* violation. Therefore, the fact that Thompson did not specifically raise an allegation that the gun was inadmissible in state court is particularly important here because it deprived the state court from making a ruling that Thompson failed to preserve this claim at trial. *See* Tex. R. App P. 33.1.

Amendment violations—therefore, evidence should be excluded if it is derived from primary evidence obtained through a Sixth Amendment violation). However, he does make an entirely conclusory assertion that "the gun was only found based on information uncovered by Gary Johnson in violation of his right to counsel." Petition at 160.

As there was never any claim made at trial that the gun was inadmissible, this claim is fatally underdeveloped; moreover, it is actually contradicted by the record. During Thompson's initial punishment hearing, Johnson testified that he was sent in to prison to obtain information on a possible solicitation to commit murder, not as Thompson now asserts to find the location of the gun. 14 RR at 158.

Johnson testified that a previous informant obtained a map of the location of the gun from Thompson and provided it to Harris County; the plan to get Thompson to talk about the solicitation plot was for Johnson to enter prison disguised as a person visiting Thompson to get more specific details on the location of the gun. *Id*. at 158–165. When explicitly asked if he knew whether or not the gun was recovered based on the information from his meeting, Johnson replied, "No. I wouldn't think so." *Id*. at 176. Johnson then explicitly stated that he didn't know where the gun was recovered and that "it would have been from a map they had prior to me." *Id*. at 177.

Moreover, Deputy Max Cox provided no indication that Johnson was sent into prison for the purpose of obtaining information about the murder weapon; instead, he confirmed that the plan was always for the initial jailhouse informant to contact them with information on the solicitation so they could "have someone else sent over and talk to Mr. Thompson, the defendant." *Id*. at 119. He explained he "had contacted Gary Johnson, who specializes in handling solicitation type cases and to work with us on this case to go over and meet with the defendant." *Id*. at 120. While Deputy Cox testified that the murder weapon was not recovered during the initial search "at the time he was there," he gave no indication that Gary Johnson went undercover for the purpose of finding the murder weapon. *Id*. Deputy Cox explained that he furnished Johnson with a map of the location of the gun "so that he would have knowledge [of where the gun was] in talking with the defendant when the defendant was wanting him to go recover the weapon." *Id*. at 125.

In any event, the record does not support an assertion that the gun was recovered as a result of Johnson's interview with Thompson, which was undertaken to obtain more evidence of the solicitation plot. The state already had a map of the location of the gun; moreover, witness Diane Zernia testified that Thompson told her, like he told Johnson, that he threw the gun a creek; accordingly, while the state never delved into the specifics surrounding the recovery of the gun at trial because its admissibility was never challenged, it

is clear that the gun was discovered either from a source independent of Johnson or that its discovery was inevitable. *See Nix*, 467 U.S. at 442 (explaining that the "independent source doctrine allows admission of evidence that has been discovered by means wholly independent of any constitutional violation" and under the inevitable discovery rule evidence should not be suppressed if the "prosecution can establish by a preponderance of the evidence that information ultimately or inevitably would have been discovered by lawful means"); 11 RR 135 (Zernia's testimony); State's Exhibit (SX) 88 (map). Any claim that the gun was recovered as a result of the interrogation is entirely conclusory. *See Schlang v. Heard*, 691 F.2d 796, 799 (5th Cir. 1982), (explaining that "[m]ere conclusory statements do not raise a constitutional issue in a habeas case").

## C.     Any error was harmless.

Even assuming *arguendo* the gun was inadmissible, Thompson was not harmed by its admission into evidence. In *Brecht v. Abrahamson*, the Supreme Court held that a federal court may grant habeas relief based on trial error only when that error "'had substantial and injurious effect or influence in determining the jury's verdict.'" 507 U.S. 619, 637 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)); *see also Fry v. Pliler*, 551 U.S. 112, 121 (2007) (explaining that the *Brecht* standard applies regardless of whether the state court recognized the constitutional error reviewed it for harmless-

error).. Under this standard a constitutional trial error is not so harmful as to entitle a defendant to habeas relief unless there is more than a mere reasonable possibility that it contributed to the verdict. *See e.g. Penry v. Johnson*, 532 U.S. 782, 795–96 (2001).

Here, Thompson contends that the intent to kill Dennise Hayslip was at issue; therefore, an expert's testimony that Thompson would have been required during to reload during the shootings helped the state prove intent. Petition at 58–60 (citing 11 RR 165–67). However, as outlined above, there was overwhelming evidence that Thompson intended to kill the victim by shooting her in the face at point-blank range. *See e.g.*, 11 RR 131–32 (Zernia's testimony that that Thompson explained to her that he put a gun to Hayslip's cheek shot her and her dentures flew out, and told her he said, "I can shoot you too, bitch" when he shot her). As such, even if the gun should not have been admitted, it did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, at 507 U.S. at 637.

In sum, to the extent this claim is not procedurally barred, Thompson fails to demonstrate that the *Massiah* violation from his initial overturned punishment hearing related in any way to the guilt/innocence phase of his trial, and even if he could, such error would be harmless. Therefore, this court must deny Thompson's claim.

## IV.  Thompson's *Massiah*-related Claims Are Procedurally Barred and Meritless (Claim 3).

Again relying on *Massiah,* Thompson argues that the State violated his Sixth Amendment right to counsel when at Thompson's retrial on punishment, the state elicited testimony from jailhouse informant, Robin Rhodes. Petition at 85–91. Thompson also argues that the state committed a *Brady* violation by failing to disclose impeachment evidence related to Thompson's informant status, Petition at 91–93, that trial counsel was constitutionally ineffective for failing to object to Rhodes's testimony pursuant to *Massiah*, Petition at 94–96, and that his attorney was ineffective for failing to argue on direct appeal that the state committed *Massiah* and *Brady* violations. Petition at 96–97. Thompson admits that he failed to raise any of these claims in his first two state habeas applications. Petition at 61. And when Thompson raised these claims in his third petition, the CCA dismissed the claims as an abuse of the writ without considering their merits. SHCR-03 at Order. As explained below, these claims are therefore procedurally barred from federal habeas review. Thompson fails to overcome the procedural bar; therefore, the claims must be dismissed. Alternatively, the claims must be denied because they lack merit.

### A.  Relevant Facts

During Thompson's retrial on punishment, the State presented evidence establishing that while he was in prison awaiting trial, Thompson attempted

to solicit the murders of potential witnesses against him. Officer Pinkins provided testimony about Thompson's initial attempts to solicit witnesses. In this regard, he testified that in early July, 1998, he received information that Thompson was trying to influence a witness. 16 RR-R 195–96. At that point, he became concerned for the safety of witness Diane Zernia. *Id.* at 196. Officer Pinkins testified that he warned Zernia that her life was in danger and told her not to stay at her house until the situation was cleared up. *Id.* at 197.

Officer Pinkins explained that he obtained statements from inmates jailed with Thompson, Jack Reid and Maxie Humphrey, and from Humphrey's girlfriend, Mallory. *Id.* He testified that money had been transferred and that he was "absolutely" concerned about Zernia's health. *Id.* at 198. He further testified that it was a very serious issue because one of the witnesses "could have been killed." *Id.* In July 1998 Thompson was indicted for the first-degree felony offense of solicitation of capital murder after Reid and Humphrey gave their statements. *Id.* at 200. He answered no when asked if he "put [Thompson] in a cell with certain people to try to gain more evidence on him." *Id.* at 204.

In addition, two letters written by Thompson discovered by Sergeant Patricia Cooper were admitted into evidence. SX 86, 87, 86A, 87A (86A and 87A are more legible copies of the letters). The letters were confiscated because Sergeant Cooper was able to identify marks consistent with membership in the Aryan Brotherhood on the envelopes. 17 RR-R 175. In one of the letters,

Thompson explained that he had been charged with solicitation for murder and writes, "So now I have really fucked myself good. This looks real bad for the jury to hear this because I'm going to trial in two and a half to three months . . . I can't believe I was set up and sold out by a white guy." *Id*. at 178; SX 86A.

Further, Zernia testified that after Thompson had been arrested and before his trial, she received a call from Thompson in jail. 17 RR-R 12. She explained that Thompson tried to get her to change her story, and that after she informed him she was going to tell the truth, he started asking her personal questions. *Id*. at 13–15. She testified that Thompson asked her for her address; and she found that question unusual, explaining, "He knew where my house was. I didn't know why he would want my address." *Id*. at 15. Zernia recounted that she was subsequently contacted by the Harris County Sherriff's Department. *Id*. at 17. A deputy was sent to Zernia's home to act as a watchman at her door. *Id*. at 18. Zernia explained that at that point, she became concerned for her safety, and she eventually moved out of her house for a period of three days. *Id*.

Finally, as challenged here, the State elicited testimony from Robin Rhodes regarding Thompson's attempts to have witnesses killed after Thompson had already been indicted for solicitation. Rhodes testified that in August of 1998, Thompson orchestrated a plan to have him to murder witnesses. Rhodes explained that he was incarcerated at the time because his

parole had been revoked. *Id*. at 133. He stated that he started talking to Thompson during recreation activities, telling him that he could get him narcotics. *Id*. Rhodes testified that he led Thompson to believe that he "could find anybody anywhere anytime." *Id*. at 138. Thompson subsequently offered him money to make some people "not appear or to disappear." *Id*. Thompson told him he had gone to over to an apartment and "shot the gentleman and got mad it didn't kill him and they accidentally got into a struggle and he shot himself and then he shot the guy again." *Id*. at 139. Rhodes explained that Thompson, referring to Hayslip, told him that "the bitch wouldn't get up again, or something along those lines." *Id*. Thompson then handed him a list of people who were not to "show up in court." *Id*. at 140–41. Rhodes contacted his previous "handler," Officer Floyd Winkler of the organized crime task force whom he had worked with at the Harris County Organized Task Force, and Winkler set him up with Mike Kelly at the district attorney's office. *Id*. at 141. The list of names was admitted into evidence. *Id*. at 142; State's Exhibit-Retrial (SX-R) 92.

During opening argument, the state explicitly disclosed and explained Rhodes's motivation for testifying: "[Robin Rhodes] takes that list to the police you will hear from him. He is expecting consideration for the evidence and has received consideration in exchange for his testimony in the case. He has eight hot check cases, Class C misdemeanors that we're going to go ahead and

45

dismiss. He also has a pending Class B misdemeanor, false report case, that we're also going to dismiss in exchange for his testimony." 16 RR-R 31–32. Further, at the very outset of Rhodes's testimony, the prosecutor asked him multiple questions regarding his previous involvement as an informant. 17 RR-R 132–35. Specifically, Rhodes explained that he had worked as a paid informant for the Harris County Organized Crime Task Force. *Id*. at 132. Rhodes explained that he understood that he was expecting consideration for the aforementioned misdemeanor offenses for his testimony in this case. *Id*. at 132–33. Most importantly, Rhodes was asked, "did anybody from any law enforcement agency ask you to target Charles Victor Thompson and help us gather evidence against him?" Thompson replied, "No, not at all." *Id*. at 134–35.

Thompson's counsel extensively cross-examined Rhodes regarding his motivation for testifying in this case and his prior history as an informant. During cross-examination, Rhodes testified that he had never met Thompson before he started talking to him and that he believed that Thompson probably chose him to talk to because he is white. *Id*. at 151–52. Rhodes answered yes when asked if he had worked with the Harris County District Attorney's Office on many occasions and indicated that he had been paid for that work. *Id*. at 152–53. He stated that during that time period "basically [he] was a full-time informant for the Harris County Organized Task Force." *Id*. at 153. He

answered yes when asked if he had testified in the *Stephens*[17] trial and in the *Benavidez* murder trial. *Id*. And after his memory was refreshed using his testimony from the *Stephens* case, he testified that he had been paid $ 30,000 dollars for his testimony in the *Benavides*[18] case. *Id*. at 159.

## B.    The claims are procedurally barred.

Because Thompson failed to present these claims in his initial state habeas application, the CCA explicitly refused to review the merits of Thompson's claims. *Ex parte Thompson*, 2016 WL 922131 at *1 ("we dismiss this application as an abuse of the writ without considering the merits of the claims") (citing Tex. Code Crim. Proc. Ann. art. 11.071 § 5(a)); *Fuller v. Johnson*, 158 F.3d 903, 906 (5th Cir. 1998) (Texas's abuse-of-the-writ doctrine is regularly and strictly applied); *Fearance v. Scott*, 56 F.3d 633, 642 (5th Cir. 1995) (per curiam) (dismissal is independent and adequate state bar). The claim is therefore likewise barred from federal habeas review. *See Coleman*, 501 U.S. at 729; *Harris*, 489 U.S. at 263. And as explained below, Thompson's specific assertions either that this regularly applied procedural bar does not apply in this case or that he is excused from its application are unavailing.

---

17    *Stephens v. State*, 59 S.W.3d 377, 381–82 (Tex. App.—Houston [1st Dist.] 2001).

18    *Benavides v. State*, 992 S.W.2d 511, 533 (Tex. App.—Houston [1st Dist.] 1999, pet. ref'd).

### 1.    The CCA's dismissal was not a merits determination on these claims.

Thompson contends that the state court's dismissal of his application as an abuse of the writ necessarily included a review of federal law. Petition at 105. He relies on *Ruiz v. Quarterman*[19] to support this assertion. Petition at 106. In *Ruiz*, a divided CCA used boilerplate language in dismissing a subsequent habeas application; the Fifth Circuit determined that the decisional basis for the CCA's dismissal was uncertain and that the concurring opinion supporting the required fifth vote in favor of dismissal "explicitly rest[ed] on the conclusion that Ruiz did not allege a meritorious Sixth Amendment claim." 504 F.3d at 528. Ultimately, the court determined that there was a merits adjudication on Ruiz's claims because "both the concurring and dissenting opinions, by their unanswered language, strongly suggest that the CCA debated and reached the federal merits question, not the independent state law ground." *Id*. The Fifth Circuit has subsequently limited *Ruiz*'s application to its facts, explaining that the decision was predicated on a determination that "'it did fairly appear' that the state court primarily relied on federal grounds.*" Balentine v. Thaler*, 626 F.3d 842, 854 (5th Cir. 2010). In order for a CCA dismissal under Article 11.071, Section 5(a)(1), to be considered a merits adjudication, "[t]here must be more than silence. In some

---

[19]    504 F.3d 523 (5th Cir. 2007).

form, the state court has to make a fair indication that the merits of the claims were reached." *Id*.

Here, Thompson contends that the CCA "remained silent" on their reason for dismissing the application; however, even assuming *arguendo* the court had remained silent, such silence is not enough for this Court to determine that the CCA adjudicated a federal constitutional issue instead of relying on an adequate and independent state procedural ground. *See Balentine*, 626 F.3d at 854. In addition, the CCA's unequivocal statement that it dismissed the application "without considering the merits of the claims" clearly establishes that the court refused to reach any federal constitutional issue. *Ex parte Thompson*, 2016 WL 922131 at*1; *see Tong v. Davis*, No. 4:10-2355, 2016 WL 5661698, at *16 (S.D. Tex. Sept. 30, 2016) ("[T]he TCCA specifically stated it was dismissing the application 'as an abuse of the writ without considering the merits of the claims.' The TCCA thus made it clear that the dismissal was on state procedural grounds, and not on a determination that Tong failed to assert a constitutional violation.") (citation omitted). Accordingly, Thompson's claim that the CCA's dismissal represented a merits adjudication of a federal constitutional issue is entirely unfounded.

### 2.    Thompson fails to show cause and prejudice.

Thompson also alleges that the State's failure to disclose evidence provides cause and prejudice to excuse his procedural default of these claims.

49

Petition at 99–101. The federal procedural default doctrine precludes federal habeas corpus review unless the petitioner establishes cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrates that failure to consider the claim will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 729, 750; *see also Wright v. Quarterman*, 470 F.3d 581, 586 (5th Cir. 2006). To show cause, a petitioner must demonstrate that an external, objective factor precipitated the default. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Prejudice is found where the petitioner is able to prove that the alleged constitutional error "worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 167 (1982).

The Supreme Court holds that for a procedurally defaulted *Brady* allegation, "cause" to excuse the default parallels the suppression component of a *Brady* claim while "prejudice" parallels "materiality." *See Banks v. Dretke*, 540 U.S. 668, 691 (2004). Thus, if Thompson can demonstrate suppression and that the suppressed evidence was material, he can avoid any default of his *Brady* claim. But as will be discussed below in Section IV(D), Thompson fails to demonstrate the necessary elements of a *Brady* claim. For this reason, he

fails to demonstrate both that his procedurally defaulted claim has merit, and "cause" and "prejudice" sufficient to excuse any default of this claim.

The Supreme Court has not addressed whether or not suppressed evidence and materiality can constitute cause and prejudice to excuse the default of *Massiah* claims or IAC claims. However, to the extent that a *Brady* violation could provide a basis to overcome the procedural bar to these claims, Thompson cannot meet the prejudice prong because as explained below the claims lack merit—specifically, Thompson's activities in other cases do not provide evidence that he was acting at the direction of the State in this case; and as a corollary, trial counsel was not ineffective for declining to raise a *Massiah*-based objection, especially given that Rhodes explicitly stated that he did not communicate with Thompson at the direction of the state.

Perhaps more importantly, Thompson clearly cannot show that the existence of any undisclosed evidence caused the default of these claims. As this Court previously explained in its denial of Thompson's motion for discovery, the bulk of the complained-of information was not only available to Thompson's attorney at trial, but was actually elicited during Rhodes's testimony and considered by the jury. ECF No. 27 at 7–8 ("The record shows that the defense knew much of the allegedly suppressed information before trial. The only information that trial court apparently lacked was a full disclosure of Rhodes'[s] extensive interaction with state actors.") In fact,

51

Thompson specifically frames the crux of his complaint about Rhodes's testimony as: "The Constitutional problem with Rhodes's testimony arises because Robin Rhodes was, by his own admission, a full time informant for Harris County when he elicited information from Thompson." Petition at 63. Indeed, Rhodes stated during his testimony, "basically I was a full-time informant for the Harris County Organized Crime Task Force." 17 RR-R 153. Here the record reveals that instead of concealing information that Rhodes had previously been an informant, the State highlighted it, eliciting an explanation from Rhodes about these previous activities at the outset of his testimony.[20] 17 R–RR 132–35.

Further, Thompson readily admits that Rhodes's prior informant activities were discoverable from a published appellate opinion. Petition at 14 n. 1, 63–64 (discussing the published opinion in *Stephens v. State*, 59 S.W.3d 3 at 381–82 (recounting that Rhodes testified that he was employed with the Harris County Organized Crime Narcotics Task Force in over fifty cases)); *see also* ECF No. 27 ("However, the Texas appellate court issued its *Stephens* opinion years before Thompson's second punishment phase; Thompson has not

---

[20]     In his brief Thompson incorrectly asserts that "[i]t was not until cross-examination that the extent of Rhodes['s] involvement with the government was partially closed." Petition at 72. To the contrary, the record establishes that the prosecutor elicited rather detailed testimony regarding his previous informant activity during direct examination. 17 RR-R 132–134.

shown how the State could have suppressed information in a published judicial decision.") (citing *Parr v. Quarterman*, 472 F.3d 245, 254 (5th Cir. 2006) ("[T]he prosecution is not required to disclose evidence that could be discovered by exercising due diligence.")). Accordingly the information that comprises the bases of Thompson's claims was available and in fact presented at trial. Any more detailed information that Thompson claims was suppressed clearly did not cause Thompson to default his *Massiah* or IAC claims in state court.

In the same vein, as discussed in more detail below, the alleged failure of the State to turn over its own records and memos indicating that Rhodes contacted them with information regarding the case in no way caused Thompson to default his *Massiah* and IAC claims as these documents do not indicate that Rhodes was acting at the direction of the state and were in fact entirely consistent with Rhodes's testimony. *See below*, Section IV(C)(1). Accordingly, there is no merit to the contention that this information was *Brady* material, much less that it prevented Thompson from raising any of his claims. For the foregoing reasons, *Brady*/*Banks* does not excuse the procedural default of Thompson's *Massiah* claim and his related *Brady* and IAC claims.

