United States District Court
Southern District of Texas
**ENTERED**
March 23, 2017
David J. Bradley, Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| CHARLES VICTOR THOMPSON, | § | |
| | § | |
| *Petitioner*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-13-1900 |
| | § | |
| LORIE DAVIS, | § | |
| | § | |
| *Respondent*. | § | |

### MEMORANDUM OPINION AND ORDER

Charles Victor Thompson ("Thompson"), an inmate on Texas's death row, has filed a federal petition for a writ of habeas corpus. Respondent Lorie Davis ("Respondent") has answered. After considering the record, the pleadings, and the applicable law, the Court finds that Thompson has not shown an entitlement to habeas relief.

### I. BACKGROUND

Thompson started dating Dennise Hayslip, who was twelve years his senior, around June of 1997. Thompson soon moved in with her. Thompson rarely worked, but relied on Hayslip and another roommate for support. Thompson became increasingly jealous, possessive, angry, and abusive. Thompson eventually moved out.

Hayslip began dating Darren Cain, but still occasionally saw Thompson. On April 30, 1998, Thompson was at Hayslip's apartment when Cain called at around 2:30 a.m. Thompson told Cain "to come over there and he would beat his ass." RR1 Vol. 11 at 76.[1] When Cain arrived, Thompson

---

[1] The state court records consist of the Clerk's Record from the initial trial that contains pretrial motions, trial court orders, jury instructions, and other pleadings, cited as "CR at __"; a Reporter's Record, including hearings on pretrial motions, jury voir dire, the guilt/innocence phase, and the penalty phase, cited as "RR1 Vol. __ at __"; and a transcript of the state habeas proceedings, cited as "State Habeas Record at __." On direct appeal, the Texas Court of Criminal Appeals reversed Thompson's sentence. The Court will cite the Clerk's Record from the second punishment proceedings as CR2 at _____, and the Reporter's Record as RR2 Vol. __ at __.

answered the door with a stick.  A fight ensued.  Thompson lost the fight.

Cain and Hayslip exited the apartment.  Thompson walked out also, yelling, cussing, and calling Hayslip a "whore."  RR1 Vol. 11 at 53.  As Cain told Thomson to "chill," Thompson responded: "do you want to die, mother fucker?"  RR1 Vol. 11 at 54.

By that time, the police had been called.  The responding officer encountered Thompson, Hayslip, and Cain standing outside.  Thompson's eye was blackened from the fight he had started.  Because no one wanted to press criminal charges, a police officer allowed Thompson to leave after threatening him with criminal trespass should he return.  After the responding officer escorted him from the premises, Thompson went to get a gun.

Thompson later described to a friend, Diane Zernia, how he returned to Hayslip's apartment and shot both Hayslip and Cain.  Thompson kicked down the door to Hayslip's apartment and encountered Cain inside.  As Cain grabbed the end of the gun, Thompson began firing.  Thompson shot Cain four times, and two bullets missed.  After Cain fell to the ground, Thompson reloaded the gun, put it up to Hayslip's cheek, and said, "I can shoot you too, bitch."  RR1 Vol. 11 at 132.  The gun fired.  The bullet traveled through Hayslip's cheek, into her tongue, and out the other side.  Thompson later claimed that he also tried to shoot himself, causing a wound on his arm.

Neighbors heard the gunshots.  Shortly thereafter, Hayslip began knocking on neighbors' doors.  A neighbor found her sitting on the ground, gasping for breath as she leaned forward to prevent drowning in her own blood.  When emergency responders arrived, they found Cain dead.  Hayslip was bleeding profusely.  Responders took her by life flight to a hospital where she later died.

Leaving the apartment, Thompson threw his gun in a nearby creek.  Thompson then went to Zernia's house and fell asleep on a couch.  When he woke up, he described the murders to Zernia.

2

Thompson then called his father, who picked him up and took him to the police station.

The State of Texas charged Thompson with capital murder for intentionally or knowingly causing the death of more than one person in the same criminal transaction. *See* TEX. PENAL CODE ANN. § 19.03(a)(7). Specifically, the indictment required the prosecution to prove that Thompson "unlawfully, during the same criminal transaction, intentionally and knowingly caused the death of" Cain by "shooting [him] with a deadly weapon" and also "intentionally and knowingly caused the death" of Hayslip by "shooting [her] with a deadly weapon . . . ." CR at 51; RR1 Vol. 11 at 4-5. Thompson stood trial in 1999.[2] The prosecution presented testimony and evidence showing that Thompson shot both Cain and Hayslip. The prosecution particularly emphasized Thompson's confession to Zernia that he shot both victims. The main defensive argument at the guilt/innocence phase was that medical malpractice, not the gunshot through Hayslip's mouth, was the primary cause of her death. The jury convicted Thompson of capital murder. He was sentenced to death.

On direct appeal, Thompson raised issues relating to both the guilt/innocence and punishment phases of trial. In 2001, the Court of Criminal Appeals found that the State violated Thompson's rights by relying in the punishment phase on the tape recording of an undercover police officer's jailhouse conversation with him. The Court of Criminal Appeals remanded for a new sentencing hearing. *Thompson v. State*, 93 S.W.3d 16 (Tex. Crim. App. 2001).

The trial court held a new sentencing hearing in 2005.[3] A Texas jury decides a capital

---

[2]     Ellis McCullough and Bettina J. Richardson represented Thompson in his original trial proceedings. The Court will refer to Thompson's trial attorneys collectively as "trial counsel."

[3]     The trial court appointed Thompson's original trial attorney, Ellis McCullough, to represent him as first chair at retrial. Terrence Gaiser was originally appointed second-chair counsel. On Thompson's *pro se* motion, the trial court later removed McCullough and elevated Gaiser to first chair. Kyle Johnson served as second-chair counsel at retrial. Unless necessary to identify one attorney, or to distinguish the attorneys who served at the second punishment phase from those in his original trial, the Court will generally refer to all trial attorneys as "trial counsel."

defendant's sentence by answering two special-issue questions: (1) will the defendant be a future

danger to society and (2) do sufficient circumstances mitigate against a death sentence?  *See* TEX.

PENAL CODE art. 37.071 § 2(b).  In addition to the evidence underlying Thompson's conviction, the

Court of Criminal Appeals summarized the State's evidence for a death sentence as follows:

> A few hours after committing the murders, [Thompson] went to the home of Diane
> Zernia and confessed to her.  After calling his father, [Thompson] surrendered to
> authorities.  [Thompson] later phoned Zernia from jail and tried to persuade her to
> lie about what he had told her, but she refused. [Thompson] also attempted, from
> prison, to solicit someone to kill Zernia and was later indicted for solicitation to
> commit capital murder.  The State also presented evidence that [Thompson] was
> associated with the Aryan Brotherhood gang in prison.  A fellow jail inmate testified
> that [Thompson] gave him a list of people who [Thompson] believed were potential
> witnesses and told the inmate that he would pay him to "eliminate" the witnesses or
> otherwise make sure that they would not appear in court. The inmate turned the list
> over to the police.
>
>  The State also presented evidence that [Thompson] began committing crimes as a
> juvenile.  In 1984, while living with his parents in an upper-middle-class
> neighborhood in Colorado, [Thompson] committed a string of crimes that resulted
> in over $60,000 of damage to homes and property.  While on probation from the
> youth center, [Thompson] stole his father's motorcycle, ran away, and committed a
> variety of crimes.  He was arrested again in 1987 and sentenced to a juvenile facility.
> [Thompson] had problems with drugs and alcohol from an early age.  He married, but
> later abandoned his wife and two children. In 1996, [Thompson] was arrested for
> transporting illegal immigrants from Mexico.

*Thompson v. State*, No. AP-73,431, 2007 WL 3208755, at *1-2 (Tex. Crim. App. Oct. 31, 2007).

The jury again answered Texas's special-issue questions in a manner requiring imposition of a death

sentence.  The Court of Criminal Appeals affirmed Thompson's sentence in a second direct appeal

in 2007.  *Thompson v. State*, No. AP-73,431, 2007 WL 3208755 (Tex. Crim. App. Oct. 31, 2007).

Thompson filed two state applications for a writ of habeas corpus.  Thompson filed a state

habeas application during the pendency of his first direct appeal.  Thompson filed a second state

habeas application after receiving his second death sentence.  In 2013, the trial-level state habeas

court entered findings of fact and conclusions of law recommending that the Court of Criminal Appeals deny both habeas applications. On April 17, 2013, the Court of Criminal Appeals adopted the lower court's recommendation and also provided additional reasons for denying Thompson's habeas applications. *Ex Parte Thompson*, No. WR-78,135-01, 2013 WL 1655676 (Tex. Crim. App. Apr. 17, 2013).

Federal review followed. Thompson filed an initial federal petition raising unexhausted issues. Dkt. 21. On Thompson's motion, the Court stayed the instant proceedings to allow state court review of Thompson's unexhausted claims. Texas only allows successive state habeas proceedings in narrowly defined circumstances. *See* TEX. CODE CRIM. PRO. art. 11.071 § 5. On March 9, 2016, the Court of Criminal Appeals found that Thompson's successive habeas application did not meet the statutory criteria and dismissed that action as an abuse of the writ. *Ex parte Thompson*, No. WR-78,135-03, 2016 WL 922131, at *1 (Tex. Crim. App. Mar. 9, 2016).

Thompson filed an amended federal habeas petition raising the following grounds for relief:

1.   Insufficient evidence supports Thompson's capital-murder conviction because intervening medical care was the direct cause of Dennise Hayslip's death.

2.   The prosecution violated Thompson's right to counsel by using a state agent to secure incriminating statements from Thompson while he was incarcerated before trial.

3.   The State's punishment-phase case relied on incriminating statements secured by a career informant.

4.   The indictment unconstitutionally omitted any facts pertaining to the Texas's special-issue questions.

5.   The State adduced impermissible victim-impact evidence in violation of Thompson's constitutional right to be free from cruel and unusual punishment.

6.      Texas's use of lethal injection to effectuate a death sentence does not comply with Eighth Amendment standards.

7.      Texas's post-conviction procedure does not afford due process.

8.      Texas's statute defining concurrent causation is unconstitutional.

9.      Thompson's attorneys provided ineffective assistance in both phases of trial.

10.     The trial court violated Thompson's rights by denying the request for a continuance before the second punishment phase.

11.     The State violated the Eighth Amendment by presenting evidence at the second penalty phase of Thompson's youthful misconduct.

12.     The Constitution requires that jurors consider the mitigation special issue under a beyond-a-reasonable-doubt standard.

13.     The mitigation special issue unconstitutionally sends mixed signals to jurors.

14.     The State's testimony and evidence relating to the autopsies of the victims violated Thompson's due process rights, his right to confront the witnesses against him, and right to counsel.

Dkt. 57.[4]  Thompson has also filed a motion for an evidentiary hearing.  Dkt. 56.  Respondent has filed an answer arguing that substantive and procedural law limits federal review and forecloses habeas relief.  Dkt. 66.  Thompson has filed a reply.  Dkt. 69.  This Court has reviewed Thompson's grounds for relief and has determined that an evidentiary hearing is not necessary to a full and fair review of his claims.  This matter is ripe for adjudication.

## II. STANDARD OF REVIEW

Federal habeas review is secondary to the state court process and is limited in scope.  The States "possess primary authority for defining and enforcing criminal law.  In criminal trials they also

---

[4]      Thompson's original federal petition contained claims that he waived in his amended habeas petition. Dkt. 57 at 109-110, 244-45.  The Court has renumbered his claims as necessary.

hold the initial responsibility for vindicating constitutional rights." *Engle v. Isaac*, 456 U.S. 107, 128 (1982). How an inmate has litigated his claims in state court determines the course of federal habeas adjudication. Under 28 U.S.C. § 2254(b)(1), "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State[.]" Exhaustion "reflects a policy of federal-state comity designed to give the State an initial opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Anderson v. Johnson*, 338 F.3d 382, 386 (5th Cir. 2003) (internal citations and quotations omitted).

As a corollary to exhaustion, the procedural-bar doctrine requires inmates to litigate their claims in compliance with state procedural law. *See Dretke v. Haley*, 541 U.S. 386, 392 (2004); *Lambrix v. Singletary*, 520 U.S. 518, 523 (1997); *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). When an inmate fails to follow well-established state procedural requirements for attacking his conviction or sentence, and the state court finds that he has procedurally defaulted his claims, federal habeas adjudication is barred. *See Lambrix*, 520 U.S. at 523; *Coleman*, 501 U.S. at 732. A federal court may review an inmate's unexhausted or procedurally barred claims only if he shows: (1) cause and actual prejudice or (2) that "a constitutional violation has 'probably resulted' in the conviction of one who is 'actually innocent[.]'" *Haley*, 541 U.S. at 393 (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)).

If the inmate has presented his federal constitutional claims to the state courts in a procedurally proper manner, and the state courts have adjudicated the merits, the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") allows federal review but limits its depth. "[A] habeas petitioner has the burden under AEDPA to prove that he is entitled to relief." *Montoya v. Johnson*,

226 F.3d 399, 404 (5th Cir. 2000); *see also DiLosa v. Cain*, 279 F.3d 259, 262 (5th Cir. 2002).  A petitioner cannot meet this burden by merely alleging constitutional error.  Instead, "focus[ing] on what a state court knew and did," *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011), an inmate must show that the state court's adjudication of the alleged constitutional error "was 'contrary to, or involved an unreasonable application of, clearly established Federal law.'" *Berghuis v. Thompkins*, 560 U.S. 370, 380 (2010) (quoting 28 U.S.C. § 2254(d)(1)); *see also Thaler v. Haynes*, 559 U.S. 43, 47 (2010); *Bell v. Cone*, 535 U.S. 685, 698 (2002); *Early v. Packer*, 537 U.S. 3, 7-8 (2002); *Williams v. Taylor*, 529 U.S. 362, 413 (2000).  A federal habeas court must presume the underlying factual determinations of the state court to be correct, unless the inmate "rebut[s] the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *see also Miller-El v. Cockrell*, 537 U.S. 322, 341 (2003); *Young v. Dretke*, 356 F.3d 616, 629 (5th Cir. 2004) ("As a federal habeas court, we are bound by the state habeas court's factual findings, both implicit and explicit.").

