IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CHARLES VICTOR THOMPSON, | § | |
| *Petitioner*, | § | |
| | § | |
| v. | § | Civ. No. 4:13-CV-1900 |
| | § | (Death Penalty Case) |
| ERIC GUERRERO, Director, | § | |
| Texas Department of Criminal | § | |
| Justice, Correctional Institutions | § | |
| Division, | § | |
| *Respondent.* | § | |

**RESPONDENT'S SUPPLEMENT TO OPPOSITION TO
PETITIONER'S MOTION TO FILE PROPOSED BUDGET EX PARTE
AND UNDER SEAL**

Federal habeas petitioner Charles Thompson is scheduled to be executed after **6:00 p.m. on January 28, 2026**. Execution Order, No. 0782657 (262nd Dist. Ct., Harris Cnty., Tex. Sept. 11, 2025). Thompson's federal habeas proceedings concluded in this Court almost nine years ago. ECF No. 71. He recently filed under seal a motion for leave to file a "budget" ex parte. ECF No. 109. This Court struck Thompson's motion for failing to make a showing on the record of the need for confidentiality. ECF No. 113 at 3. Thompson has now filed a Supplement in which he explains the purpose of the funding he requests as well as the basis for his request to conduct funding proceedings ex parte.[1]

---

[1]    Thompson still fails to explain on the record how much money he is requesting or whether it is more than the $7,500 cap, much less justify any excessive request by

ECF No. 114 (Pet'r's Suppl.). For the reasons discussed in the Director's supplement to his Motion to Strike, ECF No. 112 at 2–14, and below, Thompson's request to proceed ex parte should be denied, and his request for funding should be denied because he fails to demonstrate the requested funding is reasonably necessary. The Director provides the following supplemental response to address the specific assertions raised in Thompson's most recent filing.

## I. Thompson Fails to Make a Proper Showing of the Need for Confidentiality.

The Director's supplement to his Motion to Strike adequately explained why Thompson should not be permitted to conduct funding proceedings ex parte, particularly considering the late timing of his request. ECF No. 112 at 2–6; *see Edwards v. Davis*, No. 3:10-CV-6-M, 2017 WL 76954, at *3 (N.D. Tex. Jan. 5, 2017) ("It is hard to imagine how the disclosure of expert information regarding the forensic evidence of the crime less than a month before a scheduled execution can be considered 'premature.'"). Thompson's most recent filing adds only speculation that the State would interfere with his

---

showing the necessary services will be of an unusual character or duration. 18 U.S.C. § 3599(g)(2). Any such request should be denied. Indeed, it would be difficult to describe services of, e.g., a mitigation investigator or pathologist as being of an "unusual character," as such services are commonplace in capital cases, or that the services will be of an unusual duration when Thompson's execution is scheduled in less than two months. *See id.*

investigative efforts if he were required to divulge more information regarding his preparation of a clemency petition. Pet'r's Suppl. 3–8. Such speculative and baseless concerns do not amount to a showing of a "need for confidentiality," 18 U.S.C. § 3599, especially because—as Thompson concedes, Pet'r's Suppl. 4, 6—many of the topics he intends to investigate have been litigated before. Thompson's suggestion that the Harris County District Attorney's Office (HCDAO) or counsel for the Director will improperly interfere with his clemency proceedings is not only speculative, but also unseemly. Thompson's request to proceed ex parte should be denied.

## II. Thompson Has Failed to Demonstrate the Requested Funds Are Reasonably Necessary.

Thompson seeks funding for services to support a clemency application.[2] Pet'r's Suppl. 2–9. Specifically, he seeks assistance of (1) mental health experts and mitigation specialists, (2) a fact investigator to investigate the HCDAO's use of jailhouse informants, (3) a pathologist to investigate Dennise Hayslip's cause of death, and (4) a defense-initiated-victim-outreach specialist. Pet'r's Suppl. 2–9. As the Director has explained, the bulk of the topics Thompson identifies as targets of his proposed investigation are topics that have been investigated before. *See* ECF No. 112 at 9–12. For the reasons discussed below,

---

[2]    As the Director explained, Thompson is not entitled to funding for the purpose of investigating and preparing a subsequent state habeas application or successive federal habeas petition. ECF No. 112 at 11–14.