### 3. *Martinez/Trevino* does not excuse Thompson's default.

Thompson also asserts that the procedural bar to these claims should be excused pursuant to *Martinez*/*Trevino* because state habeas counsel was

ineffective for failing to identify and raise these claims on state habeas review. Petition at 64. Under *Martinez v. Ryan*, "inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." 132 S. Ct. 1309, 1315 (2012). Martinez's "narrow exception" applies to Texas's postconviction system. *Trevino v. Thaler*, 133 S. Ct. 1911, 1921 (2013). "[T]o succeed in establishing cause, the [inmate] must show (1) that his claim of ineffective assistance of counsel at trial is substantial—i.e., has some merit—and (2) that habeas counsel was ineffective in failing to present those claims in his first state habeas proceeding." *Garza v. Stephens*, 738 F.3d 669, 676 (5th Cir. 2013). To prove a claim "substantial," a "prisoner must demonstrate that the claim has some merit." *Id*. An "insubstantial" IATC claim, by contrast, is one that "does not have any merit" or is "wholly without factual support." *Id*. at 1319.

Here, as an initial matter, *Martinez* has no impact on claims that do not allege ineffective assistance of *trial* counsel (IATC). *See Vasquez v. Stephens,* 597 Fed. Appx. 775, 778 (5th Cir. 2015); *Reed v. Stephens*, 739 F.3d 753, 778 n.16 (5th Cir. 2014). Therefore, the default of the underlying *Massiah* claim, the *Brady* claim, and the ineffective assistance of appellate counsel claim cannot be excused by state habeas counsel's alleged ineffectiveness. *See Vasquez,* 597 F. App'x at 778; *Reed,* 739 F.3d at 778 n.16. Regarding the IATC claim, for the reasons that will be discussed in Section IV(E) below, Thompson

cannot demonstrate either a substantial IATC claim for trial counsel's failure to object on *Massiah* grounds or that state habeas counsel was ineffective for failing to raise the IATC claim. *See Martinez,* 132 S. Ct. at 1318. Accordingly, *Martinez/Trevino* does not excuse the procedural default of any of Thompson's claims.

### C. Even if the claim were not procedurally barred, Thompson fails to demonstrate a *Massiah* violation.

The Sixth Amendment right to counsel is triggered "at or after the time that judicial proceedings have been initiated . . . whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Fellers v. United States,* 540 U.S. 519, 523 (2004) (quoting *Brewer v. Williams*, 430 U.S. 387, 398 (1977)). Once the Sixth Amendment has attached, the government may not "deliberately elicit" incriminating statements from the defendant without the presence of his attorney. *See United States v. Henry*, 447 U.S. 264, 270 (1980) (outlining the deliberate-elicitation standard). Under *Massiah,* the Sixth Amendment is implicated when an undercover officer or unidentified informant acting at the behest of the State questions the defendant. 377 U.S. at 206. "A *Massiah* violation has three elements: (1) the Sixth Amendment right to counsel has attached; (2) the individual seeking information from the defendant is a government agent acting without the defendant's counsel being present; and (3) that agent 'deliberately elicit[s]'

incriminating statements from the defendant." *Henderson v. Quarterman*, 460 F.3d 654, 664 (5th Cir. 2006). The Fifth Circuit holds that one is considered an agent of the government for *Massiah* purposes where one "(1) was promised, reasonably led to believe, or actually received a benefit in exchange for soliciting information from the defendant; and (2) acted pursuant to instructions from the State, or otherwise submitted to the State's control." *Creel v. Johnson*, 162 F.3d 385, 393–94 (5th Cir. 1998).

The primary concern of *Massiah* is the "secret interrogation by investigatory techniques that are the equivalent of direct police interrogation." *Kuhlman v. Wilson,* 477 U.S. 436, 459 (1986). But "the Sixth Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached." *Maine v. Moulton*, 474 U.S. 159, 176 (1985). A defendant fails to prove a Sixth Amendment violation by simply showing that an informant voluntarily reported incriminating statements to the police. *Kuhlman,* 477 U.S. at 459. "Rather, the defendant must demonstrate that the police and their informant took some action . . . that was designed deliberately to elicit incriminating remarks." *Id.*

The Fifth Circuit's decision in *United States v. Fields,*[21] is particularly instructive in this case. There, the petitioner's cellmate, Homero DeLeon, had previously provided testimony for the government in an unrelated case in exchange for a reduced sentence. 761 F.3d at 474–75. While incarcerated together, Fields told DeLeon about details of how he escaped from prison and confessed to killing his girlfriend; DeLeon then contacted the prosecution. *Id.* The Fifth Circuit concluded that DeLeon did not act as a government agent in eliciting information from Fields. *Id.* at 477–78. The court noted that DeLeon had previously cooperated with the government, saw an opportunity to do so again, and elicited as much information as he could from Fields before contacting the government and passing the information along. *Id.* at 478. For this reason, "DeLeon was not acting at the direction of the government" and "[t]here is no evidence demonstrating that the government 'directed or otherwise knowingly exploited' DeLeon to act as a government agent." *Id.*; *see also United State v. Cutno,* 431 F. App'x 275, 279–80 (5th Cir. 2011) (unpublished) (*Massiah* complaint fails because petitioner cannot prove witness was a government agent where witness, who previously cooperated with the government agency on another case, formed friendship with petitioner in jail and petitioner confessed to murder). While *Fields* was decided after

---

[21]    761 F.3d 443 (5th Cir. 2014).

Thompson's trial, Supreme Court precedent cited in the opinion—finding no Sixth Amendment violation when the State obtains information "by luck or happenstance," and without proof that both the State and their informant took action designed to deliberately to elicit incriminating remarks—was clearly in existence. *See Kuhlman*, 477 U.S. at 459; *Moulton*, 474 U.S. at 176.

### 1. Thompson fails to show that Rhodes was acting as an agent of the state.

The record reflects that while Rhodes had previously been an informant for the Organized Crime Task Force, he was not acting at the direction of any governmental agency when he spoke with Thompson. In its previous order denying Thompson's motion for discovery, this court properly explained:

> Thompson's claims depend on showing that Rhodes "was acting *under instructions* as a paid informant for the Government[.]" [*Henry*, 447 U.S. at 270] (emphasis added); *see also Wilson*, 477 U.S. at 459 ("[T]he primary concern of the *Massiah* line of decisions is secret interrogation by investigatory techniques that are the equivalent of direct police interrogation."). The question is not just Rhodes'[s] interaction with the State, but "whether the challenged statements had been deliberately elicited" and "whether the government had directed or steered the informant toward the defendant." *United States v. York*, 933 F.2d 1343, 1356 (7th Cir.1991). Rhodes'[s] testimony, however, indicated that he did not act pursuant to any State instruction or order:
>
> > The State: When you went back in jail did anybody from any law enforcement agency ask you to target Charles Victor Thompson and help us gather evidence against him?
> >
> > Rhodes: No, not at all.

> [17 RR-R 134–35]. Even accepting Thompson's argument that "there is no doubt that [Rhodes'][s] aim, once in jail, was to get information and relay it to the government," [ECF No. 21 at 57], Thompson's briefing does not make a prima facie showing that the State instructed Rhodes to do so. As it now stands, Thompson only speculates that Rhodes "was charged with obtaining information" from him. *Henry*, 447 U.S. at 272 n. 10.

ECF No. 27 at 7–8. As this court held, prior to discovery, there was no evidence that Rhodes was directed to elicit any information from Thompson. None of the evidence provided by Harris County through discovery indicates otherwise— in fact, it actually confirms Rhodes's testimony both regarding his actions in this case and his prior informant activity.

Here, while Rhodes saw an opportunity to help himself if Thompson discussed the solicitation of the murder of witnesses, he did not elicit information from him at the behest of the State. As in *Fields*, the record reflects that once Rhodes had information that might prove useful, he contacted the government and turned over the information. 761 F.3d at 478. While Thompson strains to compare this case to *Henry*, it is clear that unlike in *Henry*, there is no evidence whatsoever that the Government gave any direction to Thompson or that he was housed next to Thompson in order to

gather information; in fact, Rhodes's testimony indicates the contrary.[22] Petition at 89; *see* 447 U.S. at 266–67 (finding a *Massiah* violation occurred when, prior to gathering incriminating information, an informant was contacted by law enforcement who explained that he was housed in the same cell block with several federal prisoners awaiting trial in order to gather information from him).

Nonetheless, Thompson contends that the facts recently disclosed provide further details indicating that Thompson was a full-time informant for

---

[22]    In addition, Thompson relies heavily on *Beatty v. United States*, 389 U.S. 45 (1967) (per curiam order reversing the Fifth Circuit opinion), which he claims stands for the proposition that his "claim does not rise or fall based on whether or not Rhodes was specifically instructed to seek information from Thompson." Petition at 87–88. In *Beatty*, a government informant was contacted by appellant, an arms-dealer already under indictment, about the sale of an illegal firearm. *Beatty v. United States*, 377 F.2d 181, 191 (5th Cir. 1967) (Ainsworth, J., dissenting). Unbeknownst to the appellant, the informant was allowing a government agent to listen to the conversation through a miniature radio transmitter. *Id.* The informant then met with appellant in his car *with a government agent carrying a tape-recorder hiding in his trunk. Id.* While the tape recorder apparently did not work, both the informant and the government agent testified about the conversation held in the car at trial. *Id.* The Fifth Circuit held that there was no *Massiah* violation, apparently because it was appellant's idea to set up the meeting. *Id.* at 189–191. And the Supreme Court reversed the Fifth Circuit in a per curiam opinion. 389 U.S. 45. Given that the informant was allowing a government agent to listen to his conversations with appellant and that the same government agent, who testified at trial, was hiding in the trunk of the informant's car at the time the incriminating statements were elicited, it is unsurprising that the case did not survive scrutiny under *Massiah*. *Beatty*, 377 F.2d at 191–94 (Ainsworth, J., dissenting) Contrary to Thompson's assertions, the Supreme Court's reversal in *Beatty* does not indicate that a *Massiah* violation can occur if an informant not acting under the direction of the state gathers information then subsequently turns it over to authorities. As explained above, case law clarifies that Thompson's *Massiah* claim turns exactly on what he contends it does not—whether or not Rhodes was acting under the direction of the state.

the State. Petition at 73–77. However, the "recently disclosed" facts merely provide more detailed specifics relating to Rhodes's informant activity that he testified about explicitly at trial. 17 RR-R 132–35, 151–155. Specifically, Thompson refers to a contract Rhodes signed using the alias "Robert Lee," in which Rhodes agreed to provide information on individuals in drug cases in exchange for the dismissal of charges. Petition at 74 (citing Appendix 3-2). But this contract ended on November 8, 1993. Petition at 75 (citing Appendix 3-2 (ECF No 57-3 at 3–4)). In addition this contract refers to information on cocaine offenses not prosecutions for murder. ECF No. 57-3 at 3. Further, Thompson contends that Rhodes received favorable treatment in multiple cases between 1993 and 1997, and that in a 1997 motion to dismiss, he explained that he had cooperated with Harris County Organized Crime Task Force in between twenty and twenty-five narcotics cases since 1993. Petition at 76 (citing Appendix 3-2 (ECF No. 57-3 at 54–55)).

This is simply more detailed evidence of exactly what Rhodes testified to in this case and in the *Stephens* case. Neither this additional evidence, nor any of the testimony from trial or in the *Stephens* case, indicates that Rhodes was directed by the state to elicit incriminating evidence from Thompson *in this case*. If anything, Rhodes's forthright disclosure of his informant status in the *Stephens* case bolsters the credibility of his explicit testimony that he was not acting at the direction of the state in the present case. 17 RR-R 132–35.

Ultimately, this more detailed information about Rhodes's actions in other cases merely supports Rhodes's testimony at trial—that, as in *Fields*, he had cooperated with the government in other cases and therefore believed that he could obtain a plea deal if he came forward with information regarding the solicitation offense. 761 F.3d at 478.

Thompson also alleges that newly discovered evidence suggests that Rhodes was acting at the direction of State authorities in this case when he spoke with Thompson.[23] Petition at 78. In this regard, he refers to a memorandum explaining that in late August, district attorney investigator Mike Kelly was contacted by "the witness in the case Robin Rhodes." *Id*. (citing

---

[23]    Thompson also suggests that after the State indicted Thompson for the solicitation offense, it waited to move him to isolation until Rhodes was able to gather more information from Thompson. Petition at 79. He argues that "[p]ossibly, the District Attorney's Office was concerned that its prior taped conversation with Gary Johnson would be excluded from trial. What better way to gather additional evidence than to put Thompson into contact with long time informant Robin Rhodes?" *Id*. However, it defies logic to assume that the State's strategy would be to charge and indict Thompson for the offense before attempting to gather more information on the offense, thereby intentionally raising a potential *Massiah* problem. Instead, the timing of the indictment suggests, if anything, that the State was not still actively attempting to gather information on the offense. Indeed, the State at all times during the proceedings was aware of *Massiah* and attempted to avoid committing violations. When the State introduced the Gary Johnson tape and testimony at the original punishment trial, it expressly conceded that Johnson was attempting to gather information on the solicitation offense and asserted that there was no Sixth Amendment violation because Thompson had not yet been charged with solicitation. 14 RR 120, 158. While ultimately, the CCA in a divided opinion, determined that the State's argument failed, there is no indication from the existing record that that district attorney would charge Thompson with a crime then hide its efforts to elicit information regarding the crime in violation of *Massiah*.

Appendix 3-1 (ECF No. 57-3 at 5–7)). Thompson contends this is significant because it shows that (1) Rhodes was already considered a witness in the case in late August of 1998; and (2) Rhodes had already been introduced to Kelly, through Winkler, prior to August 25, 1998. *Id*.

First, it is unsurprising that Rhodes would be referred to as a potential witness in either Thompson's capital murder or solicitation case immediately after he disclosed information that Thompson attempted to enlist him in a plot to murder witnesses. Second, the timing of this late August memo is entirely consistent with Rhodes's testimony. Rhodes testified that he was put into contact with Kelly after he obtained information and a list of names from Thompson in August. 17 RR-R 141. Further, the memo explains that Thompson received information from Rhodes on August 21, 1998, and contacted Kelly five days later, on August 26, 1998.[24] ECF No. 57-3 at 5. Ultimately, instead of providing an indication that the state directed Thompson to obtain information, this evidence confirms that after Thompson made the disclosures, Rhodes contacted a "handler" at the Harris County

---

[24] Thompson also explains that the memo indicates that Rhodes contacted Kelly directly. Petition at 78. Again, this is entirely consistent with Rhodes's testimony and provides no suggestion that Rhodes was acting under the direction of the state. 17 RR-R 141 (Rhodes's answered "yes" to the prosecutor's question, "Did Winkler set you up with an investigator from the District Attorney's office?").

Organized Crime Unit and was put in touch with an investigator from the District Attorney's Office to whom he provided the list. *Id.* at 141; SX 92.

Further, Thompson explains that a page of prosecutor Vic Wisner's notes appears to refer to Rhodes as someone who had received consideration for his testimony in prior cases. Petition at 80 (citing Appendix 3-1 (ECF No. 57-3 at 15)). This is entirely consistent with the Rhodes's testimony elicited by the State. 17 RR-R 132–35. Thompson also refers to a handwritten note relating to a misdemeanor offense filed against Rhodes in 2004 that states "contacted Floyd, get in hand." Petition at 80–82 (citing Appendix 3-3 (ECF No. 57-3 at 126)). Floyd likely refers to Rhodes's "handler" Floyd Winkler. 17 RR-R 141. This fails to even provide a suggestion that the Winkler directed Rhodes to obtain information from Thompson. Finally, Thompson proclaims that "we also have a note which suggests that Rhodes was in contact with Mike Kelley as early as August 12, 1998." Petition at 87 (citing Exhibit 3-7). Thompson appears to be referring to what seems to be a prosecutor's note that has the date "/13/98" written in the margin. ECF 57-3 at 143. Thompson contends that this indicates that Rhodes was talking to Mike Kelly before Thompson gave Rhodes the list of names. Petition at 83. However, the notation does not provide a month, and even if it did, the date in the margin is nowhere near the indication that Rhodes was "talking to Mike Kelly"; instead, the note seems to

indicate, if anything, that Rhodes was contacted by Thompson on the date listed in the margin.

In sum, Rhodes testified as to his previous activities as an informant at trial—he also expclitily testified that he was not acting at the behest of the state in this case. The Court has already correctly determined that Rhodes's testimony at trial indicates that he was not acting as an agent of the state and that Thompson has failed to establish even a prima facie case that a Sixth Amendment violation occurred. ECF No. 27. After conducting discovery and returning to state court, Thompson has provided no evidence to the contrary; therefore, even if it were not procedurally barred, his *Massiah* claim must be denied.

> **2.    Thompson's assertion that the evidence obtained by Rhodes should have been excluded at punishment is *Teague*-barred.**

Even assuming *arguendo*, Rhodes was an agent of the State who deliberately elicited these statements from Thompson, the Supreme Court has never held that evidence obtained pursuant to a *Massiah* violation is inadmissible at the punishment phase of a trial. More specifically, it has never held that evidence of an extraneous offense that was obtained pursuant to a *Massiah* violation in the extraneous offense case is inadmissible at punishment

in a *different* case.[25] Indeed, under existing precedent, a court could reasonably

conclude either that (1) evidence of an extraneous offense obtained by means

---

[25]    The Supreme Court has explicitly held that Sixth Amendment rights are offense specific. *See Moulton*, 474 U.S. at 176. That is to say that the right "cannot be invoked once for all future prosecutions," and it does not forbid interrogation for charges unrelated to the charged offense. *Id*.; *McNeil v. Wisconsin*, 501 U.S. 171, 175–76 (1991). However, even if the State's purpose is to obtain information on an uncharged offense, the resulting "incriminating statements pertaining to pending charges are inadmissible at the trial of those charges, notwithstanding the fact that the police were also investigating other crimes." *Moulton*, 474 U.S. at 180 (emphasis added). Relying on *Moulton*, the CCA overturned Thompson's original death sentence, over a strong dissent, based on a finding that the State elicited incriminating statements regarding Thompson's solicitation offense and admitted evidence of those statements at punishment—apparently reasoning that the extraneous offense punishment evidence "pertained" to the charged offense. *Thompson v. State*, 93 S.W.3d at 25–29. However, the CCA has recently determined that this ruling "may have been called into question" by more recent Supreme Court precedent, "which articulated views similar to those held by the dissent in *Thompson*." *See Rubalcado v. State*, 424 S.W.3d 560, 572 (Tex. Crim. App. 2014). Notably, the situation here is different from Thompson's previous punishment hearing because unlike the previous punishment hearing, at the time Rhodes obtained information, Thompson had been charged for the solicitation offense. Accordingly, the arguments from the dissent in Thompson's original direct appeal, although persuasive in the original proceedings, are generally not applicable here. This is because if Rhodes were a state agent who deliberately elicited information, Thompson's *Massiah* rights in relation to the solicitation offense would have been violated.

    Nonetheless, as explained above, the Supreme Court has not considered whether extraneous offense evidence obtained by means of a *Massiah* violation in the extraneous case is inadmissible at the punishment trial of a different case. To any extent, Thompson may try to argue that *Moulton* created an existing rule prohibiting the complained-of testimony in the present circumstances, his argument fails. *Moulton* did *not* hold that the exclusionary rule applies at punishment to evidence obtained through a *Massiah* violation. In addition, it did not find that evidence relating to an extraneous offense and then admitted at punishment for the charged offense "pertains" to the charged offense. *See Moulton*, 474 U.S. at 180. Moreover, to

of a *Massiah* violation is not subject to the exclusionary rule at punishment, or (2) that evidence of a defendant's attempts to distort his sentencing proceedings by tampering with witnesses is admissible despite being obtained in violation of *Massiah*. As explained below, Supreme Court precedent does not compel a conclusion that the complained-of evidence, if it were obtained in violation of *Massiah*, must be excluded at punishment, and instead likely suggests that it would still be admissible. *Goeke*, 514 U.S. at 118 ("The question is 'whether a state court considering [the defendant's] claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule [he] seeks was required by the Constitution.'")