A petitioner's compliance with 28 U.S.C. § 2254 does not alone create an entitlement to habeas relief.  No Supreme Court case "ha[s] suggested that a writ of habeas corpus should automatically issue if a prisoner satisfies the AEDPA standard[.]" *Horn v. Banks*, 536 U.S. 266, 272 (2002); *see also Robertson v. Cain*, 324 F.3d 297, 306 (5th Cir. 2003) (finding that 28 U.S.C. § 2254(d) "does not require federal habeas courts to grant relief reflexively").  Other judicial doctrines, such as the harmless-error doctrine and the non-retroactivity principle, bridle federal habeas relief.  *See Thacker v. Dretke*, 396 F.3d 607, 612 n.2 (5th Cir. 2005).  Any trial error cannot require habeas relief unless it "ha[d] a 'substantial and injurious effect or influence in determining the jury's verdict.'" *Robertson*, 324 F.3d at 304 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 629

(1993)); *see also Aleman v. Sternes*, 320 F.3d 687, 690-91 (7th Cir. 2003) ("Nothing in the AEDPA suggests that it is appropriate to issue writs of habeas corpus even though any error of federal law that may have occurred did not affect the outcome.").  Also, under the jurisprudence flowing from *Teague v. Lane*, 489 U.S. 288 (1989), a habeas court cannot grant relief if it would require the creation and retroactive application of new constitutional law.  *See Horn*, 536 U.S. at 272.

## III. ANALYSIS

### A.    Sufficiency of the Evidence

The State of Texas indicted Thompson for causing the death of both Cain and Hayslip.  CR at 51; RR1 Vol. 11 at 4-5.  Thompson complains that insufficient evidence supports his capital-murder conviction because intervening medical care was the direct cause of Hayslip's death.  As previously discussed, when Thompson shot Hayslip in the cheek, the bullet traveled through her mouth and nearly severed her tongue.  The wound left Hayslip bleeding profusely.  Her tongue swelled up and threatened to close off her throat.  Responders tried to keep her airway free.  Life Flight transported Hayslip to a major trauma center.  At one point in surgery Hayslip became unable to breathe, resulting in brain death.  She died sometime later in the hospital.

Thompson argues that incompetent medical care intervened in the chain of causation and resulted in her death.  Thompson argues: "The death of Ms. Hayslip was the sole result of her loss of oxygen to the brain, which in turn caused her family to terminate her life one week after she was shot.  This event was produced by the physicians' respective inability to properly provide competent medical assistance by way of a commonly performed hospital procedure."  Dkt. 57 at 52.  Because the indictment required the State to prove that he was the agent of both victims' death, Thompson

contends that medical malpractice rendered his own actions insufficient to support a capital conviction.

Insufficiency-of-the-evidence claims come before a federal habeas court under a standard of review that gives heavy deference to state-court adjudications.  Under *Jackson v. Virginia*, 443 U.S. 307 (1979), a reviewing court affirms a jury's conviction if, considering all of the evidence in a light most favorable to the prosecution, a rational trier of fact could have returned a verdict unfavorable to the defendant.  This demanding inquiry is highly deferential to, and resolves any conflicting evidence in favor of, the jury's verdict.  *See United States v. Harris*, 293 F.3d 863, 869 (5th Cir. 2002); *United States v. Duncan*, 919 F.2d 981, 990 (5th Cir. 1990).  AEDPA augments the deferential *Jackson* analysis, creating an enhanced barrier to federal habeas relief. *See Coleman v. Jackson*, 132 S. Ct. 2060, 2062 (2012); *Perez v. Cain*, 529 F.3d 588, 599 (5th Cir. 2008).  Together, *Jackson* and the AEDPA create a "double dose of deference that can rarely be surmounted." *Boyer v. Belleque*, 659 F.3d 957, 964 (9th Cir. 2011).  A federal habeas court focuses only on whether the state court reasonably applied the *Jackson* standard.

After reviewing the trial evidence, the Court of Criminal Appeals determined that the evidence sufficiently proved that Thompson's actions caused Hayslip's death.  Texas law on causation framed the Court of Criminal Appeals's review of Thompson's insufficiency-of-the-evidence claim.  Texas Penal Code § 6.04(a) provides: "A person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient."  "An accused may be exonerated under [§6.04] only if his conduct alone was clearly insufficient to produce the result and the concurrent cause clearly

sufficient, operating alone, to do so." *Felder v. State*, 848 S.W.2d 85, 90 (Tex. Crim. App. 1992)

(quotation omitted).  The Court of Criminal Appeals found:

> The shot to Hayslip's face went through her cheek and nearly severed her tongue. According to the State's medical evidence, because the tongue is especially "well vascularized" (contains more blood per gram of tissue than other parts of the body), Hayslip was at risk of bleeding to death or of bleeding down into her lungs which also could have resulted in death similar to drowning.  The doctor in charge of Hayslip's care further testified that, without any medical attention, the swelling of Hayslip's tongue could have eventually obstructed her airway entirely, resulting in suffocation.  He stated that without medical intervention, Hayslip would not have survived her injuries.  [Thompson's] medical expert agreed that the injury to Hayslip's tongue was life threatening and also agreed that Hayslip "probably" would have died without medical intervention.

*Thompson,* 93 S.W.3d at 20-21.  Thompson raises two primary criticisms of the Court of Criminal

Appeals's ruling.  Dkt. 57 at 44.  First, Thompson faults the state court for relying on a false premise

by looking at whether the victim "would not have survived her injuries" if she went "without medical

attention."  Dkt. 57 at 44.

Thompson contends that "there was no chance that Hayslip would go without medical

attention."  Dkt. 57 at 44.  Testimony from medical experts laid out the risks caused by Hayslip's

bleeding and diminished breathing ability.[5]  The Court of Criminal Appeals has interpreted Texas

law to include asking whether the initial injury would have been fatal without medical attention.

Thompson has not pointed to any law definitely disallowing the state court to factor into its causation

review the question of what would have happened to the victim without medical care.  *See Patrick*

*v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995) (rejecting the argument that a defendant

lacked a specific intent to kill because the victim did not seek medical attention).  This Court must

---

[5]    Thompson relies on evidence developed after trial to support his argument that Hayslip would have survived her wounds had she been administered adequate medical care.  This Court's analysis under *Jackson*, however, focuses on "the record evidence adduced at the trial," not that developed afterward.  *Jackson*, 443 U.S. at 324.

defer to a state court's interpretation of its own law. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."). Trial testimony sufficiently established that Thompson inflicted a life-threatening injury, one which required urgent medical attention in order to preserve Hayslip's life. "Thus, viewing the evidence in the light most favorable to the verdict, even assuming, *arguendo*, that the conduct of the doctors was 'clearly sufficient' to cause Hayslip's death, the conduct of [Thompson] was not 'clearly insufficient' so as to absolve him of criminal responsibility under § 6.04." *Thompson,* 93 S.W.3d at 20-21.

Thompson's second criticism is that the state court incorrectly characterized his expert's trial testimony. The Court of Criminal Appeals described defense witness Dr. Pat Radalat's testimony as "agree[ing] that the injury to Hayslip's tongue was life threatening and also agree[ing] that Hayslip 'probably' would have died without medical intervention." *Thompson*, 93 S.W.3d at 21. Even though Thompson disputes the Court of Criminal Appeals's interpretation of the defensive testimony, Dr. Radalat testified that, without medical intervention, the wound "would probably be fatal." RR1 Vol. 12 at 232. Thompson's own expert would not testify that the medical efforts to save Hayslip's life caused her death. RR1 Vol. 12 at 256.

Viewing the trial evidence and testimony in a light most favorable to the jury's verdict, the Court of Criminal Appeals could reasonably find that a rational jury could convict Thompson. Thompson shot the victim in the mouth, causing a wound that nearly severed her tongue. The wound was serious and threatened her ability to breathe. Care had to be taken so that Hayslip would not drown in her own blood. Tr. Vol. 15 at 84. Surgical efforts to save the victim failed. Whether

12

medical errors played some part in her death is not a question before this Court.  This Court's sole

inquiry is whether the state court unreasonably found that, construing the evidence in favor of the

jury's verdict, sufficient evidence existed to support Thompson's conviction.  The doubly deferential

nature of federal review precludes habeas relief on this claim.

## B.    Use of Information Derived from a State Actor at the Guilt/innocence Phase

The Court of Criminal Appeals ordered a new sentencing hearing after finding that the State

had unconstitutionally admitted into evidence a recording of Thompson's jailhouse conversation

with undercover police officer Gary Johnson.  In Thompson's first appellate proceeding, the Court

of Criminal Appeals provided the following background:

> Deputy Max Cox of the Harris County Sheriff's Department testified at
> punishment that he was approached by an inmate, Jack Reid, who told him that
> [Thompson] was attempting to solicit the murder of Diane Zernia, who was slated
> to be a witness in his capital murder case.  Reid shared a cell with [Thompson].  Reid
> told Cox that [Thompson] had already arranged for the murder by another inmate,
> Max Humphrey, who had also shared a cell with [Thompson] and had recently been
> discharged, but was looking for someone to retrieve a gun and give it to Humphrey
> in order for him to carry out the murder.[6]  Cox told Reid that if he was approached
> by [Thompson] again, he should tell him that he knew someone who could retrieve
> the gun for him.  Reid called Cox the next day and indicated that he had complied
> with Cox's instructions.  Cox then arranged for Gary Johnson, an investigator with
> the Harris County District Attorney's Office, to meet with [Thompson] in an
> undercover capacity to discuss the retrieval of the weapon and record their
> conversation.  Johnson was to assume the identity of Reid's friend, who had
> supposedly been contacted by Reid about retrieval of the gun.  Cox further testified
> that he gave Johnson a map that presumably identified where the gun could be
> located.[7]  Johnson testified that he had been contacted by Cox and had agreed to
> assume an undercover identity for the purpose of meeting with [Thompson] to
> discuss retrieving a weapon to be used in a murder that had possibly already been
> arranged. Johnson testified that he was wired for recording throughout their meeting.

---

[6]      The gun [Thompson] wanted retrieved was later discovered to be the murder weapon used in the instant case.

[7]      Cox testified that he received the map from the officer who did the initial interview (presumably of the informant).  However, it is not clear where this officer obtained the map.

He further testified that [Thompson] brought a hand-drawn map to the meeting, similar to the one Cox had given him, and held it up to the glass for him to see. At that point during Johnson's testimony, the State offered the tape into evidence.

[Thompson] was given permission to question Johnson on voir dire. Johnson admitted to having been aware that [Thompson] was represented by counsel on the capital murder charge at the time of their meeting. He conceded that he had not notified counsel of their meeting, had not informed [Thompson] that he was an officer of the State, and had not given [Thompson] any warnings. *See* TEX. CODE CRIM. PROC. art. 38.22; *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). [Thompson] objected and sought suppression of the tape on the ground that he had been denied counsel during the meeting with Johnson. The trial court overruled the objection and admitted the tape into evidence. The tape was played for the jury.

During their tape-recorded meeting [Thompson] and Johnson briefly discussed retrieval of the gun. Then, [Thompson] told Johnson that there was a witness in his case that he wanted "taken care of." [Thompson] stated that he had already paid Humphrey to kill the witness, but Humphrey had not gone through with the job. [Thompson] gave Johnson the witness' address, and described the witness as a mother with a fourteen year old daughter and a husband. He described her car, and informed him that she was usually home in the mornings after her daughter went to school. He described her house as Victorian and her mailbox as black and white spotted, like a cow. [Thompson] promised that when he got out of jail, he would pay Johnson $1,500 for killing the witness. After the tape was played for the jury, Johnson testified further, without objection, that [Thompson] had brought the map with him to the meeting, and that it had an address written on it. Johnson stated that [Thompson] had held it up to the glass for Johnson to read.

*Thompson*, 93 S.W.3d 1 at 22-23 (footnotes in original).

Thompson argued that the State violated his Sixth Amendment rights by using "against him at his trial evidence from his own incriminating words, which [state] agents had deliberately elicited from him after he had been indicted and in the absence of his counsel." *Massiah v. United States*, 377 U.S. 201, 206 (1964). A *Massiah* violation has three elements: "(1) the Sixth Amendment right to counsel has attached; (2) the individual seeking information from the defendant is a government agent acting without the defendant's counsel's being present; and (3) that agent deliberately elicits incriminating statements from the defendant." *Henderson v. Quarterman*, 460 F.3d 654, 664 (5th

Cir. 2006) (quotation omitted).  The Court of Criminal Appeals found that the punishment-phase introduction of the tape-recorded conversation between Thompson and Johnson was improper:

> The State elicited information from [Thompson] regarding the solicitation of the murder of a person who was to be a witness against [him].  The information was elicited by an agent of the State, without notifying [Thompson's] counsel, and was then used at [his] capital murder trial to help the State establish that [he] posed a continuing threat to society.  The State knew the capital murder charges were pending against [Thompson] at the time, and that any evidence incriminating [him] in another offense would probably be used against him in the capital punishment phase.  We hold [Thompson's] Sixth Amendment right to counsel was violated by the State's actions in soliciting the tape recorded conversation between [Thompson] and Johnson and using it against [him] in the punishment phase of his capital murder trial, the charges of which were pending at the time of the conversation.  The trial court should have granted [Thompson's] motion to suppress the tape.

*Thompson*, 93 S.W.3d at 27 (citation omitted).  On that basis, the Court of Criminal Appeals overturned Thompson's death sentence.

Thompson argues that the Court of Criminal Appeals did not ameliorate all the harm caused by the State's use of an undercover agent.  Thompson's federal petition contends that, because the information Johnson obtained from him led to evidence the State presented in the guilt/innocence phase, the Court of Criminal Appeals should have overturned not just his first death sentence, but his capital conviction also.  Thompson particularly objects because the discovery of the murder weapon revealed how many bullets it would hold, which in turn allowed the State to argue that Thompson reloaded the weapon during the criminal episode.