Thompson is not entitled to funding to supplement the evidence that has already been considered.

This Court "may authorize [and] order the payment of fees and expenses" for expert assistance if the service is "reasonably necessary for the representation of the" petitioner. 18 U.S.C. § 3599(f). "[D]istrict courts have broad discretion in assessing requests for funding." *Ayestas v. Davis*, 584 U.S. 28, 46 (2018). Indeed, there "may even be cases in which it would be within a court's discretion to deny funds after a finding of reasonable necessity." *Id.* at 47 (quotation marks omitted). Thus, the "reasonably necessary" standard requires courts to consider the potential merit of the claim, the likelihood of developing useful and admissible evidence, and the likelihood of clearing procedural hurdles. *Id.* at 46–47. "[I]t would not be reasonable—in fact, it would be quite unreasonable—to think that services are necessary to the applicant's representation if, realistically speaking, they stand little hope of helping him win relief." *Id.* at 46. And "§ 3599(f) cannot be read to guarantee that an applicant will have enough money to turn over every stone." *Id.* at 47.

When a petitioner requests funding to support a clemency application, a "district court may, in the exercise of its sound discretion, authorize federal funding for investigative and expert services in subsequent state clemency proceedings." *Wilkins v. Davis*, 832 F.3d 547, 552 (5th Cir. 2016) (citing *Brown v. Stephens*, 762 F.3d 454, 460 (5th Cir. 2014), *abrogated on other grounds by*

*Ayestas*, 584 U.S. at 45). The petitioner "must show that the requested services are reasonably necessary to provide the Governor and Board of Pardons and Paroles the information they need in order to determine whether to exercise their discretion to extend grace to the petitioner in order to prevent a miscarriage of justice." *Id.* This allows for consideration of "the facts of [the] crime w[hich] weigh heavily in . . . clemency proceedings." *Brown*, 762 F.3d at 460. Moreover, if the proposed investigation would only supplement evidence that has already been considered in the judicial proceedings, a court does not abuse its discretion in denying the funding request. *Id.*; *see Crutsinger v. Davis*, 898 F.3d 584, 586–87 (5th Cir. 2018) (explaining that clemency cannot be used as an "end-run" around the requirement to demonstrate "utility" of further investigation, and upholding denial of funding where petitioner sought $500 for DNA evidence review but failed to "explain how further review and DNA testing could conceivably support claims for relief or a case for clemency").

### A.    Thompson has thoroughly investigated and presented a mitigation case.

Thompson first requests funding to obtain services of mental health and mitigation specialists to investigate his family background, his psycho-social history, and intergenerational history of substance abuse. Pet'r's Suppl. 3. But all those topics and more were explored in depth in Thompson's two punishment trials. Thompson's father testified in both trials about Thompson's

good character, learning difficulties, and early drug use. 14 RR(1) 181–82, 186–87; 18 RR(2) 276–83; 19 RR(2) 6–7.[3] His ex-wife testified about Thompson's substance abuse. 14 RR(1) 210; 18 RR(2) 257. Dr. Jerome Brown, a clinical psychologist, testified at the first trial about Thompson's substance abuse and unresolved issues from a sexual assault that occurred when Thompson was a teenager, as well as an attempted suicide. 14 RR(1) 221–27, 272. Indeed, several witnesses testified about the impact of Thompson's substance abuse, including Dr. Katherine McQueen, a physician and "addictionologist." 17 RR(2) 237–39 (Sean Jordan); 18 RR(2) 104 (David Rutherford), 156–91 (Dr. McQueen).

Dr. McQueen conducted a semi-structured interview of Thompson to determine how alcohol and drugs affected him over the course of his life. 18 RR(2) 161–63. She obtained a family history of substance abuse, noting that genetics was the strongest risk factor. 18 RR(2) 164. Dr. McQueen also explained that the age an individual first becomes intoxicated is a factor in the development of substance abuse, and Thompson's records as a juvenile indicated he needed substance abuse treatment when he was young. 18 RR(2) 191.