Importantly, the Supreme Court has recently explained that a *Massiah* offense is a violation of a prophylactic right that occurs at the time the incriminating evidence is elicited, not when it is admitted at trial—as such the admission of the evidence is not, in itself, a constitutional violation. *See Kansas v. Ventris*, 566 U.S. 586, 591–92 (2009). Accordingly, the Court has explicitly determined that the exclusion of evidence discovered pursuant to a *Massiah* violation is not automatic; instead, an exclusionary rule "balancing test" must

---

any extent Thompson relies on the CCA's initial direct appeal ruling, it has been largely discredited and more importantly, should not affect this court's determination on whether federal habeas relief is warranted as *Teague* is dependent on Supreme Court, not state court precedent. *See Goeke*, 514 U.S. at 118.

be applied in order to determine whether the evidence must be suppressed. *Id*. at 591.

Without guidance from a Supreme Court ruling on the subject, the Second Circuit, addressing circumstances strikingly similar to the present case, has explicitly declined to exclude statements obtained in violation of *Massiah* from the punishment phase of a trial. *United States v. Pineda*, 692 F.2d 284, 288 (2d Cir. 1982). In *Pineda*, after obtaining information that the defendant had instructed a witness in his case to lie, the State instructed the witness to call the defendant to gather more information. *Id*. at 285. The State admitted a transcript of the resulting phone call at the defendant's punishment hearing. *Id*. In response to the defendant's argument that the evidence should have been excluded on *Massiah* grounds, the Second Circuit explained:

> [W]e perceive no reason why this sort of evidence concerning post-indictment obstruction of justice should not be admissible at a hearing on sentence. The sentencing judge is entitled to know that the defendant has attempted to distort the very proceeding at which the sentence is determined. Yet, since the obstruction of justice occurred after the guilty plea, the government necessarily conducted its investigation into this activity after the indictment had been filed. In these circumstances, if we adopted defendant's understanding of *Massiah* and required the government to contact defendant's counsel before using an informer, the government would be effectively prevented from fully investigating such conduct and from obtaining such compelling evidence for the sentencing judge. We refuse to read *Massiah* as providing a shield for defendant's attempts to interfere with the sentencing process.

68

*Id.* at 288. While the Second Circuit's opinion is not binding on this court, its reasoning is instructive and demonstrates that a Texas court would not be compelled by Supreme Court precedent to exclude the evidence obtained by Rhodes at punishment under *Massiah*. *See Goeke*, 514 U.S. at 118.

Moreover, in *Ventris*, the Supreme Court recently determined that evidence obtained through a *Massiah* violation is admissible for impeachment purposes. 566 U.S. at 591. This ruling indicates that the Supreme Court is likely inclined to agree with the Second Circuit's refusal "to read *Massiah* as providing a shield for defendant's attempts to interfere with the sentencing process." *Pineda*, 692 F.2d at 288. Indeed, allowing evidence obtained in violation of *Massiah* for impeachment purposes is very similar to allowing the same kind of evidence to notify the court of the defendant's attempts to distort the proceedings, as in both cases the evidence serves to reveal the defendant's own misconduct during the trial proceedings.

In any event, regardless of how the Supreme Court *might* rule, it has certainly not extended the exclusionary rule to the admission of *Massiah*-related evidence at the punishment phase of a trial. The Court has explained that evidence that would be inadmissible at guilt/innocence on constitutional grounds can be admissible at sentencing proceedings. *Williams v. New York*, 337 U.S. 241, 252 (1949); *see also Mitchell v. United States*, 526 U.S. 314 (1999) (Scalia, J., dissenting) (explaining that the Supreme Court "has long

69

recognized a natural dichotomy between the guilt and penalty phases"). In this regard, it has expressly limited Sixth Amendment confrontation clause rights at the punishment phase of a trial by holding that reports of probation officers and psychiatrists are admissible at sentencing without affording a defendant any cross-examination rights. *Williams*, 337 U.S. at 252. In addition, while the Supreme Court has not weighed in on the issue, the Seventh and Fourth Circuits have held that statements obtained in violation of a defendant's *Miranda*[26] rights—a violation of a prophylactic rule to which the Supreme Court in *Ventris* explicitly compared to *Massiah*—does not require the exclusion of a confession at the sentencing phase of a trial. *United States v. Nichols*, 438 F.3d 437, 442 (4th Cir. 2006); *Del Vecchio v. Illinois Dept. of Corr.*, 31 F.3d 1363, 1388 (7th Cir. 1994).

On the other hand, the Supreme Court has held that there is no distinction between the guilt/innocence and penalty phases of a capital murder trial for purpose of the Fifth Amendment protection against self-incrimination. *See Estelle v. Smith*, 451 U.S. 454 (1981). However, this holding does not logically extend to *Massiah* violations, particularly those related to extraneous offenses, because the Sixth Amendment is offense specific whereas the Fifth Amendment is not, and the right against self-incrimination is not solely

---

[26]     *Miranda v. Arizona*, 384 U.S. 436 (1966).

prophylactic. *See Moulton*, 474 U.S. at 168 (holding that the Sixth Amendment is offense specific). Moreover, in the same case, the Supreme Court determined that a defendant's Sixth Amendment right to counsel was violated when defense counsel was not notified in advance that a psychiatric examination that was admitted at punishment would encompass analysis relevant to the future dangerousness special issue. *See Estelle*, 451 U.S. at 470–71. However, again, this reasoning does not extend to *Massiah* violations, particularly the alleged violations in this case, as this psychiatric inquiry regarding future dangerousness was compelled and was obtained specifically for the purpose of being used against the defendant at punishment; whereas here, the alleged *Massiah* violation related to the separate solicitation offense and to obtaining information on the Thompson's efforts to distort the proceedings by tampering with witnesses.

In any event, it is plain that the Supreme Court has decided on a case-by-case basis in closely divided opinions whether or not specific individual rights apply to punishment proceedings. It is also clear that the exclusion of evidence obtained pursuant to a *Massiah* violation is not automatic, but must be subjected to an exclusionary rule balancing test. *Ventris*, 566 U.S. 586, 591–92. Accordingly, because the Supreme Court has never applied the exclusionary rule to punishment evidence obtained pursuant to a *Massiah* violation, particularly one relating to the extraneous offense of attempting to

murder witnesses, Thompson's claim is *Teague*-barred.[27] *See Goeke*, 514 U.S. at 118; *see also Knuckles v. Brigano*, 70 Fed. Appx. 830, 837 (6th Cir. 2003) (explaining that even assuming constitutional error, *Teague* would prevent a habeas petitioner from "retroactively benefitting from a broader exclusionary rule"). In the event that this Court determines that the claim is not *Teague*-barred and that a *Massiah* violation occurred, the Court should resolve this issue of first impression by finding that the exclusionary rule does not apply in these circumstances.

### 3.    Any error was harmless.

A *Massiah* violation claim is subject to a harmless-error analysis. *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991); *Canales v. Stephens*, 765 F.3d 551, 572 (5th Cir. 2014) (applying the *Brecht* harmless-error standard in the alternative to a procedurally defaulted *Massiah* violation claim). Accordingly, on federal habeas review, Thompson must show that if any error occurred, it "'had substantial and injurious effect or influence in determining the jury's verdict.'" *See Brecht*, 507 U.S. at 637; *see also Fry*, 551 U.S. at 121 (explaining

---

[27]    The Director notes that during his testimony, Rhodes also briefly recounted statements made by Thompson regarding the murders of Cain and Hayslip. If Rhodes deliberately elicited these statements, they could have been excluded from the guilt/innocence portion of the trial under *Moulton*. 474 U.S. at 180 (explaining that "incriminating statements pertaining to pending charges are inadmissible at the trial of those charges, notwithstanding the fact that the police were also investigating other crimes."). However, as explained above the Supreme Court has not held that such statements should be excluded at punishment.

that the *Brecht* standard applies regardless of whether the state court recognized the constitutional error reviewed it for harmless-error). Thompson does not provide a harm analysis for Rhodes's testimony except to generally contend that Rhodes was the "State's most damaging punishment witness" because he testified regarding the solicitation, including about the list of targets, and because he testified about statements Thompson made to him about the murders of Cain and Hayslip. Petition at 71–72. Presumably, Thompson contends that Rhodes's testimony regarding the solicitation harmed him in that it affected the jury's analysis of the future dangerousness issue, and that Rhodes's testimony relating to Thompson's statements about the victims, especially his statement that "the bitch couldn't get up," could have affected the jury's finding on the mitigation special issue. However, given the other evidence presented at punishment, Thompson cannot show that Rhodes's testimony had a substantial effect on the jury's findings.

First, Rhodes's testimony that Thompson attempted to solicit the murders of witnesses in his case was cumulative of other evidence indicating

the same.[28] *See Brecht*, 507 U.S. at 639 (references to petitioner's post-*Miranda* silence were harmless because they were merely cumulative of the extensive and permissible references to his pre-*Miranda* silence). Officer Pinkins testified that he had received statements from inmates housed with Thompson that led to Thompson being indicted for solicitation to commit capital murder. 17 RR-R 198–200. He explained that it was a very serious situation because one of the witnesses "could have been killed" and that he was "absolutely" concerned for witness Diane Zernia's safety. *Id*. at 198. In addition, Zernia testified that during a phone call from Thompson in prison, he had asked her for her address after she told him she would not lie to protect him; she also explained that she subsequently had to move out of her house for three days out of concern for her safety. 17 RR-R 12–18. Further, in confiscated letters, Thompson stated that he had been indicted for the solicitation offense, lamenting, "So now I have really fucked myself good. This looks real bad for the jury to hear." *Id*. at 178; SX-R 86A.

---

[28]    The CCA previously determined that the admission at the initial punishment hearing, of a tape recording of Thompson attempting to solicit the murder of Zernia by investigator Gary Johnson was not harmless error. *Thompson v. State*, 93 S.W.3d at 29. This previous ruling has no effect on this Court's harmless error analysis of the admission of Rhodes's testimony, especially because under Texas law, the CCA considered whether the evidence was harmless beyond reasonable doubt. *Id*. at 27 (citing Tex. R. App. P. 44.2(a)). Moreover, Rhodes's testimony is qualitatively different than the taped conversation with Johnson.

Rhodes's testimony that Thompson continued to attempt to find ways to have victims murdered likely had little additional impact on the jury. The State had already presented testimony from a police officer that he was concerned for a witness's safety and that Thompson had been indicted for solicitation; further, it heard from a witness who was forced to move out of her house, and Thompson's admission that he was responsible for harming his chances at trial. This evidence likely influenced the jury to a greater extent than similar testimony from an admittedly self-interested career criminal, especially given that Rhodes was significantly impeached with his prior informant activity. 17 RR-R 151–55; *see also* SHCR-01 250 (¶ 104) (state habeas finding that Rhodes was "effectively cross-examined").

Further, Rhodes's testimony regarding statements Thompson made to him about murdering the victims in this case is very similar to the testimony of Diane Zernia and did not play a prominent role the State's case. *See Hogue v. Johnson*, 131 F.3d 466, 501 (5th Cir. 1997) (explaining that admission of an extraneous offense was harmless at a capital sentencing trial when the conviction did not play a significant role in punishment phase arguments). Zernia testified that Thompson told her that "he grabbed [Hayslip], put the gun to her cheek and said, I can shoot you, too, bitch." 16 RR-R 279. Moreover, Rhodes's assertion that Thompson referred to Hayslip as a "bitch" did not likely substantially influence the jury as they had already heard evidence of

Thompson calling the victim derogatory names through Zernia's testimony and witness Kathryn Celeste who recalled that Thompson yelled that Hayslip was a "whore" during the initial altercation. 16 RR-R 88, 90, 103.

Because Rhodes's testimony regarding Thompson's solicitation and his statements about the murder are largely cumulative of a wealth of other evidence presented at his punishment trial, they did not have a "substantial injurious effect on the jury's verdict." *See Brecht*, 507 U.S. at 637; *Canales*, 765 F.3d at 572. Accordingly, assuming that this claim is not procedurally barred and that a *Massiah* violation occurred, this Court should must deny Rhodes's claim because the violation was harmless error.

> **D.    Even if his claim were not procedurally defaulted, Thompson fails to demonstrate that the State committed a *Brady* violation by failing to disclose impeachment evidence related to Rhodes's informant status.**

In *Brady*, the Supreme Court held that the suppression by the prosecution of evidence favorable to an accused violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution. 373 U.S. at 87. To establish a *Brady* violation, Thompson must prove the following: (1) the prosecutor suppressed or withheld evidence; (2) which was favorable; and (3) material to the defense. *Moore v. Illinois*, 408 U.S. 786, 794-95 (1972). The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the

result of the proceeding would have been different. *United States v. Bagley*, 473 U.S. 667, 684 (1985). Cases often add a fourth requirement: "nondiscovery of the allegedly favorable evidence was not the result of a lack of due diligence." *United States v. Walters*, 351 F.3d 159, 169 (5th Cir. 2003). "When evidence is equally available to both the defense and the prosecution, the defendant must bear the responsibility for failing to conduct a diligent investigation." *Kutzner v. Cockrell*, 303 F.3d 333, 336 (5th Cir. 2002).

Here, Thompson contends that the state committed a *Brady* violation by failing to disclose impeachment evidence relating to Rhodes's informant status. Petition at 91. However, as explained above, any additional information not in possession of the defense is cumulative, and simply more detailed evidence of Thompson's informant activities in other cases. ECF No. 27 at 7–8. This cumulative information was not *Brady* material because it was not relevant to Rhodes's testimony in this case. More importantly, it was not material because it merely confirmed Rhodes's testimony. *See Miller v. Dretke,* 431 F.3d 241, 251 (5th Cir. 2005) ("If the evidence provides only incremental impeachment value, it does not rise to the level of *Brady* materiality."). While Thompson did not raise his *Brady* claim in his initial state habeas applications, the state habeas court did address his claim that the trial court erred by failing to grant Thompson's trial attorneys request for a continuance. In regard to that claim, the court explained:

> Trial counsel effectively cross-examined Rhodes, impeaching his credibility eliciting testimony regarding his work as an informant for law enforcement, and suggesting that Rhodes testimony in the instant trial was a product of Rhodes'[s] desire to help himself. Trial counsel elicited testimony that Rhodes had a prior conviction for aggravated robbery that he neglected to mention during his direct examination; that Rhodes had done a lot of work for law enforcement and received pay for that work; that Rhodes was not looking for a way to gain favor with law enforcement authorities when he was in jail with [Thompson] but Rhodes would not overlook it if it was dumped in his lap; that Rhodes was a full-time informant for the Harris County Organized Crime Task Force in 1998 and 1999 and testified in two trials and that Rhodes was paid for his participation in the *Benavidez* trial even though the record from that trial reflected that Rhodes denied receiving payment [14 RR-R 148, 152–54; 22 RR-R 153–58].

SHCR-01 250 (¶ 104). Given that Thompson's counsel had ample opportunity to "effectively cross-examine" Rhodes on his prior informant work, this more detailed information about the same activity was not material. Accordingly, even if it were not procedurally barred, this Court must deny Thompson's *Brady* claim.

### E. Even if it were not procedurally defaulted, Thompson's claim that his trial counsel was ineffective lacks merit because no *Massiah* violation occurred.

The Sixth Amendment, together with the Due Process Clause, guarantee a defendant both the right to a fair trial and the right to effective assistance of counsel at that trial. *Strickland*, 466 U.S. at 684–86. A defendant's claim that he was denied constitutionally effective assistance requires him to affirmatively prove both that (1) counsel rendered deficient performance, and

(2) his actions resulted in actual prejudice. *Id*. at 687–88, 690. Importantly, failure to prove either deficient performance or resultant prejudice will defeat an ineffective–assistance–of–counsel claim, making it unnecessary to examine the other prong. *Id*. at 687.

In order to demonstrate deficient performance, Thompson must show that in light of the circumstances as they appeared at the time of the conduct, "counsel's representation fell below an objective standard of reasonableness," i.e., "prevailing professional norms." *Id*. at 689–90; *see also Richter*, 562 U.S. at 105. The Supreme Court has admonished that judicial scrutiny of counsel's performance "must be highly deferential," with every effort made to avoid "the distorting effect of hindsight."[29] *Strickland*, 466 U.S. 689–90; *see also Richter*, 562 U.S. at 105 ("It is 'all too tempting' to 'second–guess counsel's assistance after conviction or adverse sentence.'") (citations omitted); *Yarborough v. Gentry*, 540 U.S. 1, 6 (2003) ("The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight.") (citations omitted). Accordingly, there is a "strong presumption" that the alleged deficiency "falls within the wide range of reasonable professional

---

[29]    "Representation of a capital defendant calls for a variety of skills. Some involve technical proficiency connected with the science of law. Other demands relate to the art of advocacy. The proper exercise of judgment with respect to the tactical and strategic choices that must be made in the conduct of a defense cannot be neatly plotted in advance by appellate courts." *Stanley v. Zant*, 697 F.2d 955, 970 & n.12 (11th Cir. 1983).

assistance." *Strickland*, 466 U.S. at 689. If there is *any* "reasonable argument that counsel satisfied *Strickland*'s deferential standard," the state court's denial will be upheld. *Richter*, 562 U.S. at 105.

This reasonableness standard applies also to counsel's investigation. Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. *Strickland*, 466 U.S. at 690–91. Counsel must make reasonable investigations or make a reasonable decision that makes particular investigations unnecessary. *Id*. at 691. A particular decision not to investigate must be assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments. *Id*. at 691.

Finally, even if deficient performance can be established, Thompson must still affirmatively prove prejudice that is "so serious as to deprive [him] of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. This requires him to show a reasonable probability that but for counsel's deficiencies, the result of the proceeding would have been different." *Id*. at 694. A "reasonable probability" is one sufficient to undermine confidence in the outcome. *Id*. And as explained by the Supreme Court: The question in conducting *Strickland*'s prejudice analysis "is *not* whether a court can be

certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel [had] acted differently." *Richter*, 562 U.S. at 111 (emphasis added and citations omitted). Rather, "[t]he likelihood of a different result must be substantial, not just conceivable." *Id*. at 112 (citation omitted).

Here, Thompson contends that his trial counsel was ineffective for failing to file a motion to preclude Rhodes's testimony under the Sixth Amendment. Petition at 94. However, as discussed above, there was no *Massiah* violation; therefore, any objection on this basis would have been overruled, and Thompson cannot demonstrate that his counsel was ineffective for failing to object to Rhodes's testimony on such grounds. *See Emery v. Johnson*, 139 F.3d 191, 198 (5th Cir. 1997) (failure to assert meritless objection cannot be grounds for finding of deficient performance). Rhodes explicitly testified that he was not acting as an agent of the state; accordingly, counsel's decision to forgo an objection or motion to suppress on *Massiah* grounds was reasonable and appropriate. *See Strickland*, 466 U.S. at 689. Likewise, there is no reasonable probability that had trial counsel objected to Rhodes's testimony on the ground that it violated his Sixth Amendment rights pursuant to *Massiah*, his testimony would have been excluded. *Id*. at 694. Further, to the extent Thompson claims that his attorney was ineffective for failing to fully investigate the *Massiah* claims, Thompson fails to show that counsel made an

unreasonable decision not to investigate further because as explained above, there was no evidence that could have supported a successful *Massiah* claim; and, perhaps more importantly, Thompson fails to show prejudice as he has now been afforded an extended opportunity to fully investigate Thompson's informant activities, and he has been unable to uncover any evidence that contradicts Rhodes's testimony at trial, much less that indicates that a *Massiah* violation occurred. *See id*. at 691, 694.