Thompson's arguments that a *Massiah* violation harmed him the guilt/innocence phase depend on his claim that "the gun was only found based on the information uncovered by Johnson." Dkt. 57 at 60.  Before Johnson met with Thompson, the police obtained a map of where Thompson

had discarded the gun.[8]  Johnson testified that Cox had received the map "through an informant in the Harris County Jail," presumably Reid.  RR1 Vol. 14 at 156.  Thompson argues that, "because authorities were not able to recover the gun based on the map alone," the police sent "Johnson in to speak with Thompson with the goal of recovering the weapon."  Dkt. 57 at 55.  Cox testified that he gave the map to Johnson so he "would have knowledge in talking with the defendant when the defendant was wanting him to go recover the weapon."  RR1 Vol. 14 at 125.

Johnson met with Thompson on July 7, 1998.  Johnson intended to talk to Thompson about "the retrieval of the gun" and "the solicitation" to kill witnesses.  RR1 Vol. 14 at 171.  After Johnson lied and said he had personally searched for, but could not find, the gun, Thompson showed a map that was nearly identical to the first one.  RR1 Vol. 14 at 165.  The police, however, apparently never took the second map from Thompson.  RR1 Vol. 14 at 165-66, 175.  The record does not elaborate on any information outside of the map that Thompson may have provided about the gun's location.

The police recovered the murder weapon almost two weeks later.[9]  Johnson testified that he did not think that the police used the information from his conversation with Thompson to find the gun.  RR1 Vol. 14 at 175.  Johnson thought that the recovery of the gun "would have been from a map they had prior to" his involvement in the case.  RR1 Vol. 14 at 176.

Before turning to the merits, the Court must clarify what issues were resolved by the Court of Criminal Appeals on direct appeal.  Thompson contends that this Court can adjudicate the merits

---

[8]   Deputy Cox did not testify about the origin of the map because trial counsel lodged a hearsay objection to Cox explaining where it came from.  RR1 Vol. 14 at 124-25.  Cox, however, told Johnson to represent that he had received the map from Reid.  RR1 Vol. 14 at 126.

[9]   One of the investigating police officers testified that he received the recovered gun from Officer Gregory Pinkins on July 23, 1998.  RR1 Vol. 11 at 32-33.  Officer Pinkins, who had been investigating the murders, testified that "with the help of an informant" they found the gun in a bayou.  RR1 Vol. 11 at 154.  Officer Pinkins did not say when the police found the weapon other than it was "[a]pproximately four or five days" before he gave it to the other officer.

of his claim *de novo* because the Court of Criminal Appeals never ruled on his argument that a *Massiah* violation tainted the guilt/innocence phase.  Respondent argues that either (1) Thompson never made clear to the state courts that the Johnson conversation influenced the guilt/innocence phase, thus rendering the claim in his federal petition unexhausted or (2) the Court of Criminal Appeals adjudicated the whole of his claim on the merits, requiring the application of AEDPA deference.

      1.      Litigation of this Claim in State Court

Respondent primarily argues that Thompson exhausted his *Massiah* claim on direct appeal, but in the alternative asserts that Thompson did not adequately place the issue before the state courts.  Thompson never asked the trial court to find that the gun was inadmissible.  The Court must decide whether his arguments on appeal sufficiently put the guilt/innocence aspects of his claim before the Court of Criminal Appeals.

Under 28 U.S.C. § 2254(b)(1), a federal habeas petitioner must fully exhaust remedies available in state court before proceeding to federal court.  A federal court may only adjudicate a claim when the petitioner fairly presents its substance to the state courts.  *See Smith v. Dretke*, 134 F. App'x 674, 677 (5th Cir. 2005).  Then, AEDPA deference applies if the state court adjudicated the merits of the inmate's claim.  Before turning to the merits, the Court must ask: Did Thompson sufficiently raise his federal claim in state court for the purposes of exhaustion?  If so, did the state courts rule on his claim *sub silentio* or did they ignore it?  If the state courts ruled on his claim, does AEDPA govern federal review?

Thompson's appellate brief first introduced his theory that a *Massiah* violation tainted both stages of trial: "The undercover interview was intertwined with the recovery of the murder weapon

17

and the investigation of a solicitation of a homicide.  The State of Texas did not make any attempt to delineate between the two events."  Appellate Brief, at 28.  But Thompson's brief still focused its discussion on the jury's punishment phase deliberations: "The record clearly demonstrates that the Defendant's statements on the tape recording and to Gary Johnson were incriminating both at guilt and punishment and significantly aided the State of Texas in securing an affirmative answer to Special Issue Number 1. It created future dangerousness evidence for the State."  Appellate Brief, at 28.  A supplemental brief emphasized that "[a]s a direct result of the interview the weapon was recovered by the State," but only generally argued that "the judgment of the Court should be reversed and remanded for a new trial or a new punishment hearing."  Supplemental Appellate Brief, at 3.

The Court of Criminal Appeals extensively discussed the effect that the *Massiah* violation had on the punishment phase of trial without mentioning Thompson's allegations relating to the guilt/innocence phase.  Thompson subsequently filed a *pro se* motion for rehearing and argued that the *Massiah* violation harmed him "throughout trial," including in the guilt/innocence phase.  The Court of Criminal Appeals initially granted Thompson's motion for rehearing, but subsequently dismissed it as improvidently granted.[10]

On federal review, the question of whether Thompson fairly presented his claims to the Texas courts is separate from the question of whether the Texas courts adjudicated them.  *See Smith v. Digmon*, 434 U.S. 332, 333 (1978) ("It is too obvious to merit extended discussion that whether the exhaustion requirement of 28 U.S.C. § 2254(b) has been satisfied cannot turn upon whether a state appellate court chooses to ignore in its opinion a federal constitutional claim[.]").  Thompson did

---

[10]     The Court of Criminal Appeals provided only a brief explanation of its action: "We granted [Thompson's] first ground for rehearing in which he maintained we failed to fully consider his fourth point of error on original submission.  Upon further consideration, we have concluded our decision to grant rehearing was improvident and we withdraw the order granting rehearing."  *Thompson v. State*, 108 S.W.3d 269 (Tex. Crim. App. 2003).

not provide the same detailed briefing regarding the *Massiah* violation as he does in federal court, but still afforded the state courts an opportunity to consider whether the Johnson conversation influenced the guilt/innocence phase.  The Court finds that Thompson exhausted his *Massiah* claim.

The record, however, does not clearly indicate whether the Court of Criminal Appeals intended to adjudicate the guilt/innocence portion of the *Massiah* claim, intentionally ignored it, or neglected to rule on it.  Generally, "[w]hen a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits." *Johnson v. Williams*, 133 S. Ct. 1088, 1096 (2013); *see also Harrington v. Richter*, 131 S. Ct. 770, 784-85 (2011) ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits [for purposes of § 2254(d) ] in the absence of any indication or state-law procedural principles to the contrary.").  The "presumption can in some limited circumstances be rebutted . . . either by the habeas petitioner (for the purpose of showing that the claim should be considered by the federal court *de novo* ) or by the State (for the purpose of showing that the federal claim should be regarded as procedurally defaulted). . . .  Thus, while the . . . presumption is a strong one that may be rebutted only in unusual circumstances, it is not irrebuttable."  *Williams*, 133 S. Ct. at 1096.

Thompson's *pro se* motion for rehearing argued that the Court of Criminal Appeals did not fully adjudicate his claim.  The Court of Criminal Appeals ultimately denied rehearing without divulging whether it had already adjudicated the claim, considered it to be meritless, applied Texas procedural law, or found some other reason for denial.  Nevertheless, neither party has rebutted the presumption that the Court of Criminal Appeals decided the issue on the merits.  The Court, therefore, presumes that the Court of Criminal Appeals denied the guilt/innocence aspects of his

19

*Massiah* claim on the merits.  The Court will apply AEDPA's deferential scheme to Thompson's *Massiah* claim.

> 2.     The Merits

The Court of Criminal Appeals decided on direct appeal that the State had committed a *Massiah* violation by sending an undercover agent to speak with Thompson.  Because neither party questions whether the Court of Criminal Appeals was correct in finding a constitutional violation, this Court does not revisit that decision and only considers its impact on Thompson's conviction.[11]

Johnson did not testify in the guilt/innocence phase.  Instead, Thompson objects to derivative evidence and testimony relating to the murder weapon, which Thompson argues was only discovered after Johnson's conversation with him.  Information about the gun came before the jury in various contexts.[12]  Thompson argues that "[t]here is no question that [he] was harmed by the admission of the gun in his case, and the gun was only found based on the information uncovered by Gary Johnson in violation of Thompson's Right to Counsel."  Dkt. 57 at 60.

Respondent claims that two doctrines overcome the deterrence rationale underlying a *Massiah* violation.  The Supreme Court recognizes an "independent source doctrine" that allows trial courts to admit evidence when "officers independently acquired it from a separate, independent source."  *Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016); *see also Nix v. Williams*, 467 U.S. 431, 442

---

[11]     Subsequent to deciding that a *Massiah* violation occurred in this case, the Court of Criminal Appeals observed that its "holding in *Thompson* may have been called into question by the later Supreme Court decision in *Kansas v. Ventris*, [556 U.S. 586 (2009)]."  *Rubalcado v. State*, 424 S.W.3d 560, 572 (Tex. Crim. App. 2014).  As the parties have not questioned whether a *Massiah* violation occurred, and Respondent persuasively argues that Thompson has not shown any connection between the Johnson conversation and the gun's recovery, the Court will assume that the State violated the Sixth Amendment by having Johnson speak with Thompson.

[12]     Police officers described finding the weapon submerged in Cypress Creek, RR1 Vol. 11 at 32-33, 153-57, based on information from an informant, RR1 Vol. 11 at 153-54.  A firearms examiner told jurors that, since the gun could only hold six bullets, the shooter would have to reload to discharge the number of fired bullets found at the crime scene. RR1 Vol. 11 at 165-174.  In closing arguments, the State emphasized that reloading the weapon showed that the shootings were not an accident, but an intentional effort to kill.  RR1 Vol. 13 at 55-57.

(1984).  Also, Respondent argues that the inevitable-discovery doctrine, which "asks whether there is a reasonable probability that the evidence in question would have been discovered in the absence of the police misconduct," cured the *Massiah* violation.  *United States v. Zavala*, 541 F.3d 562, 579 (5th Cir. 2008); *see also Nix*, 467 U.S. at 443-44 .  Respondent argues that "it is clear that the gun was discovered either from a source independent of Johnson or its discovery was inevitable."  Dkt. 66 at 40.  Respondent's arguments under both the inevitable-discovery and the independent-source doctrine rely on the absence of a link between the Johnson conversation and the gun's recovery.

Thompson has not shown that his conversation with Johnson was the predicate for the police recovering the murder weapon.  Thompson assumes that the police recovered the gun "with the help of Johnson's recording," because they found it afterward.  Dkt. 57 at 58.  Showing that the police found the gun after the Johnson conversation does not mean they found it *because of* the conversation.  The record does not extensively discuss the discovery of the murder weapon, likely because trial counsel did not challenge its admissibility.  Still, the record does not suggest that the police used information from Johnson to find the gun.  Thompson has not pointed to anything in the record showing that he provided Johnson some detail not already known from the first map or his statements to Zernia.[13]  A previous informant had already obtained a map showing the location of the murder weapon, which the police had before sending Johnson to speak with Thompson.  RR1 Vol. 14 at 124-25.  That map indicated the location of the creek in which Thompson discarded the gun.  RR1 Vol. 14 at 126.  The police used that map in searching for the weapon.  RR1 Vol. 14 at 127.  Despite having looked before the Johnson conversation, the police did not find the gun until

---

[13]      While Johnson testified that Thompson told him which direction he threw the weapon from his car, the original map indicated where Thompson discarded the gun.  *Compare* RR1 Vol. 14 at 173 *with* RR1 Vol. 16, State's Exhibit 88.  When Johnson asked for more information, Thompson drew a map.  RR1 Vol. 14 at 174.  Thompson has not identified any meaningful difference between that map and the initial one, much less any difference that the police used to find the discarded weapon.

nearly two weeks *after* Johnson met with Thompson.  Johnson testified that he thought the police used the first map to find the murder weapon.  RR1 Vol. 14 at 176-77.  Johnson also provided uncontradicted testimony that the police did not rely on his conversation with Thompson.  Tr. Vol. 14 at 174-76.

With that record, Thompson bases his claim on speculation that he provided Johnson some previously unknown fact about the location of the discarded weapon.  He also speculates that Johnson provided some otherwise-unknown information to the officers who found the gun.  From the record before the Court, it appears that the discovery of the gun was "wholly independent of any constitutional violation."  *Nix*, 467 U.S. at 442.  Thompson, therefore, has not shown that the Court of Criminal Appeals was unreasonable in denying the guilt/innocence aspects of his *Massiah* claim.[14] The Court, therefore, will deny relief.

## C.     Testimony from an Informant in the Second Punishment Hearing

In his third ground for relief, Thompson claims that the State violated his constitutional rights by presenting testimony in the second punishment phase from fellow inmate Robin Rhodes.  As previously discussed, undercover police officer Johnson testified in the first penalty hearing that Thompson had attempted to solicit the murder of witnesses.  Johnson, however, was not the only

---

[14]     The Court's analysis would be the same whether under AEDPA or *de novo* review.  Even if Thompson had shown constitutional error, he must still prove that any improper influence resulting from the Johnson conversation had some impact in the guilt/innocence phase.  The Supreme Court has held that a *Massiah* violation can be harmless.  *See Milton v. Wainwright*, 407 U.S. 371 (1972).  Under *Brecht v. Abrahamson*, a federal court may grant habeas relief based on trial error only when that error "had substantial and injurious effect or influence in determining the jury's verdict."  507 U.S. 619, 637 (1993) (quotation omitted).  Here, testimony and evidence relating to the murder weapon had a negligible influence on the jury's decision.  No question existed as to Thompson's role as the killer.  The defense at trial focused on causation, not ballistics evidence.  To the extent that the prosecution drew inferences from the weapon, such as that Thompson reloaded before shooting Hayslip, that information bore little relationship to his decision to pull the trigger.  In fact, the most conclusive indication of his intent was his declaration "I can shoot you too, bitch" as he fired into Hayslip's face.  RR1 Vol. 11 at 132.  In short, Thompson has not shown that any *Massiah* violation harmed him in the guilt/innocence phase.

person who could describe Thompson's efforts to solicit murder. Prior to Thompson's original trial, the Harris County District Attorney's office gave Thompson the following notice: "In August, 1998 the defendant solicited inmate Robin Rhodes to kill numerous witnesses and obtain and destroy the murder weapon in this case." CR at 67-68. Rhodes, however, did not testify at the original trial.