---

[3]     The Reporter's Record from Thompson's first trial is cited as RR(1), and the Reporter's Record from Thompson's second trial is cited as RR(2), preceded by volume number and followed by page number(s).

As to "intergenerational" substance abuse in Thompson's family, his brother testified that he began using drugs when he was twelve or thirteen years old, and he introduced Thompson to drugs. 18 RR(2) 121–23. He testified that their uncle—who drank "a lot"—shared marijuana with him and Thompson. 18 RR(2) 129–30. Thompson's father testified about his use of marijuana and cocaine, and he said he drank excessively until he was arrested for driving while intoxicated in 1982. 18 RR(2) 286–87. Dr. McQueen testified that Thompson has a "strong family history of substance dependence" in his father and siblings. 18 RR(2) 166–67 (describing "multiple first-degree relatives with substance use disorders").

Lastly, neuropsychologist Dr. Daneen Milam testified that she evaluated Thompson for nine to ten hours over the course of two days. 19 RR(2) 41. She reviewed Thompson's school records, youth center records, prior psychological evaluations, the defense's mitigation data, testimony from Thompson's first trial, probation records, juvenile court records, and jail letters. 19 RR(2) 41–43. Dr. Milam testified about Thompson's learning difficulties, noting that he did not talk until he was three years old. 19 RR(2) 43–44. Thompson had significant learning disabilities in third and fourth grade. 19 RR(2) 43–44. Although Thompson's IQ was in the 85th or 86th percentile, he read at only a fourth-grade level when he was seventeen years old. 19 RR(2) 45. Dr. Milam

suggested Thompson did not receive the help he needed, noting his father did not want Thompson in class with "dumbbells." 19 RR(2) 46, 61–62.

Dr. Milam also administered "the gold standard" for measuring "brain integrity," the Halstead-Reitan Battery, which included tests of IQ, achievement, and memory. 19 RR(2) 48–50. The results showed Thompson suffers mild and diffuse brain damage. 19 RR(2) 50–51. Dr. Milam noted Thompson's learning disabilities, late language, clumsiness, lack of insight, short attention span, poor social judgment, and inability to follow direction or anticipate consequences. 19 RR(2) 52. Regarding intergenerational substance abuse, Dr. Milam found a "genetic family history of substance abuse" and explained that substance abuse intensifies the effect of brain damage. 19 RR(2) 54–55. As other witnesses did, Dr. Milam said Thompson's substance abuse started when he was young, describing his use of drugs at only eleven years old as "breathtaking." 19 RR(2) 54–55.

Although the Director has pointed out that Thompson has thoroughly investigated a mitigation case, ECF No. 112 at 9–10, he still fails to point to any truly new target of the proposed investigation. Pet'r's Suppl. 3. To the extent he explains his plan, it does not extend beyond the evidence described above and that which is already "available to the Board and the Governor," *Brown*, 762 F.3d at 460, e.g., evidence of Thompson's mental health and intergenerational substance abuse in his family. Pet'r's Suppl. 3. Thompson is

8

not entitled to funding to plow this same ground. *See Ochoa v. Davis*, 750 F. App'x 365, 373 (5th Cir. 2018). At the very least, Thompson fails to justify funding to conduct a mitigation investigation anew in light of the work that has already been done. In the event the Court is inclined to grant Thompson's request, it should only grant funding in an amount that is "reasonably necessary" in light of the investigation that has already taken place.[4] 18 U.S.C. § 3599(f).