Accordingly, Thompson fails to demonstrate that, by failing to object to Rhodes's testimony on *Massiah* grounds, trial counsel's conduct fell beyond the bounds of prevailing objective professional standards. *Id*. at 688. Accordingly, even it were not procedurally barred, this Court must deny Thompson's IATC claim.

> **F.   Even if it were not procedurally defaulted, Thompson's appellate counsel was not ineffective for failing to raise *Brady* and *Massiah* claims on direct appeal.**

The *Strickland* standard set forth above applies to claims of appellate counsel error. *Smith v. Robbins*, 528 U.S. 259, 285 (2000). In considering the deficient performance prong, an attorney's decision not to pursue a certain claim on appeal after considering the claim and believing it to be without merit falls within the "wide range of professionally competent assistance" demanded by Strickland. *Murray*, 477 U.S. at 536. Indeed, the process of "winnowing out weaker arguments on appeal and focusing on those more likely to prevail, far

from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Id.* (quoting *Jones v. Barnes*, 463 U.S. 745, 751–52 (1983)) (internal quotations omitted); *see also Robbins*, 528 U.S. at 288 (noting that notwithstanding *Jones v. Barnes*, "it is still possible to bring a *Strickland* claim based on counsel's failure to raise a particular claim, but it is difficult to demonstrate that counsel was incompetent.") An attorney's decision not to pursue a certain claim on direct appeal after considering the claim and believing it to be without merit falls within the "wide range of professionally competent assistance" demanded by *Strickland. Murray*, 477 U.S. at 527.

Thompson argues that direct appeal counsel was deficient for failing to raise *Brady* and *Massiah* claims on appeal, and had counsel done so, he would have been entitled to appellate relief. Petition at 64. However, as explained above Thompson's *Brady* and *Massiah* claims lack merit. *See above*, Section IV(C) and (D).[30] Accordingly, his ineffective assistance of appellate counsel claim fails both because it was reasonable for counsel not to raise the futile claims and because there was no resulting prejudice. *See Murray*, 477 U.S. at 527. Therefore, even if this claim were not procedurally defaulted, it must be denied.

---

[30]    In addition, Thompson's trial counsel did not raise an objection on *Massiah* grounds at trial; as such, a claim in this regard likely would have been barred because it was not properly preserved. *See* Tex. R. App. P. 33.1.

## G.    The court should not hold an evidentiary hearing on these claims.

In his petition, Thompson contends that an evidentiary hearing should be held "to discuss what documents tendered by the Harris County DA's Office should be turned over to Thompson's counsel." Petition at 107–08. Thompson does not appear to request a full evidentiary hearing in this regard; rather, he asserts that a discussion should be held regarding documents submitted for in camera review. In this regard, the Harris County district attorney's office asserted privilege in regard to trial notes and records pertaining to the *Benavides* murder trial, at which Rhodes testified as an informant and relating to Thompson's solicitation of capital murder and capital murder case. ECF No. 57-3 at (letter from Harris County district attorney's office). The Court is fully capable of reviewing these privileged documents and determining what should be turned-over to Thompson. Further, in his amended petition, Thompson has now had the opportunity to inform the court of the issues and information he deems relevant to his claim. Accordingly, the court should deny Thompson's request for a hearing on this matter.

In a separate motion for an evidentiary hearing, Thompson states that he "also request[s] a hearing at which he would be able to question a select group of people who he believes specifically have knowledge of the events making the basis of a *Massiah* claim." ECF No. 48 at 2. Thompson further

contends that 28 U.S.C. § 2254(e)(2), which creates a series of stringent conditions for excusing a petitioner's failure to develop the factual basis of his claim in state court,  does not apply to his request because the hearing's purpose would be for him to establish cause and prejudice to excuse his procedural default. ECF 48 at 2. Thompson cites no law to support his assertion. However, assuming it is correct, Thompson still fails to show entitlement to an evidentiary hearing.

Subject to the confines of AEDPA, "the decision to grant an evidentiary hearing [is] generally left to the sound discretion of district courts" *Landrigan*, 550 U.S. at 473; *Hall v. Quarterman*, 534 F.3d 365, 368 (5th Cir. 2008). Even where no factual findings have been made by any state court, a district court does not abuse its discretion in refusing to grant an evidentiary hearing if there are sufficient facts before it to make an informed decision regarding the merits of a claim. *McDonald v. Johnson*, 139 F.3d 1056, 1060 (5th Cir. 1998) ("The district court had sufficient facts before it to make an informed decision on the merits . . . and, accordingly, did not abuse its discretion in refusing to hold an evidentiary hearing."). "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Landrigan*, 550 U.S. at 474–75. In order to be entitled to a hearing, a petitioner must show that there is a factual dispute that if determined in his favor would entitle him to relief. *Murphy v.*

*Johnson*, 205 F.3d 809, 816 (5th Cir. 2000). A general assertion that a constitutional violation occurred but an evidentiary is required to develop the claim, "is tantamount to an impermissible fishing expedition." *Id.*

Here, Thompson has already been granted discovery and has provided this court with a substantial amount of briefing on the issues.[31] He now argues that if granted an evidentiary hearing he will be able to establish cause and prejudice to excuse his procedural default through a showing of a *Brady* violation; however, as explained above, Thompson cannot establish cause through any additional evidence because Thompson already knew of the bulk of the evidence indicating that Thompson had previously acted as an informant in other cases, and that evidence was used to cross-examine Thompson at trial.

Moreover, he fails to show that an evidentiary hearing would allow him to establish prejudice because his *Brady, Massiah*, and IAC claims entirely lack merit—and he has provided no indication that his proposed witnesses would prove the contrary. Again, Rhodes readily admitted at trial that he had been a paid informant in other cases. Any more detailed evidence of

---

[31]    In addition, Thompson's assertion that he requests a hearing to establish cause and prejudice is belied by his assertion that he wants to question witnesses regarding his *Massiah* claim. ECF No. 48 at 2. As is obvious from Thompson's list of witnesses, the sole goal of his request is to attempt to discover factual support for the merits of his claims that Robin Rhodes was acting at the behest of the state. Accordingly, the Director contends that Thompson's request for a hearing is much more of a "fishing expedition" for evidence to support the merits of his unexhausted claim than a legitimate attempt to establish cause and prejudice to excuse his default.

cooperation with Harris County in other cases is immaterial under *Brady* and therefore cannot excuse his procedural default; nor could any of this evidence establish a *Massiah* violation as it fails to establish that Rhodes was acting at the behest of the State *in this case.*

Moreover, the record—specifically Rhodes's own testimony—refutes Thompson's general allegation that Rhode's was acting under the direction of the state. *See Landrigan*, 550 U.S. at 474–75. Indeed, Thompson fails to show that there is a factual dispute that if determined in his favor would entitle him to relief. *See Murphy*, 205 F.3d at 816. Thompson's request for an evidentiary is nothing more than a "fishing expedition" in an attempt to find evidence of his unsubstantiated claims. *Id*. However, no evidentiary hearing is necessary because the existing record is more than enough to refute Thompson's underlying allegations of cause and prejudice to excuse his default. *See McDonald*, 139 F.3d at 1060.

In addition, even if the court were to eventually determine that Thompson could overcome the procedural default, 28 U.S.C. § 2254(e)(2) would apply on de novo review and preclude  merits consideration of any evidence obtained during Thompson's evidentiary hearing. *See Pinholster*, 563 U.S. at 185–86 (explaining that § 2254(e)(2) applies where § 2254(d) does not bar relief, equally so to claims without a state-court merits adjudication). Under 28 U.S.C. § 2254(e)(2), the prisoner must show that:

(A)    the claim relies on—

(i)    a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

(ii)   a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B)    the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2). Thompson cannot surmount these hurdles; thus, he would not be entitled to further factual development on the merits of his claims.

First, it cannot be disputed that Thompson's claims do not rely on a "new rule of constitutional law" under § 2254(e)(2)(A)(i). Thus, Thompson cannot satisfy § 2254(e)(2)(A)(i), which means that he must satisfy § 2254(e)(2)(A)(ii) in order to be entitled to a hearing.

Second, given that his claim is unexhausted he necessarily "has failed to develop the factual basis of [his] claim[s] in State court proceedings." 28 U.S.C. § 2254(e)(2). The Supreme Court has held that text connotes a "lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." (*Michael*)*Williams*, 529 U.S. at 432. For example, Michael Williams's state habeas lawyer ineffectively failed to develop the factual record for a *Brady* claim. *Id.* at 438. The Court noted that the state habeas lawyer was "on

88

notice" of the potential *Brady* material, but "fail[ed] to investigate these references in anything but a cursory manner." *Id*. at 439–40. As outrageous and harmful as the state habeas lawyer's conduct was, the Court held that state habeas counsel's ineffectiveness triggered § 2254(e)(2)'s opening clause and barred an evidentiary hearing. *Id*. at 440.

Here, by arguing that his default is excused under *Martinez/Trevino*, Thompson explicitly faults state habeas counsel and asserts that but for counsel's lack of diligence, Thompson could have raised all of his unexhausted claims in his initial state habeas application. Petition at 101–05; *see* (*Michael)Williams*, 529 U.S. at 438–40; *Keeney v. Tamayo–Reyes*, 504 U.S. 1, 4, 8–9 (1992) (no evidentiary hearing where ineffective state habeas lawyer failed to develop record). Moreover, the record demonstrates that Thompson was clearly aware of the factual predicate of his *Massiah* and IATC for failure to raise a *Massiah* objection claims because as noted above and as previously explained by this Court, the basis of this claim, and the bulk of the evidence allegedly supporting it, were available at trial. ECF No. 27 at 7–8. In addition, Thompson was clearly aware of the factual predicate of his *Brady* and IAC for failure to raise *Brady* on appeal claims as his trial counsel objected on the basis of *Brady* at trial. 17 RR-R 163. Thus, Thompson fails to show that the factual predicate of his defaulted claims could not have been previously discovered through the exercise of due diligence

89

Third, even if Thompson could satisfy either of the stringent requirements of § 2254(e)(2)(A), he still would not be entitled to evidentiary development under § 2254(e)(2)(B) unless he could show he is actually innocent of capital murder. (*Michael*)*Williams*, 529 U.S. at 436. Yet, these unexhausted claims fail to put forth such an argument. As a result, Thompson is not entitled to evidentiary development of his claims because such claims, even if developed, fail to demonstrate that no reasonable factfinder would have found him guilty of capital murder but for the alleged constitutional error. 28 U.S.C. § 2254(e)(2)(B).

Accordingly, even if Thompson could overcome his procedural default, 28 U.S.C. § 2254(e)(2) precludes further factual development on de novo review. *See Landrigan*, 550 U.S. at 474–75 (explaining that a district court is not required to hold an evidentiary hearing if the record "precludes habeas relief"). For the foregoing reasons, this Court should deny Thompson's request for an evidentiary hearing.

## V.   The State Court Reasonably Denied Thompson's Claim that *Apprendi*[32] Required the State to Allege Facts Relating to the Texas Death Penalty Special Issues.

Thompson contends that the trial court committed reversible error in proceeding to punishment in a case in which the state sought the death penalty

---

[32]    *Apprendi v. New Jersey*, 530 U.S. 466 (2000).

because "the indictment returned against him did not set out the special punishment issues. . . ." Petition at 113. More specifically, he argues that the state was required to allege facts germane to the special issues. *Id*. at 112. Thompson raised this claim on direct appeal following his retrial on punishment. Appellant's 2006 Brief at 43. And the CCA denied it, explaining that it has repeatedly rejected the argument that *Apprendi* requires the State to allege the special issues in the indictment. *Thompson v. State*, 2007 WL 3208744 at 3.

It is well-settled that *Apprendi* requirements do not apply to the Texas special issues because they are neither an element of capital murder nor an aggravating fact that increases the punishment for capital murder. As the Fifth Circuit has held, "Texas capital juries make the eligibility decision at the guilt-innocence phase. . . . *Ring* is inapposite to any discussion of the constitutional requirements of the selection phase." *Turner v. Quarterman,* 481 F.3d 292, 299–300 (5th Cir. 2007); *see also Granados v. Quarterman,* 455 F.3d 529, 536–37 (5th Cir. 2006) (explaining that "the state [is] required to prove beyond a reasonable doubt every finding prerequisite to exposing [the defendant] to the maximum penalty of death."). Accordingly, "facts germane to special issues" are not subject to *Apprendi/Ring* requirements, and are therefore not required to be included in an indictment. Fifth Circuit precedent expressly forecloses this argument. *See Turner*, 481 F.3d at 299–300;

91

*Granados*, 455 F.3d at 536–37; *cf. Rowell v. Dretke,* 398 F.3d 370, 378 (5th Cir.2005) ("No Supreme Court or Circuit precedent constitutionally requires that Texas's mitigation special issue be assigned a burden of proof."); *Allen v. Stephens*, 805 F.3d 617, 628 (5th Cir. 2015) ("[T]he jury's consideration of aggravating circumstances in connection with the mitigation special issue is not governed by *Apprendi* and *Ring*.").

In addition, Thompson's indictment argument also fails because the "Fifth Amendment's grand jury indictment requirement" has never been made applicable to the states through the Fourteenth Amendment. *See McDonald v. City of Chicago*, 561 U.S. 742, 765 n.13 (2010); *Apprendi*, 530 U.S. at 477 n.3 ("We do not address the indictment question separately today.") Finally, even if *Apprendi* did impose this requirement on state indictments, the retroactive application of such requirements would be barred by the non-retroactivity doctrine of *Teague. See Rowell*, 398 F.3d at 378–79.

The state court's rejection of Thompson's claim was objectively reasonable and not contrary to clearly-established federal law. Consequently, Thompson is not entitled to federal habeas relief on this claim.

**VI.    Thompson's Claim that the Trial Court Violated His Eighth Amendment Rights by Allowing Impermissible Victim Impact Testimony Is Procedurally Defaulted, In Part, and Entirely Meritless.**

Thompson claims that the trial court improperly allowed the State to elicit testimony from Michael Donaghy, Dennise Hayslip's brother, regarding the number and types of people who attended Hayslip's funeral. Petition at 118–21. At retrial on punishment, the following exchange occurred during the State's question of Donaghy regarding his sister's funeral:

| | |
|---|---|
| Prosecutor: | How many people showed up? |
| Donaghy: | Hundreds. There was a lot of people. |
| Prosecutor: | Did you even realize she had that many friends or that many people who knew her? |
| Donaghy: | I knew my sister touched a lot of lives and everybody loved her and she loved everybody. I didn't know she knew that many people. |
| Prosecutor: | Who showed up at the funeral? Social friends? Clients? Mixture of both? |
| Defense Counsel: | I object to this. This goes beyond victim impact with this testimony. |
| Trial Court: | Overruled. |
| Defense Counsel: | Gets to the area of victim character evidence and we object to it. |
| Trial Court: | Overruled. |

18 RR-R 35.

As an initial matter, on direct appeal, the CCA held: "[Thompson] failed to object to the State's question about the number of people who attended the funeral, and any complaint as to that question was therefore procedurally defaulted." *Thompson v. State,* 2007 WL 3208755, at *6. Because the denial of this claim was based upon the contemporaneous objection rule, an adequate and independent state procedural bar, it is procedurally barred on federal habeas review. *See Styron*, 262 F.3d at 453–54.

In addition, the trial court did not violate the Eighth Amendment by overruling Thompson's objection. In *Payne v. Tennessee*, the Supreme Court held that the Eighth Amendment does not bar testimony about the victim of a murder or testimony about the impact of the murder on the victim's family. 501 U.S. 808, 822 (1991). The Court held that the State has a legitimate interest in countering the individualization of the defendant by reminding the jury that the victim was also an individual whose death represents a unique loss to society and to the victim's family. *Id*. at 826–28. As a result, it was left to states to determine whether such testimony is relevant under their individual punishment schemes. *Id*.

In Texas, victim impact evidence and victim character evidence are admissible in the context of the mitigation special issue to show the uniqueness of the victim, the harm caused by the defendant and as rebuttal to the

defendant's mitigating evidence. *Mosley v. State*, 983 S.W.2d 249, 262 (Tex. Crim. App. 1998). "Courts have always taken into consideration the harm done by the defendant in imposing sentence." *Payne*, 501 U.S. at 825. "The assessment of harm caused by the defendant as a result of the crime charged has understandably been an important concern of the criminal law, both in determining the elements of the offense and in determining the appropriate punishment." *Id*. at 819. "A state may properly conclude that for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant." *Id*. at 826. "Victim impact evidence is simply another form or method of informing the sentencing authority about the specific harm caused by the crime in question." *Id*.

On the merits of this issue, the CCA found:

Although [Thompson] argues that the trial court erred in allowing Donaghy "to testify to the . . . types of people who attended the . . . funeral," no testimony was actually elicited. The question was asked, and the trial court overruled [Thompson]'s objection, but the prosecutor never pursued an answer. Even assuming that the question was improper, [Thompson] was not harmed by the unanswered question. The question by itself did not assume, suggest, or interject any facts about who actually attended the service or leave the jury with a particular impression about the types of persons who attended. *See Brown v. State*, 692 S.W.2d 497, 501 (Tex. Crim. App. 1985) (noting that mere asking of improper question is not reversible error unless it results in obvious harm to accused); *cf. Turner v. State*, 719 S.W.2d 190, 194 (Tex. Crim. App. 1986) (when witness does not have opportunity to respond to

improper question, instruction to disregard will render error harmless).

*Thompson v. State*, 2007 WL 3208755, at *6.

Here, the CCA reasonably determined that even assuming this question about who attended Hayslip's funeral improperly exceeded the scope permissible victim impact inquiry, it could not have harmed Thompson because the witness never answered the question asked. *See Davis v. Ayala*, 135 S. Ct. 2187, 2199 (2015) ("When a [harmlessness] decision is reviewed under AEDPA, 'a federal court may not award habeas relief under § 2254 unless the harmlessness determination itself was unreasonable.'" (quoting *Fry*, 551 U.S. at 119); *Payne*, 501 U.S. at 825 ("In the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief); *see also Castillo v. Johnson*, 141 F.3d 218, 224 (5th Cir.) (explaining that "only where such [victim impact] evidence or argument is unfairly prejudicial may a court prevent its use through the Due Process Clause of the Fourteenth Amendment").

Moreover, none of the complained-of testimony exceeded the scope of the permissible victim impact inquiry. Instead, it was reasonable to determine that the questioning regarding the attendees of Hayslip's funeral was traditional permissible victim impact testimony that served to demonstrate the harm

caused by Hayslip's murder and did not in any way ask the jury to measure "the worth of the victim compared to other members of society." *See Payne*, 501 U.S. at 823. For the foregoing reasons, the state courts' rejection of this claim did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, Thompson is not entitled to relief. 28 U.S.C. § 2254(d). Accordingly, this claim must be denied.

## VII. Thompson's Claim That the Texas Scheme for Executing Defendants by Lethal Injection Constitutes Cruel and Unusual Punishment Is Not Cognizable on Federal Habeas Review; Alternatively, It Was Reasonably Denied by the State Court.

### A. This claim is not cognizable in a § 2254 habeas petition because it must be raised under § 1983.

Thompson argues that the Texas scheme for executing defendants by lethal injection constitutes cruel and unusual punishment. Petition at 121–40. However, this Court should dismiss this claim because federal habeas corpus review is not the proper vehicle for such a challenge. This claim is not an attack on the validity of Thompson's conviction or death sentence but a challenge to the proposed method of execution; for this reason, the claim must be raised as a civil rights action under 42 U.S.C. § 1983. *See Glossip v. Gross*, 135 S. Ct. 2726, 2738–39 (2015); *see also Hill v. McDonough*, 547 U.S. 573, 579 (2006) (challenges to the validity of confinement are the province of habeas corpus,

while challenges to the circumstances of confinement may be brought under §
1983). Accordingly, his claim must be dismissed.