Because the Court of Criminal Appeals found that Johnson's testimony should have been excluded, *Thompson*, 93 S.W.3d at 22-29, the State called other witnesses to show that Thompson tried to solicit murder, including Rhodes who had been incarcerated with Thompson in 1998. Thompson contends: "it is clear that (1) his right to counsel had attached in both the capital murder and the subsequently filed solicitation of capital murder proceedings; (2) Robin Rhodes was a government agent (full time informant for Harris County law enforcement); (3) and that Rhodes deliberately elicited evidence from Thompson." Dkt. 57 at 62. Thompson, in fact, now calls Rhodes not only an informant, but a "government employee." Dkt. 69 at 27.

Based on that premise, Thompson raises three separate constitutional arguments. First, Thompson argues that Rhodes's testimony amounted to a separate *Massiah* violation.[15] Second, Thompson asserts that the State of Texas disregarded its duty under *Brady v. Maryland*, 373 U.S. 83 (1963) to disclose information about its relationship with Rhodes.[16] Finally, Thompson maintains that his trial, appellate, and state habeas attorneys provided ineffective representation in their

---

[15] Again, "[a] *Massiah* violation has three elements: (1) the Sixth Amendment right to counsel has attached; (2) the individual seeking information from the defendant is a government agent acting without the defendant's counsel being present; and (3) that agent 'deliberately elicit[s]' incriminating statements from the defendant." *Henderson*, 460 F.3d at 664 (alteration in original) (quoting *Massiah*, 377 U.S. at 206).

[16] "A *Brady* claim involves three elements; (1) the prosecution's suppression or withholding of evidence, (2) which evidence is favorable, and (3) material to the defense." *United States v. Stephens*, 964 F.2d 424, 435 (5th Cir. 1992). Also, "*Brady* does not obligate the State to furnish a defendant with exculpatory evidence that is fully available to the defendant through the exercise of reasonable diligence." *Reed v. Stephens*, 739 F.3d 753, 788 (5th Cir. 2014).

handling of Rhodes's testimony.[17]  Respondent contends that each argument is procedurally barred and, alternatively, without merit.

> 1.    Procedural Bar

Thompson failed to raise any arguments from claim three in his first two state habeas applications.  When Thompson raised these claims in his third state habeas application, the Court of Criminal Appeals dismissed the claims under TEX. CODE CRIM. PRO. art. 11.071 §5 as an abuse of the writ without considering the merits.  "A dismissal pursuant to Article 11.071 'is an independent and adequate state ground for the purpose of imposing a procedural bar' in a subsequent federal habeas proceeding." *Gutierrez v. Stephens*, 590 F. App'x 371, 384 (5th Cir. 2014) (quoting *Hughes v. Quarterman*, 530 F.3d 336, 341 (5th Cir. 2008)).[18]

Thompson makes two arguments to overcome the procedural bar.  First, Thompson contends that the suppression of evidence, discussed in the *Brady* portion of his argument, should forgive his failure to raise the claim properly in state court.  Second, Thompson argues that state habeas counsel provided ineffective representation under *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), by not raising his federal claims in the initial rounds of state habeas review.  Both arguments, however, cover the same ground as his substantive claims.  For the same reasons that Thompson has not shown constitutional error in the State's use of Rhodes's testimony, he has not shown cause or actual prejudice to overcome the procedural bar.

---

[17]    Despite some differences in application, whether an inmate complains about the representation provided by his trial, appellate, or habeas counsel he still must show deficient performance and resulting prejudice under *Strickland v. Washington*, 466 U.S. 668 (1984).

[18]    Thompson argues that the Court of Criminal Appeals's dismissal amounts to a decision on the merits under *Ruiz v. Quarterman*, 504 F.3d 523, 527 (5th Cir. 2007).  *Ruiz*, however, is not applicable in this circumstance. "The Fifth Circuit has held post-*Ruiz* that § 5(a) remains an independent and adequate state ground for the purpose of imposing a procedural bar." *Stroman v. Thaler*, 405 F. App'x 933, 935 (5th Cir. 2010) (citing *Hughes v. Quarterman*, 530 F.3d 336, 342 (5th Cir. 2008) and *Rocha v. Thaler*, 619 F.3d 387 (5th Cir. 2010)).

2.      The Merits

At the core, each of Thompson's various constitutional arguments complains that the State failed to divulge important facts about its relationship with Rhodes.  Thompson specifically says that Rhodes "was, by his own admission, a full time informant for Harris County when he elicited information from Thompson."  Dkt. 57 at 63.  Thompson wishes that the State had disclosed that Rhodes: was employed by the Harris County Organized Crime Narcotics Task Force, which included the Harris County District Attorney's Office; had been a confidential informant in numerous cases and had twice testified for the State, including once in a capital murder prosecution; had received $30,000 for his participation in another capital murder case relating to a narcotics transaction; had previously received other payments for assisting police; had helped secure numerous search warrants; and had acted at the State's direction in extracting statements from Thompson.  As discussed below, whether he casts his claims in the context of *Massiah*, *Brady*, or *Strickland* claims, much of the information on which Thompson bases his claim was known to – and used by – trial counsel.

Before the retrial, the State gave notice that it intended to call Rhodes as a witness in the retrial of Thompson's punishment.  CR2 at 110.[19]  Shortly before retrial, defense counsel moved for a continuance to investigate Rhodes's testimony.  The defense argued: "For the first time and literally by accident Counsel on overhearing a conversation learned of Rhodes's participation in a previous capital murder trial.  Subsequent investigation leads Counsel to believe that Rhodes may well have been an agent of the State while he was incarcerated with this defendant, if so, his testimony is

---

[19]     The State's notice specified: "On or about August 21, 1998 the defendant prepared a list of witnesses to fellow inmate Robin Rhodes for the purpose of Rhodes to kill or otherwise use physical means to prevent from testifying at trial."  CR at 67-68.

clearly inadmissible." CR2 at 210. The defense also argued that "there may be significant impeachment evidence" relating to Rhodes that the State had not disclosed. CR2 at 210. The trial court refused to postpone the trial.

Before testimony began in the second punishment phase, the parties discussed the disclosure of any information relating to Rhodes. RR2 Vol. 16 at 8.[20] The State had already disclosed that it had entered into an agreement with Rhodes. RR2 Vol. 2 at 28-29, 47. During opening argument, the State told jurors that Thompson had developed a hit list of potential witnesses. The prosecutor told jurors that Rhodes "takes that list to the police . . . . He is expecting consideration for the evidence and has received consideration in exchange for his testimony in the case. He has eight hot check cases, Class C misdemeanors that we're going to go ahead and dismiss. He also has a pending Class B misdemeanor, false report case, that we're also going to dismiss in exchange for his testimony." RR2 Vol. 16 at 31-32.

Rhodes testified on the second day of the punishment hearing. Rhodes told jurors that he worked with the Harris County Organized Crime Task Force relating to "pretty much whatever situation he stumbled into." RR2 Vol. 17 at 136. In August 1998, Rhodes struck up a conversation with Thompson in recreation and claimed that he "could find anybody anywhere at any time." RR2 Vol. 17 at 136. Thompson responded that he "wanted some people to not appear [at his trial] or disappear." RR2 Vol. 17 at 138. Rhodes testified:

> From my understanding he had a problem with some people that he wanted to, he said, Just go away. I don't care how it happens. He – found out he had a problem with a female and another man and there was some people that could tie him to it. He figured with my expertise I could make them go away.

---

[20] The prosecutor told the trial court that Rhodes had several criminal issues pending, and that the State agreed to treat him with leniency in return for his honest testimony. RR2 Vol. 2 at 26-29, 47.

RR2 Vol. 17 at 138.  "The deal was that [Rhodes] would do what [he] could do" to keep them from coming to court.  RR2 Vol. 17 at 138.  When Rhodes "asked for some descriptions" of the intended victims, Thompson gave him a list of names.  RR2 Vol. 17 at 140-41.  Rhodes then contacted an officer with the Harris County Organized Crime Unit and gave him the list. RR2 Vol. 17 at 141.  The State admitted the list into evidence without any objection.

Rhodes also testified that Thompson told him about the murders.  Thompson explained that "he had gone over to the apartment and he had shot the gentleman and got mad because it didn't kill him and they accidentally got into a struggle and he shot himself and then he shot the guy again."  RR2 Vol. 17 at 139.  Referring to Hayslip, Thompson said "the bitch wouldn't get up again."  RR2 Vol. 17 at 139.

On cross-examination, Rhodes explained that he had helped the government for a long time.  RR2 Vol. 17 at 149.  He had assisted the Harris County District Attorney's Office as an informant and had been paid "on many occasions."  RR2 Vol. 17 at 153.  Rhodes described his role: "I was a full-time – basically I was a full-time informant for the Harris County Organized Crime Task Force."  RR2 Vol. 17 at 153.  Rhodes explained that he had testified in two other trials that he could recall.  RR2 Vol. 17 at 154.  In one of the trials in which he provided information about a capital murder involving a significant amount of drugs, the State paid him "somewhere in the neighborhood of between 20 and $30,000" from money the government had seized.  RR2 Vol. 17 at 159.  The defense unsuccessfully moved to strike Rhodes's testimony because the District Attorney's Office violated *Brady* by not divulging that he was in their employ.  RR2 Vol. 17 at 163.

Trial counsel's thorough cross-examination of Rhodes demonstrated an intricate understanding of his past interaction with the State.[21]  To the extent that trial counsel did not know about some facets of his role as an informant, Thompson concedes that Rhodes's history was discoverable from a published appellate opinion.  In *Stephens v. State*, 59 S.W.3d 377, 381-82 (Tex. App.-Houston [1 Dist.] 2001), a Texas appellate court explained that Rhodes had:

> testified before the jury that he was currently employed by the Harris County Organized Crime Narcotics Task Force, which included the Harris County District Attorney's Office, as a confidential informant in over 50 cases, more than 80 percent of which resulted in convictions; that he had twice testified for the State, including once in a capital murder prosecution; and that the State had not doubted him.

*Stephens*, 59 S.W.3d at 381.  Thompson has not shown how the State could have suppressed information in a published judicial decision.  *See Parr v. Quarterman*, 472 F.3d 245, 254 (5th Cir. 2006) ("[T]he prosecution is not required to disclose evidence that could be discovered by exercising due diligence.").

The trial record clearly shows that Rhodes had a history of providing information to, and testimony for, the State.  Even accepting Thompson's argument that "there is no doubt that [Rhodes's] aim, once in jail, was to get information and relay it to the government," Dkt. 21 at 57,

---

[21]      In adjudicating a different claim, the state habeas court recognized that trial counsel effectively cross-examined Rhodes about his prior work as an informant:

> Trial counsel effectively cross-examined Rhodes, impeaching his credibility eliciting testimony regarding his work as an informant for law enforcement, and suggesting that Rhodes' testimony in the instant trial was a product of Rhodes' desire to help himself. Trial counsel elicited testimony that Rhodes had a prior conviction for aggravated robbery that he neglected to mention during his direct examination; that Rhodes had done a lot of work for law enforcement and received pay for that work; that Rhodes was not looking for a way to gain favor with law enforcement authorities when he was in jail with [Thompson] but Rhodes would not overlook it if it was dumped in his lap; that Rhodes was a full-time informant for the Harris County Organized Crime Task Force in 1998 and 1999 and testified in two trials and that Rhodes was paid for his participation in the Benavidez trial even though the record from that trial reflected that Rhodes denied receiving payment.

State Habeas Record at 250.

Thompson's briefing does not show that the State instructed Rhodes to do so.  Rhodes characterized himself as a "ful-time" informant, but the record does not show that he was an agent or employee of the State with regard to securing information from Thompson.  Instead, the record confirms that Rhodes often provided information to the State in return for monetary gain or leniency.  But the question is "whether the challenged statements had been deliberately elicited" and "whether the government had directed or steered the informant toward the defendant." *United States v. York*, 933 F.2d 1343, 1356 (7th Cir. 1991).  The core of Thompson's claims depends on showing that Rhodes "was acting *under instructions* as a paid informant for the Government[.]"  *United States v. Henry*, 447 U.S. 264, 270 (1980) (emphasis added); *see also Kuhlmann v. Wilson*, 477 U.S. 436, 459 (5th Cir. 1986) ("[T]he primary concern of the *Massiah* line of decisions is secret interrogation by investigatory techniques that are the equivalent of direct police interrogation.").  Rhodes explicitly testified, however, that he did not talk with Thompson pursuant to any State-directed instruction or order:

| | |
|---|---|
| The State: | When you went back in jail did anybody from any law enforcement agency ask you to target Charles Victor Thompson and help us gather evidence against him? |
| Rhodes: | No, not at all. |

RR2 Vol. 17 at 134-35.  As it now stands, Thompson only speculates that Rhodes "was charged with obtaining information" from him.  *Henry*, 447 U.S. at 272 n.10.  Even to the extent that Thompson may not have had all possible information about Rhodes, the new information only fills in outlines known at the time of trial, yet still does not suggest that the State encouraged Rhodes to act.  Simply, the record before the Court does not suggest that the State deliberately used Rhodes as an agent to

deliberately secure information from Thompson in violation of his constitutional rights.[22]

The transcript alone reveals that the defense understood at least the rudimentary facts of Rhodes's background as a government informant. While Thompson later learned additional information about Rhodes,[23] it only confirms trial testimony showing that Rhodes previously had a close relationship with law enforcement, had provided information used in criminal prosecutions, had testified for the State as an informant, and had received a benefit for his testimony. Jurors had an adequate opportunity to consider that information.[24] The record, however, does not show that the State directed Rhodes to secure information from Thompson. Whether under *Brady*, *Strickland*, or some other standard, Thompson has not shown prejudice or harm.