Additionally, Thompson's request for funding for a clemency investigation should be considered in light of the aggravating facts of his case. *See Crutsinger*, 898 F.3d at 586–87; *Brown*, 762 F.3d at 460 (explaining that it is appropriate to consider the facts of the crime in assessing a request for clemency funding). This includes evidence of his physical abuse of Dennise Hayslip that preceded Thompson's murder of her and Darren Cain. *See Thompson v. State*, 93 S.W.3d 16, 18–19 (2001). Additionally, during his incarceration, Thompson associated with the Aryan Brotherhood gang, tried to persuade prosecution witness Diane Zernia to lie, and attempted to hire someone to kill Zernia. *See Thompson v. State*, No. AP-73,431, 2007 WL 3208755, at *1 (Tex. Crim. App. Oct. 31, 2007). After he was sentenced to death

---

[4]    The Director notes again that Thompson has failed to apprise him of how much funding he is requesting, much less how much funding is necessary for each of the four pieces of his investigation. *See generally* Pet'r's Suppl.

following his punishment retrial, Thompson escaped from jail and fled to Louisiana.[5] Considering these facts, it is entirely unlikely any new investigation would result in a viable plea for clemency, and Thompson's request for funding should be denied. *See Wilkins*, 832 F.3d at 552.

**B.      Thompson admitted to trying to have Diane Zernia killed.**

Thompson next argues he is entitled to funding to investigate HCDAO's affiliation with and use of jailhouse informants, which investigation would support arguments that the prosecution withheld favorable evidence and that he is innocent of the death penalty and not a future danger.[6] Pet'r's Suppl. 4–5. To the extent he intends to reveal any such conduct with respect to cases other than his own, he fails to show any utility in such an investigation for his own clemency request. *See Crutsinger*, 898 F.3d at 586–87. But the primary problem for Thompson is that the prosecution's evidence of his solicitation from jail of the murder of prosecution witnesses did not come only from jailhouse informants—Thompson admitted it. 14 RR(1) 251 (Dr. Brown's testimony that

---

[5]      Death Row Escapee Caught, https://www.cbsnews.com/news/death-row-escapee-caught/ (last visited December 9, 2025).

[6]      Thompson's request reveals his likely true intention, i.e., an investigation to support a subsequent state habeas application or successive federal habeas petition raising a claim under *Brady v. Maryland*, 373 U.S. 83 (1963), among other claims. Pet'r's Suppl. 5. Thompson is not entitled to such funding, as already explained. ECF No. 112 at 11–12. Moreover, Thompson fails to show such claims would be appropriate in clemency proceedings. *See* 37 Tex. Admin. Code § 143.42 (a clemency application "shall not call upon the Board to decide technical questions of law which are properly presented via the judicial process").

Thompson "described to [him] the situation in which [Zernia] being killed was discussed with other people and that he talked with a hit man, etcetera, etcetera"); 14 RR(1) 107–08; 22 RR(2) (State's Exhibit 86); 22 RR(2) (State's Exhibit 87) (Thompson's letter to his brother stating, "So now I've really fucked myself good, this looks real bad for the jury to [hear] this cause I'm going to trial in 2 ½ to 3 month[s]. . . . I don't believe I got suckered like that! I can only be mad at myself[.] . . . I can't believe I was set up and sold out by a white guy[.]"); 22 RR(2) (State's Exhibit 92) (hit list of four witnesses Thompson gave to Robin Rhodes); 17 RR(2) 140–41. And again, Thompson extensively litigated claims alleging the HCDAO improperly elicited statements from him while he was incarcerated. *See, e.g., Thompson v. Davis*, 941 F.3d 813, 816 (5th Cir. 2019). Thompson cannot show funding for an investigation into the HCDAO is reasonably necessary that would amount to a futile fishing expedition. *See Jones v. Davis*, 927 F.3d 365, 373–74 (5th Cir. 2019). And to the extent Thompson wishes to negate the two juries' findings of his future dangerousness, such an endeavor would be useless considering that he escaped from jail *after* he was sentenced to death a second time. *Supra* note 5. Thompson is not entitled to funding to retain the services of an investigator.