### B.    The state court's disposition is entitled to deference.

While the state court initially properly explained that the claim was not
cognizable in an application for state writ of habeas corpus, the court also
addressed the merits of the claim.[33] SHCR-01 244–45 (¶78), 260–61 (¶ 16); *see
also Ex parte Chi*, 256 S.W.3d 702 (2008); *Ex parte Alba*, 256 S.W.3d 682, 686
(Tex. Crim. App. 2008). Specifically, the court concluded that Thompson failed
to show that the Texas lethal-injection procedure is cruel and unusual
punishment. SHCR-01 245 (¶¶ 80), 261 (¶ 18). The state court's alternative
conclusion that Thompson failed to demonstrate that the current method of
execution amounts to cruel and unusual punishment is entitled to deference
by this Court. Therefore, to the extent that this claim can be reviewed under
federal habeas corpus, the state court findings are reasonable and entitled to
deference, and relief must be denied.

Recently, in response to a § 1983 petition, a Southern District court
extensively reviewed the current Texas death penalty protocol including

---

[33]    The state court also concluded that the claim was not ripe for review because
Thompson does not have an execution date. SHCR-01 261 (¶ 17). The Fifth Circuit
now allows inmates to challenge the manner of their execution in federal court even
though no date has been set. *See Whitaker v. Livingston*, 597 F. App'x 771 (5th Cir.
2015). But the claim should still be raised through § 1983.

addressing challenges to the testing of pentobarbital and the use of the current compounded form of the drug. *Whitaker v. Livingston,* No. H-13-2901, 2016 WL 3199532, at *7–9 (S.D. Tex. June 6, 2016).[34] The court determined that none of these challenges had merit and held that the current Texas death penalty protocols are constitutional. *Id.* This decision and its reasoning foreclose Thompson's claim even if it were cognizable.

Further, the Fifth Circuit has rejected challenges to the Texas' three-drug lethal injection process.[35] *See generally Raby v. Livingston*, 600 F.3d 552 (5th Cir. 2010). And, at this point, Texas is currently using a single-drug (pentobarbital) protocol, which is also acceptable. *Sepulvado v. Jindal*, 729 F.3d 413, 417 (5th Cir. 2013); *Thorson v. Epps*, 701 F.3d 444, 447 n.3 (5th Cir. 2012) ("Though Texas recently adopted a one drug protocol—also acceptable under the flexible *Baze* [*v. Rees*, 553 U.S. 35 (2008)] standard—the method at issue here exactly parallels the one cleared for use in *Raby*."). Use of pentobarbital has been upheld by many courts. *See Ringo v. Lombardi*, 677

---

[34]    An appeal of this opinion is currently pending in the Fifth Circuit. No. 16-20364.

[35]    Thompson's argument that the Texas scheme is unconstitutional because there are news articles indicating that Texas may be considering switching to a different drug is clearly not ripe for review. Petition at 122–23; *see Texas v. United States*, 523 U.S. 296, 300 (1998) (stating that "[a] claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all") (citations and internal quotation marks omitted). Moreover, it lacks merit because it is entirely speculative.

F.3d 793, 798–99 (8th Cir. 2012) (noting that challenges to the use of pentobarbital have been uniformly denied); *Beaty v. Brewer*, 649 F.3d 1071, 1075 (9th Cir. 2011) ("Pentobarbital is a barbiturate commonly used to euthanize terminally ill patients who seek death with dignity in states such as Oregon and Washington."); *Cooey v. Strickland*, 589 F.3d 210, 221 (6th Cir. 2009). Moreover, the Fifth Circuit has repeatedly denied certificates of appealabilty on this issue. *See Rivas v. Thaler*, 432 F. App'x 395, 404–05 (5th Cir. 2011); *Kerr v. Thaler*, 384 F. App'x 400, 404–05 (5th Cir. 2010). Furthermore, pentobarbital has been used in other states and in many executions in Texas.[36]

Because the state court's decision is not unreasonable under existing Supreme Court precedent and is, in fact, in compliance with current Fifth Circuit precedent, Thompson's claim must be denied even if it were cognizable.

---

[36]    *See* http://www.deathpenaltyinfo.org/execution-list-2016 (last visited November 21, 2016); http://www.deathpenaltyinfo.org/execution-list-2015 (last visited November 21, 2016); http://www.deathpenaltyinfo.org/execution-list-2014 (last visited November 21, 2016); http://www.deathpenaltyinfo.org/execution-list-2013 (last visited November 21, 2016); http://www.deathpenaltyinfo.org/execution-list-2012 (last visited November 21, 2016); http://www.deathpenaltyinfo.org/execution-list-2011 (last visited November 21, 2016); http://www.tdcj.state.tx.us/death_row/dr_executed_offenders.html (last visited November 21, 2016).

### C.    Thompson's request for discovery on this basis should be denied.

A federal habeas petitioner is entitled to discovery only where he can show good cause. *See* Rule 6(a) of the Rules Governing Section 2254 Cases. Although the rule does not define "good cause," it was written to comply with *Harris v. Nelson*, 394 U.S. 286 (1969). *See* Advisory Committee Notes to Rule 6. This Court must provide discovery only where the petitioner gives it reason to believe that if the facts alleged are developed fully, he will be able to show that he is confined illegally and entitled to relief. *Harris*, 394 U.S. at 300. He must make his showing with allegations that are specific. *See id*.; *see also Bracy v. Gramley*, 520 U.S. 899, 905 (1997); *Perillo*, 79 F.3d at 445.

A petitioner also cannot show "good cause" for discovery where the claim is defaulted or where the federal court cannot reach the claim's merits. *See Rucker v. Norris*, 563 F.3d 766, 771 (8th Cir. 2009); *Williams v. Bagley*, 380 F.3d 932, 957 (6th Cir. 2004) (holding that district court denied request for production properly because the claim was defaulted); *Thompson v. Stephens*, 2014 WL 2765666, at *2 (S.D. Tex. June 18, 2014) (unpublished) ("A petitioner cannot show good cause if a federal court cannot reach the merits of the disputed claims."); *cf. Fuller v. Johnson*, 114 F.3d 491, 502 (5th Cir. 1997) (finding no abuse of discretion where district court denied funding for expert in habeas proceedings where the claim is defaulted). Here, Thompson fails to

state a cognizable federal habeas claim, is not entitled to relief under 28 U.S.C. § 2254, and would fail to meet the pleading requirements for a 42 U.S.C. § 1983. Since this claim has been adjudicated unfavorably to Thompson, he fails to show good cause for discovery. Accordingly, granting discovery under these circumstances would constitute an abuse of discretion.

## VIII. The State Court Reasonably Rejected Thompson's Claim that the Texas Dual-Track Habeas Application System Violates Due Process of Law.

Thompson argues that the Texas procedure requiring dual track direct appeal and application for habeas corpus review violates his right to due process. Petition at 141–51. As an initial matter, this claim is precluded from habeas relief because infirmities in state habeas proceedings do not constitute grounds for federal habeas relief. *See Trevino v. Johnson*, 168 F.3d 173 (5th Cir. 1999), (citing *Hallmark v. Johnson*, 118 F.3d 1073, 1080 (5th Cir. 1999)); *Monroe v. Johnson*, 522 U.S. 1003 (1997). More specifically, "[a]n attack on a state habeas proceeding does not entitle the petitioner to habeas relief in respect to his conviction, as it is an attack on a proceeding collateral to the detention and not the detention itself." *Nichols v. Scott*, 69 F.3d 1255 (5th Cir. 1995) (citing *Millard v. Lynaugh*, 810 F.2d 1403, 1410 (5th Cir. 1987); *Duff-Smith v. Collins*, 973 F.2d 1175, 1182 (5th Cir. 1992); *Vail v. Procunier*, 747 F.2d 277 (5th Cir. 1984). Because Thompson does not have a constitutional

right to state habeas review, his claim challenging state habeas procedures is not cognizable on federal habeas review and must be dismissed.

Furthermore, Thompson fails to show any harm related to this claim. SHCR-01 225–26 (¶¶ 9–14), 257 (¶ 1). Thompson complains that because his application for writ of habeas corpus must be filed in accordance with the requirements of Texas Code of Criminal Procedure Article 11.071, Section 4(a) prior to the CCA decision on direct appeal, he is denied due process. To support this claim, he argues that until the direct appeal is final, a habeas applicant does not know the outcome of the appellate case or the rationale of the appellate court and thus will be hindered in formulating his habeas argument. Petition at 145–46. Also according to Thompson, until his direct appeal is final, it is premature to challenge ineffective assistance of appellate counsel. *Id*.

Thompson's argument must fail.  First, the "legal basis" for which he is being held has been resolved and is evidenced by the judgment and sentence in his case.  Therefore, a challenge to the legal basis for which he is being held is not premature.  Second, the fact that Thompson has two vehicles by which to possibly obtain relief, direct appeal and habeas corpus, does not implicate a due process violation. The fact that Thompson might get relief on direct appeal does not mean that he is prohibited from raising the same claim in a writ.

Further, direct appeal is the vehicle to challenge record-based claims; while state habeas is the vehicle for a petition is a vehicle for challenging non-

record based claims. *See In re McCann,* 422 S.W.3d 701, 717 (Tex. Crim. App. 2013). As such, it is generally not important to know which claims have been raised in a direct appeal in order to properly file a complete state habeas writ and *vice-versa.* And to the extent that it is, the application for writ of habeas corpus is not required to be filed until after the State's brief on direct appeal has been filed. Thus, it will obviously be filed subsequent to the filing of the applicant's appellate lawyer's brief—and as explained below, that is exactly the situation in the instant proceeding. Therefore, Thompson's state habeas attorney had adequate opportunity to review the arguments made by Thompson's appellate counsel and make his own arguments regarding ineffective assistance of appellate counsel in his writ application. In addition, Thompson was, in fact, allowed to present a subsequent writ of habeas corpus and could have obtained relief on his claims had he met the subsequent petition requirements. Tex. Crim. Proc. Art. 11.071 § 5(a); SHCR-03.

Further, Thompson makes no substantive or compelling showing as to how the dual track appeal and habeas process prejudiced him. Thompson claims that he was somehow prevented from bringing his current claim that his appellate counsel was ineffective for failing to raise a *Brady* violation in his initial habeas applications. However, Thompson filed both of his state habeas applications after his direct appeals in the requisite proceedings. Appellant's 2000 Brief (file-stamped on May 26, 2000); SHCR-01 (file-stamped on October

104

30, 2000); Appellant's 2006 Brief (file-stamped September 19, 2006); SHCR-02 (file-stamped on June 27, 2007). In addition, Thompson contends that if he had the benefit of the direct appeal opinion, he could have challenged the court's denial or "refusal to rule" on whether there was harm from the initial *Massiah* violation. However, as explained previously, that claim was either raised and rejected by the CCA or not properly raised—in any event, Thompson was not in any way prevented from raising the claim. *See above*, Section III. In addition, and perhaps more importantly, Thompson suffered no harm because his ineffective assistance of appellate counsel claim and *Massiah*-related claims lack merit. *See above*, Section IV. Accordingly, the state habeas court properly determined, "[Thompson] fails to show that the provisions and requirements of [Texas Code of Criminal Procedure Article 11.071] prevented him from advancing meritorious habeas claims or that the statute is unconstitutional as applied." SHCR-01 257 (¶ 1).

Accordingly, because this claim represents a non-cognizable challenge to state habeas procedures and because he fails to show that the state court's denial of the claim was unreasonable, Thompson is not entitled to relief on this claim.

**XI.  The State Court Reasonably Rejected Thompson's Claims that His Trial Counsel Was Ineffective During the Guilt/Innocence Phase of His Trial.**

**A.  Thompson fails to show prejudice resulting from any these allegations because there was overwhelming evidence of his guilt.**

At the outset, before addressing Thompson's specific complaints, the Director emphasizes that all of Thompson's claims that his trial counsel was ineffective at the guilt/innocence phase of his trial must be denied because there was overwhelming evidence presented at trial of his guilt. *See Wilkerson v. Whitley*, 16 F.3d 64, 68, (5th Cir. 1994) (reasoning that if facts adduced at trial point so overwhelmingly to defendant's guilt that even the most competent attorney would be unlikely to have obtained an acquittal, defendant's IAC claim must fail). Throughout his petition, Thompson argues that there were two arguments at the guilt/innocence phase of his trial that could have created a different outcome: (1) that intervening medical care, not his actions, caused Hayslip's death; and (2) that Thompson did not intend to kill Hayslip. Regarding the first argument, as explained previously, the evidence at trial did not support a jury finding that intervening medical care caused Hayslip's death—and perhaps more importantly, there was no evidence of medical care that could have rendered Thompson's actions clearly insufficient to cause her death. *See above*, Section I; Tex. Penal Code § 6.04. Accordingly, the evidence establishing that Thompson caused Hayslip's death

106

was overwhelming, and there were no actions by trial counsel which could have created a reasonable probability of a different outcome at trial. *See Strickland*, 466 U.S. at 694.

Regarding the contention that Thompson did not intend to kill Hayslip, his act of shooting Hayslip in the face at point blank range and the testimony of Diane Zernia that he told her that he put a gun to Hayslip's cheek and said, "Bitch, I can shoot you too," before shooting her, conclusively prove otherwise. Thompson argues that there was "some evidence" supporting a theory that the shooting was an accident or that Thompson did not intend to kill Hayslip by shooting her. Petition at 75. However, in scouring the record, it is difficult to find such evidence. Thompson refers to defense counsel's cross-examination of Zernia and Debbie French's testimony to support his proposition. Petition at 75 (citing 11 RR 146, 148; 13 RR 10). However, during Zernia's cross-examination defense counsel asked questions about whether Thompson might have indicated that he accidentally shot Thompson, but Zernia never responded that he made such an indication. 11 RR 145–50. Moreover, as found by the state habeas court, upon prompting from defense counsel, Debbie French actually explicitly testified that Zernia did *not* tell her that Thompson said he accidently shot Hayslip. 13 RR 10–12; SHCR-01 229 (¶ 26). In any event this testimony combined with any action of trial counsel could not have overcome the overwhelming evidence that Thompson intended to kill Hayslip;

107

thus, Thompson fails to show that, but for any deficient performant of counsel, there was reasonable probability of a different outcome at trial. *See Strickland*, 466 U.S. at 694. Accordingly, the state court's determination that Thompson failed to show prejudice resulting from any of his IATC allegations was reasonable; as such, his claim must be denied. SHCR-01 259 (¶ 9).

## B. Trial counsel was not constitutionally ineffective for failing to properly use challenges and ask questions during jury selection.

### 1. Thompson's deficient performance claims related to punishment issues in the first trial are moot because he was granted a retrial on punishment; alternatively, counsel was not ineffective for failing to properly question prospective jurors.

Thompson contends that trial counsel, at his initial trial prior to remand on punishment, was ineffective for failing to question jurors appropriately regarding how Texas parole laws and victim-impact evidence presented at punishment would affect their answers on the Texas death-penalty special issues. Petition at 156–61. As explained above, Thompson's initial death sentence was overturned by the CCA; accordingly, Thompson could not have been harmed by ineffective questioning related to punishment issues. As such, the state habeas court properly determined that, "any alleged harm relating to trial counsel's failure to voir dire on victim impact evidence is moot." SCHR-01 at 235 (¶ 48). And while the state habeas court did not explicitly find so, any

deficient performance related to the discussion of parole laws and special issues during jury selection are likewise moot.

In addition, while the record shows that two of the jurors were not advised on the law related to parole for life-sentences during jury selection, the two jurors were informed that Thompson could receive the death penalty or a life sentence if found guilty. 7 RR 38–59, 85–102. Further, the court's charge included an explanation related to Thompson's parole eligibility. CR 205. Based on this record and counsel's affidavit, which the court explicitly held to be credible, SHCR-01 170 (attorney affidavit), the state habeas court determined that:

> The applicant fails to demonstrate deficient performance, much less harm, with respect to the instant ineffective claim regarding voir dire and parole law because the jurors in the instant case were thoroughly advised of issues relevant to the trial of the instant case. The applicant does not establish that jurors were unable to understand the relevant legal burdens and distinctions, follow the law and consider the evidence, or be fair to both the applicant and the State.

SHCR-01 234 (¶¶ 42 and 43). And regarding counsel's decision to forego questions about victim impact evidence during jury selection, the trial court explicitly held that "counsel strategically conducted his portion of voir dire in order to select jurors that would give the defense the best chance at trial." *Id*. at 235 (¶ 46). Thompson fails to demonstrate that counsel delivered deficient

performance in these regards or that he was prejudiced. Accordingly, the state court's determination on these assertions was reasonable.

### 2. Counsel was not constitutionally ineffective for failing to exercise peremptory strikes on jurors Rogers and Blassingame.

Thompson further contends that defense counsel made "some incompetent choices" by failing to exercise peremptory strikes against jurors Harrell Rogers and Maria Blassingame. Petition at 161–65. Specifically, Thompson contends that defense counsel should have used a strike against Rogers because Rogers had seen prosecuting attorney Vic Wisner personally at a health club and was married to an employee of the Harris County District Attorney's office; and he argues that defense counsel should have used a strike on Blassingame because she had been the victim of assault and domestic abuse. Petition at 161–63.

The Supreme Court has explained that the determination on juror bias is essentially one of credibility, and therefore largely based on the demeanor of the jurors at jury selection. *Patton v. Yount*, 467 U.S. 1025, 1038 (1984). It follows that the attorneys and trial court are in the best position to evaluate potential bias. Moreover, the Fifth Circuit has held that attorneys do not render ineffective assistance when they decide for strategic reasons not to strike potential jurors even when jurors have explicitly admitted they were "probably" biased against the defendant. *Morales v. Thaler*, 714 F.3d 295, 305

110

(5th Cir. 2013) (citing *Torres v. Thaler*, 395 Fed. Appx. 101, 107–08 (5th Cir. 2010) (per curiam)). Accordingly, the Fifth Circuit has explained,

> If it is not IAC to decide, strategically, not to strike a potential juror who admits to being probably or possibly biased against the defendant, it would not be IAC to decide, for tactical reasons, not to strike a potential juror who is merely impliedly biased against the defendant but whom counsel thought to be fair and who swore that she could be fair and impartial.

*Id.* Here, neither of the complained-of jurors expressed during jury selection that they were biased against Thompson. And counsel explained his strategic reasons for foregoing peremptory strikes against these jurors in his credible affidavit.[37]

The state habeas court made findings detailing the statements made by Rogers and Blassingame. SHCR-01 235 (¶¶ 50–51) (Rogers), 237–38 (¶¶ 54–55). Regarding Rogers the court found:

> Trial counsel McCullough made a reasonable strategic decision not to exercise a peremptory strike on Rogers, and his decision was based on the following considerations[:] that Rogers was then in the process of getting a divorce from his wife who was a Harris County prosecutor; that counsel did not consider Rogers'[s] relationship with his soon to be ex-wife as significant as it might have been if he was happily married; and, that counsel thought that Rogers would be fair and consider all of the evidence, including the defense evidence, before reaching a verdict.

---

[37]    Counsel did indicate that he did "not recall all of the specifics of [his] thought process" regarding questions he asked during jury selection; however, he was able to provide details about his decisions not to strike Rogers and Blassingame. CR 170–71.

*Id.* at 237 (¶ 53) (citing trial counsel's affidavit). Regarding Blassingame, the court found:

> Trial counsel McCullough made a reasonable strategic decision to not exercise a peremptory strike on Blassingame based on her voir dire testimony. Trial counsel considered Blassingame an indecisive individual who might side with the defense in reaching a verdict if she had support from other jurors, and Blassingame seemed more desirable than the potential jurors that followed her.

*Id.* at 239 (¶ 57) (citing trial counsel's affidavit). Finally, the court found that:

> The voir dire testimony of Rogers and Blassingame establishes that both jurors understood various legal burdens and distinctions, could follow the law, consider the evidence, be fair to both parties, and participate as jurors in the instant capital murder case; accordingly, the applicant fails to establish prejudice relating to the instant ineffective claim.