In conclusion, Thompson has not shown that Rhodes elicited information at the behest of state agencies or with the authority of a state actor. The record does not show that state actors

---

[22]    The Court ordered the Respondent to submit prosecutorial notes and other material not previously disclosed for *in camera* review. Dkt. 32, 35. The Court has fully reviewed the whole of the submitted material and has found nothing that would support the allegations Thompson raises in his third ground for relief. With the factual record, Thompson has not shown that an evidentiary hearing or additional factual development is necessary to a full and fair adjudication of his claims.

[23]    For instance, Thompson uncovered a contract between Rhodes and the district attorney's office to "cooperate with . . . law enforcement officers in the investigation of narcotics trafficking . . . ." Dkt. 57 at 75. Because this contract ended years before trial, and involved issues completely separate from those in the instant case, such evidence is of little value in deciding whether a *Massiah* violation occurred. Thompson also emphasizes an inter-office memorandum that an assistant district attorney prepared after being contacted by Rhodes in which he reports contact with "the witness in this case Robin Rhodes." Dkt. 57 at 85. Also, other memoranda suggest that the District Attorney's Office knew at the time of trial that Rhodes had previously worked as an informant. As Respondent observes, however, "the 'recently disclosed' facts merely provide more detailed specifics relating to Rhodes's informant activity that he testified about explicitly at trial" Dkt. 66 at 61. In particular, Respondent observes two problems. First, "it is unsurprising that Rhodes would be referred to as a potential witness in either Thompson's capital murder or solicitation case immediately after he disclosed information that Thompson attempted to enlist him in a plot to murder witnesses." Second, "the memo explains that [Rhodes] received information from [Thompson] on August 21, 1998, and contacted Kelly five days later, on August 26, 1998. Ultimately, instead of providing an indication that the State directed Thompson to obtain information, this evidence confirms that after Thompson made the disclosures, Rhodes contacted a 'handler' at the Harris County Organized Crime Unit and was put in touch with an investigator from the District Attorney's Office to whom he provided the list." Dkt. 66 at 63-64.

[24]    To that end, Thompson has also not shown that his previous attorneys provided ineffective representation at any prior stage for not doing more to advance his federal claim.

engaged in a plot to hide Rhodes's alleged role as a state agent.  Concomitantly, Thompson has not

shown any new or previously undisclosed information about Rhodes' relationship with the State that

would have excluded him from testifying or made any greater impact in the jury's consideration of

his testimony than that known at trial.  In sum, Thompson has not overcome the procedural bar of

his third federal claim and, alternatively, has not provided a reasonable basis to suspect that Rhodes

was a government agent or that the State did not divulge material details about his status.  Thompson

has not shown that claim three merits federal relief.[25]

## D.      Sufficiency of the Indictment

Thompson contends that the indictment against him was insufficient because it did not allege

any facts relating to the special-issue questions that the jury would answer.  In *Apprendi v. New

Jersey*, 530 U.S. 466, 490 (2000), the Supreme Court held that "[o]ther than the fact of prior

conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum

must be submitted to a jury, and proved beyond a reasonable doubt[.]"  *See also Ring v. Arizona*, 536

U.S. 584, 609 (2002) (extending *Apprendi* to capital cases).  Thompson argues that Texas's capital

punishment system violates *Apprendi* because it does not require the indictment to notify him of

what evidence the State intends to introduce in seeking a death sentence.

The Court of Criminal Appeals summarily denied this claim on direct appeal by simply

stating: "This Court has repeatedly rejected the argument that *Apprendi* requires the State to allege

the special issues in the indictment."  *Thompson*, 2007 WL 3208755, at *3.  Thompson has not

shown that the terse rejection of this claim was contrary to, or an unreasonable application of, federal

---

[25]      Thompson's pending motion for an evidentiary hearing focuses on developing his claim relating to
Rhodes's testimony.  The Court finds that Thompson has not shown that factual development is necessary to a fair
development of this claim.

law.  As an initial matter, defects in a state criminal indictment are of no moment on federal habeas review.  The Supreme Court has never held that the indictment provisions of the Fifth Amendment apply to the States through the Fourteenth Amendment.  *See, e.g., Branzburg v. Haynes*, 408 U.S. 665, 686-88 n.25 (1972) (noting that "indictment by grand jury is not part of the due process of law guaranteed to state criminal defendants by the Fourteenth Amendment"); *see also Apprendi*, 530 U.S. at 477 n.3 (declining to discuss the implications of that decision on the sufficiency of an indictment).  The sufficiency of a state indictment is an appropriate concern on federal habeas corpus only when it can be shown that the indictment is so defective that it deprives the convicting court of jurisdiction.  *Williams v. Collins*, 16 F.3d 626, 637 (5th Cir. 1994); *McKay v. Collins*, 12 F.3d 66, 68 (5th Cir. 1994).

State law dictates whether a state indictment is sufficient to confer a court with jurisdiction. In addressing a separate issue, the Court of Criminal Appeals found that Texas state law "do[es] not require the State to plead the punishment special issues in [the indictment in] a capital case." *Thompson*, 2007 WL 3208755, at *4.  The Fifth Circuit has held that the district court is "required to accord due deference to the state's interpretation of its own law that a defect of substance in an indictment does not deprive a state trial court of jurisdiction."  *McKay*, 12 F.3d at 69 (citations omitted).  Where, as here, the state court has been presented the question of the indictment's sufficiency on appeal and ruled that the indictment was not fundamentally defective, federal habeas review is foreclosed.  *See Wood v. Quarterman*, 503 F.3d 408, 412 (5th Cir. 2007).

Even if federal law placed any requirement on state criminal indictments, Thompson has not shown that *Apprendi* requires that an indictment include facts relating to the special issues.  The Supreme Court has approached *Apprendi* from several different legal angles, but has never held that

the prosecution must plead punishment-phase factors in the indictment.  *See Apprendi*, 530 U.S. at

477 n. 3 (refusing to address the indictment issue because the petitioner did not raise it); *Ring*, 536

U.S. at 597 n. 4 (noting that petitioner did not allege constitutional defects in the indictment); *see*

*also United States v. Bourgeois*, 423 F.3d 501, 507 (5th Cir. 2005) (noting that the Supreme Court

has yet to hold that aggravating factors must be charged in the indictment).  The Fifth Circuit has

summarily denied a similar claim in at least one case.  *See Bigby v. Stephens*, 595 F. App'x 350, 354

(5th Cir. 2014).  For this court to rule otherwise would violate the non-retroactivity principle of

*Teague v. Lane*, 489 U.S. 288 (1989).  *See Harris*, 81 F.3d at 541.[26]

      For the reasons discussed above, the Court of Criminal Appeals's denial of Thompson's

claim of error in the indictment was not contrary to, or an unreasonable application of, federal law.

*See* 28 U.S.C. § 2254(d)(1).

## E.      Victim-Impact Testimony

      Thompson contends that the State adduced impermissible victim-impact evidence in

violation of his constitutional right to be free from cruel and unusual punishment.  "To be clear, the

Eighth Amendment does not per se bar the introduction of victim impact evidence in capital cases."

*Roberts v. Thaler*, 681 F.3d 597, 611 (5th Cir. 2012) (citing *Payne v. Tennessee*, 501 U.S. 808, 827

(1991)).  Instead, the United States Supreme Court has held that, because "[a] State may legitimately

conclude that evidence about the victim and about the impact of the murder on the victim's family

is relevant to the jury's decision as to whether or not the death penalty should be imposed," a State

---

[26]      At any rate, Texas places the constitutionally required finding of an aggravating factor in the guilt/innocence phase where the jury finds a defendant guilty of a death-eligible offense.  *See Jurek v. Texas*, 428 U.S. 262, 270-71 (1976) (approving Texas's use of aggravating factors in the guilt/innocence phase to narrow the class of death-eligible defendants); *Woods v. Cockrell*, 75 F.3d 1017, 1033-34 (5th Cir. 1996); *James v. Collins*, 987 F.2d 1116, 1119 (5th Cir. 1993).  After a jury convicts a capital inmate, the maximum punishment available is death.  The punishment phase's factual issues do not increase an inmate's authorized punishment, making *Apprendi* inapplicable. *Allen v. Stephens*, 805 F.3d 617, 628 (5th Cir. 2015).

may "choose[] to permit the admission of victim impact evidence and prosecutorial argument on that subject . . . ."  *Payne*, 501 U.S. at 827.  Still, "an Eighth Amendment problem may result" if "'evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair . . . .'"  *Janecka v. Cockrell*, 301 F.3d 316, 328 (5th Cir. 2002) (quoting *Payne*, 501 U.S. at 825).

During the second punishment phase, Michael Gene Donaghy, Hayslip's brother, testified about her funeral.  During that testimony, Thompson claims that the State "exceeded the scope of permissible victim impact [testimony] when it sought detailed testimony on the number and types of persons who appeared at the complainant Hayslip's funeral."  Dkt. 57 at 12.  Specifically, Thompson objects to the following interchange:

| | |
|---|---|
| The State: | How many people showed up [at the funeral]? |
| Donaghy: | Hundreds. There was a lot of people. |
| The State: | Did you even realize she had that many friends or that many people who knew her? |
| Donaghy: | I knew my sister touched a lot of lives and everybody loved her and she loved everybody.  I didn't know she knew that many people. |
| The State: | Who showed up at the funeral?  Social friends?  Clients?  Mixture of both? |
| Trial Counsel: | I object to this. This goes beyond victim impact with this testimony. |
| Trial Court: | That's overruled. |
| Trial Counsel: | Gets to the area of victim character evidence and we object to it. |
| Trial court: | Overruled.  Go ahead. |

RR2 Vol. 18 at 35.  At that point, the prosecutor did not pursue any more testimony about who attended Hayslip's funeral.

On direct appeal, Thompson complained that the trial court erred in allowing Donaghy to testify about both the number and the type of people who attended Hayslip's funeral.  The Court of Criminal Appeals provided three justifications for denying Thompson's claim.  The Court finds that each ground provides a reasonable basis to deny federal habeas relief.

First, the Court of Criminal Appeals held that Thompson failed to preserve error with regard to testimony about number of people who attended Hayslip's funeral.  *See Thompson*, 2007 WL 3208755, at *6.  Texas contemporaneous objection rule requires "a party to preserve an issue for appellate review" by making "a timely objection with specific grounds for the desired ruling[.]" *Livingston v. Johnson*, 107 F.3d 297, 311 (5th Cir. 1997).  The Fifth Circuit "has consistently held that the Texas's contemporaneous objection rule constitutes an adequate and independent state ground that procedurally bars federal habeas review of a petitioner's claims." *Fisher v. Texas*, 169 F.3d 295, 300 (5th Cir. 1999); *see also Cotton v. Cockrell*, 343 F.3d 746, 754 (5th Cir. 2003).  The state courts's invocation of its procedural law on that portion of Thompson's claim bars federal review.

Second, the Court of Criminal Appeals found that Thompson failed to show error because Donaghy never actually testified about the type of people who attended Hayslip's funeral.  The Court of Criminal Appeals observed: "Although [Thompson] argues that the trial court erred in allowing Donaghy 'to testify to the . . . types of people who attended the . . . funeral,' no testimony was actually elicited.  The question was asked, and the trial court overruled [Thompson's] objection, but the prosecutor never pursued an answer." *Thompson*, 2007 WL 3208755, at *6.  Even if the

prosecutor asked a question intended to elicit improper victim-impact testimony, the witnesses did not answer it.

Finally, the Court of Criminal Appeals found that "assuming that the question was improper," Thompson "was not harmed by the unanswered question.  The question by itself did not assume, suggest, or interject any facts about who actually attended the service or leave the jury with a particular impression about the types of persons who attended." *Thompson*, 2007 WL 3208755, at *6.  Given the nature of the evidence against Thompson, inferences the jury may have taken from the question would have had negligible, if any, impact on the jury's consideration of Thompson's sentence.  Even if the prosecution erred in asking for details about the victim's funeral, Thompson has not shown any prejudice resulting therefrom.

Thompson procedurally defaulted a portion of this claim in state court.  Thompson has otherwise not shown that the state court's adjudication of the merits was contrary to, or an unreasonable application of, federal law.  *See* 28 U.S.C. § 2254(d)(1).

**F.      Lethal Injection**

Thompson claims that Texas's lethal-injection procedure violates the Eighth Amendment. In 1982, the State of Texas adopted lethal injection as its sole method of execution.  Texas law does not specify what substance will be used to effectuate its death sentences, but since 2012 Texas has used pentobarbital.  Thompson asserts that a constitutionally unacceptable risk attends Texas's use of pentobarbital.  Respondent contends that Thompson's complaints about lethal injection sound in civil rights, not habeas, law.  Alternatively, Respondent argues that Thompson has not shown that the state habeas court's rejection of his arguments about lethal injection were contrary to, or an unreasonable application of, federal law.

36

In *Hill v. McDonough*, 547 U.S. 573 (2006), the Supreme Court confronted the question of "whether a challenge to a method of execution must be brought by means of an application for a writ of habeas corpus or a civil action under § 1983." *Glossip v. Gross*, 135 S. Ct. 2726, 2738 (2015). The Supreme Court "held that a method-of-execution claim must be brought under § 1983 because such a claim does not attack the validity of the prisoner's conviction or death sentence." *Glossip v. Gross*, 135 S. Ct. 2726, 2738 (2015). Based on *Hill* and *Glossip*, this ground for relief should be dismissed without prejudice so that Thompson may raise it in a § 1983 action.[27]

The Court observes, however, that, even if an inmate could properly litigate a lethal-injection challenge on habeas review, Thompson has not met his AEDPA burden to show an entitlement to relief. The state habeas court found that the "Texas lethal injection procedure satisfies the prohibition against cruel and unusual punishment." State Habeas Record at 255. Federal law defers to that factual determination, absent clear and convincing evidence to the contrary. *See* 28 U.S.C. § 2254(e)(1). Texas has performed numerous executions using pentobarbital as the only agent of execution. Even while identifying hypothetical concerns about the use of pentobarbital, Thompson has not pointed to any particularized defect in its use, administration, or efficacy. *See Raby v. Livingston*, 600 F.3d 552, 560 (5th Cir. 2010) (concluding that the plaintiff "has failed to establish that the Texas lethal injection protocol creates a demonstrated risk of severe pain" in Texas's lethal injection process). Thompson provides nothing but conjecture that Texas will change the execution drug any time before his execution. "The reality is that pentobarbital, when used as the sole drug in a single-drug protocol," has not realized "a sure or very likely risk of pain." *Wood v. Collier*, 836

---

[27]     Even in civil rights actions, however, the federal courts in this circuit have not viewed favorably attacks on pentobarbital. For instance, the Fifth Circuit recently refused to enjoin an execution based on a lethal-injection challenge and noted: "The reality is that pentobarbital, when used as the sole drug in a single-drug protocol, has realized no . . . risk" that it "is sure or very likely to cause serious illness and needless suffering, and give rise to sufficiently imminent dangers." *Wood v. Collier*, 836 F.3d 534, 540 (5th Cir. 2016) (quotation omitted).