### C.   Thompson has extensively litigated the cause of Dennise Hayslip's death.

Thompson requests funding to investigate the cause of Dennise Hayslip's death—a topic that has been a central focus for the span of his case. *See Thompson v. State*, 93 S.W.3d at 20–22; *Thompson v. Davis*, No. H-13-1900, 2017 WL 1092309, at \*5–7 (S.D. Tex. Mar. 23, 2017); *Thompson v. Davis*, 916 F.3d 444, 451 (5th Cir. 2019) ("The guilt stage of the trial centered on Hayslip's injuries, and whether Thompson's shooting—as opposed to medical malpractice—caused her death."); *Thompson v. Davis*, 916 F.3d at 458–59. Thompson's latest effort to blame the medical care provided to Dennise Hayslip—which was necessitated by Thompson shooting her in the face and inflicting a wound that Thompson's trial expert admitted was not survivable without medical care, 12 RR(1) 243–46, 251, 255–56—would be just as unavailing now as it was a quarter of a century ago. Thompson is not entitled to relitigate this issue at this late stage. *See Wilkins*, 832 F.3d at 553 ("The district court could therefore reasonably conclude that further investigation into the facts underlying Wilkins's confessions would be fruitless.").

Thompson also curiously seeks clemency funding to support a potential Confrontation Clause claim. Suppl. 7. But this request suggests a future habeas application or petition, which the Director has explained Thompson is not entitled to funding to support. ECF No. 112 at 11–12. Moreover, to the

extent this request relates to clemency, it is almost surely outside the scope of the clemency process. 37 Tex. Admin. Code § 143.42(8) (a clemency application "shall not call upon the Board to decided technical questions of law which are properly presented via the judicial process"). In any event, Thompson has already unsuccessfully litigated a claim premised on the Confrontation Clause regarding Dennise Hayslip's autopsy. *Thompson v. Davis*, 2017 WL 1092309, at \*32–33; *see* ECF No. 66 at 152–54; *see also Whorton v. Bockting*, 549 U.S. 406, 421 (2007) (holding that the rule announced in *Crawford v. Washington*, 541 U.S. 36 (2004), does not apply retroactively). Thompson fails to show that funding to re-tread these issues is reasonably necessary.

**D.    Thompson fails to show funding is reasonably necessary for him to reach out to his victims.**

Lastly, Thompson requests funding to obtain services of a specialist in victim outreach. Suppl. 8. Thompson fails to show expert services are reasonably necessary to attempt to communicate with his victims or that there would be any utility in such an effort. *See Crutsinger*, 898 F.3d at 586–87. Thompson's speculation that the victims of his crime may decline to speak with his representatives—a decision they are entitled to make—does not show this Court must grant funding to make it incrementally more likely that the victims will be receptive to them. *See Ayestas*, 584 U.S. at 46 ("Congress changed the verb from 'shall' to 'may,' and thus made it perfectly clear that determining

13

whether funding 'is reasonably necessary' is a decision as to which district courts enjoy broad discretion."). Thompson fails to show the requested funding is reasonably necessary, and it should be denied.

## CONCLUSION

The Director respectfully requests that the Court deny Thompson's motion for leave and deny his request for funding.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

JOSH RENO
Deputy Attorney General
for Criminal Justice

TOMEE M. HEINING
Chief, Criminal Appeals Division

s/ Jay Clendenin
JAY CLENDENIN
Assistant Attorney General
*Counsel of Record*
State Bar No. 24059589
Southern District No. 920324

Office of the Attorney General of Texas
P.O. Box 12548, Capitol Station
Austin, TX 78711-2548
(512) 936-1400

*Counsel for Respondent*

## CERTIFICATE OF SERVICE

I do hereby certify that on December 9, 2025, I electronically filed the foregoing document with the Clerk of the Court for the U.S. District Court, Southern District of Texas, using the electronic case-filing system of the Court. The electronic case-filing system sent a "Notice of Electronic Filing" (NEF) to the following counsel of record, who consented in writing to accept the NEF as service of this document by electronic means:

Eric Allen
The Law Office of Eric J. Allen LTD
4200 Regent St., Suite 200
Columbus, OH 43219
eric@eallenlaw.com

Gregory Gardner
Law Office of Gregory Gardner, PLLC
P.O. Box 2366
Boulder, CO 80306
gardnerlegal@gmail.com

s/ Jay Clendenin
JAY CLENDENIN
Assistant Attorney General