*Id.* (¶ 58).

Indeed, the record supports the state court's findings as Roger's explained that he would not be affected by his wife's job and that his decision "is a pretty heavy moral burden to carry around with you." 4 RR 65–66. Moreover, Blassingame explicitly testified that she did not believe that everyone convicted of capital murder should be executed and would opt for a life sentence in some circumstances. 7 RR 90. She further explained that she needed to "go in with an open mind" and that she was a "little nervous" about whether she could "do the right thing." *Id.*

Here, other than simply disagreeing with both the determinations of trial counsel and the state habeas court, Thompson offers nothing to indicate

that either of these jurors were not fair and impartial. Particularly given the explicit Fifth Circuit precedent holding that trial counsel is permitted to strategically accept jurors even if they have an implied or admitted bias, Thompson fails to show that the state court unreasonably determined that counsel was not deficient for foregoing strikes against Rogers or Blassingame, or that Thompson was not prejudiced by their inclusion on the jury. *See Strickland*, 466 U.S. at 689, 692–94; *Morales*, 714 F.3d at 305.

### C. Trial counsel was not constitutionally ineffective for failing to object to the admission of extraneous offense evidence.

Thompson contends that counsel was ineffective for failing to immediately object to the testimony of Lisa Gonzalez on the basis that it related to inadmissible extraneous offenses. Petition at 165–69. Lisa Gonzalez testified that she lived with Thompson and Hayslip. 11 RR 188–90. She explained that Thompson would get angry with Hayslip and that when he got angry, "at one point he went out in the garage and threw a lot of things and broke a couple of things," that he dented a refrigerator by kicking it, and that he put five holes in a wall. *Id.* at 191. Defense counsel objected to this testimony on the basis that it violated his motion in limine with regard to extraneous offense evidence. *Id.* A hearing was then held outside the presence of the jury, at which the prosecutor explained that he anticipated that Gonzalez would testify about acts of violence Thompson committed against Hayslip when he

113

was angry; the trial court overruled defense counsel's objections to this anticipated testimony, but explained that Gonzalez was barred from making statements that constituted hearsay. *Id.* at 191–95. The jury then returned to the court room, and Gonzalez testified regarding violent altercations between Thompson and Hayslip. *Id.* at 195–210. Thompson contends that his counsel was ineffective for failing to object to Gonzalez's testimony, prior to the conference held outside the presence of the jury, about the damage Thompson caused to the garage when he was angry. Petition at 165–69.

In response to this claim, the state habeas court relied on Article 38.36(a) of the Texas Code of Criminal Procedure which states:

> In all prosecutions for murder, the state or the defendant shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense.

SHCR-01 241 (¶ 65). The court concluded that "[t]rial counsel was not ineffective for failing to object and/or preserve error regarding the State's properly admitted evidence of the applicant's violent acts involving complainant Hayslip at guilt-innocence." *Id.* at 259 (¶12) (citing *Shaw v. State*, 530 S.W.2d 838 (Tex. Crim. App. 1976) (evidence that defendant had previously hit, threatened, and shot at victim held admissible at guilt-innocence phase of murder trial); *Alford v. State*, 505 S.W.2d 813, 814 (Tex.

114

Crim. App. 1974) (in murder prosecution, evidence that the defendant attempted to choke his estranged wife to death five months before he killed her ruled admissible)).

As an initial matter, the state habeas court explicitly found that trial counsel was not ineffective for failing to object this testimony because it was admissible under state law. Accordingly, Thompson's claim is not cognizable on federal habeas review because it clearly challenges the state habeas court's determination of the statements admissibility under its own law. *See Ries v. Quarterman*, 522 F.3d 517, 531 (5th Cir. 2008) (explaining that trial counsel's performance was not ineffective for failing to object to a statement by the prosecutor that the habeas court deemed was admissible under state law, and explaining that it could not review the state habeas court's interpretation of state law). This claim therefore must be dismissed.

Further, the state court's determination was reasonable under Texas law. In his petition Thompson contends that the trial court improperly relied on Article 38.36(a) and on Texas case law, allowing for the admission of evidence related to the prior relationship between the defendant and the victim, because the damage caused by Thompson to the garage represented "six acts of criminal mischief" that related to "what Thompson would do when he got angry." Petition at 169. However, it is entirely clear from the context of Gonzalez's testimony that she was referring to what Thompson would do when

115

he got angry *with Hayslip*. Accordingly, the state court reasonably determined that this was testimony related to the "previous relationship existing between the accused and the deceased" and to "facts and circumstances going to show the condition of the mind of the accused at the time of the offense"; therefore, the state court properly found that the testimony was admissible under Texas law. *See* Tex. Code Crim. Proc. 38.36(a).

Further, as explained above, there was overwhelming evidence that Thompson intended to kill Hayslip when he shot her in the face. And any damage suffered by Thompson at guilt/innocence from Gonzalez's testimony occurred when she recounted his violent altercations with Hayslip, not from any reference to acts of "criminal mischief." For the foregoing reasons, the state court reasonably determined that defense counsel was not deficient in this regard and that Thompson was not prejudiced by any deficient performance.

**D.   Trial counsel was not constitutionally ineffective for failing to object during closing argument to the prosecution's characterization of Dr. Radalat's testimony.**

Thompson contends that his counsel was ineffective for failing to object at closing argument to the State's characterization of the testimony of his medical expert, Dr. Radalat. Petition at 169–72. Specifically, he complains about the prosecutor arguing twice during closing argument that Dr. Radalat admitted that Thompson was guilty. 13 RR 21, 30. The prosecutor subsequently explained that Dr. Radalat had criticized the doctors who treated

Hayslip, but that he had been paid "for second guessing people." *Id* at 30–31. The prosecutor then stated, "But he finally admitted to you that the wounds would be fatal if left untreated. You got causation. The defendant is guilty." *Id.* at 31.

Counsel is not required to file frivolous motions or make frivolous objections. *See Green v. Johnson,* 160 F.3d 1029, 1037 (5th Cir. 1998). Further, under Fifth Circuit precedent, when claiming improper comments by the prosecutor, the petitioner carries a substantial burden. *United States v. Diaz-Carreon*, 915 F.2d 951, 956 (5th Cir. 1990). Under well-established Texas law, the following are proper areas for closing argument: (1) summary of the evidence; (2) reasonable deductions from the evidence; (3) response to opposing counsel's argument; and (4) pleas for law enforcement. *See Jackson v. State*, 17 S.W.3d 664, 673 (Tex. Crim. App. 2000). In addition, "[e]ven when a prosecutorial argument exceeds the permissible bounds of the approved areas, such will not constitute reversible error unless, in light of the record as a whole, the argument is extreme or manifestly improper, violative of a mandatory statute, or injects new facts harmful to the accused into the trial proceeding." *Wesbrook v. State*, 29 S.W.3d 103 (Tex. Crim. App. 2000).

Again, as an initial matter, Thompson fails to state a cognizable federal habeas claim because he challenges the state court's finding that trial counsel was not deficient on the basis that the prosecutor's statements were admissible

under state law. *See Ries*, 522 F.3d at 531 (explaining, in response to a very similar argument, that trial counsel was not deficient for failing to object to a statement by the prosecutor that the habeas court deemed was admissible under state law, and explaining that it could not review the state habeas court's interpretation of state law). Accordingly, this claim should be dismissed.

Alternatively, the claim should be denied because the state court's determination was reasonable under state law. Dr. Radalat initially testified on direct examination that he believed Hayslip's initial wound was survivable and "not life threatening in itself." 12 RR 232. However, immediately following this statement he further explained that Hayslip had been shot in a vital part of the body, that she was bleeding, her jaw was broken, and that she was "probably aspirating blood into her lungs." *Id*. at 232–33. As such, he concluded that "all of those are life threatening to some extent if not properly handled. And that makes it a critical wound." *Id*. at 233.

Moreover, on cross-examination, Dr. Radalat explicitly stated that "[t]he intermediate long term conditions without any medical intervention, which I suppose is what you mean when you say in and of itself . . . Over the long term as I previously testified it would probably be fatal." 12 RR 255–56. Further, Dr. Radalat said "no" when asked on cross-examination if the doctors' actions caused Hayslip's death. 12 RR 256. Even Thompson's own attorney stated in

his affidavit provided for state habeas review that "[u]nfortanately, Dr. Radalat's [sic] was not a strong witness on cross-examination by the state." *Id.* at 170. Accordingly, the state court reasonably determined that the State's argument was "proper as a summary of the evidence and/or a reasonable deduction of evidence elicited at trial." SHCR-01 243 (¶69) (citing *Jackson*, 17 S.W.3d at 673).

Further, as explained above, there was overwhelming evidence that Thompson caused Hayslip's death and that intervening medical care did not render his actions insufficient to cause her death. *See* Tex. Penal Code § 6.04. Accordingly, the state court correctly found that "[t]he applicant was not prejudiced by the complained-of arguments; the arguments were not extreme, manifestly improper, violative of a mandatory statute, and did not inject new facts harmful to the applicant into the trial proceedings." *Id.* (¶ 70) (citing *Wesbrook*, 29 S.W.3d at 115).

Thompson fails to show that the state court's determination on deficient performance or harm was unreasonable. Accordingly, his claim must be denied.

### E. Trial counsel was not constitutionally ineffective for failing to request a lesser-included offense instruction as to the murder of Dennise Hayslip.

Thompson was charged with capital murder under Texas Penal Code Section 19.03(a)(7)(A), which required the state to prove that Thompson

119

committed murder as described in Texas Penal Code 19.02(b)(1), and that he killed two people in the same criminal transaction. The jury was also instructed to find Thompson guilty of the lesser-included offense of murder if it determined that Thompson had murdered Cain, but had not intentionally and knowingly murdered Hayslip. CR 192. Nonetheless, Thompson argues that his trial counsel was ineffective because he should have requested an instruction on the lesser-included offenses of aggravated assault under 22.01(a)(1), murder under 19.02(b)(2), and felony murder under 19.02(b)(3) for Thompson's actions in shooting Hayslip in the face. Petition at 172–78. However the state court reasonably rejected this claim. The evidence in the record did not support any of these instructions, he was not entitled to a lesser-included offense instruction on the aggravating murder of his capital murder charge, and his trial counsel's decision not to request these instructions reflected a reasonable trial strategy.

Texas courts employ a two-step analysis for determining whether a lesser-included-offense instruction is required: (1) the lesser included offense must be included within the proof necessary to establish the offense charged, and (2) there must be some evidence in the record that if the defendant is guilty, he is guilty of only the lesser included offense. *Rousseau v. State*, 855 S.W.2d 666, 672–73 (Tex. Crim. App. 1993). Here, because there was no evidence supporting a theory that Thompson *accidentally* shot Zernia,

Thompson would not have been entitled to a lesser-included offense instruction had his counsel requested one. *See id*.; *see above*, Section XI(A). In response to Thompson's claim that the trial court erred by failing to include a lesser-included offense instruction, the state habeas court found: "[Thompson's] criminal conduct towards complainant Hayslip was committed intentionally and knowingly. Evidence did not exist in the record that [Thompson's] shooting of Hayslip was an accident; that [Thompson] intended only one victim; or that [Thompson] knew with a reasonable certainty that only one person would die." SHCR-01 230 (¶ 28).  And regarding his ineffective assistance claim the court found, "The evidence presented at trial did not support the submission of the lesser-included offense instructions urged in the instant habeas application; accordingly, [Thompson] was not prejudiced by counsel's failure to request such instructions at trial." SHCR-01 243 (citing ¶¶ 23–28). Thompson fails to show that these findings were unreasonable.

Moreover, even assuming *arguendo* the evidence supported any of these alternative theories as to the shooting of Hayslip, Thompson provides no legal support for the proposition that he was entitled to a lesser-included offense instruction on the aggravating murder in his capital murder case. The record is instead clear that the jury was properly instructed that if it found Thompson had committed the murder of Cain, the predicate murder, but was only guilty an aggravated assault, or some crime other than murder, against Hayslip, it

should find Thompson guilty of the lesser-included offense of murder. CR 192. Thompson properly cites *Beck v. Alabama*[38] for the proposition that the jury must be permitted to consider a verdict of guilt for a lesser-included noncapital offense if the evidence supports such a verdict. Petition at 173. However, *Beck* does *not* stand for the proposition that the jury must be instructed on potential lesser-included offenses for a crime that aggravates murder to capital murder—and Thompson's claim that it does is barred pursuant to the *Teague* non-retroactivity doctrine. *See Goeke*, 514 U.S. at 118.

Indeed, in the present case, defense counsel appropriately insured that the trial court complied with *Beck* by presenting the jury with a clear choice: if it found Thompson guilty of knowingly and intentionally murdering both Cain and Hayslip, it was to find Thompson guilty of capital murder; if it were to find Thompson guilty of murdering Cain but not Hayslip, it was to find Thompson guilty of murder. *Id.*; 13 RR 39 (counsel's request for a lesser-included offense instruction). Further, Thompson's assertion that the jury was compelled to return a verdict for capital murder because it had no avenue to find Thompson guilty of the aggravated assault of Hayslip is illogical and entirely conclusory. Petition at 17–78; *see Schlang*, 691 F.2d at 799. Accordingly, defense counsel

---

[38]     447 U.S. 625 (1980).

delivered effective assistance by properly asking for the appropriate lesser-included offense of murder. *See Strickland*, 466 U.S. at 689.

In addition, as Thompson appears to admit in his petition, had the jury found that Thompson committed the murder of Hayslip under the theories described in Sections 19.02(b)(2) or 19.03(b)(3), he still would have been guilty of capital-murder under Section 19.03(a)(7)(a). Petition at 174. This is because the capital murder statute explicitly reads that while the predicate murder must be committed as defined under Section 19.02(b)(1), the aggravating murder, under Section 19.03(a)(7)(A) is subject to no such requirement. Tex. Pen. Code 19.03(a), 19.03(a)(7)(A) (explaining a person who commits murder as defined by Section 19.02(b)(1) is guilty of capital murder if "the person murders more than one person: during the same criminal transaction"); *cf. Ex Parte Milner*, 394 S.W.3d 502, 507 (Tex. Crim. App. 2013) ("A plain reading of the capital-murder statute shows that, in order to be convicted pursuant to Section 19.03(a)(7)(B), a defendant must commit both a murder under Texas Penal Code Section 19.02(b)(1) and at least one additional murder during different criminal transactions, but pursuant to the same scheme or course of conduct.").

Nonetheless, Thompson makes the entirely unsupported assertion that because the indictment alleged that the murder of Hayslip was committed intentionally or knowingly, a murder under a lesser-included offense theory

could not have been the aggravating murder under Section 19.03(a)(7). Petition at 174. To the contrary, as is clear from the statute, had any lesser-included murder offense instruction for Hayslip been supported by the evidence and found to be true by the jury, it still would have resulted in a conviction for capital murder. *See* Tex. Penal Code § 19.03(a)(7)(A). As such, had trial counsel requested instructions on these alternative definition of murder, it only would have afforded the jury more avenues for convicting Thompson of capital murder. Accordingly, trial counsel's decision in this regard was not only reasonable, but, in fact, effective trial strategy. *See Strickland,* 466 U.S. at 689.

And for all of the reasons listed above, Thompson clearly fails to show that had counsel requested these lesser-included offense instructions, the outcome of the trial would have been different. *See id.* at 694. More specifically: (1) due to the overwhelming evidence of Thompson's intent to kill Hayslip, the jury would not have determined that Thompson committed these lesser-included offenses; (2) the request for any lesser-included offense would not have been granted because it was not supported by the evidence and because it was not appropriate for the aggravating murder; (3) the absence of a lesser-included offense as to Hayslip did not cause the jury to find Thompson guilty of capital-murder; and (4) even if the jury had believed that Thompson was guilty of the murdering Hayslip under the theories described in Section19.02(b)(2) or 19.02(b)(3), he still would have been convicted of capital

murder. For the foregoing reasons, Thompson fails to show that the state court's adjudication of this claim was unreasonable.

**F.    Thompson's claim that his trial counsel was ineffective for failing to object to the admission of the murder weapon is procedurally barred and meritless.**

Thompson also complains that his trial counsel should have objected, at guilt/innocence, to the admission of the gun used to murder the victims because it was discovered as a result of a Sixth Amendment violation. Petition at 178–79. However, because Thompson did not raise this claim on direct appeal or in any of his state habeas applications, and the state court would now refuse to rule on its merits, the claim is likewise procedurally barred from federal habeas review. *See Coleman*, 501 U.S. 722, 735 n.1. Thompson fails to argue cause or prejudice for his procedural default; accordingly, this claim should be dismissed under the federal procedural default doctrine. *Id.* at 749–50.

Alternatively, as the Director has previously explained, the murder weapon was not inadmissible—accordingly, his trial counsel could not have been ineffective for failing to object its admission. *See Green*, 160 F.3d at 1037 (explaining that "failure to make a frivolous objection does not cause counsel's performance to fall below an objective level of reasonableness"); *see above*, Section II(b). Further, Thompson admits that the facts that comprise the basis for his Sixth Amendment violation claim related to the discovery of the gun were not available until Gary Johnson testified at Thompson's original

punishment hearing. Petition at 179. As such, counsel could not have been deficient for failing to object to the admission of the gun at guilt/innocence. Finally, the Director has previously explained that even if the admission of the gun was improper, it and the testimony related to its admission were harmless; for the same reasons, any failure of trial counsel to object the admission of the gun did not prejudice Thompson. *See Strickland,* 466 U.S. at 692–94; *see above*, Section II(C). Accordingly, even if it is not procedurally barred, this claim must be denied.

## X.    The State Court Reasonably Rejected Thompson's Claim that the Trial Court's Denial of his Request for a Continuance Prior to His Retrial on Punishment Deprived Him Of Due Process of Law and His Right to Effective Counsel.

Thompson contends that that the state court violated his constitutional rights by denying two motions for continuance prior to the start of his retrial on punishment. Petition at 183–216. He argues that these denials harmed him at his punishment retrial because they prevented his counsel from: (1) adequately investigating Robin Rhodes, which would have allowed him exclude his testimony; and (2) presenting additional expert testimony to bolster the mitigation evidence that Thompson suffered from brain damage. *Id*. This court should deny this claim because it is, in part, procedurally barred and entirely meritless.

## A.    Relevant Timeline

The state habeas court provided the relevant timeline of trial counsel's

preparation prior to Thompson's retrial on punishment:

> Ellis McCullough, who represented the applicant in his initial capital murder trial conducted in 1999, was originally appointed lead counsel in the punishment retrial of the instant case.

> On **January 21, 2005**, the trial court appointed Terrence Gaiser to represent the applicant as second chair counsel in the instant retrial on punishment.

> On **July 25, 2005**, the applicant filed a pro se motion asking the trial court to dismiss appointed counsel McCullough because he was not qualified under the Fair Defense Act to proceed as counsel in a capital murder case where the State sought the death penalty ([CR-R at 3; 2 RR. 5]).

> On **August 4, 2005**, trial counsel Gaiser and [McCullough[39]] filed numerous pretrial motions, including motions relevant to the development of mitigating evidence, and the trial court granted counsels' request for a mitigation specialist, investigator, and toxicology examination ([CR-R at 99–106]).

> On **August 31, 2005**, the trial court granted counsel Gaiser's and Johnson's pretrial motions requesting funding for expert assistance in the area of toxicology and psychology, and a motion to permit an examination of the applicant by neuropsychologist Daneen Milam ([CR-R at 113–21]).

> On **September 15, 2005**, McCullough was relieved as lead counsel, and the trial court appointed Kyle Johnson as second chair counsel, elevating Gaiser to first chair, and the trial court advised the applicant that Gaiser and Johnson would represent the applicant as lead counsel and second chair counsel in the instant punishment hearing ([2 RR-R 6; CR-R at 136, 249]).