F.3d 534, 540 (5th Cir. 2016).  Thompson's speculative habeas claim falls far short of proving that the state habeas court's rejection of his lethal-injection claim was contrary to, or an unreasonable application of, federal law.  *See* 28 U.S.C. § 2254(d)(1).  The Court would still deny habeas relief even if lethal-injection claims were cognizable on habeas review.

## G.    Texas Capital Habeas Procedure

Under Article 11.071 of the Texas Code of Criminal Procedure, a state habeas applicant must file his or her state habeas application (1) within 180 days of appointment of state writ counsel or (2) forty-five days after the State has filed its response on direct appeal, whichever is later.  An applicant may obtain a 90-day extension of the deadline upon a showing of good cause. TEX. CODE. CRIM. PROC. ANN. art. 11.071 § 4(a),(b).  Thompson "contends that [Texas's capital-habeas statute] is unconstitutional, on its face and as applied, because it distorts the historic purpose of a post-conviction application for [a] writ of habeas corpus."  Dkt. 57 at 143.  Thompson argues that the short time for filing a habeas writ precludes development of the record and the ripening of issues, including *Strickland* claims.  With those defects, Thompson contends that Texas's habeas statute does not provide due process.

The state habeas court rejected Thompson's arguments because "[t]he imposition of a time limit for filing an initial application for  writ of habeas corpus in capital cases is appropriate [and] constitutional."  State Habeas Record at 220.  To the extent some claims may not ripen by the time for habeas filing, Texas allows successive habeas actions to proceed "provided [the inmate] meets the statutory exceptions."  State Habeas Record at 220.  The state habeas court concluded that Texas habeas procedure met constitutional requirements.  State Habeas Record at 220.  Importantly,

Thompson failed to show that Texas's habeas procedure "prevented him from advancing meritorious habeas claims . . . ."  State Habeas Record at 34.

The Supreme Court has held that state collateral proceedings are not constitutionally required.  *Murray v. Giarrantano*, 492 U.S. 1, 10 (1989); *Pennsylvania v. Finley*, 481 U.S. 551, 557 (1987).  Because the federal constitution does not require state post-conviction remedies, defects in a State's chosen habeas process do not give rise to a federal constitutional claim.  *See Trevino v. Johnson*, 168 F.3d 173, 180 (5th Cir. 1999).[28]  The state habeas court's rejection of this claim was not contrary to, or an unreasonable application of, federal law.  *See* 28 U.S.C. § 2254(d)(1).

## H.    Constitutionality of Texas Statutory Law

As previously discussed, the defense in this case argued that medical error, not Thompson's action, was the primary cause of Hayslip's death.  With the defense's argument that botched medical care caused Hayslip's death, the trial court instructed the jury as follows:

> A person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the defendant clearly insufficient.

> Therefore if you find from the evidence beyond a reasonable doubt that the death of Glenda Dennise Hayslip would not have occurred but for the defendant's conduct as charged in the indictment operating either alone or concurrently with another cause unless the concurrent cause was clearly sufficient to produce the result and the conduct of the defendant clearly insufficient you will find the defendant criminally responsible.  Unless you so find beyond a reasonable doubt or if you have a reasonable doubt thereof you will find the defendant not criminally responsible and say by your verdict "Not Guilty of Capital Murder."

. . .

---

[28]    Thompson has failed to establish that the statutory time limits have prevented him from investigating any known avenues or would prevent him from asserting any potential claims that might be discovered in the future.  In fact, the state habeas court found that Thompson did "not specify or complain that the dual track habeas application system forced him to neglect certain meritorious claims . . . ."  State Habeas Record at 220.

> The prosecution has the burden of proving the defendant guilty and it must do so by proving each and every element of the offense charged beyond a reasonable doubt and if it fails to do, so you much [sic.] acquit the defendant.

State Habeas Record at 221. The trial court's instruction mirrored the Texas statutory language on causation found in Texas Penal Code Section 6.04.[29] Thompson argues that the Texas statute violates *Mullaney v. Wilbur*, 421 U.S. 684 (1975) by shifting the burden of proof to the defense.

*Mullaney* was the first case the Supreme Court decided based on *In re Winship*, 397 U.S. 358 (1970), which "made clear what has long been accepted in our criminal justice system[:] . . . in a criminal case the government must establish guilt beyond a reasonable doubt." *Jones v. United States*, 526 U.S. 227, 264 (1999). In *Mullaney*, the Supreme Court struck down a Maine law placing the burden of proof on a defendant when he argued that a killing was in the heat of passion or due to provocation. Cases have relied on *Mullaney* to hold "that a State must prove every ingredient of an offense beyond a reasonable doubt, and that it may not shift the burden of proof to the defendant by presuming that ingredient upon proof of the other elements of the offense." *Patterson v. New York*, 432 U.S. 197, 215 (1977). Thompson contends that the Texas statute, by asking whether the conduct in the concurrent cause was "clearly insufficient" to "produce the result," unconstitutionally "creates an impermissible burden of proof for defendants." Dkt. 57 at 149.

When Thompson raised this claim on state habeas review, the state habeas court found two reasons to apply a procedural bar. First, Thompson's claim ran afoul of Texas's contemporaneous-objection rule because "counsel objected to the trial court's charge on concurrent causation, but not on the basis urged in the instant habeas application." State Habeas Record at 222. Additionally,

---

[29] Under Texas Penal Code Section 6.04, "[a] person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient."

Thompson "fail[ed] to assert legal arguments or authorities to support his [state habeas] claim that TEX. PENAL CODE 6.04 is unconstitutional . . . ."  State Habeas Record at 222.  Both Texas's contemporaneous-objection rule and a dismissal for inadequate briefing provide a sufficient basis to bar federal review.  *See Roberts v. Thaler*, 681 F.3d 597 (5th Cir. 2012); *Corwin v. Johnson*, 150 F.3d 467, 473 (5th Cir. 1998).  Thompson has not shown cause or actual prejudice to overcome the procedural bar to federal review.

Alternatively, the state habeas court found that Thompson's "claims are meritless" because TEX. PENAL CODE § 6.04(a) "does not create a burden of proof for defendants."  State Habeas Record at 252.  The trial court's instructions properly directed the jury to consider concurrent causes as provided by the statute.  Unlike the Maine law in *Mullaney*, neither the Texas statute or the jury instructions explicitly or implicitly placed a burden on the defense to prove that any concurrent cause was sufficient to product the victims' death.  The instructions centered the jury's duty on the reasonable doubt standard, and focused their inquiry on whether Thompson's own actions caused the victim's death, without requiring the defense to present evidence about a separate, concurrent cause.  Thompson has not pointed to any clearly established Supreme Court precedent extending *Mullaney* to the circumstances presented by a statute such as TEX. PENAL CODE § 6.04(a).  Thompson, therefore, has not shown that the state court's decision was contrary to, or an unreasonable application of, federal law.  *See* 28 U.S.C. § 2254(d)(1).

## I.    Ineffective Assistance of Trial Counsel

On state habeas review, Thompson exhausted several complaints about trial counsel's representation in the guilt/innocence phase.  Thompson now argues that trial counsel performed deficiently by: (1) failing to conduct an effective voir dire; (2) failing to prevent the State from

presenting evidence of extraneous bad acts; (3) not objecting to the prosecution's characterization of one defense witness's testimony; (4) not requesting a lesser-included-offense instruction relating to Hayslip's death; and (5) not objecting to the admission of the gun.

*Strickland v. Washington*, 466 U.S. 668, 686 (1984), provides the general conceptual framework for judging an attorney's representation. Under *Strickland*, a criminal defendant's Sixth Amendment rights are "denied when a defense attorney's *performance* falls below an objective standard of reasonableness and thereby *prejudices* the defense." *Yarborough v. Gentry*, 540 U.S. 1, 3 (2003) (emphasis added); *see also Rompilla v. Beard*, 545 U.S. 374, 387 (2005); *Wiggins v. Smith*, 539 U.S. 510, 520 (2003). To establish deficient performance, the petitioner must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Strickland*, 466 U.S. at 687. A petitioner must also show actual prejudice, meaning "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Strickland*, 466 U.S. at 694; *see also Wiggins*, 539 U.S. at 534.

"Surmounting *Strickland*'s high bar is never an easy task . . . ." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). In federal habeas proceedings, the *Strickland* inquiry merges with AEDPA's forgiving standards into a "doubly deferential" review. *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009); *see also Pinholster*, 131 S. Ct. at 1403; *Gentry*, 540 U.S. at 5-6. In practice, this standard gives wide latitude to state adjudications: "The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105; *see also Premo v. Moore*, 562 U.S. 115, 123 (2011) (quoting *Richter*).

42

1.      Voir Dire

Thompson generally criticizes his initial trial counsel's handing of jury selection, claiming that trial counsel engaged in superficial and too-brief questioning.  Thompson, however, only makes two specific complaints about trial counsel's handling of voir dire.  First, Thompson complains that trial counsel did not adequately question jurors about Texas parole law and victim-impact testimony.  Second, Thompson claims that trial counsel should have used peremptory strikes on two prospective jurors who served at his first trial.  Neither argument warrants federal habeas relief.

Thompson's challenge to trial counsel's approach to questioning jurors only complains about the voir dire before his first trial.  The Court of Criminal Appeals reversed Thompson's sentence, allowing the state habeas court to conclude that "any alleged harm relating to [his initial] trial counsel's failure to voir dire on victim impact evidence is moot."  State Habeas Record at 235.  Thompson's complaints about trial counsel's questioning focus on punishment issues without drawing a connection to why those potential jurors would have been partial on questions of guilt.  Thompson cannot show harm because the jurors affected by his initial counsel's questioning did not return the death sentence under which he is currently in custody.

The only portion of this claim presenting a judicable issue is that relating to trial counsel's failure to use peremptory strikes on two prospective jurors.  The state habeas court engaged in a detailed review of trial counsel's questioning of the two challenged jurors.  The state habeas court rejected this claim for three reasons.  First, trial counsel used strategic professional judgment in not striking the two jurors.  Second, the record suggested that the two jurors would be favorable to the defense.  Finally, the questioning of the two jurors "establishes that both jurors understood various

legal burdens and distinctions, could follow the law, consider the evidence, be fair to both parties, and participate as jurors in the instant capital murder case . . . ." State Habeas Record at 239.

The state habeas court was not unreasonable in finding that trial counsel did not provide deficient representation in this regard. Trial counsel made a strategic decision to accept the final two jurors, which a reviewing court must uphold unless the decision was "so ill chosen that it permeates the entire trial with obvious unfairness." *Teague v. Scott*, 60 F.3d 1167, 1172 (5th Cir. 1995). Perhaps Thompson has provided reasons for which an attorney may have used peremptory strikes to remove the two final jurors. He has not, however, shown that those jurors were biased as a matter of law or subject to strikes for cause. Thompson has not shown that the two challenged jurors were so poorly chosen that it permeated his trial with unfairness. Thompson has not shown that the state habeas court's decision on this issue was contrary to, or an unreasonable application of, federal law.

2.      Evidence of Extraneous Bad Acts

Trial counsel filed a pre-trial motion in limine to preclude the prosecution from discussing "prior convictions, extraneous offenses, and bad acts." CR at 33. The trial court granted the motion. During the guilt/innocence phase, Hayslip's co-worker and roommate Lisa Gonzalez described the tumultuous relationship between Hayslip and Thompson. Gonzalez testified that when Thompson became angry he would break things, kick things, and punch holes in the wall. RR1 Vol. 11 at 190-92. Trial counsel objected to Gonzalez's testimony, and in a bench conference reminded the judge of the motion in limine, but did not seek any ruling from the trial court. Thompson faults trial counsel for not acting more zealously to exclude testimony about his anger outbursts.[30]

---

[30]     Trial counsel explained in an affidavit that: "[t]he defense had filed a motion in limine to prevent the State from going into extraneous matters without the approval of the trial court judge, and the defense reminded the judge of our motion once the State started questioning Gonzalez about those extraneous matters." State Habeas Record at 171.

"In order to show that counsel was deficient for failing to object . . ., the objection must have merit." *Ries v. Quarterman*, 522 F.3d 517, 530 (5th Cir. 2008). "Admitting evidence of prior convictions and other bad acts is generally prohibited in the guilt-innocence phase." *Robles v. State*, 85 S.W.3d 211, 213 (Tex. Crim. App. 2002). Still, as the state habeas court observed, Texas law "allows admission of evidence that shows (1) relevant facts and circumstances surrounding the murder, (2) the previous relationship between the accused and the deceased, or (3) the condition of the mind of the accused at the time of the offense." State Habeas Record at 235; *see also* TEX. CODE CRIM. PRO. art. 38.36(a). Presumably because Gonzalez's testimony related to the "previous relationship existing between the accused and the deceased" and to "facts and circumstances going to show the condition of the mind of the accused at the time of the offense," the state habeas court concluded that "[t]rial counsel was not ineffective for failing to object and/or preserve error regarding the State's properly admitted evidence of the [Thompson's] violent acts involving complainant Hayslip at guilt-innocence." State Habeas Record at 259.