---

[39]    The state habeas court listed Johnson as filing the motion with Gaiser; however, Johnson had not yet been appointed.

On **September 15, 2005**, the trial court granted trial counsels' motions for funds to retain psychologist Carl Gacono and for Gacono to evaluate the applicant at the Harris County Jail ([CR-R at 126–28, 132–34]).

Trial counsel Gaiser and Johnson retained investigator Millie Steinle and mitigation specialist Gina Vitale ([CR-R at 191]).

On **September 29, 2005**, trial counsel Gaiser filed a motion for continuance stating that jury selection was scheduled to commence on September 30, 2005; that testimony was set to begin on October 24, 2005; that second chair counsel Kyle Johnson was appointed on September 15, 2005, and had a limited time to prepare for the instant punishment retrial; and, that Gaiser and Johnson required a minimum of an additional ninety days to assimilate the evidence presented during the original trial and investigate potential mitigation evidence ([CR-R at 171–74]).

Also, on **September 29, 2005**, the trial court conducted a hearing on the defense's pretrial motions, including an initial motion for continuance, during which trial counsel Gaiser stated that he was recently elevated to first chair, and Johnson was recently appointed to the applicant's case as second chair counsel and had a limited time to prepare for trial; Gaiser stated that he and Johnson lost time in their offices due to the threat of a hurricane; and, prosecutor Vic Wisner stated that counsel Gaiser had been the de facto lead counsel on the case since his appointment, that Wisner had worked with Gaiser on discovery over the last two months, that Wisner had met with Gaiser and his expert, and, that the State's file had been available to Gaiser and his experts "at length" ([CR 175; 2 RR-R 6–9]).

[On **September, 29, 2015**,] [t]he trial court denied the applicant's initial motion for continuance ([CR-R at 175; 2 RR-R 6–9]).

On **October 5, 2005**, defense counsel filed a notice naming Dr. Paul Radelet and Carl Gacono, Ph.D., as potential experts to testify during the applicant's capital murder punishment retrial ([CR-R at 186]).

On **October 24, 2005**, trial counsel Gaiser filed a second motion for continuance alleging that testimony in the instant punishment hearing was scheduled to begin on October 24, 2005; that the defense needed a continuance in order to investigate State's witness Robin Rhodes; and, that the defense wanted to investigate whether Rhodes participated in a previous capital murder trial and look for additional impeachment evidence regarding Rhodes ([CR-R at 209–14]).

[On **October 24, 2005**,] [t]he trial court denied the defense's second motion for continuance ([CR-R at 209–14]).

SHCR-01 245–48 (¶¶ 82–95) (reordered to reflect chronology).

### B. Thompson's argument that the trial court's denial prevented him from excluding Rhodes's testimony is procedurally barred.

In grounds 2 through 4 of his second state habeas application, Thompson argued that the trial court violated his constitutional rights by denying his continuance. SHCR-02 9–48. Thompson primarily argued that the denial affected his attorney's performance at closing argument; however, in *one sentence* he also stated that "more time could have been helpful in being able to impeach Rhodes." SHCR-02 13. In its findings of fact, the trial court explicitly determined that the denial of the continuance did not prejudice Thompson because counsel was able to successfully cross-examine Rhodes. SHCR-01 250 (¶ 105). However, Thompson did not argue that the denial prevented him from developing a *Massiah* violation claim. This is unsurprising considering that Thompson did not raise a claim that Rhodes's testimony was inadmissible based on *Massiah* in his initial state habeas writs. Because the

Thompson has not raised this claim in state court and the state court would now refuse to rule on its merits, the argument is likewise procedurally barred from federal habeas review. *See Coleman*, 501 U.S. 722, 735 n.1.

## C. The state court reasonably denied this claim.

The Supreme Court has held that "broad discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the right to the assistance of counsel.[40] *Morris v. Slappy*, 461 U.S. 1, 11–12 (1983) (citing *Ungar v. Sarafite*, 376 U.S. 575, 589, (1964)). "When a denial of a continuance is the basis for a habeas petition, the petitioner must show an abuse of discretion that was so arbitrary and fundamentally unfair as to violate the constitutional principles of due process.[41] *Newton v. Dretke*, 371

---

[40]   In addition, Thompson cites Texas state law regarding motions for a continuance. Petition at 188 (citing Tex. Code Crim. Proc. art. 29.03). However, to any extent Thompson's claim challenges the state court's application of its own law, he fails to raise a claim entitling him to federal habeas relief. *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (stating that the Court has repeatedly held that "federal habeas corpus relief does not lie for errors of state law.")

[41]   Thompson contends that the court's denial deprived him of due process and the right to present a complete defense under *Crane v. Kentucky*, 476 U.S. 683 (1986). Moreover, Thompson frequently cites Sixth Amendment case law. While the Supreme Court has held that the denial of continuance, in some circumstances, could deprive a defendant of his due process rights by violating his right to effective assistance of counsel, it has not extended any Sixth Amendment case law or *Crane v. Kentucky* to an analysis of whether or not a court commits a due process violation. While some of this case law might be instructive, the Director contends that finding a Sixth Amendment violation on this basis would constitute a "new rule" as is prohibited by the *Teague* non-retroactivity doctrine.

F.3d 250, 255 (5th Cir. 2004) (citation omitted); *Hicks v. Wainwright*, 633 F.2d 1146, 1148 (5th Cir. Unit B 1981) (citations omitted). "If abuse of discretion is demonstrated [concerning the denial of a motion for continuance], the [habeas] petitioner must sustain the burden common to due process claims that 'there is a reasonable probability that the verdict might have been different had the trial been properly conducted.'" *Schrader v. Whitley*, 904 F.2d 282, 288 (5th Cir. 1990).

As an initial matter, Thompson's complaint that that the trial court abused its discretion by failing to grant the October 24, 2016, continuance, which asked for more time to gain information on Robin Rhodes's previous informant status entirely lacks merit because he fails to show any resulting harm. As has already been extensively discussed in the Director's response, no increased preparation could have supported a successful objection to Rhodes's testimony on *Massiah* grounds. Moreover, as explained by the state habeas court, Rhodes was sufficiently cross-examined with available information regarding his prior informant activities and the benefits he received for his testimony in this case—any additional information would have been superfluous and any inability to gather more impeachment information was not prejudicial. *See* SHCR-01 250 (¶ 104); *see above* Section IV.

In addition, Thompson's contention that the trial court violated his constitutional rights by denying his September 29th motion for continuance

because he needed more time to prepare a mitigation defense lacks merit. Thompson cannot show that his attorneys lacked appropriate preparation time or that any lack of preparation time adversely affected his defense. As detailed above, Thompson's first-chair counsel, Terrence Gaiser, was appointed to this case as second-chair counsel on January 21, 2005, more than nine months before the start of voir dire for Thompson's retrial on punishment. Gaiser worked with Ellis McCullough as first-chair, who had prepared Thompson's defense for his original punishment trial in 1999, until Thompson filed a pro se motion to remove counsel on July 25, 2005, and McCullough was relieved as lead counsel on September 15, 2005.[42] The record therefore reveals that lead counsel had been working on Thompson's case for over nine-months, had access to the attorney that defended Thompson against the death penalty prior to remand, and had consulted with multiple experts.

Here, while Thompson spends pages of his petition citing case law explaining what constitutes effective representation, he simply fails to point to any part of the record indicating that his counsel was unprepared. Thompson agrees that counsel properly chose the two themes of drug-use and brain

---

[42]    The trial court held a hearing to consider the motion for continuance on September 29, 2005, the same day the motion was filed. 2 RR-R. At the hearing, the prosecutor explained that he had been dealing with Gaiser exclusively for the months he had been appointed to the case, and that he had at least two "lengthy sessions" by himself and with his expert. *Id.* at 7–8. He stated that Gaiser had been "the de facto first chair since we have been getting this case ready for trial" and that he had no dealings with McCullough since the case was set for trial. *Id.*

damage that constituted a strong mitigation case. Petition at 200. However, he contends that he could have presented more evidence to bolster the existing testimony and further explain the effect of Thompson's brain damage.

To the contrary, at trial, Dr. Daneen Milam testified that she had administered the Halstead-Reitan battery of tests, and that based on these tests, she concluded that Thompson had brain damage. 19 RR-R 49–52. Dr. Milam referred to the Halstead-Reitan tests as the "gold standard" of neurological tests, and stated that she had provided multiple books on the subject to defense counsel. *Id*. at 48. Dr. Milam further described Thompson's brain damage as "diffuse and mild," explaining that the damage affected everything but not to the point where he could not function. *Id*. at 51–52. Dr. Milam then testified explicitly that physical injury to Thompson's brain may or may not be seen on a CAT scan or MRI, and that a physical examination was not necessary for the tests she administered. *Id*. at 60–62. Dr. Milam was cross-examined by the State regarding the lack of physical testing to support her findings; in response, in response Dr. Milam defended her previous statements about the tests, and explained that she had subjected Thompson to multiple physical tests and that her opinion was not subjective but instead based on objective data. *Id*. at 62–72.

Despite this testimony offered by Dr. Milam in support of the theory that Thompson suffered from brain damage, Thompson argues that with increased

preparation time, "it would have dawned on [counsel] that they either needed to (1) shore up Milam's opinion as to the stand-alone significance of the Halstead-Reitan Battery, or (2) obtain expert opinions from other experts to head off the prosecutor's eventual line of attack on Milam." Petition at 204. In other words, Thompson does not contend that more tests could have been administered or any opinion specific to Thompson could have been offered to rebut the prosecution's line of attack; rather, he simply asserts that other doctors *might* have agreed with Milam that the Halstead-Reitan test is significant proof of brain damage even absent of physical proof of brain damage, and that documentary evidence supports Milam's explicit testimony about the tests.

As an initial matter, as explained by the state habeas court, this claim is speculative. SHCR-01 249 (¶ 99). Thompson asserts that had counsel had more time, he could have called experts to agree with Milam that the Halstead-Reitan battery of tests were reliable; however he fails to show that these experts were available to testify, how they would have testified to bolster Milam's testimony, or even provide any assurance that they might not disagree with Milam's assessment of Thompson. *See Hicks*, 633 F.2d at 1149 (explaining that one of the factors in determining whether a trial court abused it's discretion by denying a continuance is "the specificity with which the defense is able to describe [the witnesses'] knowledge or testimony"); *cf. Day v.*

*Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009) (reasoning that a petitioner seeking to show ineffective assistance of counsel for failure to call witnesses must "name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense"); *Wong v. Belmontes*, 558 U.S. 15, 20 (2009) (explaining that when evaluating prejudice in an ineffective assistance context a reviewing court must "consider all the relevant evidence that the jury would have had before it if [the inmate] had pursued a different path—not just the . . . evidence [the inmate] could have presented, but also the . . . evidence that almost certainly would have come in with it.")

Moreover, Thompson also contends that with more time, counsel could have discovered documentary evidence of research studies to support the reliability of the Halstead-Reitan tests. However, it is clear, that counsel was sufficiently aware of the documentary evidence as Milam explicitly testified that she had provided counsel with multiple books on the subject. 19 RR 48–49. Given that counsel had been made aware of this documentary evidence and clearly had time to contact multiple experts, it is clear that Thompson's attorney had sufficient time to gather information about the Halstead-Reitan tests and made a strategic decision not use it. However, likely because this decision was reasonable and not prejudicial under *Strickland*, Thompson does

135

not argue that his counsel was ineffective, but instead blames the trial court for counsel's decision not to present more evidence to bolster Dr. Milam's testimony. Ultimately, Thompson cannot show that the trial court's denial of his motion for continuance prevented his attorney from presenting evidence bolstering Dr. Milam's testimony, nor that such evidence would have been beneficial to his case.

In addition, even if defense counsel was prevented from presenting more evidence supporting the reliability of the Halstead-Reitan battery of tests, Dr. Milam only testified that that Thompson had "mild and diffuse" damage and explicitly testified that he could still function. It is clear that if Dr. Milam had any weakness as a witness, it was that she admitted that the tests did not reveal brain damage that prevented Thompson from functioning, not in her inability to defend the Halstead-Reitan tests. Thompson has not argued that he would be able to secure any further testing indicating that his brain damage was more significant than Dr. Milam testified—rather he simply speculatively asserts that with more time he would have had the opportunity to gather more information; however, even if that were true, such information would have been cumulative of Dr. Milam's testimony. Accordingly, he fails to show that but for the trial court's failure to grant the continuance, the outcome of the trial would have been different. *See Schrader*, 904 F.2d at 288.

In this regard, the state habeas court found:

[Thompson]'s assertions of prejudice, due to the trial court's denial of the defense's motions for continuance, are speculative. [Thompson]'s habeas assertions that defense counsel might have been able to call an expert, such as Dr. Reitan, the developer of the Halstead-Reitan Battery, to shore up Milam's testimony and/or present documentary evidence regarding the validity of the Halstead-Reitan Battery, are purely speculative.

[Thompson]'s claim that trial counsel could have shored up Dr. Milam's testimony with documentary evidence of the validity of the Halstead-Reitan Battery fails because Dr. Milam had already provided trial counsel with documentary evidence concerning the Halstead-Reitan Battery ([19 RR-R 48]).

Based on Dr. Milam's trial testimony concerning the futility of obtaining a MRI or CAT scan to support her diagnosis of [Thompson]'s alleged brain damage, [Thompson] fails to demonstrate prejudice regarding his assertion that the trial court's denial of the defense's motion for continuance prejudiced counsels' ability to present physical evidence of [Thompson]'s alleged brain damage ([19 RR-R 48, 71–72]).

The following indicates that trial counsel investigated the potential benefit of presenting other experts during the instant retrial: the defense presented Dr. Katherine McQueen, M. D., who testified regarding [Thompson]'s alcohol and drug dependencies and their effects on his life; the defense's October 5, 2005 notice of potential experts suggests that counsel considered presenting two additional medical experts, Dr. Paul Radelet and Carl Gacono, Ph.D.; and, the defense obtained funds to retain psychologist Carl Gacono and for Gacono to evaluate [Thompson] at the Harris County Jail ([CR-R at 126–28, 132–34, 186]).

SHCR-01 248–49 (¶¶ 99–102) (case citations omitted). As explained above, Thompson fails to demonstrate that the state court's decision was unreasonable. Accordingly, his claim must be denied.

### D.  Thompson's renewed request for funding must be denied.

As noted in his petition, this court previously denied Thompson's request for funding to hire a new mitigation specialist. Petition at 212; ECF Nos. 15, 24. However, in his federal petition Thompson renews his request for funding.

The decision to appoint an investigator or expert lies within this Court's discretion. *Hill v. Johnson*, 201 F.3d 481, 487 (5th Cir. 2000); *Fuller*, 114 F.3d at 502. But a petitioner seeking such an appointment must make a threshold showing that the services are "reasonably necessary." 18 U.S.C. § 3599(f); *Clark v. Johnson*, 202 F.3d 760, 768 (5th Cir. 2000).[43] The Fifth Circuit has construed "reasonably necessary" to mean that a petitioner "must demonstrate a 'substantial need' for the requested assistance." *Riley v. Dretke*, 362 F.3d 302, 307 (5th Cir. 2004) (quoting *Clark*, 202 F.3d at 768), and *Fuller*, 114 F.3d at 502)).

In determining what is reasonably necessary, courts have looked at whether the proposed services can be tied to viable claims of constitutional violations. *Fuller*, 114 F.3d at 502. For this reason, a denial of funding has been upheld when a petitioner has (a) failed to supplement his funding request with a viable constitutional claim that is not procedurally defaulted, or (b) when the request would only support a meritless claim, or (c) when the sought after

---

[43]    The statute also requires a showing of indigence. The Director does not contest that Thompson qualifies. ECF No. 1 (application to proceed IFP).

assistance would only supplement prior evidence. *Woodward v. Epps*, 580 F.3d 318, 334 (5th Cir. 2009); *Smith v. Dretke*, 422 F.3d 269, 288 (5th Cir. 2005) (citations omitted). Furthermore, if the services are only sought to go on a "fishing expedition," funding has been denied. *Murphy*, 205 F.3d at 814 (habeas discovery rules do not "authorize fishing expeditions"); *see also Patrick v. Johnson*, 48 F. Supp.2d 646, 647 (N.D. Tex. 1999) (statute not intended to provide funds to investigate claims "founded on mere suspicion and surmise").

Even if this threshold showing is met, a petitioner is not automatically entitled to funding. 18 U.S.C. § 3599(f) requires only that this Court may authorize funds; it is not incumbent upon the Court to do so. *Smith*, 422 F.3d at 288 (emphasizing the statute's use of the discretionary "may" rather than the mandatory "shall" and rejecting claim that petitioner had a "mandatory right" to funding); *Fuller*, 114 F.3d at 502 (noting the congressional choice to drop "shall" in favor of "may" in amending 21 U.S.C. § 848(q)(9)).

As an initial matter, Thompson fails to explain the need for a mitigation specialist in this case. Thompson's claim that a constitutional violation occurred is predicated on his contention that trial counsel did not have the necessary preparation time to discover evidence to support the reliability of the Halstead-Retain tests; however, federal habeas counsel has had access to and has provided the courts with documentation explaining the reliability Halstead-Reitan tests. Moreover, Dr. Milam testified that she performed nine

or ten hours of testing. 19 RR-R 49. Thompson has at no point argued that those tests were unreliable or inadequate; nor has he indicated that any re-testing would yield contrary results. For these reasons, Thompson fails to show that any funding is "reasonably necessary" or that it could help support a viable constitutional claim. *See Hill*, 201 F.3d at 487; *Fuller*, 114 F.3d at 502. And even if Thompson could show that funding was "reasonably necessary" to his claim, any new evidence would be barred by *Pinholster* and § 2254(e)(2). *See* 563 U.S. 181–82. Accordingly, this Court should deny Thompson's request for funding.

## XI. Thompson's Claim Challenging the Use of Evidence of Youthful Misconduct at the Punishment Stage of Trial is Procedurally Barred; Alternatively, the State Court Reasonably Denied This Claim.

Thompson contends that the trial court improperly admitted evidence of his youthful misconduct at the punishment stage of his trial. Petition at 216–22. However, the state court determined that Thompson was procedurally barred from presenting this claim because he failed to object to the use of this testimony at trial. SHCR-01 251 (¶ 109) (citing Tex. R. App. P. 33.1(a)), 262 (¶ 21). Accordingly, Thompson is likewise procedurally barred on federal habeas review. *See Styron*, 262 F.3d at 453–54.

Alternatively, Thompson's claim lacks merit. The state habeas court, citing prior CCA cases rejecting claims that punishment evidence of

misconduct committed prior to the age of eighteen is inadmissible in death penalty cases, denied this claim on the merits. SHCR-01 251 (¶¶ 111, 112) (citing *Corwin v. State*, 870 S.W.2d 23, 36 (Tex. Crim. App. 1993), and *Matthews v. State*, No. 74,936, 2006 WL 1752169, at 7–8 (Tex. Crim. App. June 28, 2006)). There is no existing Supreme Court precedent that is contrary to this ruling, or that renders it unreasonable. 28 U.S.C. 2254(d). Nonetheless, in support of his claim, Thompson cites *Roper v. Simmons*, 543 U.S. 551 (2005), which prohibited executions for those who committed their crimes before the age of eighteen, and *Graham v. Florida*, 560 U.S. 48, (2010), which prohibited sentences of life without parole for juveniles who did not commit a homicide. However, these cases do not hold or even suggest that presenting evidence of youthful misconduct is unconstitutional, and Thompson's claim that they do is barred pursuant to the *Teague* non-retroactivity doctrine. *See Goeke*, 514 U.S. at 118. Accordingly, Thompson is not entitled to federal habeas relief on this claim.

## XII. The State Court Reasonably Rejected Thompson's Claim that the Trial Court Violated *Apprendi* by Failing to Instruct the Jury to Apply a Beyond a Reasonable Doubt Standard to the Mitigation Issue.