The state habeas court found that the complained-of testimony was admissible under state law. A federal habeas court does not sit in judgment of a state court's interpretation of its own law. With that state-law finding, Thompson has not shown that trial counsel failed to make a meritorious objection. The state habeas court reasonably found that counsel did not provide deficient performance with regard to the testimony about his anger outbursts.[31] Thompson has not shown that the state habeas court's decision was contrary to, or an unreasonable application of, federal law

3.     Prosecutor's Closing Argument

Thompson contends that trial counsel should have objected to prosecution's closing

---

[31]     With the weighty evidence against Thompson, any minor prejudicial effect caused by Gonzalez's testimony would not amount to a reasonable probability of a different result.

arguments summarizing Dr. Radalat's testimony as "finally admitt[ing] to you that the wounds would be fatal if left untreated."  With that testimony, the prosecution said: "You got causation. The defendant is guilty."  RR1 Vol. 13 at 30-31.  Thompson claims that the prosecution's argument "mischaracterized" Dr. Radalat's testimony because he "did not quite go so far as to concede that the shooting did cause death."  Dkt. 57 at 169-70.  The state habeas court, however, found that "the State's complained of argument at guilt-innocence was proper as a summary of the evidence and/or a reasonable deduction of evidence elicited at trial."  State Habeas Record at 237.[32]

Courts traditionally give defense attorneys broad discretion in choosing whether to object during closing arguments.  *See, e.g., Hernandez v. Thaler*, 463 F. App'x. 349, 356 (5th Cir. 2012); *Charles v. Thaler*, 629 F.3d 494, 502 (5th Cir. 2011).  Here, the prosecutor's statements were within the range of proper closing argument and a fair interpretation of the defense witness's testimony. Dr. Radalat told jurors that "[t]he intermediate long term conditions without any medical intervention . . . [o]ver the long term . . . would probably be fatal."  RR1 Vol. 12 at 255-56.  In addition, Dr. Radalat replied "no" when asked on cross-examination if the doctors' actions caused Hayslip's death.  RR1 Vol. 12 at 256.  A reasonable trial attorney could decide not to highlight the prosecution's fair interpretation of Dr. Radalat's testimony by objecting.  The state habeas court was not unreasonable in finding that trial counsel did not provide deficient representation at closing argument.[33]

---

[32]    Under Texas law, proper closing argument may discuss: (1) summary of the evidence; (2) reasonable deductions from the evidence; (3) response to opposing counsel's argument; and (4) pleas for law enforcement.  *See Jackson v. State*, 17 S.W.3d 664, 673 (Tex. Crim. App. 2000).

[33]    Further, the state habeas court found that Thompson "was not prejudiced by the complained-of arguments; the arguments were not extreme, manifestly improper, violative of a mandatory statute, and did not inject new facts harmful to [Thmpson] into the trial proceedings."  State Habeas Record at 237.  Given the additional evidence against Thompson, he has not shown any actual prejudice because trial counsel did not lodge an objection to the

(continued...)

4.      Lesser-Included-Offense Instructions

On trial counsel's request, RR1 Vol. 13 at 39, the trial court instructed jurors that, if they found Thompson had committed the murder of Cain, but was only guilty of some crime other than capital murder against Hayslip, they should find Thompson only guilty of the lesser-included offense of murder.  Thompson argues that trial counsel should have requested two additional lesser-included-offense instructions.  First, Thompson argues that the defense's theory blaming Hayslip's death on botched medical care would have allowed jurors to convict him only of aggravated assault.  Second, Thompson contends that he did not intentionally shoot Hayslip, allowing for an instruction on felony murder.

Texas law entitles a defendant to a lesser-included-offense instruction when: (1) the lesser-included offense is included within the proof necessary to establish the offense charged, and (2) there is some evidence showing that if the defendant is guilty, he is guilty only of the lesser offense. *Rousseau v. State*, 855 S.W.2d 666, 672-673 (Tex. Crim. App. 1993).  Respondent does not dispute that aggravated assault and felony murder are lesser-included offenses of capital murder.  Respondent, however, argues that the evidence did not only allow for Thompson's conviction of lesser offenses.[34]

---

[33]      (...continued)
comments.

[34]      To that end, the state habeas court found that Thompson's "criminal conduct towards complainant Hayslip was committed intentionally and knowingly. Evidence did not exist in the record that [Thompson's] shooting of Hayslip was an accident; that [Thompson] intended only one victim; or that [Thompson] knew with a reasonable certainty that only one person would die."  State Habeas Record at 224.  The state habeas court also found that "[t]he evidence presented at trial did not support the submission of the lesser-included offense instructions urged in the instant habeas application; accordingly, [Thompson] was not prejudiced by counsel's failure to request such instructions at trial." State Habeas Record at 243.

47

Here, trial counsel gave the jury the options to render a non-capital verdict. Trial counsel's closing argument urged jurors to find that Thompson did not intend to harm Hayslip, requiring them to return a lesser verdict of simple murder. RR1 Vol. 13 at 36. Trial counsel tried to form a defense for an acquittal based on the medical-malpractice theory, CR at 171, and asked jurors to convict Thompson only on a lesser offense based on that same theory, RR1 Vol. 13 at 48-49. Thompson may wish that trial counsel had requested additional instructions, but trial counsel explained on habeas review: "I did everything possible to rebut the State's theory of causation and persuade the jury to adopt the defense's theory of the case. Consistent with the defensive theory an instruction on concurrent causation and the lesser-included offense of murder were included in the guilt/innocence charge." State Habeas Record at 171. Thompson may wish that trial counsel had made different tactical decisions, but under *Strickland* jurisprudence decisions such as those made by counsel are "virtually unchallengeable." *Strickland*, 466 U.S. at 690-91. Thompson has also not shown that jurors would be more likely to forgo a capital conviction had the trial court given instructions different from those provided by trial counsel. Thompson may argue that counsel should have made different choices, but he has not shown that counsel should have made better ones. Trial counsel gave the jury two vehicles to return a non-capital conviction; Thompson has not shown that trial counsel provided constitutionally deficient, prejudicial representation by not doing more.

5.     Admission of the Murder Weapon

Thompson makes a conclusory argument that trial counsel should have objected to the admission of the murder weapon. Thompson does not elaborate, but his argument presupposes that trial counsel should have argued that the police only found the weapon because they had violated his constitutional rights by sending Johnson to interview him. Thompson did not raise this claim on

direct appeal or in any of his state habeas applications.  Because the state courts would not authorize him to file a successive application raising this argument, and he has not shown cause or prejudice to allow federal review, it is procedurally barred from federal habeas review.

Alternatively, the Court has already discussed at length the tenuous connection between the Johnson conversation and the recovery of the gun.  Thompson had already provided the police a map of where he discarded the weapon.  The trial testimony did not show that the Johnson conversation provided the police with previously unknown information necessary to recover the gun.  Thompson has not shown that the murder weapon was inadmissible, and thus has not shown that trial counsel provided ineffective representation.

## J.     Denial of a Continuance

Thompson argues that the trial court violated his rights by denying his requests to postpone trial.  Specifically, Thompson complains that the trial court's denial of additional time for trial preparation deprived him of due process under the Fourteenth Amendment and precluded effective legal representation under the Sixth Amendment.

The Constitution guarantees inmates "a meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (citations omitted).  Still, not every denial of a continuance violates the Constitution:

> The matter of continuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel.  Contrariwise, a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality.  There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process.  The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.

*Ungar v. Sarafite*, 376 U.S. 575, 589 (1964) (citations omitted).  "When a denial of a continuance forms a basis of a petition for a writ of habeas corpus, not only must there have been an abuse of discretion but it must have been so arbitrary and fundamentally unfair that it violates constitutional principles of due process." *Skillern v. Estelle*, 720 F.2d 839, 850 (5th Cir. 1983) (quotation omitted).  Also, "the failure to grant a continuance [must have] harmed the defense." *Newton v. Dretke*, 371 F.3d 250, 255 (5th Cir. 2004).

Determining whether the trial court abused its discretion in refusing to continue Thompson's trial requires a detailed review of the trial court proceedings.  When the Court of Criminal Appeals remanded this case for a new punishment hearing, the trial court appointed Thompson's original trial attorney, Ellis McCullough, to represent him at retrial.  On January 21, 2005, the trial court appointed Terrence Gaiser as second-chair counsel.  Six months later, Thompson filed a *pro se* motion to dismiss McCullough arguing that he was not qualified to represent capital defendants under Texas's Fair Defense Act.  The trial court delayed ruling on the motion, but on September 15, 2005, removed McCullough from representing Thompson.  The trial court elevated Gaiser to first chair and appointed Kyle Johnson as second-chair counsel.

Gaiser had not been inactive during the pendency of Thompson's substitution motion.  Throughout August and September 2005, Gaiser filed motions on Thompson's behalf.  Gaiser's filings included motions for the appointment of a mitigation specialist, an investigator, and various experts, including a psychologist.  The trial court promptly granted the defense's motions.  Gaiser secured investigative assistance.

The trial court set October 24, 2005, as the first day for trial testimony.  On September 29, 2005, the day before jury selection was set to begin, Thompson's attorneys filed a motion for

continuance.  Trial counsel asked for an additional ninety days because the attorneys had a limited time to prepare and to investigate mitigating theories after their appointment.  In a hearing, trial counsel provided additional background on the motion for a continuance: "Gaiser stated that he was recently elevated to first chair, and Johnson was recently appointed to [Thompson's] case as second chair counsel and had a limited time to prepare for trial; Gaiser stated that he and Johnson lost time in their offices due to the threat of a hurricane . . . ."  State Habeas Record at 241.  The prosecution, however, provided reasons to deny a continuance: "prosecutor Vic Wisner stated that counsel Gaiser had been the de facto lead counsel on the case since his appointment, that Wisner had worked with Gaiser on discovery over the last two months, that Wisner had met with Gaiser and his expert, and, that the State's file had been available to Gaiser and his experts 'at length.'"  State Habeas Record at 241.  The trial court denied a continuance.

The next week the defense filed a notice listing two potential experts for defense testimony.  On October 25, 2005, the defense filed a second motion for a continuance.  This time, the defense specifically said it needed additional time to investigate the State's proposed witness Robin Rhodes.  The trial court denied the second motion for a continuance. CR2 at 209-14.

On state habeas review, Thompson argued that the trial court's denial of a continuance violated federal and state law.  Thompson argued that additional time would have allowed the defense to (1) develop mitigating themes, particularly relating to an expert's testimony about past substance abuse and possible brain damage and (2) engage in additional investigation of witness Rhodes for impeachment.[35]  The state habeas court found that the trial court did not abuse its

---

[35]     As he does on federal review, Thompson observed in state court that the development of a mitigation case requires six steps:

(continued...)

discretion in denying a continuance on those two arguments.

Thompson wanted more time to prepare his punishment phase expert neuropsychologist, Dr Daneen Milam. Dr. Milam testified that Thompson suffered from "mild and diffused" brain damage, but was able to function. Dr. Milam based her conclusion on Thompson's results from an IQ test and the Halstead-Reitan Battery. A sharp cross-examination centered on the lack of physical testing to verify Dr. Milam's conclusions. Thompson argued that additional time would have allowed trial counsel to bolster Dr. Milam's conclusions. In particular, Thompson argues that trial counsel should have sought out the psychologist who developed the Halstead-Reitan Battery to shore up Dr. Milam's interpretation of Thompson's results.

The state habeas court found that Thompson had not shown prejudice relating to Dr. Milam's testimony. The state habeas court specially found that Thompson's claim that he suffered prejudice from the denial of a continuance was "purely speculative." State Habeas Record at 242. The state habeas court observed that "trial counsel investigated the potential benefit of presenting other experts" who could provide information about Thompson's mental health. State Habeas Record at

---

[35]      (...continued)

(1)      Hiring a mitigation specialist to guide the research;

(2)      Gathering of background information;

(3)      Determination, based on that information, of what type of expert could be helpful to the defense;

(4)      Expert evaluations, reported back to counsel;

(5)      Attempts to negotiate a life sentence; and

(6)      Strategic decisions as to what defensive theories and what witnesses to use.

Dkt. 57 at 199-200. Thompson conceded that "[s]teps one, two, and three had been undertaken by Gaiser while he was second-chair counsel," but argues that his trial attorneys did not have time to complete "work still needed to be done on steps four, five, and six . . . ." Dkt. 57 at 200.

243.  The state habeas court found that Dr. Milam had provided trial counsel documentary evidence relating to her testing.  Also, Dr. Milam testified "concerning the futility of obtaining a MRI or CAT scan to support her diagnosis of the [his] alleged brain damage," thus discounting the benefit of any physical confirmation of Dr. Milam's testimony.  State Habeas Record at 243.

The state habeas court also found no prejudice in the lack of additional time to investigate State's witness Rhodes.  The state habeas court found that Thompson "concede[d] that counsel did not do a bad job impeaching Rhodes . . . ."  State Habeas Record at 244.[36]  Importantly, the state habeas court observed that Thompson had "not allege[d] the specific information that could have been garnered had trial counsel obtained additional time to prepare for Rhodes cross-examination."  State Habeas Record at 244.  Without some indication of how the denial of additional time prejudiced the defense, Thompson's claims were "purely speculative."  State Habeas Record at 244.

Under AEDPA jurisprudence, Thompson must show that the state habeas court unreasonably found that the trial court did not abuse its discretion and that he had not shown prejudice.  Thompson has not shown constitutional error in the state court's decision not to provide more time before trial.  The Supreme Court has noted that trial judges enjoy "a great deal of latitude in scheduling trials and "only an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable

---

[36]        Specifically, the state habeas court found:

Trial counsel effectively cross-examined Rhodes impeaching his credibility eliciting testimony regarding his work as an informant for law enforcement and suggesting that Rhodes testimony in the instant trial was a product of Rhodes desire to help himself. Trial counsel elicited testimony that Rhodes had a prior conviction for aggravated robbery that he neglected to mention during his direct examination that Rhodes had done a lot of work for law enforcement and received pay for that work that Rhodes was not looking for a way to gain favor with law enforcement authorities when he was in jail with the applicant but Rhodes would not overlook it if it was dumped in his lap that Rhodes was a full-time informant for the Harris County Organized Crime Task force in 1998 and 1999 and testified in two trials and that Rhodes was paid for his participation in the Benavidez trial even though the record from that trial reflected that Rhodes denied receiving payment.

State Habeas Record at 244.

request for delay" poses constitutional concern.  *Morris v. Slappy*, 461 U.S. 1, 11-12 (1983)

(quotation omitted).  Gaiser represented Thompson ten months before the punishment hearing began.