Thompson contends that, under *Apprendi/Ring* the trial court must instruct the jury that it is required to make an affirmative finding on the mitigation special issue beyond a reasonable doubt. Petition at 222. However,

Thompson acknowledges that this claim is foreclosed under Fifth Circuit precedent. *Id*. at 222–23. Indeed, as explained above, the Fifth Circuit has "specifically held that the Texas death penalty scheme did not violate either *Apprendi* or *Ring* by failing to require the state to prove beyond a reasonable doubt the absence of mitigating circumstances." *Scheannette v. Quarterman*, 482 F.3d 815, 828 (5th Cir. 2007). Accordingly, "[r]easonable jurists would not debate [denial] of this claim because it has been previously rejected in both state and federal court, and is not supported by Supreme Court authority." *Id*. (footnote omitted). The Fifth Circuit has also found such claims to be barred by *Teague*. *See Rowell*, 398 F.3d at 378–79. Accordingly, the state court's rejection of Thompson's *Apprendi* claim was not objectively unreasonable, and it is barred by non-retroactivity principles.

### XIII. Thompson's Claim That the Texas Capital Sentencing Scheme Violates the Eighth Amendment Because the Instructions Give the Jury Mixed Signals as to How the Mitigation Issue is to be Applied Is Procedurally Barred and Lacks Merit.

Thompson contends that the mitigation special issue sends "mixed signals" to the jury, thereby rendering any verdict reached in response to that special issue intolerably unreliable under *Penry II*. Petition at 231–36 (citing *Penry v. Johnson*, 532 U.S. 782 (2001) (*Penry II*). These "mixed signals" apparently refer to: (1) the *Apprendi* burden-of-proof issue discussed above; and (2) the fact that the mitigation instruction purportedly limits mitigating

evidence to evidence that could be considered as reducing a defendant's moral blameworthiness. *Id*. However, the state court found that this claim was barred because it was not properly raised on direct appeal. Alternatively, the state habeas court found that this claim failed on the merits based on CCA precedent. As shown below, the state court's conclusion is indisputably correct in light of the fact that Thompson did not receive the problematic *Penry II* issues—he received the current mitigation special issue, which has been cited approvingly by both the Supreme Court and the Fifth Circuit. Accordingly, AEDPA precludes relief on this claim.

### A. Thompson's claim is procedurally barred because he failed to properly raise the issue on direct appeal.

The state habeas court found that the claim was procedurally barred on state habeas review because Thompson failed to raise it on direct appeal. SHCR-01 263 (¶ 25). Texas's courts require that record-based claims be raised on direct appeal or not at all. *Ex parte Gardner*, 959 S.W.2d 189, 191 (Tex. Crim. App. 1996). This procedural rule has been repeatedly upheld as adequate and independent. *See, e.g., Dorsey v. Quarterman*, 494 F.3d 527, 532 (5th Cir. 2007); *see also Sanchez-Llamas v. Oregon*, 548 U.S. 331, 351 (2006) ("Normally, in our review of state-court judgments, [the failure-to-raise-a-claim-on-direct-appeal bar] constitute[s] an adequate and independent state-law ground

preventing us from reviewing the claim."). Accordingly, the claim is likewise barred from federal habeas review and must be dismissed.

> **B. Alternatively, the state court reasonably determined that this claim is meritless.**

A review of the instruction given clearly shows that Thompson's capital-sentencing jury was not denied a vehicle for expressing its reasoned moral response to Thompson's mitigating evidence. The trial court instructed the jury on the mitigation issue as follows:

> Do you find from the evidence, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, Charles Victor Thompson, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

CR-R 235.

The Fifth Circuit has repeatedly held that "Texas' definition 'encompasses 'virtually any mitigating evidence.'" *Roach v. Quarterman*, 220 F. App'x 270, 277 (5th Cir. 2007) (unpublished) (quoting *Beazley*, 242 F.3d at 260); *see also McCoskey v. Thaler*, 478 F. App'x at 150 ("The capacious definition of 'mitigating evidence' employed in the Texas statute can 'encompass[ ] virtually any mitigating evidence.'"). Furthermore, the Supreme Court specifically commended the new statute as a "[a] clearly drafted catchall

instruction on mitigating evidence" and a model of "brevity and clarity." *Penry II*, 532 U.S. at 802–03.

With respect to Thompson's argument that the jury received "mixed signals" because no burden of proof is placed on the mitigation special issue, the Supreme Court does not require the states to assign a burden of proof to mitigating evidence. In fact, the Supreme Court "doubt[s] whether it is even possible to apply a standard of proof to the mitigating-factor determination" because the existence of a mitigating factor is a "judgment call" and subject to the individual juror's discretion. *Kansas v. Carr*, 136 S. Ct. 633, 642 (2016). "[T]he ultimate question whether mitigating circumstances outweigh aggravating circumstances is mostly a question of mercy[.]" *Id.* The Fifth Circuit has likewise rejected "mixed signals" arguments based upon a lack of burden of proof for the mitigating special issue. *Blue v. Thaler*, 665 F.3d 647, 668 (5th Cir. 2011) (rejecting argument that failure to assign burden of proof to mitigating special issue violates the Due Process Clause); *Oliver v. Quarterman*, 254 F. App'x 381, 386-87 (5th Cir. 2007) (rejecting argument that the Texas special issues send "mixed signals" to the jury, noting that the Supreme Court has implicitly upheld Texas' current scheme); *Scheanette*, 482 F.3d at 825–27 (rejecting argument that the additional mitigation instructions sent "mixed signals" and effectively nullified the mitigation special issue because it did not apply a burden of proof); *Coleman*, 456 F.3d at 542.

Thompson "fail[s] to make any plausible argument that Texas's mitigation special issue does not allow the jury to consider and give effect to a defendant's mitigating evidence." *Oliver*, 254 F. App'x at 387.

Accordingly, Thompson has not shown that the state court proceedings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly-established federal law, as determined by the Supreme Court of the United States, or that the decision was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. 2254(d). Therefore, no relief should issue on this claim.

## XIV. Thompson's Claims Relating to Dr. Shrode's Autopsy Report Are Procedurally Barred and Lack Merit.

Thompson alleges multiple claims in relation to the autopsy report for Hayslip completed by Dr. Shrode. Petition at 236–43. Dr. Shrode's autopsy report stated that Hayslip's cause of death was a "gunshot wound to the face." SX 80.  The report was admitted into evidence during the testimony of Dr. Patricia Moore, Dr. Shrode's colleague who performed the autopsy on Darren Cain. 12 RR 109. Having considered the autopsy report, multiple photos, and Hayslip's medical records, Dr. Moore testified that she believed that the cause of death was a gunshot wound to the face. *Id*. at 106, 13–14.

Specifically, Thompson contends that: (1) the state committed a *Brady* violation by failing to disclose Dr. Shrode's lack of qualifications; (2) his trial counsel was ineffective for failing to object to the admission of Dr. Moore's testimony about the autopsy report on Sixth Amendment Confrontation Clause grounds; and (3) the state committed a due process violation by knowingly admitting a false autopsy report. Petition at 236–43. However, Thompson is not entitled to relief on these claims because they are all procedurally barred and lack merit.

## A.    The claims are procedurally barred.

Thompson failed to raise these claims in his initial state habeas applications. But he eventually raised them in his third state habeas application, which, as explained previously, was dismissed as an abuse of the writ pursuant to Texas Code of Criminal Procedure Article 11.071, Section 5(a). *Ex Parte Thompson*, 2016 WL 922131, at *1. Accordingly, these claims are likewise procedurally barred from federal habeas review. *See Coleman*, 501 U.S. at 729; *Harris*, 480 U.S. 263. Nonetheless, Thompson asserts the same arguments as he does for his *Massiah* related claims in an attempt to avoid the default—(1) that the CCA's dismissal involved a merits determination on his federal constitutional claim; (2) that *Brady/Banks* provides cause and prejudice for the default; and (3) that his default is excused under the *Martinez* exception. Petition at 243–44; *see above*, Section IV(B).

147

First, as explained previously, the state court's dismissal of Thompson's third habeas application clearly did not include a review of Thompson's federal constitutional claim. *See above*, Section IV(B)(1). Second, Thompson fails to show cause and prejudice because, as set out below, he fails to establish the elements of a *Brady/Banks* claim for failure to disclose that Dr. Shrode was allegedly unqualified. *See Banks,* 540 U.S. at 691, *see below*, Section XIII(B). Finally, Thompson does not meet the *Martinez* standard because he fails demonstrate a substantial IATC claim for his counsel's failure to object to the admission Dr. Moore's testimony about the autopsy on Confrontation Clause grounds, and as a result also fails to show that his state habeas counsel was ineffective for failing to raise the IATC claim. *See Martinez*, 132 S. Ct. 1318; *see below* Section XIII(C). Because all of these assertions fail, Thompson's claims are procedurally defaulted and must be dismissed.

## B.   Even if the claim were not procedurally defaulted, Thompson fails to show that the State committed a *Brady* violation.

Thompson claims that the State of Texas withheld evidence that Dr. Shrode was incompetent and unqualified to perform autopsies. Petition at 240. As explained previously, to establish a *Brady* violation, Thompson must prove the following: (1) the prosecutor suppressed or withheld evidence; (2) which was favorable; and (3) material to the defense. *Moore*, 408 U.S. at 794–95. The evidence is material only if there is a reasonable probability that, had the

evidence been disclosed to the defense, the result of the proceeding would have been different. *Bagley*, 473 U.S. at 684. Moreover, "[w]hen evidence is equally available to both the defense and the prosecution, the defendant must bear the responsibility for failing to conduct a diligent investigation." *Kutzner*, 303 F.3d at 336.

Thompson's claim that the state failed to disclose impeachment evidence related to Dr. Shrode's incompetence is entirely conclusory, but appears to be based on attached documentary evidence that Dr. Shrode had poor performance evaluations, all completed more than a year after he performed the autopsy in this case, and that work disciplinary actions were imposed against him well-after he completed his autopsy in this case. Petition at 22; ECF No. 57-2. In addition, Thompson refers to Dr. Shrode's work in other cases that has very recently been brought into question and to information indicating that he lied on his resume in 2005. Petition at 21, 25; ECF No. 57-2. As these documents were not created at the time of Thompson's trial, Thompson fails to explain how any of this information constitutes *Brady* material. *See Schlang*, 691 F.2d at 799 (conclusory allegations fail to support a claim for federal habeas relief).

In addition, Dr. Shrode was obviously employed by the state at the time of Thompson's trial and well after, and Dr. Shrode's performance evaluations provide typical criticisms found in these types of documents, and one of the

performance evaluations even rates Dr. Schrode as "good" or "excellent" in *all* job performance categories and describes his "Strengths" as "excellent autopsy skills" and "expansive knowledge"—these documents hardly indicate that state employees believed that Dr. Shrode was incompetent. ECF No. 57-2 at 81–82. Further, to the extent it was possible to uncover evidence showing that Dr. Shrode was unqualified or incompetent, defense counsel had the responsibility to piece together that subjective, opinion-based, argument. *See Kutzner*, 303 F.3d at 336. Finally, the evidence that some of Dr. Shrode's autopsies have been recently called into question and that he lied on a resume in 2005 is clearly not *Brady* material because it all involves circumstances that occurred well after Thompson's trial. Accordingly, Thompson fails to show that the State failed to disclose evidence.

Further, Thompson cannot show that any of this alleged impeachment evidence related to Dr. Shrode's autopsy was material. *See Bagley*, 473 U.S. at 684. As explained throughout the Director's answer, there was overwhelming evidence presented at trial that Thompson's action in shooting Hayslip in the face caused her death, and that intervening medical care did not render Thompson's actions clearly insufficient. *See* Tex. Penal Code § 6.04. The testimony of Dr. Marvin and Dr. Radalat in this regard is described above. *See above*, Section I. Further, even the testimony of Dr. Moore as to Hayslip's cause

150

of death was not only based on the autopsy report, but also on pictures of Hayslip and medical records from her surgery. 12 RR 13–14.

In addition, Thompson contends, without clear support from the evidence, that a proper autopsy report would have verified that the cause of death was Cerebral Edema. Petition at 238. Even if this were true and the Edema was caused by doctor's attempts to intubate Hayslip, it would not indicate that Thompson's actions were clearly insufficient to cause her death. See Tex. Penal Code § 6.04; *see above*, Section I. Accordingly, there is not a reasonable probability that impeachment evidence related to Dr. Shrode's qualifications would have affected the jury's verdict. For the foregoing reasons, Thompson is not entitled to relief on this claim.

### C. Even if the claim were not procedurally defaulted, Thompson fails to show that his trial counsel was ineffective for failing to object to the testimony of Dr. Moore on Confrontation Clause grounds.

As explained above, Dr. Moore testified about the autopsy of Hayslip, which was performed by Dr. Shrode. 12 RR 106. Thompson contends that his trial attorney was ineffective for failing to object to this testimony on Confrontation Clause grounds. The Sixth Amendment guarantees a criminal defendant the right "to be confronted with the witnesses against him." U.S. Const. amend. VI. In *Crawford v. Washington*, the Court held that that right is violated where the prosecution introduces "testimonial statements of a

witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." Here, however, Thompson's counsel was not deficient. 541 U.S. 36, 53–54, (2004). Under Texas law at the time of Thompson's trial, Dr. Moore's testimony was admissible because autopsy reports were considered non-testimonial. Accordingly, because deficiency of performance is measured at the time of counsel's conduct, Thompson fails to establish *Strickland*'s first prong for his underlying claim. *See United States v. Fields*, 565 F.3d 290, 296 (5th Cir. 2009) (explaining that counsel need not anticipate changes in the law or raise meritless objections); *Green*, 160 F.3d at 1037 (explaining that "failure to make a frivolous objection does not cause counsel's performance to fall below an objective level of reasonableness").

In support of his claim, Thompson cites *Melendez-Diaz* and *Bullcoming*, in which the Supreme Court held that certificates of analysis sworn by state laboratory analysts and a forensic laboratory report were testimonial. *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 310–11 (2009); *Bullcoming v. New Mexico*, 131 S. Ct. 2705, 2710 (2011). However, even assuming Dr. Moore's testimony would be rendered inadmissible by this precedent, these cases were

decided more than ten years after Thompson's trial on guilt innocence.[44] And as the Fifth Circuit described the legal landscape prior to the Supreme Court's decision in *Melendez-Diaz v. Massachusetts*, 129 S. Ct. 2527 (2009):

> The [Crawford] Court observed . . . that certain statements, "by their nature [are] not testimonial-for example, business records or statements in furtherance of a conspiracy."
>
> The Court left "for another day any effort to spell out a comprehensive definition of 'testimonial,'" so the circuits necessarily developed their own interpretation of what is a "testimonial statement" for Sixth Amendment purposes.

*United States v. Martinez-Rios*, 595 F.3d 581, 585 (5th Cir. 2010). Important here, until *Melendez-Diaz*, Texas courts held that autopsy reports were non-testimonial, and therefore, not subject to *Crawford*. *See Wood v. State*, 299 S.W.3d 200, 208 (Tex. App.—Austin, 2009) (describing the rule before *Melendez-Diaz*); *see also Campos v. State*, 256 S.W.3d 757, 762–63 (Tex. App.—

---

[44]    In fact, this precedent does not establish that Dr. Moore's testimony would be inadmissible, even if it were presented today, because the Supreme Court has not extended *Bullcoming/Melendez-Diaz* to autopsy reports. As a court in this district explained:

> The application of *Melendez-Diaz* has not been uniform in Texas or nationwide. . . [T]he Texas Court of Criminal Appeals has still not expressly considered Crawford's application to autopsy records. Even [the cases from Texas intermediate appellate courts] . . . recognize that not "all autopsy reports are categorically testimonial." [*Wood*, 299 S.W.3d at 209]. Those cases require courts to "determine whether the primary purpose of the autopsy report was to establish or prove past events potentially relevant to later criminal prosecution." *Martinez v. State*, 311 S.W.3d 104, 111 (Tex. App.—Amarillo 2010).

*Martinez v. Stephens*, 2015 WL 1282199, at *10–11.

Houston [14 Dist.] 2008); *Moreno Denoso v. State*, 156 S.W.3d 166 (Tex. App.—Corpus Christi 2005); *Mitchell v. State*, 191 S.W. 219, 221–22 (Tex. App.—San Antonio 2005, pet. ref'd); *see also Segundo v. State*, 270 S.W.3d 79, 107 (Tex. Crim. App. 2008) (citing *Campos*, 256 S.W.3d at 761–62). Thus, at the time of Thompson's trial, the CCA did not provide an adequate basis to advance a Confrontation Clause objection, and trial counsel was clearly not deficient for failing to do so. *See Fields*, 565 F.3d at 296; *Green*, 160 F.3d at 1037.

In addition even if the testimony were inadmissible Thompson fails to show that, but for his attorney's error, the result of his trial would have been different. *See Strickland*, 466 U.S. at 694. Accordingly, Thompson is not entitled to relief on this claim.

### D. Even if the claim were not procedurally defaulted, Thompson fails to demonstrate that the State committed a due process violation under *Giglio/Napue*.

The State denies a criminal defendant due process when it knowingly uses false evidence at trial or allows untrue testimony to go uncorrected. *See Giglio v. United States*, 405 U.S. 150, 153 (1972); *see also Napue*, 360 U.S. 264, 269 (1959); *Faulder v. Johnson*, 81 F.3d 515, 519 (5th Cir. 1996). "To establish a due process violation based on the government's use of false or misleading testimony, the defendant must show (1) that the witness's testimony was actually false, (2) that the testimony was material, and (3) that the prosecution knew the witness's testimony was false." *Fuller v. Johnson*, 114 F.3d 491, 496

(5th Cir. 1997) (citing *Giglio*, 405 U.S. at 153-54). In adjudicating a *Giglio/Napue* claim, the "any reasonable likelihood" standard has been applied to determine materiality. *Giglio*, 405 U.S. at 153–54.

As explained above, Thompson's evidence related to Dr. Shrode fails to establish that Dr. Shrode was unqualified to perform the autopsy, much less that the findings therein, which were consistent with Dr. Marvin's testimony, were *false* and the state knew or should have known it. *See Faulder*, 81 F.2d at 519. In addition, as explained above, Thompson fails to show that the evidence related to the autopsy was material or that but for the evidence, there was a reasonable likelihood the result of the case would have been different. *See Giglio*, 405 U.S. at 153–54. Accordingly, Thompson's claim that his due process rights were violated fails, and he is not entitled to federal habeas relief.

## CONCLUSION

For the foregoing reasons—and considering the totality of the record—the State respectfully requests that this Court deny Thompson's petition for federal habeas relief and deny a Certificate of Appealability.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

ADRIENNE MCFARLAND
Deputy Attorney General for Criminal Justice

EDWARD L. MARSHALL
Chief, Criminal Appeals Division

_ s/ George A. d'Hemecourt _
GEORGE A. D'HEMECOURT*
Assistant Attorney General
State Bar No. 24082888
Southern Id. No. 2533916

* Counsel of Record

P. O. Box 12548, Capitol Station
Austin, Texas 78711
(512) 936-1400
(512) 936-1280 (Facsimile)

ATTORNEYS FOR RESPONDENT

156

## CERTIFICATE OF SERVICE

I hereby certify that, December 5, 2016, I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, Southern District of Texas, using the electronic case filing system. The electronic case filing system sent a "Notice of Electronic Filing" to lead counsel, who has consented in writing to accept this Notice as service of this document by electronic means:

Seth Kretzer
Law Office of Seth Kretzer
The Lyric Center
440 Louisiana, Suite 200
Houston, TX 77002
Tel.: (713) 775-3050
Fax: (713) 623-0029
seth@kretzerfirm.com

Jonathan David Landers
2813 W T C Jester
Houston, TX 77018
Tel.: (713) 685-5000
jlanders.law@gmail.com

  s/ George A. d'Hemecourt
GEORGE A. D'HEMECOURT*
Assistant Attorney General