Even though he initially served as second-chair counsel, Gaiser represented Thompson until

eventually appointed first chair.  In fact, Gaiser told the trial court that he had been "the de facto first

chair" for some time.  RR1 2 Vol. 2 at 7-8.  Thompson's trial attorneys approached the defense of

his punishment retrial with a preview of what evidence the State would present and the viability of

defensive theories.  Despite his arguments to the trial court about needing additional time, the record

shows that investigators and experts had been assembled and were working toward a mitigation

defense.  Given those circumstances, the state habeas court was not unreasonable in finding that the

trial court had not abused its discretion.

Additionally, Thompson has not shown that the denial prejudiced him.  As in state court,

Thompson does not prove that his trial attorneys were unprepared or demonstrate what evidence

remained unpresented.   Instead, Thompson speculates that additional witnesses or additional

evidence may have influenced jurors, but provides no specificity about what trial counsel should

have put forth.  Without a concrete understanding of how additional time would have amplified or

altered the mitigation defense, the state habeas court was reasonable in finding his allegations of

prejudice to be speculative.  Thompson has not shown that the state habeas court's rejection of this

claim was contrary to, or an unreasonable application of, federal law.  *See* 28 U.S.C. § 2254(d)(1).

## K.    Testimony about Youthful Misconduct

Thompson contends that the State violated his Eighth Amendment rights by presenting

evidence of his youthful misconduct.  As described by the Court of Criminal Appeals, the State

presented evidence during the punishment stage of trial of crimes and bad acts Thompson committed as a minor:

> . . . [Thompson] began committing crimes as a juvenile.  In 1984, while living with his parents in an upper-middle-class neighborhood in Colorado, [Thompson] committed a string of crimes that resulted in over $60,000 of damage to homes and property.  While on probation from the youth center, [Thompson] stole his father's motorcycle, ran away, and committed a variety of crimes.  He was arrested again in 1987 and sentenced to a juvenile facility.  [Thompson] had problems with drugs and alcohol from an early age.

*Thompson*, 2007 WL 3208755 at 3.

Thompson, however, did not object to the use of youthful-misconduct testimony at trial.  The state habeas court found that the lack of a contemporaneous objection defaulted judicial consideration of the instant claim.  State Habeas Record at 256.  Thompson has not shown cause or prejudice to overcome the procedural bar of that claim, thus precluding federal review.

Alternatively, the state habeas court found that "the admission of punishment evidence of the [Thompson's] youthful misconduct did not violate [his] constitutional rights."  State Habeas Record at 256.  Thompson has not pointed to any Supreme Court case preventing the State from relying on youthful misconduct when arguing for a death sentence.  Thompson instead asks for an extension of other cases in which the Supreme Court has recognized special protections for juvenile offenders. Thompson relies on the prohibition on executing juvenile offenders, *Roper v. Simmons*, 543 U.S. 551 (2005); *Thompson v. Oklahoma*, 487 U.S. 815 (1988), and the exclusion of juveniles from mandatory life sentences, *Miller v. Alabama*, 132 S. Ct. 2455 (2012); *Graham v. Florida*, 560 U.S. 48 (2010), to emphasize the lessened moral blameworthiness of juvenile offenders.  Because "the juvenile crimes used against Thompson in his sentencing, essentially crimes of criminal mischief, show both

a lack of maturity and a strong correlation to peer pressure," Thompson contends that the Constitution should bar their use in determining his sentence. Dkt. 57 at 218.

The Supreme Court has recognized that important constitutional principles protect juvenile offenders. Here, although the State presented evidence of bad acts Thompson committed when he was under the age of eighteen, he was tried and convicted for an offense he committed as an adult. The Fifth Circuit has held that Supreme Court precedent "does not clearly establish that [a juvenile] offense may not be used to elevate murder to capital murder." *Taylor v. Thaler*, 397 F. App'x 104, 108 (5th Cir. 2010). Extending the constitutional protections in the manner proposed by Thompson would require the creation of new constitutional law in violation of *Teague*'s non-retroactivity principles. For those reasons, Thompson has not shown that he merits federal habeas relief on this claim.

## L.    Mitigation Special Issue

Thompson raises two claims challenging the manner in which Texas structures a jury's consideration of mitigating evidence. In his twelfth claim, Thompson argues that the Constitution requires that jurors consider the mitigation special issue under a beyond-a-reasonable-doubt standard. Thompson's thirteenth claim argues that Texas's mitigation special issue unconstitutionally sends mixed signals to jurors. Settled precedent forecloses relief on both claims.

Citing *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Ring v. Arizona*, 536 U.S. 584 (2002), Thompson's twelfth claim argues the Texas capital sentencing scheme violates constitutional protections by not requiring the State to prove the absence of sufficient mitigating evidence beyond a reasonable doubt. The Fifth Circuit has repeatedly rejected the argument that the prosecution bears a burden to disprove the existence of mitigating factors beyond a reasonable doubt. *See Blue v.*

*Thaler*, 665 F.3d 647, 668 (5th Cir. 2011); *Druery v. Thaler*, 647 F.3d 535, 546-47 (5th Cir. 2011); *Adams v. Thaler*, 421 F. App'x 322, 334 (5th Cir. 2011); *Granados v. Quarterman*, 455 F.3d 529, 536-37 (5th Cir. 2006)*; Rowell v. Dretke*, 398 F.3d 370, 378 (5th Cir. 2005).[37]   Because "[n]o Supreme Court or Circuit precedent constitutionally requires that Texas's mitigation special issue be assigned a burden of proof," granting relief on a capital petitioner's *Apprendi* claim would require the creation of new constitutional law in violation of *Teague v. Lane*, 489 U.S. 288 (1989).

Thompson's thirteenth claim argues that the Texas death penalty scheme violates the Eighth Amendment in light of the Supreme Court's decision in *Penry v. Johnson*, 532 U.S. 782 (2001), because the mitigation special issue sends "mixed signals" to the jury.  In *Penry*, the Supreme Court struck down a judicially crafted jury instruction because it was perplexing and, in effect, required the jury to answer the special issues dishonestly in order to give effect to the defendant's mitigating evidence.  Thompson clams that current mitigation special issue sends mixed signals because it is unclear about the burden of proof.  The state habeas court relied on Texas precedent and denied relief.  State Habeas Record at 247-48.[38]

Here, the mitigation instruction that the trial court delivered did not contain the defect identified in *Penry*.  In fact, the Supreme Court has described the current mitigation special issue as "[a] clearly drafted catchall instruction on mitigating evidence" whose "brevity and clarity . . . highlight[ed] the confusing nature of the supplemental instruction" they had previously condemned. *Penry*, 532 U.S. at 803.  Given that endorsement, the Fifth Circuit has found no merit to similar

---

[37]     Thompson argues that a recent Supreme Court case, *Hurst v. Florida*, 126 S. Ct. 616, 622 (2016), would compel a different result.  The Fifth Circuit, however, has held that *Hurst* does not change its precedent.  *See Davila v. Davis*, 650 F. App'x 860, 873 (5th Cir. 2016).

[38]     The state habeas court also found that Thompson had defaulted federal consideration of this claim by failing to raise it on direct appeal.  State Habeas Record at 257.  In addition to the fact that well-settled precedent undercuts the merits of this claim, the state habeas court's procedural ruling forecloses relief.

claims raised by other inmates.  *See Foster v. Thaler*, 369 F. App'x 598, 606 (5th Cir. 2010); *Manns v. Quarterman*, 236 F. App'x 908, 911-12 (5th Cir. 2007); *Oliver v. Quarterman*, 254 F. App'x 381, 385-86 (5th Cir. 2007).   The Texas court's rejection of this claim was not contrary to, or an unreasonable application of, federal law.  *See* 28 U.S.C. § 2254(d)(1).

**M.**      **The Autopsy**

Thompson complains that the State violated his due process rights, his right to confront witnesses against him, and right to counsel though its use of the autopsy results in this case.  At the guilt/innocence phase, the State presented evidence about Hayslip's cause of death based on an autopsy performed by Dr. Paul Shrode.  Dr. Shrode reported that Hayslip's cause of death was a "gunshot wound to the face."  Dr. Shrode, however, did not testify at trial.  The State admitted the autopsy report into evidence during the testimony of Dr. Shrode's colleague Dr. Patricia Moore.  Dr. Moore had performed the autopsy on Cain and testified about the cause of death for both victims.  Dr. Moore's testimony reiterated Dr. Shrode's finding that the cause of Hayslip's death was a gunshot wound to the face.

Thompson raises three separate claims based on Dr. Shrode performing the autopsy and the related testimony.  Thompson contends that: (1) the State violated *Brady* by failing to disclose that Dr. Shrode lacked  adequate qualifications; (2) trial counsel should have objected to the admission of Dr. Moore's testimony about the autopsy report on Sixth Amendment Confrontation Clause grounds; and (3) the State violated the Due Process Clause by knowingly admitting a false autopsy report. Dkt. 57 at 236-43.  Thompson, however, raised these arguments in his third state habeas application that the Court of Criminal Appeals found to be an abuse of the writ.  This claim is procedurally barred from federal review unless Thompson can show cause and actual prejudice.

58

Thompson contends that the Court can reach the merits of this claim because the State suppressed evidence of Dr. Shrode's qualifications and the true cause of Hayslip's death.  Also, Thompson contends that he can show ineffective representation by habeas counsel for failing to raise the issues.  This Court's review of the records and the pleadings shows that Thompson cannot overcome the procedural bar.

As an initial matter, Thompson contends that "Shrode was incompetent and unqualified to perform the work he was tasked with, and for failing to disclose that his autopsy was factually incorrect and misleading."  Dkt. 57 at 240.  Thompson bases his arguments on disciplinary actions and allegations of falsehoods on Dr. Shrode's curriculum vitae that came to light well after the trial in this case.  Thompson has not pointed to any contemporaneous evidence that any member of the prosecutorial team knew of the alleged problems with Dr. Shrode's work.  Additionally, Thompson's allegations of incompetency may serve to allow the impeachment of Dr. Shrode's work, but he has not shown demonstrable errors in Hayslip's autopsy.  Thompson has provided the opinion of another expert, Dr. Lloyd White, who would have reached a different conclusion about Hayslip's death.  In doing so, however, Thompson only casts a defensive theory from trial in a different light.  Trial counsel attempted to convince the jury that intervening medical care caused Hayslip's death.  The fact that other medical professionals may disagree with Dr. Shrode's conclusions does not mean that the prosecution knowingly suppressed information about Hayslip's death.

Also, Thompson faults trial counsel for not raising a Confrontation Clause objection because Dr. Moore, rather than Dr. Shrode who performed the autopsy, testified about the cause of Hayslip's death.  After Thompson's trial, the Supreme Court decided *Crawford v. Washington*, 541 U.S. 36 (2004), which held that admission of testimonial statements against a criminal defendant violates

the Confrontation Clause unless the witness is unavailable and was subject to a prior cross-examination. At the time of Thompson's trial, however, Texas courts held that autopsy reports were not testimonial, and thus not subject to a Confrontation Clause challenge. Since *Crawford* courts have been split on its application to autopsy reports, and some Texas courts have held autopsy reports are testimonial, *see Martinez v. Davis*, 653 F. App'x 308, 320 n.5 (5th Cir. 2016) (reviewing relevant law), but the law at the time of trial and of Thompson's first two habeas proceedings did not support a Confrontation Clause challenge to the autopsy report.

Accordingly, Thompson has not shown cause to overcome the procedural bar of his claims under either *Brady* or *Martinez*. For those same reasons, and in consideration of the Court's review of the record and the parties' briefing, the Court would find his claims without merit if fully available for federal review. The Court denies Thompson's final ground for relief.

### IV.  CERTIFICATE OF APPPEALABILTIY

Under AEDPA, a prisoner cannot seek appellate review from a lower court's judgment without receiving a Certificate of Appealability ("COA"). *See* 28 U.S.C. § 2253(c). Thompson has not yet requested that this Court grant him a COA, though this Court can consider the issue *sua sponte*. *See Alexander*, 211 F.3d at 898. "The COA statute establishes procedural rules and requires a threshold inquiry into whether the circuit court may entertain an appeal." *Slack v. McDaniel*, 529 U.S. 473, 482 (2000). A court may only issue a COA when "the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

The Fifth Circuit holds that the severity of an inmate's punishment, even a sentence of death, "does not, in and of itself, require the issuance of a COA." *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000). The Fifth Circuit, however, anticipates that a court will resolve any questions about a

COA in the death-row inmate's favor.  *See Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir. 2000).

The Supreme Court has explained the standard for evaluating the propriety of granting a COA on

claims rejected on their merits as follows: "Where a district court has rejected the constitutional

claims on the merits, the showing required to satisfy §2253(c) is straightforward: The petitioner must

demonstrate that reasonable jurists would find the district court's assessment of the constitutional

claims debatable or wrong."  *Slack*, 529 U.S. at 484; *Miller-El*, 537 U.S. at 336-38.  On the other

hand, a district court that has denied habeas relief on procedural grounds should issue a COA "when

the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states

a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable

whether the district court was correct in its procedural ruling.  *Slack*, 529 U.S. at 484; *Miller-El*, 537

U.S. at 336-38.  Unless the prisoner meets the COA standard, "no appeal would be warranted."

*Slack*, 529 U.S. at 484.

Thompson's petition raises several issues worthy of judicial review.  Nevertheless, having

considered the merits of Thompson's petition, and in light of AEDPA's standards and controlling

precedent, this Court determines that a COA should not issue on any of Thompson's claims.

## V. CONCLUSION

For the reasons described above, the Court finds that Thompson has not shown an entitlement to federal habeas relief.  The Court **DISMISSES** Thompson's challenge to Texas's lethal-injection protocol **WITHOUT PREJUDICE**.   The Court otherwise **DENIES** Thompson's petition and **DISMISSES** the remainder of Thompson's claims **WITH PREJUDICE**.  The Court also **DENIES** Thompson's motion for an evidentiary hearing.  Dkt. 56.  The Court will not issue a Certificate of Appealability.

The Clerk will provide copies of this Order to the parties.

Signed at Houston, Texas, on March 23, 2017.

_____
Gray H. Miller
United States District Judge